UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

───────────────────────────────────────

ROCHELLE MARETTA-BROOKS, et al.

                    Plaintiff,

v.                                                    5:22-CV-1261
                                                       (BKS/ML)

COMM'R OF SOCIAL SECURITY, et. al.

                    Defendants.

───────────────────────────────────────


APPEARANCES:                                  OF COUNSEL:

ROCHELLE MARETTA-BROOKS
  Plaintiff, *Pro Se*
107 Wood Ave
Syracuse, New York 13205


MIROSLAV LOVRIC, United States Magistrate Judge


## ORDER and REPORT-RECOMMENDATION

The Clerk has sent a *pro se* complaint in the above captioned action together with an application to proceed *in forma pauperis* and an application for appointment of legal counsel, filed by Rochelle Maretta-Brooks ("Plaintiff") to the Court for review. (Dkt. Nos. 1, 2, 3.)  For the reasons discussed below, I grant Plaintiff's *in forma pauperis* application, deny Plaintiff's motion for appointment of counsel, and recommend that the Complaint be dismissed in its entirety with leave for Plaintiff to replead violations of her rights to access records of the Social Security Administration pursuant to the Freedom of Information Act ("FOIA") or the Privacy Act.  I further recommend that any other claims raised in Plaintiff's Complaint, including any

claims raised against defendant Mrs. Hanley and any claims purported to be raised on behalf of minor children F.B. or H.B., be dismissed without leave to amend. (Dkt. No. 1.)

## I.   BACKGROUND

Construed as liberally[1] as possible, Plaintiff's Complaint alleges that named defendant "Mrs. Hanley," an employee of the Social Security Administration, refused to provide unspecified governmental records in response to Plaintiff's request in November 2022. (Dkt. No. 1-1, at 1).   Plaintiff further alleges that Mrs. Hanley "told me my request for appeal/review was denied in 2019 so I am being denied my right to records." (*Id.*)

Plaintiff identifies two minor children, "F.B." and "H.B." as other plaintiffs in this matter but does not include any discernible factual allegations relating to them in the Complaint or supporting documents. (*Id.*)  She also cites a number of criminal statutes as basis for relief, with references to kidnapping, fraud, identity theft, embezzlement, tax evasion, collusion and a "Ponzi scheme." (Dkt. No. 1 at 3.)

Based on these factual allegations, Plaintiff seeks significant monetary damages, potentially reaching up to three million dollars. (Dkt. No. 1 at 4.)

## II.   PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid.  28 U.S.C. § 1914(a).  A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action.  28 U.S.C. § 1915(a)(1).[2]  After reviewing Plaintiff's *in*

---

[1]    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[2]    The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates.  *See* 28 U.S.C. § 1915(a)(1)

*forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff meets this standard.

Therefore, Plaintiff's application to proceed *in forma pauperis* is granted for this proceeding.[3]

Plaintiff is advised that the ability to litigate an action without prepayment of fees is a privilege that can be denied, revoked, or limited based upon a showing of prior abuses. *See In re Anderson*, 511 U.S. 364, 365-66 (1994) (denying the *pro se* petitioner's request for leave to proceed IFP where the Court found that, like the previous twenty-two petitions filed during the three immediately preceding years, the instant petition was "patently frivolous"); *see also Cuoco v. United States Bureau of Prisons*, 328 F. Supp. 2d 463, 467 (S.D.N.Y. 2004) ("The ability to proceed IFP is a privilege provided for the benefit of indigent persons."). The authority of a court to deny or limit a request to proceed IFP is implicit in the permissive, rather than compulsory, language of the controlling statute, which provides that "any court of the United States *may* authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees or security therefor[.]" 28 U.S.C. § 1915(a)(1) (emphasis added); *In re McDonald*, 489 U.S. 180, 183 (1989). For this reason, courts are regarded as possessing discretionary authority to deny IFP status to litigants who have abused the privilege. *See Hurt v. Soc. Sec. Admin.*, 544 F.3d 308, 309-310 (D.C. Cir. 2008) (quoting *Butler v. Dep't of Justice*, 492 F.3d 440, 444-45 (D.C. Cir. 2007) ("This Circuit grants IFP status to various plaintiffs, but asserts its discretion to deny or

---

(authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[3]   Plaintiff is reminded that, although her application to proceed *in forma pauperis* has been granted, she is still required to pay fees that she may incur in this action, including copying and/or witness fees.

revoke this privilege for abusive litigants, looking to 'the number, content, frequency, and disposition of their previous filings[.]'").

The exhibits included with the Complaint show that Plaintiff was previously known by the name Rochelle Coleman. (Dkt. No. 1-1, at 4). This Court notes that under that name, she was granted IFP status for a number of actions that were dismissed following review of the substance of the factual allegations in the complaints in accordance with 28 U.S.C. § 1915(e). *See Coleman v. Detter,* No. 16-CV-0834 (N.D.N.Y. filed July 8, 2016)*; Coleman v. Engle,* No. 16-CV-0833 (N.D.N.Y. filed July 8, 2016)*; Coleman v. Olinski,* No. 16-CV- 0838 (N.D.N.Y. filed July 8, 2016); *Coleman v. Sutkowy,* No. 16-CV-0837 (N.D.N.Y. filed July 8, 2016); *Coleman v. Syracuse Police Dep't,* No. 16-CV-0836 (N.D.N.Y. filed July 8, 2016); *Coleman v. Hanuszczak,* No. 16-CV-0735 (N.D.N.Y. filed June 22, 2016); *Coleman v. Levandowski,* No. 16-CV-0734 (N.D.N.Y. filed June 22, 2016). Under the name Rochelle Maretta-Brooks, Plaintiff has been granted IFP status in a case that was ultimately dismissed as insufficient pursuant to 28 U.S.C. § 1915(e). *See Brooks v. Onondaga County Dep't of Children & Fam. Svcs.*, No. 17-CV-1186 (N.D.N.Y. filed April 8, 2018). In *Maretta-Brooks v. Hanuszcak*, No. 18-CV-426 (N.D.N.Y. filed April 9, 2018), Plaintiff's IFP application was deemed incomplete, and the complaint was dismissed without prejudice for failure to state a claim.

In light of her litigation history, Plaintiff is hereby cautioned that (1) proceeding IFP is a privilege that is extended to litigants at the discretion of the court, and (2) filing of patently frivolous lawsuits may result in the denial of any request to proceed IFP in an action and/or a recommendation to the Chief District Judge that a filing injunction be issued against Plaintiff, barring her from filing any future lawsuits in this district without prior permission.

### III.    LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

"[E]xtreme caution should be exercised in ordering sua sponte dismissal of a . . . complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond."  *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).  The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a plaintiff's complaint to proceed.  *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee).  "Legal frivolity . . . occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint."  *Aguilar v. United States*, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory . . . or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

## IV.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the Court must construe her pleadings liberally.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

### A.     Purported Claims on Behalf of Minor Children

A nonlawyer parent ordinarily cannot represent a child's interests *pro se*.  *See Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990); *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (holding that it is "a well-established general rule in this Circuit that a parent not admitted to the bar cannot bring an action *pro se* in federal court on behalf of his or her child").  Minors "are entitled to trained legal assistance so their rights may be fully protected" and nonlawyer parents are not trained to represent competently the interests of their children.  *Cheung*, 906 F.2d at 61.  Moreover, "a district court has a duty to raise this issue *sua sponte*."  *Thomas v. Astrue*, 674 F. Supp. 2d 507, 511 (S.D.N.Y. 2009).

Plaintiff has been advised of this prohibition in previous proceedings.  *See, e.g., Brooks v. Onondaga County Dep't of Children and Family Svcs.*, No. 17-CV-1186 (N.D.N.Y. filed April 8, 2018) (Dkt. No. 11).  Moreover, the custodial status of Plaintiff's minor children and the scope of Plaintiff's parental rights have been adjudicated in state court proceedings and were a significant issue in an earlier unrelated proceeding before Chief Judge Sannes.  *See F.B. v. Saul*, No. 15-CV-148 (N.D.N.Y. filed February 10, 2015) (Dkt. Nos. 94, 95.)  Because Plaintiff has not alleged any substantive claims on behalf of F.B. and H.B.in this filing, this Court declines to delve into that potentially sensitive issue here.  Rather, in line with well-established caselaw, I recommend that the Court dismiss any claims Plaintiff is purporting to assert on behalf of her minor children.

### B.     Claims Alleging Violations of Criminal Laws

Without elaboration, Plaintiff cites a number of federal criminal statutes in her Complaint and the accompanying exhibits: 18 U.S.C. §§ 241 (Conspiracy against Rights), 242 (Deprivation of Rights under Color of Law), 245 (Interference with Federally Protected

Activities), 246 (Deprivation of Relief Benefits), 247 (Obstruction of Free Exercise of Religion), 249 (Hate Crime Acts), and 1201 (Kidnapping). (Dkt. No. 1 at 1, 3; Dkt No. 1-1 at 1.)   She also uses a number of disconnected phrases typically associated with criminal enforcement actions such as "fraud," "theft," "Ponzi scheme, " "embezzlement," "tax evasion" and "kidnapping," but provides no factual allegations associated with these terms.  (Dkt. No. 1 at 3.)

There is no private right of action to enforce state or federal criminal statutes.  *See generally Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Walker v. CIBC Ltd.*, 20-CV-1337, 2021 WL 3518439, at *5 (N.D.N.Y. Apr. 13, 2021) (Hummel, M.J.) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."), *report-recommendation adopted by* 2021 WL 3204860 (N.D.N.Y. July 29, 2021) (McAvoy, J.); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *3 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (holding that "there is no private right of action to enforce either state or federal criminal statutes."). This court notes that Plaintiff has been advised in prior litigation that she may not enforce criminal statutes in a civil action.  *See, e.g., Marietta-Brooks v. Hanuszcak*, 18-CV-426 (N.D.N.Y. filed September 4, 2018) (Dkt. No. 7 at 20.)

As a result, I recommend dismissal of all of Plaintiff's claims that are premised on alleged violations of federal or state criminal laws.  *See Hall v. Sampson*, 21-CV-4839, 2022 WL 2068248, at *2 n.2 (E.D. Pa. June 8, 2022) (collecting cases) (holding that the plaintiff cannot bring criminal charges against the defendants through a private lawsuit and that claims pursuant to, *inter alia*, 18 U.S.C. §§ 241, 371 do not give rise to a civil cause of action); *Patterson v. Patterson*, 16-CV-0844, 2019 WL 1284346, at *7 (W.D.N.Y. Mar. 20, 2019) (quoting *Christian*

*v. Town of Riga*, 649 F. Supp. 2d 84, 91 (W.D.N.Y. 2009)) ("Courts within this Circuit have accordingly held consistently that criminal charges under New York law 'cannot be prosecuted by a private person.'"); *Walthour v. Herron*, 10-01495, 2010 WL 1877704, at *2 (E.D. Pa. May 6, 2010) (recognizing no private right of action under, *inter alia*, 18 U.S.C. §§ 241, 371).

## C.     Purported RICO Claims[4]

Again without elaboration, Plaintiff's Complaint references the Racketeer Influenced and Corrupt Organizations ("RICO") Act. (Dkt. No. 1 at 1; Dkt. No. 1-1 at 1.)

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  Section 1964 establishes a private right of action for individuals who are harmed by racketeering activity.  18 U.S.C. § 1964.  This private right of action permits a plaintiff to bring a RICO claim for sustaining injuries "in his business or property by reason of a violation of section 1962."  18 U.S.C. § 1964(c).  Generally, a plaintiff bringing a civil RICO claim under "Section 1962(c) must allege that (1) the defendant has violated the substantive RICO statute, and (2) the plaintiff was injured in his business or property "by reason of a violation of section 1962."  *Malvar Egerique v. Chowaiki*, 19-CV-3110, 2020 WL 1974228, at *7 (S.D.N.Y. Apr. 24, 2020) (citing *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(c))).  More specifically, to assert a civil RICO claim under Section 1962(c), a plaintiff must allege the following elements: "(1) conduct, (2) of an

---

[4]     Under General Order No. 14 and N.D.N.Y. L.R. 9.2, a party who files a RICO claim must also file a Civil RICO statement within thirty days after the filing date of the Complaint. Despite thirty days having elapsed since the filing of her Complaint, Plaintiff has failed to file a Civil RICO statement.  (*See generally* docket sheet.).

enterprise, (3) through a pattern, (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).  Additionally, a plaintiff asserting a civil RICO claim must plead facts plausibly suggesting a resulting "domestic injury" to their business or property.  *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2111 (2016).

Plaintiff has failed to state a RICO claim against either defendant.  To begin with, the doctrine of sovereign immunity bars federal courts from hearing all suits against the federal government, including suits against federal agencies, unless sovereign immunity has been waived.  *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *see Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against a federal agency . . .is essentially a suit against the United States, such suits are . . .barred under the doctrine of sovereign immunity, unless such immunity is waived.").  Any RICO claims against the Social Security Administration or Mrs. Hanley in her official capacity would thus be barred by the doctrine of sovereign immunity.

To the extent that Plaintiff attempts to allege a RICO claim against Mrs. Hanley in her individual capacity, Plaintiff fails to allege any facts plausibly suggesting the existence of an "enterprise" within the meaning of RICO.  "Without such an enterprise, a RICO claim like [Plaintiff]'s must fail."  *Liang v. City of New York*, 10-CV-3089, 2013 WL 5366394, at *13 (E.D.N.Y. Sept. 24, 2013); *see also Peterson v. City of New York*, 11-CV-3141, 2012 WL 75029, at *3-4 (S.D.N.Y. Jan. 9, 2012) (dismissing the plaintiff's RICO claim because "[t]he existence of a RICO enterprise is a necessary element for liability" and the plaintiff failed to allege facts plausibly suggesting the existence of a RICO enterprise).  Moreover, Plaintiff fails to allege any facts plausibly suggesting a pattern of racketeering activity.  18 U.S.C. § 1961(5) (To sufficiently allege a "pattern of racketeering activity," a plaintiff must allege at least two acts of

"racketeering activity" that occur within ten years of each other); *Westchester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 608 (S.D.N.Y. 2015) (emphasis in original) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir 1999)) (To qualify as a "pattern" of racketeering activity, the predicate acts "must be from the crimes listed in [Section] 1961(1) and they must be 'related, *and* . . . amount to or pose a threat of continued criminal activity.'").

As a result, I recommend that Plaintiff's RICO claims be dismissed.

### D.    Access to Public Records

As discussed in Section I, the only discernible factual allegations in the Complaint describe a denial of Plaintiff's request for governmental records in November 2022.

The Freedom of Information Act ("FOIA") allows persons to request any public records subject to disclosure. *See* 5 U.S.C. § 552(a)(3). The Privacy Act allows persons to request records pertaining specifically to them. *See* 5 U.S.C. § 552a(d)(1). Both federal statutes allow persons to bring suit in federal district court to challenge an agency's refusal to disclose properly requested records. *See* 5 U.S.C. § 552(a)(4)(B); 5 U.S.C. § 552a(g)(1)(B). Neither statute permits an action against individual governmental employees such as Mrs. Hanley. *See Burch v. Pioneer Credit Recovery, Inc*., 551 F.3d 122, 124 (2d Cir. 2008) ("The private right of civil action created by the Privacy Act is specifically limited to actions against agencies of the United States government."); *Geer v. Pheffer*, No. 14-CV-2829 (CBA), 2015 WL 332996, at *2 (E.D.N.Y. Jan. 23, 2015) ("FOIA only authorizes suits against federal agencies and does not apply to individual officers . . .").

There are distinctions between the two records access statutes. In particular, while any individual may make a request for records pursuant to the FOIA, under the Privacy Act, only an

individual, or his authorized representative, may request the individual's records.  5 U.S.C. §§ 552, 552a(d)(1).  Moreover, while the FOIA applies to any type of record, the Privacy Act narrowly applies to records that agencies maintain within their "systems of records" that are retrievable by an individual's name, social security number or other personal identifier.  *See* 5 U.S.C. §§ 552, 552a(d).  Additionally, unlike the FOIA, the Privacy Act allows individuals to request that agencies amend their records.  5 U.S.C. § 552a(d)(2).

Under both the FOIA and the Privacy Act, a plaintiff must first exhaust her administrative remedies, including the administrative appeals process, before a court will exercise jurisdiction over a claim based upon an agency's refusal to provide documents.  *See Sussman v. United States Dep't of Justice*, No. 03-Civ-3618 (DRH/ETB), 2006 WL 2850608, at *4 (E.D.N.Y. September 30, 2006) (summarizing administrative appeals process).  In order to withstand dismissal, both a FOIA and Privacy Act claim require a proper pleading that a plaintiff has exhausted his or her administrative remedies.  *Checksfield v. Internal Revenue Svc.*, No. 5:21-CV-1180 (GTS/ML), 2022 WL 2713499, at *8 (N.D.N.Y. July 13, 2022) (collecting FOIA cases); *Cross v. Potter*, No. 3:09-CV-1293 (TJM), 2013 WL 1149525, at *9 (collecting Privacy Act cases).

Plaintiff has failed to state a claim under the FOIA or the Privacy Act because she failed to describe the nature of her alleged request for records, the details of the agency's response, and the exhaustion of available administrative remedies.  As a result, I recommend dismissal of Plaintiff's claims alleging denial of access to records.

## V.     OPPORTUNITY TO REPLEAD

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to replead at least once "when a liberal reading of the complaint

gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  An opportunity to replead is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.").  Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[5]

With respect to Plaintiff's RICO claims and those claims alleging violations of criminal statutes including but not limited to 18 U.S.C. §§ 241, 242, 245, 246, 247, 249, and 1201,  I recommend that those claims be dismissed without leave to replead because the problem with those claims is substantive such that a better pleading will not cure it.

I likewise recommend that any purported claims in the Complaint raised by Plaintiff on behalf of F.B and H.B. be dismissed without leave to replead.  *See Antonetti, on behalf of C.J.A. v. Dave & Busters 42nd Street Times Square*, 23-CV-0101, 2023 WL 1869012, at 5 (S.D.N.Y.

---

[5]     *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

Feb. 6, 2023) (declining leave to amend where the complaint sought to assert claims on behalf of the plaintiff's minor son).

However, with respect to potential claims against the Social Security Administration pursuant to the FOIA or the Privacy Act, it is not clear whether better pleading would permit Plaintiff to assert a cognizable claim. Out of deference to Plaintiff's *pro se* status, I therefore recommend that Plaintiff be granted leave to replead those claims. At the same time, I recommend that any claims against Mrs. Hanley pursuant to the FOIA or the Privacy Act be dismissed without leave to replead, because such claims are not viable against individual government employees.

If Plaintiff chooses to avail herself of an opportunity to amend, such amended pleading must set forth a short and plain statement of the facts on which she relies to support any legal claims asserted. Fed. R. Civ. P. 8(a). In addition, the amended complaint must include allegations reflecting the substance of her records request, any agency response, and any attempt to exhaust administrative remedies. Finally, Plaintiff is informed that any amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted)).

## VI.   PLAINTIFF'S MOTION TO APPOINT COUNSEL

Plaintiff has also submitted a request for appointment of counsel. (Dkt. No. 3.) As an initial matter, "[a] party has no constitutionally guaranteed right to the assistance of counsel in a civil case." *Lefridge v. Connecticut State Trooper Officer No. 1283*, 640 F.3d 62, 68

(2d Cir. 2011) (citation omitted).  Furthermore, there is no bright-line test determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin*, 114 F.3d 390, 392-393 (2d Cir. 1997).  Rather, the court must carefully consider a number of factors, including whether the indigent's claims seem likely to be of substance. *See Leftridge*, 640 F.3d at 69 (stating that "[t]he court properly denies the plaintiff's motion for counsel if it concludes that his chances of success are highly dubious.") (citations omitted).

As I have recommended dismissal of the instant matter, it cannot be said that Plaintiff's claims are likely to be of substance; therefore, the motion (Dkt. No. 3) must be denied.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED only for purposes of filing and any appeal unless the trial court certifies in writing that the appeal is not taken in good faith**; and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 3) is **DENIED without prejudice**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) only to the extent that it asserts claims against the Social Security Administration for denial of access to records pursuant to the FOIA or the Privacy Act; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** all other claims raised in Plaintiff's Complaint (Dkt. No. 1), including all claims against defendant Ms. Hanley and all claims purportedly raised on behalf of minor children F.B. and H.B., and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and

recommendation on the docket of this case and serve a copy upon the parties in accordance with

the local rules.[6]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within

which to file written objections to the foregoing report.[7]  Such objections shall be filed with the

Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1) (Supp. 2013);

Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v.*

*Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).


Dated: March  27 , 2023
      Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[6]     The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[7]     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment

Distinguished by   U.S. v. $6,787.00 in U.S. Currency,   N.D.Ga.,   February 13, 2007

1999 WL 1067841

Only the Westlaw citation is currently available.

United States District Court, D. Connecticut.

Francisco AGUILAR, Plaintiff,

v.

UNITED STATES OF AMERICA, Defendant.

Nos. 3:99–MC–304 (EBB), 3:99–MC–408 (EBB).

|

Nov. 8, 1999.

*Dismissal of Plaintiff's Complaints*

BURNS, Senior J.

**\*1**  Francisco Aguilar, pro se, seeks leave to proceed in forma pauperis ("IFP") to press two meritless complaints against the government, which is prosecuting related civil forfeiture actions against his properties. Although Aguilar is otherwise financially eligible, the court dismisses these complaints sua sponte pursuant to  28 U.S.C. § 1915(e)(2)(B) because the purported claims are frivolous, baseless and irremediable.

*Background*

Would-be plaintiff Aguilar is no stranger to this court. He is currently serving a forty-year sentence for drug trafficking at the federal penitentiary in Leavenworth, Kansas. *See* *United States v. Tracy,* 12 F.3d 1186, 1189 (2d Cir.1993) (affirming conviction and sentence). In connection with his conviction for narcotics offenses, the government filed civil forfeiture actions pursuant to  21 U.S.C. § 881(a) in 1990 and 1991 against four of Aguilar's Connecticut properties, which have since been sold. With the help of CJA-appointed counsel, Aguilar has vigorously defended each of these four actions, three of which remain pending before this court, and are scheduled for trial in January 2000.[1]

Now Aguilar seeks to take the offensive by filing these purported claims against the government, and serving the current property owners as well as the Assistant United States Attorney who is prosecuting the related forfeiture cases. This court denied without prejudice Aguilar's initial complaint, which was erroneously captioned "United States v. One Parcel Of Property Located At 414 Kings Hwy.," one of the cases already docketed and then pending. *See* Order of June 15, 1999. Upon refiling an amended complaint (the "Amended Complaint") with the appropriate caption, Aguilar also filed a second complaint (the "Second Complaint"), seeking the same relief and asserting essentially the same claims against the government for bringing the other three forfeiture cases. The clerk returned these pleadings because Aguilar failed to complete the IFP forms. *See* Order of August 25, 1999. After Aguilar cured these pleading deficiencies, miscellaneous docket numbers were assigned to the complaints.

In Aguilar's Amended Complaint—the one originally filed against his own property at 414 Kings Highway—Aguilar seeks return of the property, compensatory damages and $100,000,000 in punitive damages "to deter the United States of America from committing a similar Abuse of Power." Aguilar pleads his case in four "Articles," asserting sundry state and federal "constitutional" claims, including conversion, false pretenses, mail fraud, and breach of fiduciary duty. The Amended Complaint also suggests an allegation that the government falsified and deliberately omitted known material facts from its probable cause affidavit in "disregard" of  19 U.S.C. § 1615, the statute outlining the burden of proof in administrative forfeiture proceedings.

The Second Complaint—the one related to the government's seizure of the other three properties—seeks similar equitable and monetary relief, including return of the properties, compensation for "suffering," "usurpation," denial of his use and enjoyment of the properties and lost rents, and one billion dollars in punitive damages. Liberally construed, the Second Complaint simply repeats the claims of the Amended Complaint except for one additional allegation: that Aguilar was entitled to, and did not receive, a hearing prior to the seizure and sale of his properties.

*Discussion*

A.  *§ 1915(e)(2)(B) Standards*

**\*2**  The Prisoner Litigation Reform Act ("PLRA") mandates dismissal of an IFP action if it: "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune

from such relief." 28 U.S.C. § 1915(e)(2)(B) (as amended in 1996). Prior to the adoption of the PLRA, district courts had discretion to dismiss frivolous actions; now they are required to do so. *See* Pub.L. 104–134, 110 Stat. 1321 (1996) (making dismissal of frivolous actions mandatory, and also requiring dismissal for failing to state a claim or seeking damages from an immune defendant). Because Aguilar's claims qualify for dismissal under all three of these prongs, the standards for each are set out in turn.

### 1. *Frivolous or Malicious*

A complaint is frivolous if "it lacks an arguable basis either in law or in fact." Neitzke v. Williams, 490 U.S. 319, 325, 109 S.Ct. 1827, 1831–32, 104 L.Ed.2d 338 (1989) (interpreting § 1915(d), later redesignated as § 1915(e)(2)(B)(i), to preclude "not only the inarguable legal conclusion, but also the fanciful factual allegation"). Factual frivolity occurs where "the 'factual contentions are clearly baseless,' such as when allegations are the product of delusion or fantasy." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir.1998) (quoting Neitzke, 490 U.S. at 327, 109 S.Ct. at 1833). Legal frivolity, by contrast, occurs where "the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Livingston,* 141 F.3d at 327 (internal quotes and citation omitted); *see also* Tapia–Ortiz v. Winter, 185 F.3d 8, 11 (2d Cir.1999) (upholding dismissal as frivolous where "[t]he complaint's conclusory, vague, and general allegations ... d[id] not [ ] suffice to establish" plaintiff's claims).

In addition to frivolous claims, the court must also dismiss any malicious claims, i.e., where "[t]he manifest purpose of appellant's complaint [i]s not to rectify any cognizable harm, but only to harass and disparage." Tapia–Ortiz, 185 F.3d at 11.

### 2. *Failure To State A Claim*

An IFP action must also be dismissed sua sponte if it fails to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii); *see also* Star v. Burlington Police Dep't, 189 F.3d 462, 1999 WL 710235 (2d Cir.1999) (summarily affirming dismissal made pursuant to § 1915(e)(2)(B)(ii)

of purported due process challenge that failed to state a claim). As in a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a § 1915(e)(2)(B)(ii) dismissal is warranted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

**\*3** Pro se complaints, such as these, however, must be read broadly, *see* Haines v. Kerner, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (per curiam), and may not be dismissed "simply because the court finds the plaintiff's allegations unlikely." Denton v. Hernandez, 504 U.S. 25, 33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1982) (construing pre-PLRA complaint as frivolous). Therefore,

> a pro se plaintiff who is proceeding in forma pauperis should be afforded the same opportunity as a pro se fee-paid plaintiff to amend his complaint prior to its dismissal for failure to state a claim [under § 1915(e)(2)(B)(ii) ], unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.

Gomez v. USAA Federal Sav. Bank, 171 F.3d 794, 796 (2d Cir.1999) (per curiam) (vacating § 1915(e)(2)(B)(ii) dismissal where "the district court did not give th[e] pro se litigant an opportunity to amend his complaint, and because [the court] cannot rule out the possibility that such an amendment will result in a claim being successfully pleaded").

### 3. *Relief Against An Immune Defendant*

Dismissal of an IFP case is also required where plaintiff seeks monetary damages against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(iii); *see also,* Spencer v. Doe, 139 F.3d 107, 111 (2d Cir.1998) (affirming dismissal pursuant to § 1915(e)(2)(B)(iii) of

official-capacity claims in § 1983 civil rights action because "the Eleventh Amendment immunizes state officials sued for damages in their official capacity"). Here, even if Aguilar's claims had any merit, the complaints must be dismissed nevertheless because each seeks monetary damages from the United States, which is immune from such relief. *See* 🚩 *Presidential Gardens Assocs. v. United States,* 175 F.3d 132, 139 (2d Cir.1999) (noting "[t]he sovereign immunity of the United States may only be waived by federal statute").

B. *Dismissal Standards Applied*
Aguilar's complaints are devoid of any arguable basis in law or fact. Most of his factual allegations—to the extent they are even comprehensible—are conclusory, vague and baseless. For example, he purports to allege: "The United States of America has misused its power against the Francisco Aguilar's Intangible Rights." (Amended Complaint at 2); and "The United States of America overpassed its bound of its authority and make a tyrannic use of its powers." (Second Complaint at 4). Even the Second Circuit has recognized Aguilar's prior handiwork to be "so indisputably lacking in merit as to be frivolous within the meaning of 🚩 28 U.S.C. § 1915(e)." *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 97–6004 (2d Cir. April 23, 1997) (mandate [Doc. No. 167] dismissing appeal of Aguilar's motion to enjoin state default proceedings).

Only two allegations asserted by Aguilar are even arguably actionable: the lack-of-probable-cause argument in the Amended Complaint and the due process claim in the Second Complaint. Both of these, however, must be dismissed because each fails to state a claim for which relief may be granted.

1. *Probable Cause*
**\*4**  The one potentially cogent legal claim that can be derived from a liberal reading of the Amended Complaint has already been conclusively decided by the court and is therefore barred from relitigation. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158 (denying lack-of-probable-cause argument in motion to dismiss [Doc. No. 64] in 1993, and in motions for summary judgment [Doc. Nos. 55, 96] in 1996). Here again, Aguilar reiterates his allegation that the government's affidavit in support of probable cause was tainted because it failed to disclose that the 414 Kings Highway property was subject to a mortgage held by People's

Bank, and therefore could not have been purchased with funds traceable to drug sales.

After the government voluntarily dismissed that forfeiture action, this court initially ordered the sale proceeds of the property disbursed to Aguilar. *See id.,* Order of Oct. 25, 1996 [Doc. No. 151]. The bank appealed the order and, during the pendency of the appeal, secured a default judgment in state court against Aguilar. *See People's Bank v. Aguilar,* No. CV–96–0337761–S (Conn.Super.Ct.1997). On the Bank's appeal from this court's disbursal of proceeds to Aguilar, the Second Circuit reversed and remanded. *See* 🚩 *United States v. One Parcel Of Property Located At 414 Kings Hwy.,* 128 F.3d 125, 128 (2d Cir.1997). On remand, in accordance with the Second Circuit mandate, this court disbursed the proceeds from the sale of 414 Kings Highway to the bank in partial satisfaction of Aguilar's debt owed on the defaulted mortgage. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158, 1999 WL 301704 (D.Conn. May 11, 1999).

Because the lack-of-probable-cause claim, perfunctorily adverted to in Aguilar's otherwise meritless Amended Complaint, has already been addressed in the *414 Kings Highway* forfeiture case, the court will not consider it again. As such, it must be dismissed because it fails to state a claim for which this court could grant further relief.

2. *Due Process*
In addition to his now-stale probable cause allegation about 414 Kings Highway, Aguilar claims in the Second Complaint that he was wrongfully denied a hearing prior to the seizure and sale of the other three properties. However, the constitutional right to a preseizure hearing in civil forfeiture proceedings was not recognized until 1993, two years after the seizure in this case. *See* 🚩 *United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (holding that Fifth Amendment Due Process protections apply to civil forfeiture proceedings against real property). Even if such due process protections applied retroactively, Aguilar's challenge to the sale of the properties would lack merit because exigent circumstances required their interlocutory sale.

In civil forfeiture proceedings "[u]nless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil

forfeiture." *Id.* at 62, 114 S.Ct. at 505; *see also United States v. One Parcel Of Property Located At 194 Quaker Farms Rd.,* 85 F.3d 985, 988 (2d Cir.1996) ("[a]bsent exigent circumstances, a hearing, with notice to record owners, is held before seizure."). "To establish exigent circumstances, the Government must show that less restrictive measures— i.e., a lis pendens, restraining order, or bond—would not suffice to protect the Government's interest in preventing the sale, destruction, or continued unlawful use of the real property." *Id.* at 62, 114 S.Ct. at 505.

**\*5** Aguilar's properties addressed in the Second Complaint were seized because there was probable cause that each had been used to facilitate the offenses for which he was convicted. *See* 21 U.S.C. § 881(a)(7) (1999). This civil forfeiture statute authorizes interlocutory sale of seized properties by two methods, which are incorporated by reference into the statute. *See* 21 U.S.C. § 881(b) (authorizing seizure of property subject to civil forfeiture upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims; 21 U.S.C. § 881(d) (authorizing seizure and summary sale governed by the customs laws codified in the Tariff Act of 1930, 19 U.S.C. §§ 1602–1619). Though the source of authority differs, the standards for sale under each are virtually indistinguishable.

Rule E(9)(b) of the Maritime Rules permits the interlocutory sale of seized property if such property

> is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action, or if the expenses of keeping the property is [sic] excessive or disproportionate, or if there is unreasonable delay in securing the release of property....

Supplemental Rule for Certain Admiralty and Maritime Claims E(9)(b). Section 1612(a) of the customs laws, by contrast, provides for seizure and summary sale whenever it appears that such property

> is liable to perish or to waste or to be greatly reduced in value by keeping, or

that the expense of keeping the same is disproportionate to the value thereof....

19 U.S.C. § 1612(a) (1999).

Here, the Chief Deputy United States Marshal certified that the properties located at both 2030–32 Main St., Bridgeport (No. 5:90–cv–544), and 8 Drumlin Rd., Westport (No. 5:90– cv–545), were abandoned and therefore subject to vandalism, deterioration and depreciation. *See* 2/20/91 Declaration in Support of Motion for Interlocutory Sale [Doc. Nos. 28 (5:90– cv–544), 31 (5:90–cv–545) ] at ¶¶ 4, 5. The marshal also certified that the mortgage obligations exceeded by over $ 1,000 per month the rental income of the 2034–38 Main St., Bridgeport (No. 5:90–cv–546), property, which was several months in arrears and had little or no equity. *See* 2/21/90 Declaration in Support of Motion for Interlocutory Sale [Doc. No. 27 (5:90–cv–546) ] at ¶ 4. This court found these reasons sufficiently exigent to order the interlocutory sales. *See* 8/1/90 Order for an Interlocutory Sale [Doc. Nos. 34 (5:90–cv–544), 50 (5:90–cv–545), 31 (5:90–cv–546) ]. Interlocutory sale was thus warranted under both Rule E(9)(b) and § 1612(a) because the two abandoned properties were liable to deteriorate or lose value and the mortgage liabilities of the rented property were disproportionate in comparison to its value. *Cf. United States v. Esposito,* 970 F.2d 1156, 1161 (2d Cir.1992) (vacating order of interlocutory sale of forfeited home where "there was no finding that t[he amount expended for maintenance and repairs] was excessive or disproportionate").

**\*6** Aguilar's claim that he was wrongfully denied an opportunity to be heard prior to the sale of his properties is therefore not a cognizable due process challenge because the exigency of the properties' abandonment and disproportionate cost of upkeep required their interlocutory sale. Thus, sua sponte dismissal is warranted because Aguilar's due process claim fails to state a remediable cause of action.

3. *Other Claims*

The remainder of Aguilar's claims are frivolous and can be disposed of readily. To the extent Aguilar's claim invoking 19 U.S.C. § 1615 can be construed as challenging the constitutionality of shifting the burden to the claimant upon the government's showing of probable cause, the Second Circuit has "h[e]ld that it does not violate due process to place the burden of proving an innocent owner affirmative

defense on the claimant." 🚩 *194 Quaker Farms Rd.,* 85 F.3d at 987. In addition, the tort claims for false pretenses and conversion are not actionable as these are intentional torts to which the limited waiver of sovereign immunity of the Federal Tort Claims Act ("FTCA") is inapplicable.

*See* 🚩 28 U.S.C. § 2680(h); *see also* *Bernard v. United States,* 25 F.3d 98, 104 (2d Cir.1994) ("the FTCA does not authorize suits for intentional torts based on the actions of Government prosecutors"). Furthermore, because the United States government is not a fiduciary and owes no associated duties to Aguilar, his breach of fiduciary duty allegation against the government fails to state a claim. Finally, Aguilar also fails to state a valid mail fraud claim as that criminal code provision, 🚩 18 U.S.C. § 1341, may only be prosecuted by the government, not against it.

**Conclusion**

For the foregoing reasons, Aguilar's complaints [Nos. 3:99–mc–304 and 3:99–mc–408] are dismissed pursuant to 🚩 28 U.S.C. § 1915(e)(2)(B) because they present frivolous allegations, none of which state a cognizable claim, and seek monetary relief from an immune defendant. Because the court cannot definitively rule out the possibility that amendment to the pleadings might result in an actionable claim, *see* 🚩 *Gomez,* 171 F.3d at 796, these dismissals are made without prejudice and may be replead after the conclusion of the related forfeiture proceedings.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 1067841

## Footnotes

1    *See United States v. One Parcel Of Property Located At 2030–32 Main St.,* No. 5:90–cv–544(EBB) (pending); *United States v. One Parcel Of Property Located At 8 Drumlin Rd.,* No. 5:90–cv–545 (EBB) (pending); *United States v. One Parcel Of Property Located At 2034–38 Main St.,* No. 5:90–cv–546(EBB) (pending); *see also United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158(EBB) (closed).

2021 WL 3518439
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,

v.

CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)

|

Signed 04/13/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, 841 Western Avenue, Apartment
2A, Albany, New York 12203, Plaintiff pro se.

### REPORT-RECOMMENDATION & ORDER

CHRISTIAN F. HUMMEL, UNITED STATES
MAGISTRATE JUDGE

#### I. In Forma Pauperis

**\*1** Plaintiff pro se Myrna Althia Alicia Walker purported
to commence this action on October 28, 2020, by submitting
a complaint and application to proceed in forma pauperis
("IFP") in lieu of paying the Court's filing fee. See Dkt.
No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff
submitted a supplement to her complaint. Dkt. No. 4. On
April 6, 2021, plaintiff submitted an additional filing entitled
"Emergency Petition for the Death Penalty Against Adethia
Keshia Fitten and Others on the Principle Found in the Law of
Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted
additional 86 pages to supplement to her complaint. Dkt. Nos.
6, 7. On April 8, 2021, plaintiff submitted additional exhibits
and a letter requesting to file those exhibits under seal. Dkt.
No. 8.

The Court has reviewed plaintiff's IFP application and
determines that she financially qualifies to proceed IFP for
purposes of filing only. [1]

#### II. Legal Standards

Section 1915(e) of Title 28 of the United States Code
directs that, when a plaintiff seeks to proceed IFP, "the court
shall dismiss the case at any time if the court determines
that ... the action or appeal (i) is frivolous or malicious;
(ii) fails to state a claim on which relief may be granted;
or (iii) seeks monetary relief against a defendant who is
immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It
is a court's responsibility to determine that a plaintiff may
properly maintain his complaint before permitting her to
proceed with her action. As plaintiff is representing himself,
the court must afford plaintiff special solicitude; thus, it is
to consider her claims "liberally" and "interpret them 'to
raise the strongest arguments that they suggest.' " Cold Stone
Creamery, Inc. v. Gorman, 361 F. App'x 282, 286 (2d Cir.
2010) (summary order) (quoting Brownell v. Krom, 446
F.3d 305, 310 (2d Cir. 2006)).

Pleading guidelines are set forth in the Federal Rules of
Civil Procedure. Specifically, Rule 8 provides that a pleading
which sets forth a claim for relief shall contain, inter alia,
"a short and plain statement of the claim showing that the
pleader is entitled to relief." See FED. R. CIV. P. 8(a)(2).
"The purpose ... is to give fair notice of the claim being
asserted so as to permit the adverse party the opportunity to
file a responsive answer, prepare an adequate defense and
determine whether the doctrine of res judicata is applicable."
Flores v. Graphtex, 189 F.R.D. 54, 54 (N.D.N.Y. 1999)
(internal quotation marks and citations omitted). Rule 8 also
requires the pleading to include:

> (1) a short and plain statement of the grounds for the court's
> jurisdiction ...;
>
> (2) a short and plain statement of the claim showing that
> the pleader is entitled to relief; and
>
> (3) a demand for the relief sought ....

FED. R. CIV. P. 8(a). Although "[n]o technical form is
required," the Federal Rules make clear that each allegation
contained in the pleading "must be simple, concise, and
direct." Id. at 8(d).

**\*2** Further, Rule 10 of the Federal Rules provides in
pertinent part that:

> [a] party must state its claims or
> defenses in numbered paragraphs,

each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

FED. R. CIV. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" Flores, 189 F.R.D. at 54 (internal quotation marks and citations omitted). A complaint that fails to comply with the pleading requirements "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims."

Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y. 1996). As the Second Circuit has held, "[w]hen a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative ... to dismiss the complaint." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (citations omitted). However, "[d]ismissal ... is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. (citations omitted). In such cases of dismissal, particularly when reviewing a pro se complaint, the court generally affords the plaintiff leave to amend the complaint. Simmons v. Abruzzo, 49 F.3d 83, 86-87 (2d Cir. 1995). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

### III. Initial Review

### A. Plaintiff's Complaint

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, et seq. On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter." Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." Id.

Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. Included with the exhibits to the complaint is an Equal Employment Opportunity Commission ("EEOC") dismissal notice [2] noting that plaintiff's EEOC charge was not timely filed and the EEOC was closing its file. Dkt. No. 1-1. The remainder of the exhibits appended to the complaint appear to be an 80-page letter relating to apparent visa fraud that plaintiff sent to The US Department of Justice; the United States Department of Homeland Security, Immigration and Customs Enforcement; and the Federal Bureau of Investigation; as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff. Dkt. No. 1-2 at 81-82.

**\*3** The supplement plaintiff filed on March 15, 2021, is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. Id. The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy, New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State

incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021, appear to be letters plaintiff sent to the New York State Department of Labor, United States Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." See dkt. no. 7.

Plaintiff's complaint discusses Allison Carolyn Rattray, the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. Id. Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill the employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." Id. at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica," force plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. Id. at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom stables has visual and audio devices inside of them." Id. at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. See generally Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

> has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have men from any where have sex with The Plaintiff because The Plaintiff was born on the day the crucifixion was

celebrated, that is Easter and Good Friday.

Id. at 13. Plaintiff asks the Court for

> an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC FirstCarribean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda Ford children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

Id. at 14.

As for plaintiff's causes of action, plaintiff lists:

> forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands of the global organ Donor list. The staff is Allison Carolyn Rattray.

**\*4** Dkt. No. 1 at 69. As for a second cause of action is

employment discrimination – I chose a career path to be an Attorney-At-Law. Allison Carolyn Rattray (maiden name Smith) my (former) then manager at CIBC had be fired; told me that (1) I am not worthy to be an Attorney-at-Law because of my Race (2) I was not worthy to be in the same Profession as her. She has been defaming my character ever since.

Id. at 70. Third cause of action is listed as employment discrimination - compensation: denied increases in my salary verbally communicated to be by Ms. Cherlyn Blackman my Senior Manager of 3% in 2004; Denied Promotion communicated to be by my Human Resources Regional Director, Jerime Cjnttihs-Bell; denied fringe benefits that accompanied my five (5) CIBC Achievers awards – my salary was split and part paid to my aunt." Id. In the prayer for relief, plaintiff requests:

> (1) an Injunction(s) for Criminal Indictment(s) of Allison Carolyn (Smith) Rattray, Corporate Secretary and Legal Counsel CIBC for her forced Prostitution of The Plaintiff and Others; (2)An Injunction to prevent and stop all Prostitution or abuse of The Plaintiff; (3) Restitution(s) by CIBC for lost Incomes and fringe benefits[; and] (4) Job Reference letter from CIBC and an apology and my land Title Deed.

Id. at 71.

**B. Analysis**

First, plaintiff's complaint fails to meet the pleading requirements of Rules 8 and 10. Her complaint does not present a short and plain statement of the claim showing that she is entitled to relief. FED. R. CIV. P. 8. Further, she does not present her claims in numbered paragraphs, limited to one "circumstance" per paragraph. FED. R. CIV. P. 10. Instead, her complaint is a lengthy, disjointed, difficult to follow narrative. Her complaint clearly "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of their claims." Gonzales, 167 F.R.D. at 355.

Second, plaintiff's claims, insofar as she seeks to bring them under Title VII are (1) barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII.[3] To the extent plaintiff suggests that she was discriminated against in violation of Title VII insofar as she was told that she was inadequate due to her race or denied promised promotions because of her race, dkt. no. 1 at 70, even if plaintiff could provide additional factual support and clarification for the alleged discrimination, plaintiff provides that the alleged discrimination occurred as early as 1995 until 2004, and would be beyond the statute of limitations of Title VII. Indeed, plaintiff's entire employment with defendant occurred outside of the statute of limitations as she suggests that her employment began in January 1995 and that she was terminated in March 2009. Dkt. No. 1 at 52-53. Thus, the complained-of actions occurred more than 300 days prior to when plaintiff appears to have filed a complaint with the EEOC. See Gunning v. New York State Just. Ctr. for Prot. of People with Special Needs, No. 1:19-CV-1446 (GLS/ CFH), 2020 WL 5203673, at *3 (N.D.N.Y. Sept. 1, 2020) ("Title VII's statute of limitations bars claims based upon events that occurred more than 300 days prior to filing a charge of discrimination with a state or local employment agency, and, therefore, "[a] plaintiff may bring a claim under Title VII only for acts of discrimination that occurred within the statutory period set by 42 U.S.C. § 2000e–5(e)(1).") (quoting Patterson v. Cnty. of Oneida, 375 F.3d 206, 220 (2d Cir. 2004)). The undersigned notes that plaintiff does not indicate when she filed a complaint with the EEOC. However, she submits the EEOC's dismissal letter, dated September 10, 2020, which states that plaintiff did not timely file a complaint with the EEOC. Dkt. No. 1-1. As plaintiff likely filed her EEOC complaint in 2020,[4] appears to have been last employed by defendant in 2009, and complains of alleged employment discrimination occurring as early as 1995, her filing of an EEOC complaint in 2020 is clearly more than 300 days after the alleged discrimination occurred. Thus, any

cognizable Title VII claims arising out of her employment with defendant are barred by the statute of limitations.

**\*5** However, even if the statute of limitations was not an issue, plaintiff's claims still must fail because plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails establish this Court's jurisdiction under federal question or diversity jurisdiction.[5] Plaintiff makes several disjointed, confusing claims about being sold as a prostitute against her will by defendant's employees and other nonparties, defendant's employees and others murdering innocent people, defendant's employees drinking plaintiff's blood, and being stalked and prostituted by various officials from Jamaica and employees of defendant's company. See generally dkt. nos. 1, 4, 6, 7. Plaintiff makes several allegations against her former supervisor, Ms. Rattray, and says the various physical wrongdoings Ms. Rattray committed against plaintiff were all due to "The employment agreement between The Plaintiff and CIBC FirstCarribean Jamaica." Dkt. No. 1 at 60-61. Although plaintiff's submissions seem to suggest that she was employed by defendant at some point in time, and that a supervisor told her she could not be a lawyer due to her race and denied promised salary increases for unclear reasons, nothing about the factual allegations pleadings suggest that she presents a valid employment discrimination claim under Title VII or any other statute.

The Court is at a loss as to how the allegations in the complaint relate to a valid employment discrimination claim or any valid legal claim. Plaintiff presents a difficult to comprehend series of allegations against various individuals – many of whose connections to her apparent former employer is difficult, if not impossible, to comprehend – who she alleges forced her into prostitution, performed plastic surgeries on her against her will, installed "spying devices" into plaintiff's body, forced her to undergo various injections, and involved plaintiff in murder scheme that is somehow related to her Easter birthday. See Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained allegations that appear to involve Ms. Rattray and others, such as "an abuse of a veteran of the United States Army by the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff submits dozens of pages of exhibits and supplements that appear to relate to cases filed in other courts, orders of protection obtained in other courts, unemployment insurance issues, police reports, and documents sent to various federal agencies. See dkt. nos. 4, 5, 6, 7. The relevance of this deluge of documents is entirely unclear.

Further, to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction. See generally Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); McFadden v. Ortiz, 5:12-CV-1244(MAD/ATB), 2013 WL 1789593 (N.D.N.Y. Apr. 26, 2013) (noting that there is no private right of action to enforce either state or federal criminal statutes).

Next, plaintiff files an "emergency motion" for the Death Penalty,[6] which appears to ask the United States Supreme Court to enforce the death penalty against various individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a lease [sic]," and other similar allegations. See Dkt. No. 5. As discussed above, this Court does not have the authority or jurisdiction to sua sponte impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff or decide the ultimate punishment if convicted after a criminal trial.

**\*6** Generally, in cases involving pro se plaintiffs, a court should not dismiss a complaint without granting leave to amend "at least once" "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Branum v. Clark, 927 F.2d 698, 704-05 (2d Cir. 1991). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); see also Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be

dismissed with prejudice."). The Court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a pro se plaintiff's complaint to proceed. See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp., 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may sua sponte dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " Aguilar v. United States, 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998)); see also Neitzke v. Williams, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); Pino v. Ryan, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint."). Thus, although the Court must show special solicitude to pro se litigants, see Nance v. Kelly, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and is to exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis.

Even if, arguendo, the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." See Bennett v. Mnuchin, 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing Denton v. Hernandez, 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that

"describ[e] fantastic or delusional scenarios."); Brown v. New York State Educ. Dept., 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing pro se plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be clearly futile.

## IV. Conclusion

**WHEREFORE**, for the reasons set forth herein, it is hereby

**ORDERED**, that plaintiff's in forma pauperis application (dkt. no. 2) be granted for purposes of filing only; and it is

**RECOMMENDED**, that plaintiff's complaint (dkt. no. 1) be **DISMISSED WITH PREJUDICE**; and it is further

**RECOMMENDED**, that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be **DISMISSED**; and it is further

**RECOMMENDED**, that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be **DISMISSED AS MOOT**.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), plaintiff has FOURTEEN (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a). [7]

### All Citations

Slip Copy, 2021 WL 3518439

## Footnotes

1    Plaintiff is still financially responsible for any other fees or costs she may incur.

2    It appears that the EEOC dismissal notice is dated September 10, 2020. Dkt. No. 1-1.

3    A plaintiff establishes "a prima facie case of discrimination by showing that (1) he is a member of a protected class; (2) he is competent to perform the job or is performing his duties satisfactorily; (3) he suffered an adverse employment decision or action; and (4) the decision or action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class." Dawson v. Bumble & Bumble, 398 F.3d 211, 216 (2d Cir. 2005) overruled on other grounds Zarda v. Altitude Express, Inc., 883 F.3d 100 (2d Cir. 2018).

4    As the EEOC dismissal notice is dated September 10, 2020, the Court makes the reasonable inference that plaintiff filed her EEOC complaint some time in 2020.

5    Even if this Court were to assess this case as seeking to proceed under diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), the plaintiff has also failed to set forth a cognizable state law claim. Scherer v. Equitable Life Assur. Soc'y of the United States, 347 F.3d 394, 397 (2d Cir. 2003) (quoting 28 U.S.C. § 1332(a)) (noting that diversity jurisdiction "confers original jurisdiction on the federal district courts with respect to 'all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States.' ").

6    This "emergency motion" notes that it is presented to the United States Supreme Court, but contains a caption including this Court. It is unclear if this is a document plaintiff intends to submit before this Court, or before the United States Supreme Court. See dkt. no. 5.

7    If you are proceeding pro se and are served with this Report-Recommendation & Order by mail, three (3) additional days will be added to the fourteen (14) day period, meaning that you have seventeen (17) days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(c).

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3204860
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Myrna Althia Alicia WALKER, Plaintiff,

v.

CIBC LIMITED, Defendant.

1:20-CV-1337 (TJM/CFH)
|
Signed 07/29/2021

**Attorneys and Law Firms**

Myrna Althia Alicia Walker, Albany, NY, Pro Se.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District Judge

## I. INTRODUCTION

**\*1** This case was before the Hon. Christian F. Hummel, United States Magistrate Judge, for an initial review of plaintiff's complaint and other filings pursuant to 28 U.S.C. § 1915(e)(2)(B). Judge Hummel recommends that plaintiff's complaint (dkt. no. 1) be dismissed with prejudice; that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) be dismissed; and that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be dismissed as moot. *See* April 13, 2021 Report-Recommendation & Order, dkt. no. 10. Plaintiff did not file objections directed to Judge Hummel's recommendations, and the time to do so has expired. Plaintiff did, however, file an amended complaint. For the reasons that follow, the Court adopts Judge Hummel's recommendations, and independently reviews plaintiff's amended complaint and finds it fails to assert viable causes of action.

## II. DISCUSSION

### a. Complaint

As Judge Hummel explains, plaintiff *pro se* Myrna Althia Alicia Walker purported to commence this action on October 28, 2020, by submitting a complaint and application to proceed in forma pauperis ("IFP") in lieu of paying the Court's filing fee. *See* Dkt. No. 1 ("Compl."); Dkt. No. 2. On March 15, 2021, plaintiff submitted a supplement to her complaint.

Dkt. No. 4. On April 6, 2021, plaintiff submitted an additional filing entitled "Emergency Petition for the Death Penalty Against Adethia Keisha Fitten and Others on the Principle Found in the Law of Necessity." Dkt. No. 5. On April 7, 2021, plaintiff submitted an additional 86 pages to supplement to her complaint. Dkt. Nos. 6, 7. On April 8, 2021, plaintiff submitted additional exhibits and a letter requesting to file those exhibits under seal. Dkt. No. 8.

Plaintiff purports to bring this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000, *et seq.* On her form Title VII complaint, she indicates that defendant discriminated against her due to her race and color, religion, sex, and "my date of birth – Easter." Compl. at 2. Plaintiff further indicates, through checking the boxes on the form complaint, that defendant terminated her employment, failed to promote, engaged in unequal terms and conditions of employment, retaliated against her, and "forced prostitution; [i]dentity theft, which is used to do Bank frauds & Poisonings." *Id.* Plaintiff's complaint, inclusive of exhibits, is 158 pages long. Dkt. No. 1. The exhibits include an 80-page letter relating to apparent visa fraud that plaintiff sent to the US Department of Justice, the United States Department of Homeland Security, Immigration and Customs Enforcement, and the Federal Bureau of Investigation, as well as an incident report dated May 29, 2019, regarding an apparent rape of plaintiff.

The supplement plaintiff filed on March 15, 2021 is 112 pages long. Dkt. No. 4. The supplement appears to be filings from a complaint plaintiff had before the Supreme Court, Rensselaer County against Unity House of Troy and Joseph Posa. *Id.* The "emergency motion," filed on April 4, 2021, is 22 pages long, with 70 additional pages of exhibits. Dkt. No. 5. These exhibits are (1) various transfer orders and orders of protection plaintiff either sought or obtained against various individuals in family court proceedings in different counties (dkt. no. 5-1); (2) a residential lease agreement from July 2018, for a property in Troy, New York, with landlord Joseph Posa (dkt. no. 5-2); (3) records from a proceeding before the Rensselaer County Supreme Court in a case captioned Myrna Althia Alicia Walker vs. "Change of Name" Heidi Elizabeth Zuach (dkt. no. 5-3); and (4) a lease agreement dated May 2, 2017, between Capital Group Management LLC and plaintiff for a property in Troy, New York (dkt. no. 5-4). The submission filed on April 7, 2021, is 59 pages long and includes various orders of protection, a USPS tracking number report, a Unity House Domestic Violence Services Transitional Housing Program

Handbook, a form from the Rensselaer County Department of Social Services, earnings statements, a New York State incident report from 2018, an eviction notice, a letter from the Unity House Transitional Housing program, a "notice" letter, and a "birth registration" form. Dkt. No. 6-6. The exhibits filed on April 7, 2021 appear to be letters plaintiff sent to the New York State Department of Labor, United States Department of Homeland Security, Immigration and Customs Enforcement, and the EEOC, apparently related to "pandemic unemployment compensation benefits." *See* dkt. no. 7.

**\*2**  Plaintiff's complaint discusses Allison Carolyn Rattray, allegedly the Corporate Secretary and Legal Counsel of defendant CIBC First Caribbean International Bank (Jamaica) Limited. Dkt. No. 1 at 3. Plaintiff contends that Ms. Rattray kills unidentified people "with her married name" and drinks plaintiff's blood. *Id.* Apparently, plaintiff contends that Ms. Rattray is or was her "employer" who "uses the drinking blood of the employee to kill employing the employment agreement and the incomes paid by direct deposit as the consideration for the blood that is drank before the killings and the doomings if [sic] innocent persons." *Id.* at 4. Plaintiff also appears to suggest that Ms. Rattray and her husband, "Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica," forced plaintiff to use "illegal psychotropic medicines," cocaine, and alcohol. *Id.* at 5. Plaintiff refers to an employment agreement she signed with Ms. Rattray in 1995 and appears to suggest that since that date, Ms. Rattray "has been stalking the Plaintiff inside her bedroom, bathroom mirror, on her cell phone from 1995 even until today October 20, 2020 even the bathroom staples [sic] has visual and audio devices inside of them." *Id.* at 6. The Complaint then appears to proceed to explain why Ms. Rattray and her various family members are carrying out unspecified killings. *See generally* Dkt. No. 1. Plaintiff further suggests that through her employment with defendant, both defendant and the Commercial Division of the Supreme Court of Jamaica

> has been using me as a sex doll; as sex services; as sex product also incorporating The University of the West Indies Hospital to do surgeries; using illegal force of The Jamaican police; using the illegal Force of the Jamaican Army; using the illegal force of the Jamaican parliament to have

men from any where have sex with The Plaintiff because The Plaintiff was born on the day the crucifixion was celebrated, that is Easter and Good Friday.

*Id.* at 13. Plaintiff asks the Court for

> an Injunction to stop, restrain and prevent Allison Carolyn Rattray (maiden name Smith), Corporate Secretary and Legal Counsel, CIBC First Carribean Jamaica; her husband, Barrington Andrew Rattray, Senior Judge, The Commercial Division, The Supreme Court of Jamaica, King Street, Kingston, Jamaica, West Indies Deryke Smith, her brother; Lacelles Smith retired lecturer The University of the West Indies, Jamaica, West Indies; and the Rhoda Ford children and others from practicing their religion in a way that results in the death or harm or injury of The Rights of The Plaintiff and or the mother of The Plaintiff and or the siblings of The Plaintiff; and or any member of The Public, which includes anyone in the global community.

*Id.* at 14.

As for plaintiff's first cause of action, plaintiff lists:

> forced religion imposed on The Plaintiff whom is the employee by The Employer, CIBC Limited. The Forced Religion imposed on Myrna Althia Alicia Walker [ ] to kill innocent Persons. The daily murders of innocent Persons is used to supply the demands of the global organ Donor list. The staff is Allison Carolyn Rattray.

Dkt. No. 1 at 69. As for a second cause of action is

> employment discrimination – I chose a
> career path to be an Attorney-At-Law.
> Allison Carolyn Rattray (maiden name
> Smith) my (former) then manager at
> CIBC had me fired; told me that (1)
> I am not worthy to be an Attorney-at-
> Law because of my Race (2) I was not
> worthy to be in the same Profession
> as her. She has been defaming my
> character ever since.

*Id.* at 70. The third cause of action is listed as

> employment discrimination -
> compensation: denied increases in my
> salary verbally communicated to me
> by Ms. Cherlyn Blackman my Senior
> Manager of 3% in 2004; Denied
> Promotion communicated to me by
> Human Resources Regional Director,
> Jerime Cjnttihs-Bell; denied fringe
> benefits that accompanied my five (5)
> CIBC Achievers awards – my salary
> was split and part paid to my aunt.

*Id.* In the prayer for relief, plaintiff requests:

> (1) an Injunction(s) for Criminal
> Indictment(s) of Allison Carolyn
> (Smith) Rattray, Corporate Secretary
> and Legal Counsel CIBC for her
> forced Prostitution of The Plaintiff and
> Others; (2) An Injunction to prevent
> and stop all Prostitution or abuse of
> The Plaintiff; (3) Restitution(s) by
> CIBC for lost Incomes and fringe
> benefits[; and] (4) Job Reference letter
> from CIBC and an apology and my
> land Title Deed.

*Id.* at 71.

Judge Hummel found (a) that plaintiff's complaint fails to meet the pleading requirements of Fed. R. Civ. P. 8 and 10, *see* Dkt. 10 at 8-9; (b) plaintiff's claims under Title VII (1) are barred by the statute of limitations, and (2) fail to state a claim for employment discrimination in violation of Title VII, *see id.* at 9-10; and (c) apart from the Title VII claims, "plaintiff's claims fail to state any cognizable legal claim under the United States Constitution, federal statute, or state law, and ultimately fails [to] establish this Court's jurisdiction under federal question or diversity jurisdiction." *Id.* at 10. Judge Hummel indicated that he was

> **\*3** at a loss as to how the allegations in the
> complaint relate to a valid employment discrimination
> claim or any valid legal claim. Plaintiff presents a
> difficult to comprehend series of allegations against
> various individuals – many of whose connections to her
> apparent former employer is difficult, if not impossible, to
> comprehend – who she alleges forced her into prostitution,
> performed plastic surgeries on her against her will, installed
> "spying devices" into plaintiff's body, forced her to undergo
> various injections, and involved plaintiff in a murder
> scheme that is somehow related to her Easter birthday. *See*
> Dkt. No. 1 at 56-60. Plaintiff also sets forth unexplained
> allegations that appear to involve Ms. Rattray and others,
> such as "an abuse of a veteran of the United States Army by
> the said Allison Carolyn Rattray" (dkt. no. 1 at 54). Plaintiff
> submits dozens of pages of exhibits and supplements that
> appear to relate to cases filed in other courts, orders
> of protection obtained in other courts, unemployment
> insurance issues, police reports, and documents sent to
> various federal agencies. See dkt. nos. 4, 5, 6, 7. The
> relevance of this deluge of documents is entirely unclear.

*Id.* at 11.

Judge Hummel also concluded that to the extent plaintiff requests injunctions (dkt. no. 1 at 71) to prevent defendant's employees from prostituting or harming plaintiff or seeks some kind of prosecution of defendant's employees for criminal conduct, this Court does not have authority to direct persons to cease engaging in illegal activity through a civil suit as it is not a law enforcement agency. *Id.* at 11-12.

As to plaintiff's "emergency motion" for the Death Penalty, Judge Hummel found that it appears to ask the United States Supreme Court to enforce the death penalty against various

individuals who plaintiff contends engaged in "drug assisted surgeries on The Plaintiff herein to induce The Coronavirus ahead of the proposed mass vaccination of the US public, which is set for May 1, 2021[,]" implanting maggots into plaintiff's bones, releasing poisons into plaintiff's body, "install[ing] television" and "Netflix Television" into plaintiff's eye and spinal cord, "alter[ing]" plaintiff's "joints to make [her] walk in [sic] all four" to be "displayed as a naked dog on a leash [sic]," and other similar allegations. *See* Dkt. No. 5. Judge Hummel concluded that "this Court does not have the authority or jurisdiction to *sua sponte* impose the death penalty in a civil case nor can it seek the criminal prosecution of individuals or at the request of a plaintiff or decide the ultimate punishment if convicted after a criminal trial." Dkt. 10 at 12.

Judge Hummel concluded that although the Court must show special solicitude to *pro se* litigants, and is to exercise "extreme caution ... in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond, ..." *id.* at 14 (quoting Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted)), the Court also has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action *in forma pauperis*. *Id.* Judge Hummel concluded:

> Even if, *arguendo*, the statute of limitations was not a jurisdictional bar and plaintiff had been able to establish this Court's jurisdiction, the undersigned would still recommend dismissal with prejudice on its initial review as plaintiff's complaint is "factually frivolous." *See Bennett v. Mnuchin*, 6:20-CV-243 (BKS/TWD), 2020 WL 1674068 (citing Denton v. Hernandez, 504 U.S. 25, 32-33 (1992)) (holding that a court may dismiss a factually frivolous claim when the allegations are "clearly baseless," including claims that "describ[e] fantastic or delusional scenarios."); *Brown v. New York State Educ. Dept.*, 8:18-CV-169 (TJM/CFH), 2018 WL 1865547, at *2 (N.D.N.Y. Mar. 19, 2018) (dismissing *pro se* plaintiff's complaint with prejudice where "it is clear that no federal claim can be stated on these facts[.]"). Accordingly, the undersigned recommends dismissal with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be clearly futile.

**\*4** *Id.* at 14. As indicated above, Judge Hummel also recommends that plaintiff's "Emergency Motion for the Death

Penalty" (dkt. no. 5) be dismissed, and that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) be dismissed as moot. *Id.* at 15.

After examining the record, this Court has determined that the recommendations in the Report-Recommendation and Order are not subject to attack for plain error or manifest injustice. Further, even if plaintiff's amended complaint is treated as an objection, the Court has completed a *de novo* review and has determined to adopt Magistrate Judge Hummel's recommendations for the reasons stated in his report.

**b. Amended Complaint**

As indicated, plaintiff filed an amended complaint after Judge Hummel recommended that the complaint be dismissed with prejudice. After a review of the amended complaint, the Court finds that it too must be dismissed with prejudice.

Plaintiff's amended complaint is a form Title VII complaint. *See* dkt. no. 11. She indicates that the defendant is "CIBC Limited/Michael Capatide CEO CIBC." *Id.* at ¶ 3(b). [1] Plaintiff checks the boxes indicating that the defendant discriminated against her on account of her "race or color," "religion," "sex (or sexual harassment)," "national origin," and "other" indicating on the line that follows: "my right to marry; my right to life; my right to work and provide for my daily living expenses." *Id.* at ¶ 6. Where plaintiff is asked to indicate what the complained-of conduct involves, she checked the boxes for "failure to employ," "termination of employment," "failure to promote," "unequal terms and conditions of employment," "retaliation," and "other acts as specified below" after which she writes: "I am being sex trafficked by CIBC First Caribbean staff in lieu of my salary." *Id.* at ¶ 7. In the section of the amended complaint asking for the facts underlying her claims, plaintiff asserts she is being sex trafficked because she was born on Easter and that the sex trafficking is in lieu of her salary paid to her by CIBC First Caribbean Jamaica." *Id.* ¶ 8. She also asserts that "the force" of the Jamaican Police, the Jamaican Judiciary, the Jamaican Hospital, and the University of the West Indies are conspiring with her "Walker relatives used to commit crimes with my identity using identity theft of Myrna Suzette Walker employed by Jamaican government Judge Barrington Andrew Rattray & Allison Carolyn Rattray." *Id.* In addition, she asserts that "Adethia Keisha Fitten is physically cutting me to create presumed consent for the crimes organized by Judge Barrington Andrew Rattray." *Id.*

The First Cause of Action alleges "forced organized criminality using the salary that was paid to the plaintiff by CIBC First Caribbean Jamaica January 1, 1995 to March 28, 2009." It also asserts that Myrna Suzette Walker "is a thief," and that "Allison Carolyn Rattray ... hired Myrna Suzette Walker and her five (5) children and Adethia Keisha Fitten to steal and to say that the stealing was done by the plaintiff." Plaintiff also appears to indicate that "to do the stealing," Myrna Suzette Walker "and others" repeatedly physically injure plaintiff. As discussed by Judge Hummel, these allegations do not provide plaintiff with a timely Title VII cause of action, *see, e.g.,* Am. Compl. attach. 4, dkt. no. 11-4 at 1, [2] nor do they provide a basis for the relief plaintiff seeks. *See* Dkt. 11, at 5. [3]

**\*5** The Second Cause of Action asserts violations of the "Human Rights Act of 1998." The Human Rights Act of 1998 appears to be a law or act of Parliament in the United Kingdom. *See Brady v. Wks. Med. Ctr.*, No. 19-CV-00655-SM, 2019 WL 6529870, at \*2 (D.N.H. Nov. 12, 2019)("A law in effect in the United Kingdom bears that title.")(citing Human Rights Act 1998, ch. 42, http://www.legislation.gov.uk/ukpga/1998/42/contents), *report and recommendation approved*, No. 19-CV-655-SM, 2019 WL 6529459 (D.N.H. Dec. 4, 2019); *Simpson v. Dauphin Cty. Hous. Auth.*, No. 1:16-CV-01747, 2017 WL 2375702, at \*2, n. 4 (M.D. Pa. Apr. 26, 2017) ("*Simpson* also references a 'Human Rights Act of 1998,' which as best we can tell refers to an Act of Parliament of the United Kingdom, not applicable in this jurisdiction."), *report and recommendation adopted*, No. 1:16-CV-1747, 2017 WL 2362510 (M.D. Pa. May 31, 2017). The Human Rights Act of 1998 does not provide plaintiff with a viable cause of actions against the defendant for any events occurring in the Northern District of New York over which this Court would have jurisdiction. *See Brady*, 2019 WL 6529870, at \*2.

The Third Cause of Action is confusing but appears to be a claim seeking unpaid wages. *See* dkt. no. 11 at 4 (stating at the start of Third Cause of Action: "The right to my paycheck."). Plaintiff asserts that her aunt Myrna Suzette Walker "assisted by CIBC First Caribbean staff Allison Carolyn Rattray has been falsely selling me as a whore in lieu of my current income(s) from JC Penney, Aerotek, Walmart, Fidelis Care and more." However, Myrna Suzette Walker, Allison Carolyn Rattray, JC Penney, Aerotek, Walmart, or Fidelis Care are not defendants in this action. Further, plaintiff does not assert when it was that she worked at JC Penney, Aerotek, Walmart, or Fidelis Care, or when or where it was that Myrna

Suzette Walker and Allison Carolyn Rattray purportedly took actions preventing plaintiff from receiving her wages from these employers. The claim in this regard fails to assert a viable cause of action under Title VII. In addition, in nearly incomprehensible fashion plaintiff ends the Third Cause of Action by asserting: "The rapes of me by co-workers is [sic] recorded and published. Walmart staff a [sic] man named Donnell she [sic] gave permission to live in my apartment as well as Fidelis Care Health Insurance staff- Rashid Rardon." These allegations fail to provide a sufficient basis for the Court to discern any viable cause of action under Title VII or any other law or statute over which the Court would have jurisdiction.

Accordingly, for the reasons set forth above plaintiff's amended complaint will be dismissed. Because the allegations in the amended complaint are factually frivolous, and because plaintiff filed an amended complaint that did not cure the pleading defects pointed out by Judge Hummel, dismissal will be with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i) as any leave to amend would be futile.

### III. CONCLUSION

For the reasons discussed above, the Court **ACCEPTS AND ADOPTS** Judge Hummel's recommendations in the April 13, 2021 Report-Recommendation & Order, dkt. no. 10. Thus, it is hereby

**ORDERED** that plaintiff's complaint (dkt. No. 1) is **DISMISSED with prejudice**; and it is further

**ORDERED** that plaintiff's "Emergency Motion for the Death Penalty" (dkt. no. 5) is **DENIED and DISMISSED**; and it is further

**ORDERED** that plaintiff's letter motion to file exhibits under seal (dkt. no. 8) is **DENIED and DISMISSED as moot**.

Based on the Court's review of the amended complaint, it is hereby

**ORDERED** that plaintiff's amended complaint (dkt. No. 11) is **DISMISSED with prejudice**.

The Clerk of the Court may mark this file as closed.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3204860

# Footnotes

1      At paragraph 3(a) asking to identify the defendant, plaintiff writes: "Not Applicable"

2      Dkt. no. 11-4 is a letter from Maureen Kielt, Director of the EEOC Buffalo Local Office to plaintiff in the matter
       of *Walker v. CIBC* confirming that plaintiff indicated that her "last date of harmed occurred on March 24,
       2009, when [she] was terminated," thus making her EEOC administrative claim against CIBC untimely. Dkt.
       No. 11-4 at 1.

3      In the Prayer for Relief, plaintiff requests the Court to grant the following relief:

       1. The plaintiff do not [sic] want to be a party to the religious killing business of Myrna Suzette Walker;
       her five children; and CIBC First Caribbean Jamaica staff, Allison Carolyn Rattray and her husband Judge
       Barrington Andrew Rattray, Supreme Court of Jamaica;

       2. The plaintiff do not [sic] want cocaine nor any thing to ingest from anyone, by force or otherwise.

       3. The plaintiff wants full restitution socially, physically, professionally.

       Dkt. 11, at 5 (emphasis in original).

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1789593
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Alexander McFADDEN, Plaintiff,

v.

Jose D. ORTIZ, Executive Officer Chase JP
Morgan Chase & Co., and James Simon, Manager
Chase JP Morgan Chase & Co., Defendants.

No. 5:12–CV–1244 (MAD/ATB).
|
April 26, 2013.

**Attorneys and Law Firms**

Alexander McFadden, Pine City, NY, pro se.

Jose D. Ortiz, Executive Officer for Chase JP Morgan Chase & Co., Houston, TX.

James Simon, Manager for Chase JP Morgan Chase & Co., New York, NY.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

\*1 Plaintiff *pro se* Alexander McFadden ("McFadden"), an inmate at the Southport Correctional Facility ("SCF"), filed this action pursuant to 42 U.S.C. § 1983. In his complaint, Plaintiff appears to allege that Defendants, two executives of Chase JP Morgan Chase & Co. ("Chase"), violated his constitutional rights through conduct that, in some way, involved a bank account. *See* Dkt. No. 1 at ¶ 4.

On August 7, 2012, Magistrate Judge Andrew T. Baxter issued an Order and ReportRecommendation, recommending that the Court dismiss Plaintiff's complaint in its entirety with prejudice, pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5. Currently before the Court are Plaintiff's objections to Magistrate Judge Baxter's August 7, 2012 Order and ReportRecommendation.

**II. BACKGROUND**

In his Order and Report–Recommendation dated August 7, 2012, Magistrate Judge Baxter recommended that Plaintiff's motion to proceed *in forma pauperis* ("IFP") should be denied by the Court and, upon review of the complaint, that this action be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii). *See* Dkt. No. 5 at 9. Further, Magistrate Judge Baxter recommended that if the Court approves his report, the Court should certify that any appeal from this matter will not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3). *See id.*

Regarding Plaintiff's complaint, Magistrate Judge Baxter's Order and ReportRecommendation recommends that because there is no indication that either Defendant acted under "color of state law," and because there are no allegations that either or both Defendants "conspired" with any state actors to bring this action under section 1983, Plaintiff's complaint should be dismissed. *See* Dkt. No. 5 at 5.

Regarding Plaintiff's claim that Defendants violated New York Penal Law by offering false documents for filing, tampering with public records, and falsifying business records, Magistrate Judge Baxter recommended that because there is no private right of action to enforce either state or federal criminal statutes, Plaintiff is barred from bringing a claim to enforce these provisions of the New York State Criminal Law. *See* Dkt. No. 5 at 6.

Accordingly, Magistrate Judge Baxter recommended this Court hold that, due to Plaintiff's failure to state a claim under 42 U.S.C. § 1983 upon which relief can be granted, combined with the courts inability to determine what venue might be appropriate, Plaintiff's motion for IFP should be denied, and Plaintiff's complaint should be dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) (i)-(ii). *See* Dkt. No. 5 at 9.

In his "objections" to Magistrate Judge Baxter's Order and Report–Recommendation, Plaintiff simply provides the Court with language from various cases discussing various types of objections and the Court's authority to review unpreserved errors. *See* Dkt. Nos. 14, 15.

### III. DISCUSSION

**A. Review of a magistrate judge's decision**

**\*2** If a party files specific objections to a magistrate judge's report-recommendation, the district court performs a *"de novo* determination of those portions of the report of specified proposed findings or recommendations to which objections is made." 28 U.S.C. § 636(b)(1) (2006). However, if a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that were presented] to the magistrate judge," the court simply reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). At the conclusion of the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

**B. *In Forma Pauperis* application**

In order for a plaintiff to proceed without payment of any fees, he must first meet the financial criteria for IFP status. *See* 28 U.S.C. § 1915(a)(1). The plaintiff must submit an affidavit, including a statement of all assets, establishing his inability to pay the filing fee of $350.00. *See id.* Here, Plaintiff submitted a standard IFP application form, but answered only some of the relevant questions. Furthermore, while Plaintiff is incarcerated and has filed a motion to proceed IFP, his application states that, in the past twelve months, he has had income from "[b]usiness, profession or other self employment," and has "millions of dollars" in "cash, checking or savings accounts." *See* Dkt. No. 2 at ¶¶ 3, 4. Plaintiff, however, does not answer the question that asks him to "describe the source of money and state the amount received and what you expect you will continue to receive ." *See id.* at ¶ 3. Plaintiff answers "yes" to the questions asking whether he owns "real estate, stocks, bonds, securities, other financial instruments, automobile or any other assets." *See id.* at ¶ 5. Once again, however, Plaintiff does not complete the question by describing the property and stating its value. *See id.* Lastly, the form indicates that Plaintiff only has $9.60 in his prison account, and that during the last six months prior to this application, the average balance in his prison account was $4.03. *See* Dkt. No. 2 at 2.

If Plaintiff's claims are true and he does in fact have millions of dollars and real estate or other valuable property, then he cannot meet the financial requirements for proceeding IFP. Generally, when plaintiff has failed to properly complete the IFP request, the court will deny IFP without prejudice and allow plaintiff to resubmit the form with proper information. However, in this case, based upon the inadequacy of Plaintiff's responses, combined with his failure to state a plausible cause of action and the fact that amendment would be futile as discussed below, even if Plaintiff met the financial requirements for IFP, the Court would still find dismissal of this action to be proper.

**C. Sufficiency of the complaint**

*1. Legal Standard*

**\*3** In addition to determining whether Plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if it determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B) (i)-(iii).

*2. Application*

*a. Color of state law*

Plaintiff brings this complaint pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1. To state a claim under section 1983, a plaintiff must allege two elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a deprivation of her rights or privileges as secured by the Constitution of the United States. *See Annis v.*

*County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998). Under extremely limited circumstances not alleged here, private actors, such as Defendant, may be held liable under section 1983. *See White v. Monarch Pharmaceuticals,* Inc., No. 08–CV–0430, 2009 WL 3068217, *1 (2d Cir. Sept. 28, 2009); *see also Rendell—Baker v. Kohn,* 457 U.S. 830, 838–42 (1982). The law does not reach private conduct, no matter how "discriminatory or wrongful." *Annis,* 136 F.3d at 245 (quoting *Blum v. Yaretsky,* 457 U.S. 991, 1002 (1982)).

In the present matter, Plaintiff names two executives of Chase as Defendants. Along with being very difficult to determine what these Defendants allegedly did to Plaintiff, there is no indication that either Defendant acted under color of state law. Moreover, the complaint does not allege or suggest that Defendants conspired with a state actor to violate his constitutional rights. Further, Plaintiff does not allege any conduct attributable to either Defendant sufficient to establish their personal involvement in any alleged constitutional deprivation. *See* Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted).

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss the complaint.

### b. Criminal statutes

Plaintiff states in the "Causes of Action" section of his complaint that Defendants violated the New York Penal Law regarding falsifying business records, tampering with public records, and offering false documents for filing. *See* Dkt. No. 1 (citing N.Y. PENAL LAW §§ 175.10, 175.25, and 175.35). Even if this is true, however, there is no private right of action to enforce either state or federal criminal statutes. *See* Abrahams v. Incorporated Village of Hempstead, No. 08–CV–2584, 2009 WL 1560164, *8 (E.D.N.Y. June 2, 2009) (holding that dismissal of civil suit for perjury was proper because there is no private right of action for perjury under New York Law). Therefore, even assuming, *arguendo*, that Defendants violated some criminal statutes, Plaintiff may not bring a claim based on those statutes to enforce New York Criminal Law.

**\*4** As such, Magistrate Judge Baxter correctly recommended the Court find that Plaintiff has failed to allege a plausible cause of action.

### c. Venue

Venue in federal-question cases is generally determined by 28 U.S .C. § 1391(b) which provides that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, ... or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). In this case, one of the Defendants is listed with a Houston, Texas address, while the other Defendant is listed as having a New York City address. *See* Dkt. No. 1 at ¶¶ 3(a) and (3)(b). Thus, neither of the Defendants reside, or are located, in the Northern District of New York. Plaintiff is incarcerated at Southport Correctional Facility, located in the Western District of New York. Therefore, since both Plaintiff and one of the Defendants are New York residents, this case could clearly not be brought as a diversity action. Moreover, under Plaintiff's section 1983 claim, venue is not proper in the Northern District of New York. All Defendants do not reside in the same state, neither Defendant is located in this district, and the complaint does not allege any conduct that occurred in the Northern District of New York.

Under 28 U.S.C. § 1406, a district court faced with a case brought "laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The Second Circuit has suggested that "a district court should not dismiss for improper venue on its own motion except in extraordinary circumstances." Concession Consultants, Inc. v. Mirisch, 355 F.2d 369 (2d Cir.1966).

In the present matter, the Court finds and agrees with Judge Baxter's Order and ReportRecommendation that this case presents precisely the extraordinary circumstances making it proper for the Court to dismiss for improper venue *sua sponte.*

### d. Leave to amend

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint

gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted); *see also Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993).

 **\*5** Here, the Court agrees with Magistrate Judge Baxter that any attempt by Plaintiff to amend his complaint would be futile. As discussed, although Plaintiff alleges "due process violations," section 1983 does not permit such actions to be brought against private individuals absent some involvement by the state. Moreover, Plaintiff does not have the right to enforce New York State criminal statutes.

Based on the foregoing, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should dismiss Plaintiff's complaint with prejudice.

### IV. CONCLUSION

After carefully considering Magistrate Judge Baxter's Order and Report–Recommendation, the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's August 7, 2012 Order and Report–Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further **ORDERS** that Plaintiff's application to proceed *in forma pauperis* is **DENIED;** and the Court further

**ORDERS** that Plaintiff's complaint is **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i)-(ii); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve Plaintiff with a copy of this Memorandum–Decision and Order in accordance with Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1789593

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 2068248
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Anthony J. HALL, Plaintiff,

v.

Frank SAMPSON, et al., Defendants.

CIVIL ACTION No. 21-CV-4839
|
Signed 06/08/2022

**Attorneys and Law Firms**

Anthony J. Hall, Philadelphia, PA, Pro Se.

**MEMORANDUM**

YOUNGE, District Judge

**\*1** Plaintiff Anthony J. Hall, a convicted prisoner incarcerated at the Federal Detention Center in Philadelphia, filed this civil action pursuant to ⚑42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), based on allegations that he was illegally prosecuted, convicted and imprisoned on conspiracy and drug charges. (ECF No. 2.) ("Compl.") For the following reasons, the Court will dismiss the Complaint for failure to state a claim pursuant to 28 U.S.C. § 1915A(b)(1).

**I. FACTUAL ALLEGATIONS** [1]

Hall's claims arise from criminal proceedings presided over by the Honorable Wendy Beetlestone and the criminal investigation that resulted in those proceedings. *United States v. Gordon*, Crim. A. No. 15-0496-9 (E.D. Pa.). On August 17, 2016, Hall was charged with one count of conspiracy to distribute phencyclidine ("PCP") and one count of possession with intent to distribute PCP. The charges were included in the Second Superseding Indictment in the multi-defendant case. *Id.* (ECF No. 94.) Thereafter, a bench warrant issued for Hall's arrest; Hall was detained at SCI-Graterford at the time. *Id.* (ECF No 105.) On September 14, 2016, Hall appeared at a hearing before a Magistrate Judge at which he pled not guilty and stipulated to pretrial detention. *Id.* (ECF No. 159.) Following a 22-day jury trial before the Honorable Wendy

Beetlestone, on December 19, 2018, the jury returned no verdict on the charges against Hall. *Id.* (ECF No. 780.)

On August 6, 2019, Hall was charged with 4 counts of possession with intent to distribute PCP and one count of conspiracy to distribute PCP. *Id.* (ECF No. 866 at 2-3, 60-63.) The charges were included in the Third Superseding Indictment in the same multi-defendant case. Following a six-day jury trial before the Honorable Wendy Beetlestone, on October 13, 2019, the jury returned a verdict of guilty against Hall on two counts of possession with intent to distribute PCP and one count of conspiracy to distribute PCP. (ECF No. 943.) Hall was found not guilty on the remaining two counts of possession with intent to distribute. (*Id.*) A sentencing hearing is currently scheduled for July 19, 2022. *Id.* (ECF No. 1135.)

Hall's Complaint names the following Defendants: (1) Drug Enforcement Agency ("DEA") Special Agent Frank Sampson; (2) DEA Task Force Officer Efrain Torres; (3) Assistant United States Attorney ("AUSA") Sozi Pedro Tulante; (4) AUSA Mary Teresa Soltis; (5) DEA Task Force Officer Kyle Boyd; (6) DEA Group Supervisor Raymond Franklin; (7) AUSA Anthony J. Wzorek; and (8) Judge Beetlestone. The Defendants are sued in their individual and official capacities. (Compl. at 4.) The gist of Hall's claims is that the investigation resulting in the charges against him was riddled with error, and that the decision to try him a second time following his acquittal on similar charges was the result of vindictive prosecution.

**\*2** Hall includes lengthy, detailed allegations regarding the investigation and prosecution of the charges against him. In short, Hall claims that the DEA, its agents, its task force officers, and the AUSAs assigned to his criminal case "conducted a constitutionally inadequate investigation ... planted evidence, falsified documents, committed perjury, to falsely arrest, indict and convict the Plaintiff." (*Id.* at 41.) He alleges that the "evidence against Plaintiff is exclusively recorded telephone conversation captured over the Title III wiretap, which the Government believes the Plaintiff was a participant. The Government has not to date produced no evidence, visual or physical, that the Plaintiff sold or purchase PCP. The Plaintiff is facing a mandatory ten (10) years to life imprisonment." (*Id.* at 33-34.)

Hall asserts the following claims pursuant to ⚑42 U.S.C. § 1983 – violations of his Fourth, Fifth, Eighth and Fourteenth amendment rights, and violations of ⚑42 U.S.C. § 1985 and

various criminal statutes.[2] He raises the following claims under *Bivens* – illegal seizure, and due process and equal protection violations. (*Id.* at 3, 34.) He seeks an award of compensatory and punitive damages. (*Id.* at 41.) He also requests that his conviction be overturned, that a new Judge be appointed to his case, and that he be granted a new trial on the charges included in the Second Intervening Indictment only. (*Id.* at 36-37.)

## II. STANDARD OF REVIEW

Although Hall has paid the filing fee in full, the Court has the authority to screen his Complaint pursuant to 28 U.S.C. § 1915A. *See* Shane v. Fauver, 213 F.3d 113, 116 n.2 (3d Cir. 2000) (recognizing that the district courts have the authority to screen a prisoner complaint pursuant to § 1915A(b)(1) even if the prisoner is not proceeding *in forma pauperis*.) Section 1915A requires that the Court "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). In doing so, the Court must dismiss a complaint or any portion thereof that "is frivolous, malicious, or fails to state a claim upon which relief may be granted," *id.* § 1915A(b)(1), or that "seeks monetary relief from a defendant who is immune from such relief," *id.* § 1915A(b)(2).

**\*3** Whether a complaint fails to state a claim under § 1915A(b)(1) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* Neal v. Pa. Bd. of Prob. & Parole, No. 96-7923, 1997 WL 338838, at \*1 (E.D. Pa. June 19, 1997); *see also* Tourscher v. McCullough, 184 F.3d 236, 240 (3d Cir. 1999). Accordingly, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotations omitted). " 'At this early stage of the litigation,' '[the Court will] accept the facts alleged in [the *pro se*] complaint as true,' 'draw[ ] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, ... contains facts sufficient to state a plausible [ ] claim.' " Shorter v. United States, 12 F.4th 366, 374 (3d Cir. 2021) (quoting Perez v. Fenoglio, 792 F.3d 768, 774, 782 (7th Cir. 2015)). Conclusory allegations do not

suffice. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). As Hall is proceeding *pro se*, the Court construes his allegations liberally. Vogt v. Wetzel, 8 F. 4th 182, 185 (3d Cir. 2021) (citing Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 244-45 (3d Cir. 2013)).

## III. DISCUSSION

Hall brings constitutional claims against federal actors pursuant to 42 U.S.C. § 1983 and *Bivens.* However, because § 1983 does not apply to federal actors, the Court will construe all of Hall's claims as having been raised pursuant to *Bivens. Bivens* provides a judicially recognized remedy for constitutional violations committed by federal actors in limited circumstances.[3] Since *Bivens* was decided in 1971, the Supreme Court "has repeatedly refused to extend *Bivens* actions beyond the specific clauses of the specific amendments [of the Constitution] for which a cause of action has already been implied, or even to other classes of defendants facing liability under those same clauses." Vanderklok v. United States, 868 F.3d 189, 200 (3d Cir. 2017). The Supreme Court has recognized an implied private action against federal officials in only four cases: (1) *Bivens* itself, which recognized an implied cause of action for violation of the Fourth Amendment's right against unreasonable searches and seizures; (2) Davis v. Passman, 442 U.S. 228 (1979), which recognized a claim for gender discrimination in the employment context under the Fifth Amendment's Due Process Clause; (3) Carlson v. Green, 446 U.S. 14 (1980), which recognized a claim against prison officials for inadequate medical care in the prison context under the Eighth Amendment; and (4) Farmer v. Brennan, 511 U.S. 825 (1994), which concerned a claim under the Eighth Amendment against prison officials for failure to protect a prisoner from violence by another prisoner. Shorter, 12 F.4th at 371-373 ("*Farmer* made clear[ ] ... that an Eighth Amendment *Bivens* remedy is available to a transgender prisoner who has been assaulted by a fellow inmate.").

**\*4** Because expanding *Bivens* is "a 'disfavored' judicial activity," *see* Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017), a "rigorous inquiry ... must be undertaken before implying a *Bivens* cause of action in a new context or against a new category of defendants." Vanderklok, 868 F.3d at 200.

That inquiry involves determining whether the case presents a new context for a *Bivens* claim that has not been recognized by the Supreme Court and, if so, asking whether "special factors counsel hesitation in expanding *Bivens*." *Mack v. Yost*, 968 F.3d 311, 320 (3d Cir. 2020); *see also* *Abbasi*, 137 S. Ct. at 1857-58.

Here, Hall alleges that his conviction and incarceration are the result of a constitutionally deficient investigation and irregularities in his prosecution. Hall's claims concerning his arrest, detention and criminal prosecution are best construed as claims for malicious prosecution, as he was detained pursuant to a warrant. *See Johnson v. United States*, No. 20-3256, 2021 WL 1626522, at *2 (3d Cir. Apr. 27, 2021) (*per curiam*) ("[T]he Magistrate Judge correctly concluded that because Johnson was arrested pursuant to a warrant, his claims for false arrest and false imprisonment were, in essence, malicious prosecution claims."). Thus, based on the allegations therein, the Court construes Hall's Complaint as presenting claims for malicious prosecution, as well as claims that the Defendants conspired to secure his unlawful conviction by, among other things, fabricating evidence against him.[4] Whether or not these claims present viable *Bivens* claims is immaterial at present, because the claims may not proceed at this time.

The Supreme Court has held that "to recover damages [or other relief] for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus[.]" *Heck*, 512 U.S. at 486-87 (footnote and citation omitted); *see also Wilkinson v. Dotson*, 544 U.S. 74, 81-82 (2005) ("[A] state prisoner's § 1983 action is barred (absent prior invalidation) — no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) — if success in that action would necessarily demonstrate the invalidity of confinement or its duration." (emphasis omitted)); *Vanderklok*, 868 F.3d at 199 (the Supreme Court has only recognized a *Bivens* remedy in a handful of contexts and "has plainly counseled against creating new *Bivens* causes

of action"). "Although *Heck* involved a § 1983 action by a state prisoner, the reasoning in *Heck* has been applied to bar *Bivens* claims." *Lora-Pena v. F.B.I.*, 529 F.3d 503, 506 n.2 (3d Cir. 2008).

**\*5**  The favorable termination doctrine applies to malicious prosecution claims, as well as claims based on alleged fabrication of evidence. *Floyd v. Attorney Gen. of Pennsylvania*, 722 F. App'x 112, 114 (3d Cir. 2018) (*per curiam*) ("Because Floyd's malicious prosecution and fabrication of evidence claims do not accrue until the criminal proceedings have terminated in Floyd's favor, and Floyd has not demonstrated as much, they are barred by *Heck*."). Additionally, *Heck* has been applied to preclude claims under § 1985. *Zhai v. Cedar Grove Municipality*, 183 F. App'x 253, 255 (3d Cir. 2006) (*per curiam*) (civil rights claims under §§ 1985 and 1986 were barred by *Heck*).

Here, success on Hall's claims would necessarily undermine the validity of his intact conviction because his Complaint challenges the constitutionality of his prosecution, conviction and related imprisonment. Accordingly, his claims for damages are barred by *Heck*. *See Garrett v. United States*, 771 F. App'x 139, 141 (3d Cir. 2019) (*per curiam*) ("Here, because Garrett's claims directly challenged the validity of his federal conviction and sentence—which have not been invalidated— his complaint sought the sort of relief that is plainly barred by *Heck*." (internal quotations omitted)); *Murphy v. Bloom*, 443 F. App'x 668, 669 (3d Cir. 2011) (*per curiam*) (holding that *Heck* barred *Bivens* claims where plaintiff "alleged that the defendants conspired to alter his trial transcript and to include a false declaration in his sentencing memorandum"); *Stuler v. United States*, 301 F. App'x 104, 106 (3d Cir. 2008) (*per curiam*) (*Heck* applied in *Bivens* action in which the bulk of plaintiff's complaint was "little more than a thinly veiled attempt to attack his criminal conviction ... under the guise of a civil action"). Accordingly, Hall's claims will be dismissed without prejudice to Hall filing a new case only in the event his conviction is first invalidated, whether on appeal or otherwise.[5]

### IV. CONCLUSION

**\*6**  For the foregoing reasons, the Court will dismiss Hall's Complaint as legally baseless, pursuant to 28 U.S.C. § 1915A(b)(1). Although leave to amend would be futile, the Court will dismiss Hall's challenges to his conviction without

prejudice to him filing a § 2255 motion in his criminal case, and will dismiss his remaining claims without prejudice to reassertion in a new civil action only in the event his conviction is reversed, vacated, or otherwise invalidated. *See* 🚩 *Curry v. Yachera*, 835 F.3d 373, 379 (3d Cir. 2016).

An appropriate Order follows, which shall be docketed separately.

**All Citations**

Slip Copy, 2022 WL 2068248

## Footnotes

1    The following facts are taken from the Complaint, exhibits to the Complaint, and public records, which the Court may consider in evaluating Hall's claims. *See* 🚩 *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

2    Hall asserts claims under 🚩 18 U.S.C. §§ 241 and 242. These sections establish criminal liability for certain deprivations of civil rights and conspiracy to deprive civil rights. 🚩 *Molina v. City of Lancaster*, 159 F. Supp. 2d 813, 818 (E.D. Pa. 2001); *Figueroa v. Clark*, 810 F. Supp. 613, 615 (E.D. Pa. 1992); *see* 🚩 *United States v. Philadelphia*, 644 F.2d 187 (3d Cir. 1980) (declining to create civil remedy under 🚩 18 U.S.C. §§ 241 and 🚩 242). However, a plaintiff cannot bring criminal charges against defendants through a private lawsuit, and these sections do not give rise to a civil cause of action. *U.S. ex rel. Savage v. Arnold*, 403 F. Supp. 172, 174 (E.D. Pa. 1975). Hall also cites 18 U.S.C. § 71, which relates to theft from interstate shipments. The Court assumes that he intended to cite 18 U.S.C. § 371, relating to conspiracy, which also does not provide for a private right of action. *See Walthour v. Herron*, No. 10-1495, 2010 WL 1877704 at *3 (E.D. Pa. May 6, 2010) (no private right of action exists under 🚩 18 U.S.C. § 241, 🚩 242, 🚩 245, 🚩 247, 371 or 🚩 1951); *Jones v. Lockett*, No. 08-16, 2009 WL 2232812 at *8 (W.D. Pa. July 23, 2009) ("It is clear that the criminal statutes invoked by Plaintiff, i.e., 🚩 18 U.S.C. §§ 241, 371 and 🚩 1341 do not provide for a private cause of action.") Hall also cites 18 U.S.C. § 1519 relating to destroying, altering or falsifying documents in a federal investigation, and 18 U.S.C. § 1623 relating to perjury, which also do not provide a private right of action. *Antonelli v. Kennedy Hosp.*, No. 17-13780, 2018 WL 443455, at *2 (D.N.J. Jan. 16, 2018) (no private right of action under 18 U.S.C. 1519).

3    Although *Bivens* provides a remedy against federal actors, "[a]n action against government officials in their official capacities constitutes an action against the United States; and *Bivens* claims against the United States are barred by sovereign immunity, absent an explicit waiver." *Lewal v. Ali*, 289 F. App'x 515, 516 (3d Cir. 2008) (*per curiam*); *see also* 🚩 *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Ynfante v. United States*, Civ. A. No. 13-767, 2015 WL 631055, at *5 (M.D. Pa. Feb. 12, 2015) ("[A] *Bivens* claim can only be asserted against individual officials."). Accordingly, the constitutional claims against the Defendants in their official capacities are in essence claims against the United States that must be dismissed on sovereign immunity grounds. *See Brooks v. Bledsoe*, 682 F. App'x 164, 169 (3d Cir. 2017) (*per curiam*) ("To the extent that Brooks is suing the BOP employees in their official capacities, his claim fails as actions against prison officials in their official capacities are considered actions against the United States, and *Bivens* claims against the United States are barred by sovereign immunity, absent an explicit waiver."); *Bell v. Rossott*, 227 F. Supp. 2d 315, 320 (M.D.

Pa. 2002) (dismissing claim against individual federal defendants sued in their official capacity because the claims are essentially made against the United States).

4     The Court notes that "[m]otions pursuant to 28 U.S.C. § 2255 are the presumptive means by which federal prisoners can challenge their convictions or sentences that are allegedly in violation of the Constitution," although § 2241 may be used when the remedy provided by § 2255 is "inadequate or ineffective." *Okereke v. United States*, 307 F.3d 117, 120 (3d Cir. 2002). In other words, a § 2255 motion is the proper way to challenge a federal conviction, rather than a *Bivens* action. *See Okoro v. Callaghan*, 324 F.3d 488, 490 (7th Cir. 2003) ("Okoro adhered steadfastly to his position that there were no drugs, that he was framed; in so arguing he was making a collateral attack on his conviction, and *Heck* holds that he may not do that in a civil suit, other than a suit under the habeas corpus statute or its federal-defendant equivalent, 28 U.S.C. § 2255."); *Beverly v. Reno*, 23 F.3d 158, 159 (7th Cir. 1994) (federal prisoner cannot circumvent § 2255 "by bringing an independent civil action"); *see generally Abbasi*, 137 S. Ct. at 1863 ("[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not."). The Court will not construe Hall's Complaint as such a motion because the sentencing Judge is in a better position to determine the validity of any challenges to his conviction. Furthermore, this Court does not possess the authority to revoke or alter an order issued by a federal judge in another federal proceeding. *See Smith v. Meyers*, 843 F. Supp. 2d 499, 505 (D. Del. 2012) ("The structure of the federal courts does not allow one judge of a district court to rule directly on the legality of another district judge's judicial acts or to deny another district judge his or her lawful jurisdiction.").

5     There are other reasons why Hall's claims fail. Notably, judges are entitled to absolute immunity from liability based on acts or omissions taken in their judicial capacity, so long as they do not act in the complete absence of all jurisdiction. *See Stump v. Sparkman*, 435 U.S. 349, 355-56 (1978). Similarly, prosecutors are entitled to absolute immunity from liability for acts that are "intimately associated with the judicial phase of the criminal process" such as "initiating a prosecution and ... presenting the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976); *see also See Van de Kamp v. Goldstein*, 555 U.S. 335, 348-49 (2009). However, the Court need not address these or other defects in Hall's Complaint as alternative reasons for dismissal. Moreover, to the extent the Complaint could be construed as raising claims based on the DEA's investigation consideration of which would not be barred by *Heck*, it is apparent from the face of the Complaint that those claims are time-barred because Hall knew or should have known of those violations more than two years before he filed the Complaint in the instant action.

---

**End of Document**                                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 44 of 162

Patterson v. Patterson, Not Reported in Fed. Supp. (2019)

2019 WL 1284346

Only the Westlaw citation is currently available.

United States District Court, W.D. New York.

John P. PATTERSON, Plaintiff,

v.

Joel M. PATTERSON, Sergeant, Five Points
Correctional Facility, Shari L. Kampnich, Correctional
Officer, Five Points Correctional, William S. Palmer,
Correctional Officer, Five Points Correctional Facility,
Matthew R. Piotrowski, Correctional Officer, Five Points
Correctional Facility, and Joanne L. Springer, Facility
Nurse, Five Points Correctional Facility, Defendants.

1:16-CV-00844 EAW
|
Signed 03/20/2019

**Attorneys and Law Firms**

John P. Patterson, Marcy, NY, pro se.

Joel J. Terragnoli, New York State Attorney General, Buffalo,
NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

**\*1** Plaintiff John P. Patterson ("Plaintiff"), proceeding *pro
se*, is an inmate currently housed at the Marcy Correctional
Facility ("Marcy"). Plaintiff brings the instant action pursuant
to ⚑ 42 U.S.C. § 1983 and New York Penal Law Article
130, alleging that defendants Joel M. Patterson ("Sergeant
Patterson"), Shari L. Kampnich ("Kampnich"), William S.
Palmer ("Palmer"), Matthew R. Piotrowski ("Piotrowski"),
and Joanne L. Springer ("Nurse Springer") (collectively
"Defendants") committed various violations of Plaintiff's
state and constitutional rights arising from an alleged assault
that occurred while he was housed at the Five Points
Correctional Facility ("Five Points"). (Dkt. 12).

Presently before the Court is Plaintiff's motion for a
preliminary injunction (Dkt. 21), and Defendants' partial
motion to dismiss (Dkt. 22). For the reasons that follow,

Plaintiff's motion for a preliminary injunction is denied, and
Defendants' partial motion to dismiss is granted.

**BACKGROUND**

**I. Factual History**

The following facts are taken from Plaintiff's Amended
Complaint (Dkt. 12), the operative complaint in the instant
action. As is required at this stage of the proceedings, the
Court has treated Plaintiff's allegations as true.

On November 22, 2013, Plaintiff was housed at Five Points, one
of three maximum security prisons in the state of New
York that has a residential mental health unit ("RMHU").
(*Id.* at ¶¶ 12-13). He was in his RMHU cell when a nurse
made her evening rounds with Officer Kimball to administer
medication. (*Id.* at ¶ 13). Officer Kimball asked Plaintiff
why he had his pants down when Plaintiff's pants were not
actually down. (*Id.*). The nurse said that Plaintiff's pants were
not down, and Plaintiff got into an argument with Officer
Kimball. (*Id.* at ¶ 14). Officer Kimball then threatened to take
Plaintiff across to the infirmary, an area with no cameras, so
that he could beat Plaintiff up. (*Id.*). In response, Plaintiff
became suicidal and swallowed the arms of his glasses. (*Id.*
at ¶ 15).

At approximately 7:00 p.m., Plaintiff was transported to the
Cayuga Medical Center in Ithaca, New York by Piotrowski
and Kampnich so he could get an endoscopy to remove the
glasses arms from his stomach. (*Id.* at ¶ 16). The procedure
could not be performed at that time, and Plaintiff returned
to Five Points, arriving at approximately 12:30 a.m. (*Id.*
at ¶¶ 17-18). Piotrowski escorted Plaintiff to the infirmary
while Kampnich returned the transport vehicle. (*Id.* at ¶ 19).
Palmer was at the infirmary's desk when Plaintiff checked
in, and Plaintiff was placed in the infirmary holding pen.
(*Id.*). Sergeant Patterson and Kampnich joined Piotrowski
and Palmer at the infirmary desk, and Kampnich referred to
Plaintiff as "the Penis Flasher." (*Id.* at ¶ 20). Nurse Springer
entered the infirmary and took Plaintiff's vital signs. (*Id.* at
¶ 21). Sergeant Patterson informed Plaintiff that until the
objects he swallowed were removed, he would have to spend
the night in a dry cell. [1] (*Id.* at ¶ 22).

**\*2** Palmer opened up the door to the dry cell, and Plaintiff
was told to step inside. (*Id.* at ¶ 23). Plaintiff had on handcuffs,
a waist chain, and leg restraints. (*Id.*). As Plaintiff stepped in,
Sergeant Patterson pushed him from behind, and Kampnich

tripped him. (*Id.*). Unable to catch himself because of his restraints, Plaintiff fell to the ground and struck his face. (*Id.* at ¶ 24). Palmer then kicked the left side of Plaintiff's face, fracturing Plaintiff's upper left molar. [2] (*Id.* at ¶ 25). Sergeant Patterson told Palmer "not the face" because Plaintiff had to return to the medical center in the morning. (*Id.* at ¶ 26). Then Sergeant Patterson, Palmer, Piotrowski, and Kampnich kicked and punched Plaintiff in the head, back, ribs, and legs, causing bruises and contusions on his legs, exacerbating a low-back injury, and busting his lip. (*Id.* at ¶¶ 27-28). Piotrowski grabbed Plaintiff by his shirt collar, causing him to pass out momentarily. (*Id.* at ¶ 29).

When Plaintiff came to, the corrections officers were forcing him to stand with his face shoved in the corner of the cell, getting blood from his lip onto the wall. (*Id.* at ¶ 30). Plaintiff was then ordered to kneel on the bed so his leg restraints could be removed, and afterwards he was told to stand. (*Id.* at ¶¶ 31-32). Kampnich and Palmer held Plaintiff on either side by his shirt, and one of them lifted his collar. (*Id.* at ¶ 33). Plaintiff jumped back, and he was punched on his head, back, and ribs before being thrown to the ground on his stomach with his pants around his thighs. (*Id.* at ¶¶ 33-34). Palmer held his upper body down, one or two of the other correctional officers held down his legs, and Kampnich said, "So you like showing your dick!" (*Id.* at ¶ 35). Plaintiff's underwear was pulled down further and either Sergeant Patterson, Kampnich, or Piotrowski pulled on Plaintiff's penis and then penetrated his anus with a small object. (*Id.*). Plaintiff tried to yell out, but Palmer covered his mouth to keep him from screaming. (*Id.*). One of the corrections officers choked Plaintiff by his shirt collar, causing him to pass out again. (*Id.* at ¶ 36).

When Plaintiff regained consciousness, Defendants were gone. (*Id.* at ¶ 37). Sergeant Brinkeroff banged on his door, and Plaintiff told him he needed to report a sexual assault and be looked at by Nurse Springer. (*Id.* at ¶ 38). Sergeant Brinkeroff said Nurse Springer would be there shortly. (*Id.*).

At approximately 12:45 a.m., Plaintiff was seen by Nurse Springer. He was stripped down to his boxers, and Nurse Springer looked him up and down and began to leave. (*Id.* at ¶ 40). Plaintiff told her he had been sexually assaulted and listed his injuries, but Nurse Springer just said "yeah, yeah," before walking out of the room. (*Id.*). She came back two minutes later and gave Plaintiff a wet paper towel to wipe the blood off his face and ignored Plaintiff when he asked if she had reported the sexual assault. (*Id.* at ¶ 42). In the medical report

about the appointment, Nurse Springer stated that Plaintiff had no visible injuries. (*Id.* at ¶ 48).

At 8:00 a.m. on November 23, 2013, Plaintiff returned to the Cayuga Medical Center for the endoscopy. (*Id.* at ¶ 43). He told the first nurse he saw that he had been sexually and physically assaulted at Five Points. (*Id.* at ¶ 44). His doctor notified the New York State Police and the Inspector General's Office about his claims, and while Plaintiff was waiting for his medical procedure, an Inspector General officer came to speak with him. (*Id.* at ¶¶ 46-47). At approximately 10:00 a.m., Plaintiff was given a sexual assault nurse exam ("S.A.N.E. exam"), where the nurse reported the following injuries: (1) three small rectal tears and a small amount of bleeding; (2) an abrasion on his lower lip; (3) a fracture on his left upper molar tooth; (4) a tender, red mid-back; (5) an abrasion on his right shin; and (6) a small abrasion on his lower leg. (*Id.* at ¶¶ 48-49). Plaintiff had the endoscopy to have the glasses arms removed from his stomach, and he returned to Five Points around 1:30 p.m. (*Id.* at ¶ 50).

**\*3** From November 22 to December 20, 2013, Plaintiff was held at Five Points under suicide watch and with a camera order. (*Id.* at ¶ 51). On December 20, 2013, he was sent to the Central New York Psychiatric Center where he stayed for three months, and then he was placed in the mental health behavioral unit at the Great Meadow Correctional Facility ("Great Meadow"). (*Id.*).

On February 20, 2014, Plaintiff filed a grievance regarding the November 23, 2013, incident. Around February or March 2014, after Plaintiff filed his grievance, Plaintiff was served with a misbehavior report alleging that he had assaulted Five Points staff. (*Id.* at ¶ 59). The report stated that Plaintiff initiated the altercation and included the medical report where Nurse Springer stated Plaintiff had no visible injuries. (*Id.* at ¶ 62). A disciplinary hearing was conducted, and the charges against Plaintiff were dismissed due to Kampnich's conflicting testimony. (*Id.* at ¶ 67). Plaintiff requested the hearing disposition and tape number, which he never received. (*Id.*). On March 27, 2016, Plaintiff submitted a request pursuant to New York's Freedom of Information Law ("FOIL request") for the papers related to the incident as well as the hearing disposition and tape number. (*Id.* at ¶ 69). On April 27, 2016, Plaintiff received a response that said there were "no such documents to give" to Plaintiff. (*Id.* at ¶ 71). Plaintiff contacted the Prisoners Legal Service of New York ("PLS"), and a PLS attorney called Great Meadow about the hearing and was told it was still pending. (*Id.* at ¶ 74).

**Patterson v. Patterson**, Not Reported in Fed. Supp. (2019)

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 46 of 162

Sometime between 2013 and 2016, Plaintiff was transferred to Attica Correctional Facility, and on November 28, 2016, he was transferred to Marcy. (Dkt. 6). On February 9, 2017, he was transferred to Great Meadow (Dkt. 9), and then back to Attica on July 19, 2017 (Dkt. 14). Sometime in 2018, Plaintiff was transferred to Five Points (Dkt. 21), and on October 29, 2018, he was transferred to the Central New York Psychiatric Center. (Dkt. 26). As of December 19, 2018, Plaintiff resides at Marcy. (Dkt. 28).

## II. <u>Procedural History</u>

Plaintiff filed the instant lawsuit on October 21, 2016. (Dkt. 1). On April 14, 2017, he was granted leave to proceed *in forma pauperis*, and the Court allowed his 🏳 § 1983 claims for excessive use of force, deliberate indifference, and conspiracy to proceed. (Dkt. 11). Plaintiff was also given the opportunity to amend his complaint so as to properly assert a retaliation claim based on his allegations that Defendants filed a false misbehavior report. (*Id.* at 12). On May 8, 2017, Plaintiff filed an Amended Complaint re-alleging the false misbehavior report claim, and also asserting claims for equal protection against Nurse Springer, retaliation against Nurse Springer, and violations of New York Penal Law. (Dkt. 12). On April 18, 2018, the Court dismissed Plaintiff's false misbehavior report claim and directed service of the Amended Complaint, original complaint, and the April 14, 2017, and April 18, 2018, Orders on Sergeant Patterson, Kampnich, Palmer, Piotrowski, and Nurse Springer. (Dkt. 18). [3]

**\*4**  On June 22, 2018, Plaintiff moved for a preliminary injunction. (Dkt. 21). On July 19, 2018, Defendants filed a partial motion to dismiss Plaintiffs claims for equal protection, violations of New York Penal Law, retaliation, conspiracy, injunctive relief, and against them in their official capacities. (Dkt. 22). No responses were filed to either motion. Palmer passed away on September 9, 2018. [4] (Dkt. 25).

## <u>DISCUSSION</u>

## I. <u>Motion for Preliminary Injunction</u>

After Plaintiff was transferred to Five Points sometime in 2018, he filed a motion for a preliminary injunction, asking to be moved from Five Points to a different correctional facility.

(Dkt. 21 at 5). Plaintiff was moved from Five Points to the Central New York Psychiatric Center on October 29, 2018 (Dkt. 26), and then to Marcy on December 19, 2018 (Dkt. 28). As Plaintiff is no longer housed at Five Points, Plaintiff's motion is denied as moot. *See, e.g., McPherson v. Coombe,* 992 F. Supp. 229, 232 (W.D.N.Y. 1997) (holding the transfer of the inmate to a different correctional facility rendered his preliminary injunction motion moot).

## II. <u>Motion to Dismiss</u>

### A. <u>Legal Standards</u>

#### 1. 12(b)(1) Motion to Dismiss

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that the court retains jurisdiction." 🏳 *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). "When considering a motion to dismiss for lack of subject matter jurisdiction or for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint." 🏳 *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir. 1998). "[T]he district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." 🏳 *Luckett v. Bure,* 290 F.3d 493, 496-97 (2d Cir. 2002). "Indeed, a challenge to the jurisdictional elements of a plaintiff's claim allows the Court to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Celestine v. ML Vernon Neighborhood Health Ctr.,* 289 F. Supp. 2d 392, 399 (S.D.N.Y. 2003), *aff'd,* 249 F. App'x 851 (2d Cir. 2007). "The court may consider affidavits and other materials beyond the pleadings but cannot rely on conclusory or hearsay statements contained in the affidavits." *Young v. United States,* No. 12-CV-2342 ARR SG, 2014 WL 1153911, at \*6 (E.D.N.Y. Mar. 20, 2014) (quotation omitted).

#### 2. 12(b)(6) Motion to Dismiss

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir. 2010). A court should consider

Case 5:22-cv-01261-BKS-ML    Document 5    Filed 03/27/23    Page 47 of 162

**Patterson v. Patterson, Not Reported in Fed. Supp. (2019)**

the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N. Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279 (2017). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ).

**\*5** "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

### B. Official Capacity Claims and Request for Injunctive Relief

Plaintiff alleges claims against Defendants in their official capacities and requests injunctive relief that he not be housed at Five Points at any time in the future. (Dkt 12 at 44). Defendants seek to dismiss Plaintiff's request for injunctive relief and his claims against them in their official capacities. (Dkt. 22-1 at 6-7, 18-21).

Under the Eleventh Amendment, states and their agencies are immune from suits brought by private parties in federal court, unless Congress "unequivocally expresses its intent" to abrogate that immunity and "acts pursuant to a valid exercise of power," or a state waives its immunity. *In re Charter Oak Assocs.*, 361 F.3d 760, 765 (2d Cir. 2004) (quotations and citation omitted). This jurisdictional bar applies "whether the relief sought is legal or equitable." *Papasan v. Allain*, 478 U.S. 265, 276 (1986). The protections of the Eleventh Amendment extend to state officials acting in their official capacity. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *see also Fulton v. Goord*, 591 F.3d 37, 45 (2d Cir. 2009); *K & A Radiologic Tech. Servs., Inc. v. Comm'r of Dep't of Health*, 189 F.3d 273, 278 (2d Cir. 1999). "This is so because ... a judgment against a public servant in his official capacity imposes liability on the entity that he represents[.]" *Graham*, 473 U.S. at 169 (quotations and citation omitted).

However, "a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment —for prospective, injunctive relief from violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007). When determining whether a claim "avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.' " *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alteration in original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment) ).

"Neither the Supreme Court nor the Second Circuit has directly addressed whether a violation that is not currently in progress may nevertheless be considered 'ongoing' where the possibility of a future violation exists." *Babyrev v. Lanotte*, No. 16 Civ. 5421 (ER), 2018 WL 388850, at \*4 (S.D.N.Y. Jan. 11, 2018). However, the other circuits that have examined this issue "have held that the challenged action need not literally 'be in progress' to defeat a claim of sovereign immunity; rather, 'where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied.' " *Doe v. Annucci*, No. 14 Civ. 2953(PAE), 2015 WL 4393012, at \*16 (S.D.N.Y. July 15, 2015) (quoting *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999) ); *see Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001) ("The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent."); *Vickery v. Jones*, 100 F.3d 1334, 1346 (7th Cir. 1996) ("[T]he *Young* exception permits relief against state officials only when there is an ongoing or threatened violation of federal law."); *Han v. U.S. Dep't of Justice*, 45 F.3d 333, 338 (9th Cir. 1995) (holding the Eleventh Amendment bars suits where "[t]here is no allegation that the

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 48 of 162

Patterson v. Patterson, Not Reported in Fed. Supp. (2019)

state defendants are likely to approve third party agreements in the future or that plaintiffs otherwise face a threat of harm from the state defendants' future actions").

**\*6** Plaintiff fails to allege an ongoing violation or threat of future enforcement of federal law that would entitle him to injunctive relief. Plaintiff requests that he not be transferred back to Five Points, alleging that if he is, Defendants will retaliate against him by assaulting him and tampering with his mail and food. (Dkt. 12 at 45). Such statements merely speculate as to possible future conduct by Defendants; Plaintiff does not allege that Defendants are currently engaging in unconstitutional behavior or that a policy could be enforced against Plaintiff in violation of his constitutional rights. *See Lee v. O'Harer*, No. 9:13-CV-1022, 2014 WL 7343997, at \*11 (N.D.N.Y. Dec. 23, 2014) (dismissing the plaintiffs request for injunctive relief because "[e]ven plaintiff's retaliation claim, if it were to proceed, does not allege anything other than speculative future conduct. There is no allegation of any ongoing policy that could be enjoined"); *see also Vega v. Semple*, No. 3:17-CV-107 (JBA), 2018 WL 4656236, at \*12 (D. Conn. Sept. 27, 2018) (allowing a claim for prospective injunctive relief to go forward because the plaintiffs' allegations "are not merely speculative" and state a continuous violation of law), *appeal filed*, No. 18-3176 (2d Cir. Oct. 24, 2018).[5]

The Court therefore finds Plaintiff's request for injunctive relief is insufficient to avoid the protections extended to state actors by the Eleventh Amendment, as are his claims against Defendants in their official capacities, and they are accordingly dismissed.

### C. Equal Protection Claim

Plaintiff alleges that Nurse Springer violated his equal protection rights. (Dkt. 12 at ¶ 83). For the reasons that follow, the Court finds the Amended Complaint fails to state an equal protection claim.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). "Plaintiffs in such cases generally allege that they have been arbitrarily classified as members of an identifiable group." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (quotation omitted). " 'Unless a classification trammels fundamental personal rights or

is drawn upon inherent suspect distinctions such as race, religion, or alienage,' the courts must presume that the distinctions made are constitutional as long as they are 'rationally related to a legitimate state interest.' " *Robles v. Dennison*, 745 F. Supp. 2d 244, 301 (W.D.N.Y. 2010) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976), *aff'd*, 449 F. App'x 51 (2d Cir. 2011) ).

However, "an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that [he] has been irrationally singled out as a so-called 'class of one.' " *Id.* "To state an equal protection claim based on a theory of selective enforcement, a plaintiff must plausibly allege ... that he was treated differently from other similarly situated individuals." *Lanning v. City of Glen Falls*, 908 F.3d 19, 29 (2d Cir. 2018). "He also must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to [any] legitimate penological interests.' " *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (alteration in original) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001) ).

**\*7** Plaintiff has failed to allege either that he was a member of a protected class or that he was treated differently from other similarly situated individuals. *See, e.g., Roman v. Donelli*, 347 F. App'x 662, 663 (2d Cir. 2009) (holding the prisoner's equal protection claim was properly dismissed because he "has not established that he is a member of a protected class, nor has he established an equal protection violation under a 'class of one' theory"); *Green v. Martin*, 224 F. Supp. 3d 154, 171 (D. Conn. 2016) (dismissing the prisoner's equal protection claim because he did not allege that he was a member of a protected class or that he was treated differently from a similarly situated inmate). Plaintiff alleges that Nurse Springer "neglecting to report my sexual assault complaint was an act of discrimination in violation of my equal protection [rights] under the United States Constitution." (Dkt. 12 at ¶ 83). Plaintiff's conclusory statements are not sufficient to state an equal protection claim. *See A'Gard v. Perez*, 919 F. Supp. 2d 394, 406 (S.D.N.Y. 2013) (holding the plaintiff failed to state a claim for denial of equal protection "because the Amended Complaint states no facts demonstrating that the plaintiff was treated differently from similarly situated inmates"); *Marrero v. Kirkpatrick*,

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 49 of 162

Patterson v. Patterson, Not Reported in Fed. Supp. (2019)

659 F. Supp. 2d 422, 424-25 (W.D.N.Y. 2009) (dismissing the prisoner's equal protection claim because he made the allegation "in conclusory fashion"). Accordingly, the Court grants Defendants' motion to dismiss as to this claim.

### D. New York Penal Law Claims

Plaintiff alleges that Defendants violated 🚩New York Penal Law §§ 130.20(1), 🚩130.25(1), 🚩130.55, and 🚩130.60. The Court dismisses these claims for the reasons that follow.

Under New York law, "[i]n the absence of an express private right of action, plaintiffs can seek civil relief in a plenary action based on a violation of the statute only if a legislative intent to create such a right of action is fairly implied in the statutory provisions and their legislative history." *Cruz v. TD Bank, N.A.*, 22 N.Y.3d 61, 70 (2013) (quotation omitted). Determining whether a private right of action exists depends on three factors: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme."

🚩*Sheehy v. Big Flats Cmty. Day, Inc.*, 73 N.Y.2d 629, 633 (1989). Defendants do not contest the first two factors, but rather whether a private right of action for these New York Penal Law sections would be consistent with the legislative scheme. (Dkt. 22-1 at 9-10); *see* 🚩*Sheehy*, 73 N.Y.2d at 634 ("[W]e must, most importantly, determine the consistency of [finding a private right] with the purposes underlying the legislative scheme." (internal alteration, quotation, and emphasis omitted) ).

Plaintiff does not have a private right to bring claims pursuant to 🚩New York Penal Law §§ 130.20(1), 🚩130.25(1), 🚩130.55, and 🚩130.60. New York courts decline "to recognize a private right of action in instances where the Legislature specifically considered and expressly provided for enforcement mechanisms in the statute itself." *Cruz*, 22 N.Y.3d at 71. Courts within this Circuit have accordingly held consistently that criminal charges under New York law "cannot be prosecuted by a private person." 🚩*Christian v. Town of Riga*, 649 F. Supp. 2d 84, 91 (W.D.N.Y. 2009); *see, e.g., Ong v. Park Manor (Middletown Park) Rehab. And Healthcare Ctr.*, 51 F. Supp. 3d 319, 348 n.19 (S.D.N.Y. 2014) (discussing that a provision of N.Y. Penal Law "cannot form the basis of a civil claim, nor can it form the basis of a

🚩§ 1983 or related claim given that those statutes apply only to violations of federal constitutional rights"); *Peterec v. Hilliard*, No. 12-CV-3944 (CS), 2013 WL 5178328, at *8 (S.D.N.Y. Sept. 16, 2013) ("[P]rivate citizens do not have a private cause of action for criminal violations." (quotation omitted) ); *Smith v. N.Y.C. Police Dep't*, No. 06 Civ. 15436(JSR)(KNF), 2010 WL 423039, at *5 (S.D.N.Y. Feb. 4, 2010) ("[A]n individual cannot bring a private cause of action for alleged criminal violations."), *report and recommendation adopted*, 2010 WL 2008839 (S.D.N.Y. May 17, 2010); *Moore v. N.Y.C. Dep't of Educ.*, No. 03 Civ.2034(LAP), 2004 WL 691523, at *5 (S.D.N.Y. Mar. 31, 2004) ("These claims [pursuant to N.Y. Penal Law] must be dismissed because plaintiff has set forth no authority to support his claim that a private right of action to enforce rights allegedly created by these provisions exists.").

**\*8** Moreover, the New York state legislature provided a civil cause of action for victims who have suffered from the acts defined under various sections of New York Penal Law Article 130. *See* 🚩Civil Practice Law and Rules ("CPLR") § 213-c ("[A] civil claim or cause of action to recover from a defendant ... for physical, psychological or other injury or condition suffered by a person as a result of acts by such defendant of rape in the first degree as defined in 🚩section 130.35 of the penal law, or criminal sexual act in the first degree as defined in 🚩section 130.50 of the penal law, or aggravated sexual abuse in the first degree as defined in 🚩section 130.70 of the penal law, or course of sexual conduct against a child in the first degree as defined in 🚩section 130.75 of the penal law may be brought within five years."). The legislature's designation of express provisions of Article 130 of New York Penal Law that may be pursued in a civil action indicates that the legislature did not intend for there to be a private right to pursue the remaining provisions, including those invoked by Plaintiff.

*See* 🚩*Sheehy*, 73 N.Y.2d at 636 ("Where the Legislature has not been completely silent but has instead made express provision for civil remedy, albeit a narrower remedy than the plaintiff might wish, the courts should ordinarily not attempt to fashion a different remedy ... at least where ... the two statutes address the same wrong."); *see also* 🚩*People ex rel. Spitzer v. Grasso*, 42 A.D.3d 126, 135, 836 N.Y.S.2d 40 (1st Dep't 2007) (applying *expressio unius* to disallow the state Attorney General from bringing causes of action against corporate officers "other than the [five] causes of

action the Legislature expressly authorized" in the statute). Additionally, the phrasing of the statute indicates that the New York Legislature only intended for the victims of defendants convicted of, or at least charged with, those crimes to be able to pursue civil claims under the statute's purview. *See* CPLR § 213-c ("[A] civil claim or cause of action to recover from a defendant ... for physical, psychological or other injury or condition suffered by a person as a result of acts by such defendant[.]").

Moreover, the state civil statutes that specifically reference the provisions invoked by Plaintiff either discuss legal consequences that stem from a conviction under those sections of the New York Penal Law or use them to articulate term definitions. *See, e.g.*, Dom. Rel. §§ 170, 200 (citing behaviors defined in N.Y. Penal § 130.20 as a cause for filing an action for separation or divorce); Veh. & Traff. § 509-cc (listing N.Y. Penal §§ 130.20, 130.25, and 130.55 as offenses that disqualify a person from being a school bus driver); Alco. Bev. Cont. § 53.1 (stating a conviction under N.Y. Penal §§ 130.55 or 130.60 may cause revocation of a license or permit issued pursuant to the Alcohol Beverage Control Law). Not one of these statutes indicates that the legislature intended for there to be a private right of action pursuant to New York Penal Law §§ 130.20(1), 130.25(1), 130.55, or 130.60.

The Court accordingly finds that a private right of action for Plaintiff's New York Penal Law claims would not be consistent with New York's legislative scheme, and grants Defendants' motion to dismiss them.

### E. Retaliation Claim

Plaintiff alleges that Nurse Springer violated his First Amendment rights after he told her that Sergeant Patterson, Kampnich, Piotrowski, and Palmer had assaulted him on November 23, 2013. (Dkt. 12 at ¶ 83). He claims she retaliated against his verbal report by ignoring his medical concerns related to the incident. (*Id.*). The Court grants Defendants' motion as to this claim for the following reasons.

To make out a § 1983 retaliation claim, an inmate must show the following: (1) he was engaged in constitutionally protected conduct; and (2) the prison officials conduct was taken in retaliation for the inmate's protected conduct.

*Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). A prisoner's claims of retaliation are examined with "skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). "Prisoner plaintiffs may rely on circumstantial evidence to prove their retaliation claims, such as temporal proximity of events, but in doing so, the plaintiff also must usually provide some non-conclusory evidence that raises an inference of retaliatory animus in order to proceed to trial." *Parks v. Blanchette*, 144 F. Supp. 3d 282, 331 (D. Conn. 2015) (quotation omitted).

"While courts in this Circuit have found that verbal complaints may be protected for the purposes of a First Amendment retaliation claim, the Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate." *Booker v. Griffin*, No. 16-CV-00072 (NSR), 2018 WL 1614346, at *17 (S.D.N.Y. Mar. 31, 2018). *Compare McIntosh v. United States*, No. 14-CV-7889 (KMK), 2016 WL 1274585, at *26 (S.D.N.Y. Mar. 31, 2016) ("[T]here is authority in the Second Circuit for the proposition that verbal complaints can be protected action for purposes of a First Amendment retaliation claim."), *with Allah-Kasiem v. Sidorowicz*, No. 09 Civ. 9665(DLC), 2012 WL 2312930, at *9 (S.D.N.Y. July 17, 2012) ("Having chosen not to use the grievance process provided by [DOCCS], [the plaintiff] cannot claim that his comments to [the defendant] are entitled to the same protection that adheres to properly filed grievances."). Additionally, the vast majority of cases that address whether a prisoner's verbal complaints may constitute protected speech do so in the context of prisoners complaining to corrections officers—the Court's research found only one case in this Circuit where instead a law librarian was implicated, *see White v. Westchester County*, No. 18-CV-730 (KMK), 2018 WL 6726555, at *1, *16 (S.D.N.Y. Dec. 21, 2018) ("Plaintiff has plausibly alleged that he was engaging in protected speech both when he approached [the defendant] to notarize his notice of claim against [the other defendants] and when he confronted [the defendant] about her harassment of him."), and none involving complaints made to medical staff. [6]

**\*9** "Qualified immunity insulates public officials from claims for damages where their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Defore v. Premore*, 86 F.3d 48, 50 (2d Cir. 1996) (quoting *Harlow v.*

**Patterson v. Patterson, Not Reported in Fed. Supp. (2019)**

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 51 of 162

*Fitzgerald,* 457 U.S. 800, 818 (1982) ). " 'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby,* 138 S. Ct. 577, 589 (2018). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Id.* "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* at 590.

Nurse Springer is entitled to qualified immunity as to Plaintiff's retaliation claim. Assuming the truth of Plaintiff's claims, Nurse Springer's alleged conduct occurred on November 23, 2013, and the law surrounding whether a prisoner's verbal complaints are protected speech was unsettled then, and is still unsettled as of the issuance of this Decision. *See Booker,* 2018 WL 1614346, at *17 (holding the defendants were entitled to qualified immunity at the pleadings stage as to the First Amendment retaliation claim "[b]ecause the law is not well-settled regarding whether an inmate's verbal complaint constitutes protected speech"); *Ford v. Martuscello,* No. 9:14-cv-01566 (DNH/DEP), 2016 WL 5322166, at *4 (N.D.N.Y. June 23, 2016) ("[T]he Second Circuit has yet to articulate a bright line rule regarding constitutionally protected oral speech by an inmate[.]"), *report and recommendation adopted,* 2016 WL 5256901 (N.D.N.Y. Sept. 22, 2016); *see also Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir. 1995) (granting qualified immunity where an officer allegedly retaliated against a prisoner for verbally defending another inmate because there was "no clearly established First Amendment right to approach and speak to" the officer).

Accordingly, the Court grants Defendants' motion as to Plaintiff's retaliation claim. [7]

### F. Conspiracy to Cover-Up Claim

Plaintiff alleges Defendants conspired to file a false a misbehavior report against him to cover up their unlawful use of force. The Court dismisses Plaintiff's conspiracy claim for the reasons that follow.

To state a conspiracy claim in violation of constitutional rights under § 1983, a plaintiff must allege: "(1) an agreement between two or more state actors or between

a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999).

The intracorporate conspiracy doctrine provides that "if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own ... officers[ ] and employees, each acting within the scope of his employment[,] there can be no actionable conspiracy." *O'Diah v. Neth,* No. 6:10-CV-6592(MAT), 2013 WL 6440610, at *4 (W.D.N.Y. Dec. 9, 2013) (quotation and citation omitted) (alterations in original). "[A]n exception to the doctrine applies when individual employees are pursuing personal interests wholly separate and apart from the entity[.]" *Anemone v. Metro. Transp. Auth.,* 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006).

**\*10** "While exact specifics are not required, 'the pleadings must present facts tending to show agreement and concerted action.' " *Graham v. Peters,* No. 13-CV-705JTC, 2013 WL 5924727, at *2 (W.D.N.Y. Oct 31, 2013) (quoting *Anilao v. Spota,* 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) ). Plaintiff is required to " 'make an effort to provide some details of time and place and the alleged effects of the conspiracy." In addition, a plaintiff must plead facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (quoting *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir. 1993) ).

Plaintiff has failed to allege that Defendants acted to inflict an unconstitutional injury on him. The Amended Complaint alleges that Defendants conspired to file a false misbehavior and medical report against Plaintiff regarding the events of November 23, 2013, to cover up their unlawful use of force on Plaintiff. (Dkt. 12 at ¶¶ 62-63). "[T]here is no constitutional right to be free from the cover-up of a past constitutional violation." *Lewis v. Havernack,* No. 9:12-CV-0031 (GLS/DEP), 2013 WL 1294606, at *12 (N.D.N.Y. Mar. 28, 2013), *report and recommendation adopted,* 2013 WL 1294592 (N.D.N.Y. Mar. 28, 2013); *see James v. Annucci,* No. 9:17-CV-0843 (GTS/DEP), 2018 WL 4565771, at *4 (N.D.N.Y. Sept. 24, 2018) ("General allegations that a party conspired to cover up a past constitutional violation are insufficient to establish liability under Section 1983."); *De Ponceau v. Bruner,* No. 9:09-CV-0605 (GTS/DEP), 2012 WL 1030415,

Patterson v. Patterson, Not Reported in Fed. Supp. (2019)

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 52 of 162

at *7 (N.D.N.Y. Feb. 21, 2012) ("A claim that a prison employee has taken steps to conceal evidence of a past constitutional violation which is not ongoing does not alone state a cognizable constitutional claim under 🚩 42 U.S.C. § 1983."), *report and recommendation adopted by* 2012 WL 1014821 (N.D.N.Y. Mar. 23, 2012). Rather, Plaintiff must allege that the conspiracy itself inflicted some sort of unconstitutional injury, such as a deprivation of due process rights. *See* 🚩 *Barrett v. United States*, 798 F.2d 565, 578 (2d Cir. 1986) (finding the existence of a constitutional deprivation when a cover-up resulted in a lower settlement figure).

The Court previously addressed how Defendants' alleged conduct impacted Plaintiff's due process rights in its April 14, 2018, and April 18, 2018, Orders in the context of Plaintiff's false misbehavior report claim. (Dkt. 11 at 11-12; Dkt. 18 at 2-3). "In general, a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." 🚩 *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015) (quotation omitted). There are two exceptions to this rule: "when an inmate is able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right." *Id.* (quotation omitted). The Court found Plaintiff has not alleged that he was disciplined because of the conspiracy or allegedly false misbehavior report (Dkt. 18 at 3)—in fact, he alleges that the charges brought against him were dismissed after a disciplinary hearing or are still pending (Dkt. 12 at ¶¶ 67, 74). As Plaintiff alleges that he was not disciplined, he has failed to allege, nor could he allege, that any agreement between Defendants resulted in a deprivation of his due process rights. *See* 🚩 *McCloud v. Prack*, 55 F. Supp. 3d 478, 483 (W.D.N.Y. 2014) (holding the plaintiff's allegations could not establish a constitutional deprivation because "the

misbehavior reports issued against plaintiff, arising out of the incidents in question, were dismissed").

**\*11** Plaintiff also alleges that Nurse Springer falsified her medical report as part of the cover-up. (Dkt. 12 at ¶ 62 ("Defendant Joann L. Springer, misrepresented the altercation of Nov. 23, 2013 by falsifying the medical report, which she wrote in conspiracy with [the other defendants], that Plaintiff (me) had no [visible] injuries[.]") ). A guard or nurse's failure to document an inmate's injuries is not a constitutional deprivation, and bare allegations that a medical report was used to cover up a conspiracy are not sufficient to state a conspiracy claim pursuant to 🚩 § 1983. *See Tavares v. N.Y.C. Heath and Hosps. Corp.*, No. 13-cv-3148 (PKC) (MHD), 2015 WL 158863, at *9 (S.D.N.Y. Jan. 13, 2015) (holding the plaintiff's allegations that medical staff tried to cover-up for the defendants in their medical report was not sufficient to state a conspiracy claim); 🚩 *Evans v. Murphy*, No. 12CV365, 2013 WL 2250709, at *3 (W.D.N.Y. May 22, 2013) ("[T]he plaintiff asserts that [a prison official] failed to document [the plaintiff's] injuries to cover-up the incident. Such a claim does not state a constitutional claim."). [8]

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's conspiracy claim.

## CONCLUSION

For the forgoing reasons, Plaintiff's motion for a preliminary injunction (Dkt. 21) is denied, and Defendants' partial motion to dismiss (Dkt. 22) is granted.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1284346

## Footnotes

| | |
|---|---|
| 1 | A dry cell is a cell with no sink or toilet; only a bedframe and mattress. (Dkt. 12 at ¶ 22). |
| 2 | The tooth was so severely damaged that it later had to be removed. (Dkt. 12 at ¶ 25). |

**Patterson v. Patterson**, Not Reported in Fed. Supp. (2019)

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 53 of 162

3    To the extent the Court's April 18, 2018, Order references Plaintiff's deliberate indifference claim as being dismissed (Dkt. 18 at 2), any such statement was in error. Only the false misbehavior report claim was dismissed, as stated in the decretal section of the Order. (*Id.* at 4). Plaintiff's deliberate indifference claim has not been dismissed and may proceed to discovery.

4    An order will issue under separate cover addressing the procedural implications raised by Defendants' filing of the suggestion of death of Palmer.

5    Although this argument was not raised by Defendants, another potential problem with Plaintiff's request for injunctive relief is that any Defendants named in the instant lawsuit do not appear to have the authority to decide where Plaintiff is housed, and therefore it is not certain that Plaintiff's injury could be redressed if he is granted the injunctive relief he seeks. *See* NY Correction Law § 72.2 ("The commissioner, or the superintendent or director of an institution in which an inmate is confined, may permit an inmate to be taken, under guard, to any place or for any purpose authorized by law[.]").

6    Liberally construing Plaintiff's allegations, as is required when a plaintiff proceeds *pro se*, Plaintiff could claim that Nurse Springer retaliated against him for telling Sergeant Brinkeroff that he needed to report a sexual assault. (Dkt. 12 at ¶ 38). However, the Court finds that even if that were Plaintiff's claim, Nurse Springer would still be entitled to qualified immunity for the reasons discussed below.

7    In its April 14, 2017, Order, the Court noted that while filing a grievance is a constitutionally protected activity for retaliation purposes, Plaintiff did "not allege that his filing of the grievance was the substantial or motivating factor behind the Misbehavior report." (Dkt. 11 at 11-12). The Court afforded Plaintiff leave to file an amended complaint to cure this defect (*id.* at 12), but Plaintiff's Amended Complaint failed to do so (Dkt. 12 at 23-31). Accordingly, the Court dismissed Plaintiff's false misbehavior report claims in its April 18, 2018, Order. (Dkt. 18 at 3).

8    Additionally, as discussed above, to the extent that Plaintiff alleges Nurse Springer engaged in retaliatory conduct by issuing a false medical report in response to his verbal complaint, she is entitled to qualified immunity. Moreover, Plaintiff has not alleged facts demonstrating "that [D]efendants entered into an agreement, express or tacit," to retaliate against him—his conspiracy claim instead centers around Defendants' alleged cover-up. *Warren*, 33 F. Supp. 2d at 177; *see supra* note 7.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1877704
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Victor WALTHOUR, Sr., Plaintiff,

v.

Judge Jon HERRON, Defendant.

Civil Action No. 10–01495.
|
May 6, 2010.

**Attorneys and Law Firms**

Victor Walthour, Sr., Garnet Valley, PA, pro se.

Geri Romanello St. Joseph, Administrative Office Of
Pennsylvania Courts, Philadelphia, PA, for Defendant.

***OPINION AND ORDER***

SLOMSKY, District Judge.

**\*1** This case was instituted by *pro se* Plaintiff, Victor
Walthour, Sr., on April 5, 2010. The Complaint (Doc.
No. 1) alleges that on March 24, 2010 Defendant, the
Honorable John W. Herron (improperly captioned as "Judge
Jon Herron"), signed a decree removing Plaintiff as the legal
guardian of Plaintiff's wife, Mrs. Rosalyn Walthour. (Compl.,
3.) The only further averments are that a person named
Sheila Gibson was also involved and that court reporters
witnessed this event. (*Id.*) The Complaint asserts federal
question jurisdiction under 18 U.S.C. §§ 241, 242,
245, 247, 371 and 1951, and 42 U.S.C. §§ 1983,
1985, 1986, and 3631. (*Id.* at 2.) The relief sought by
Plaintiff includes:

> Removal of decision making duties[.]
> Everything he has now and in the
> future [.] Everything his wife has now
> and in the future[.] Everything any
> offspring has now and in future[.]
> Everything his in-laws have now and

in future [.] Everything his parents
have now and in future[.]

(*Id.* at 3–4.)

Before the Court is a Motion to Dismiss (Doc. No. 3) and
supporting Memorandum of Law (Doc. No. 4) filed by
Judge Herron. Plaintiff filed a response in the form of a
Motion (Doc. No. 6) requesting that Judge Herron's Motion
to Dismiss be denied (hereinafter "Plaintiff's Response in
Opposition"). Plaintiff's Response in Opposition states in full:

> Now this day 16 April 2010 I ask that the motion to dismiss
> be denied.

> 1) Knowledge is power, I have the knowledge that a Judge
> cannot open and alter a settlement brokered by another
> Judge who ordered it sealed!

(Pl.'s Response in Opposition, 1.)

Attached to Plaintiff's Response in Opposition is a copy of a
March 24, 2010 Interim Order and Opinion from the Court
of Common Pleas of Philadelphia, Orphan's Court Division,
signed by Judge Herron (hereinafter "Exhibit A"). From this
Opinion, it is apparent that Plaintiff's wife is incapacitated
and is the beneficiary of a trust for her care and maintenance,
which is worth approximately $9,649,643. (*Id.* at Exhibit A,
1.)

On February 16, 2010, Judge Herron held a hearing regarding
the proposed spending plan under Mrs. Walthour's trust.
(*Id.*) After this hearing, Judge Herron Ordered that Plaintiff
be removed as co-guardian of his wife's estate because the
proposed spending plan was wasteful of Mrs. Walthour's
assets. (*Id.*) The proposed spending plan would have resulted
in a projected annual income deficit of approximately
$368,500. (*Id.*) The concluding paragraphs of Judge Herron's
Opinion state that:

> Victor Walthour, co-guardian, fails to appreciate the
> significant financial issues and in consideration of his
> testimony during the proceedings, this Court deems him
> unqualified to serve as co-guardian and orders that he cease
> to serve in this capacity.

> A further hearing shall take place on April 13, 2010 at
> 10:00 a.m. in Courtroom 416 City Hall at which time the
> remaining guardian Ms. Hobkirk shall appear and present

an alternative care plan for the Incapacitated Person [i.e., Rosalyn Walthour].

**\*2**  (*Id.* at Exhibit A, 2.)

For reasons stated below, the Court will grant Defendant's Motion and dismiss the Complaint in its entirety.

## I. MOTION TO DISMISS STANDARD

The motion to dismiss standard has undergone recent transformation, culminating with the Supreme Court's Opinion in *Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). After *Iqbal* it is clear that "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice" in defeating a motion to dismiss. *Id.* at 1949; *see also Bell Atlantic Corp. V. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Applying the principles of *Iqbal,* the Third Circuit in *Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir.2009), articulated a two part analysis that district courts in this Circuit must conduct in evaluating whether allegations in a complaint survive a motion to dismiss.

First, the factual and legal elements of a claim should be separated, meaning "a District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. Second, the Court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." *Id.* at 211. In other words, a complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. *Id.* (citing *Phillips v. County of Allegheny* 515 F.3d 224, 234–35 (3d Cir.2008)). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " *Iqbal,* 129 S.Ct. at 1950. This "plausibility" determination under step two of the analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

In this case, the allegations contained in Plaintiff's Complaint will be liberally construed, as pleadings filed by *pro se* plaintiffs are held to a less stringent standard than formal pleadings drafted by attorneys. *Erickson v. Pardus,* 551

U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *see also* Fed.R.Civ.P. 8(e) ("[p]leadings must be construed so as to do justice"). Plaintiff has not indicated whether he is suing Judge Herron in his official or personal capacity. Therefore, in deciding this Motion to Dismiss and construing Plaintiff's Complaint liberally, the Court will infer that Plaintiff intended to sue Judge Herron in both his official and personal capacity.

## II. DISCUSSION

### A. Failure to State a Claim Upon Which Relief May be Granted

**1. Claims Under Criminal Statutes:** 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951

A private individual may sue under a federal statute only when Congress intended to create a private right of action. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 284–85, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) ("where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit").

**\*3**  In this case, Plaintiff asserts a violation of his rights under the following federal criminal statutes: 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951. (Compl., 2.) These statutes do not provide a private right of action under which Plaintiff may sue. *See Powers v. Karen,* 786 F.Supp. 46, 51 (E.D.N.Y.1991) ("because [18 U.S.C. §§ ] 241 and 242 do not provide for a private right of action, plaintiff's reliance on them is misplaced"), *aff'd,* 963 F.2d 1522 (2d Cir.1992); *People ex rel. Snead v. Kirkland,* 462 F.Supp. 914, 920 (E.D.Pa.1978) ("[ 18 U.S.C. § 245] permits federal prosecution for interference with a long list of federally protected activities; it confers neither substantive rights nor a private right of action for damages"); *Vega v. Daniels,* No. 07–1193, 2009 WL 80434, \*10 (E.D.Cal. Jan.13, 2009) (noting that 18 U.S.C. § 247 does not provide a "basis for Plaintiff to pursue claims of violation of his constitutional rights"); *Rockefeller v. U.S. Court of Appeals Office for Tenth Circuit Judges,* 248 F.Supp.2d 17, 23 (D.D.C.2003) (finding that there is no private right of action under 18 U.S.C. § 371); *Peterson v. Philadelphia Stock Exchange,* 717 F.Supp. 332, 336 (E.D.Pa.1989) ("The Hobbs Act [ 18 U.S.C. §

1951] contains no language which suggests it can provide civil relief.")

It is clear that none of the criminal statues cited by Plaintiff provide him with a private right of action. Generally, crimes are prosecuted by the government not by private citizens. Therefore, Plaintiff's claims under 18 U.S.C. §§ 241, 242, 245, 247, 371 and 1951 will be dismissed for failure to state a claim upon which relief may be granted.

**2. Claims Under Civil Rights Statutes: 42 U.S.C. §§ 1983, 1985, 1986, and 3631**

*a. Claims Under 42 U.S.C. § 1983*

The civil rights statute 42 U.S.C. § 1983 provides in pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

Thus, in order to properly plead a Section 1983 claim, Plaintiff must allege (1) conduct by a person, (2) who acted under color of state law, (3) which caused a deprivation of a federally protected right. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

Although a state official, such as Judge Herron, is literally a "person," a suit for money damages against a state official

in his official capacity is, in reality, a claim against the state itself. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 64, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). A state is not a "person" within the meaning of Section 1983. *Id.* at 64. As the Supreme Court explained in *Will:*

> **\*4** Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.... Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity ...

*Id.* at 66. In other words, a claim against Judge Herron in his official capacity is simply a claim against the state, and a state cannot be sued under Section 1983 for money damages. [1]

Moreover, to adequately plead a § 1983 claim, Plaintiff must allege a deprivation of a federally protected right. Plaintiff has failed to do so. The primary factual allegation contained in the Complaint is that Judge Herron signed a decree removing Plaintiff as the guardian of his wife. This factual averment does not demonstrate a violation of any federally protected right by Judge Herron. Therefore, Plaintiff's Section 1983 claim must be dismissed for failure to state a claim upon which relief may be granted.

*b. Claims Under 42 U.S.C. § 1985*

Section 1985(3) allows an action to be brought by one harmed by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3); *Farber v. City of Patterson,* 440 F.3d 131, 134 (3d Cir.2006). To state a claim under Section 1985(3), Plaintiff must allege:

(1) a conspiracy; (2) for the purposes of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Farber,* 440 F.3d at 134 (quoting *United Bhd. of Carpenters & Joiners v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)).

This civil rights provision was not "intended to provide a federal remedy for 'all tortious, conspiratorial interferences with the rights of others,' or to be a 'general federal tort law.' " *Id.* at 135 (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 101–02, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Rather, Plaintiff must allege "some racial, *or perhaps otherwise class-based,* invidiously discriminatory animus behind the conspirators' action." *Id.* (quoting *Griffin,* 403 U.S. at 102) (emphasis in original). Thus, the conspiracy alleged must have been motivated by discriminatory animus against an identifiable class, and the discrimination must have been invidious. *Id.*

Plaintiff's Complaint is devoid of any allegations of any of the elements required to establish a Section 1985 claim. Therefore, Plaintiff's Section 1985 claim will be dismissed.

### c. Claims Under 42 U.S.C. § 1986

Section 1986 provides in relevant part:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to

be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented ...

**\*5** 42 U.S.C.A. § 1986.

Thus, to state a claim under Section 1986, Plaintiff must have stated a valid claim under 42 U.S.C. § 1985. *Bieros v. Nicola,* 839 F.Supp. 332, 336 (E.D.Pa.1993). As noted above, Plaintiff has failed to do so. Accordingly, Plaintiff's Section 1986 claim will be dismissed.

### d. Claims Under 42 U.S.C. § 3631

Section 3631 is a violations and penalties provision under the Fair Housing Act. It provides that penalties may be imposed against:

Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with—

(a) any person because of his race, color, religion, sex, handicap ..., familial status ..., or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling ...

42 U.S.C. § 3631.

Plaintiff's allegation that Judge Herron signed a decree removing Plaintiff as Mrs. Walthour's guardian fails to demonstrate any willful interference with Plaintiff's rights under the Fair Housing Act. Even construing the *pro se* Complaint liberally, the Court is unable to discern any relationship between Plaintiff's Fair Housing Act claim and the allegations in the Complaint. Therefore, Plaintiff's Section 3631 claim will be dismissed.

**B. Judicial Immunity**

Notwithstanding the fact that Plaintiff has failed to state any claims upon which relief may be granted, the Court also finds that Judge Herron is entitled to judicial immunity for all claims against him in his personal capacity. A judicial officer, in the performance of his duties as a judge, is absolutely immune from suit in his personal capacity and is not liable for his judicial acts. *Azbuko v. Royal,* 443 F.3d 302, 303 (3d Cir.2006) (*per curiam* ). A judge will not be deprived of his judicial immunity even if his actions were in error, or in excess of his authority, or were taken with malice. *Stump v. Sparkman,* 435 U.S. 349, 356–57, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Azbuko,* 443 F.3d at 303. "[O]nly when he has acted in the 'clear absence of all jurisdiction' " will a judge be subject to liability. *Stump,* 435 U.S. at 356–57.

The allegations in Plaintiff's Complaint involve actions that were clearly taken in the performance of Defendant's duties as a judge. There are no facts to suggest that Judge Herron's conduct relates to actions taken in the clear absence of all jurisdiction. Accordingly, Judge Herron is entitled to judicial immunity for all claims against him in his personal capacity.

**III. CONCLUSION**

For all of the aforementioned reasons, Plaintiff's Complaint will be dismissed in its entirety. An appropriate Order follows.

*ORDER*

AND NOW, this 6th day of May, 2010, upon consideration Plaintiff's Complaint (Doc. No. 1), Defendant's Motion to Dismiss and supporting Memorandum of Law (Doc. Nos. 3 and 4), and Plaintiff's response thereto (Doc. No. 6), it is ORDERED that Defendant's Motion to Dismiss is GRANTED, this case is DISMISSED, and all pending motions are DENIED AS MOOT.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1877704

**Footnotes**

1    After the 1996 amendments to Section 1983, it is clear that a judicial officer may be sued in his official capacity for injunctive relief (i.e., non-monetary damages), but only where a declaratory decree was violated or declaratory relief was unavailable. 42 U.S.C. § 1983; *Catanzaro v. Cottone,* 228 Fed. App'x 164, 167 (3d Cir.2007). This is a very narrow avenue for relief and Plaintiff has failed to adequately allege that a declaratory decree was violated or that declaratory relief was unavailable to him.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment
Vacated in Part by  Weiss v. David Benrimon Fine Art LLC,  2nd Cir.(N.Y.),
December 28, 2021

2020 WL 1974228
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Alejandro Domingo MALVAR EGERIQUE, Plaintiff,

v.

Ezra CHOWAIKI, David Benrimon Fine Art LLC,

Linda Benrimon, Piedmont Capital LLC, Avichai Rosen,

David Benrimon, and John Does 1-10, Defendants.

19 Civ. 3110 (KPF)
|
Signed 04/24/2020

**Attorneys and Law Firms**

Sidney N. Weiss, Sidney N. Weiss, Attorney at Law, New
York, NY, for Plaintiff.

Adam Michael Felsenstein, Tannenbaum Helpern Syracuse
& Hirschtritt LLP, New York, NY, for Defendant Ezra
Chowaiki.

Luke William Nikas, Maaren Alia Shah, Quinn Emanuel
Urquhart & Sullivan LLP, New York, NY, for Defendants
David Benrimon Fine Art LLC, Linda Benrimon, Piedmont
Capital LLC, Avichai Rosen, David Benrimon.

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

 **\*1**  Plaintiff Alejandro Domingo Malvar Egerique is
understandably upset. He was deprived of two valuable
artworks of which he was the rightful owner, and the person
responsible for that deprivation was ultimately convicted
of fraud charges in this District. Unsatisfied with the
results of the criminal prosecution and a related bankruptcy
proceeding, Plaintiff has decided to take matters into his
own hands, bringing a civil lawsuit under the Racketeer
Influenced and Corrupt Organizations Act ("RICO"), 18
U.S.C. §§ 1961–1968, against a wide swath of individuals
(collectively, "Defendants") he blames for his losses. In
relevant part, Plaintiff alleges that: (i) Ezra Chowaiki, the

convicted art dealer, used his art gallery to engage in a pattern
of fraudulently acquiring and selling artwork; (ii) David and
Linda Benrimon, through their art gallery David Benrimon
Fine Art LLC ("DBFA"), engaged in a pattern of selling
artwork that they had no legal right to sell; (iii) the Benrimons,
through DBFA, engaged in the unlawful collection of debt;
(iv) Avichai Rosen, through his enterprise, Piedmont Capital
LLC ("Piedmont"), also engaged in the unlawful collection
of debt; (v) Defendants conspired to facilitate each of the
previously mentioned RICO violations; and (vi) Defendants
committed analogous state-law claims of fraud, conversion,
and replevin.

Because of the sanctions and stigma attendant to them,
civil RICO claims are notoriously — and appropriately —
difficult to plead. Chowaiki has moved to dismiss the claims
against him, and the remaining Defendants, David and Linda
Benrimon, DBFA, Piedmont, and Rosen (collectively, the
"Benrimon Defendants"), have separately moved to dismiss
the claims against them. The Benrimon Defendants have
also moved for sanctions pursuant to Rule 11 of the Federal
Rules of Civil Procedure. For various reasons outlined herein,
Plaintiff has not pleaded viable RICO claims in this case.
Accordingly, Chowaiki's motion to dismiss is granted in part
and denied in part; the Benrimon Defendants' motion to
dismiss is granted in part and denied in part; and the Benrimon
Defendants' motion for Rule 11 sanctions is granted in part
and denied in part.

**BACKGROUND**

**A. Factual Background** [1]

**1. The Parties**
 **\*2**  Plaintiff is a citizen and resident of Spain, and the
owner of two works of art, *le Gueridon* by Pablo Picasso
(the "Picasso"), and *Composition avec Profil de Femme* by
Fernand Leger ("the Leger"). (Compl. ¶¶ 3, 4). Plaintiff
acquired both works of art at a sale at Sotheby's in London on
February 6, 2007. (*Id.* at ¶ 4). The Picasso was purchased as
Lot 0152, and the Leger was purchased as Lot 0235. (*Id.*).

Because Plaintiff alleges several RICO enterprises involving
different permutations of the defendants, a word about each
Defendant is in order. During the relevant time period, Ezra
Chowaiki was the Chief Executive Officer and one of the
owners of Chowaiki & Co. Fine Art Ltd. (the "Gallery"),
an art gallery in New York City. (Compl. ¶ 5). On or about

November 13, 2017, the Gallery filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. *See* *In re Chowaiki & Co. Fine Art Ltd.*, No. 17-13228 (MKV) (Bankr. S.D.N.Y. Nov. 13, 2017) (the "Bankruptcy Case"). Six months later, on May 3, 2018, Chowaiki pleaded guilty to a single count of wire fraud, in violation of 18 U.S.C. § 1343, in this District, relating to his theft of several pieces of artwork. *See* *United States v. Ezra Chowaiki*, No. 18 Cr. 323 (JSR) (the "Criminal Case"). As part of Chowaiki's plea and sentencing, Chowaiki agreed to forfeit to the United States 26 works of art that were the proceeds of his crimes. (*Id.*) The Picasso is one of the forfeited works. (*Id.*)

DBFA is an art gallery in New York City. (Compl. ¶ 6). David Benrimon is the Director and Chief Executive Officer of DBFA. (*Id.* at ¶ 7). Linda Benrimon is the Executive Director of DBFA. (*Id.* at ¶ 8). She is also the daughter of David Benrimon and the spouse of Avichai Rosen. (*Id.*) As Director and Executive Director of DBFA, respectively, David and Linda Benrimon buy and sell art for DBFA. (*Id.* at ¶ 19). Piedmont, of which Rosen is a principal, is a boutique investment manager specializing in strategic investments in alternative asset classes, including artwork. (*Id.* at ¶¶ 9-10).[2] As noted above, the Court refers to DBFA, David and Linda Benrimon, Avichai Rosen, and Piedmont as the "Benrimon Defendants."

**2. Plaintiff Consigns the Picasso and the Leger to Chowaiki and the Gallery**

Immediately after purchasing the Picasso and the Leger from Sotheby's in February 2007, Plaintiff installed them in his home in Spain, where they remained for eight years. (Compl. ¶ 34). On April 27, 2015, Plaintiff's brother, Benito Malvar, at Plaintiff's instruction and authority, and on Plaintiff's behalf, consigned the Picasso and the Leger to the Gallery. (*Id.* at ¶ 35). Plaintiff sent the two pieces of art to the Gallery that month (*id.* at ¶ 34), and they arrived in early June 2015 (*id.* at ¶ 36). After the consignments expired, Plaintiff — through his brother and through Chowaiki's agent — repeatedly demanded the return of the artwork. (*Id.* at ¶ 37). Chowaiki promised by telephone and email to return the artwork, but never did so. (*Id.* at ¶¶ 37, 105).

**\*3** Instead, Chowaiki converted the artwork for his own purposes. In January or February of 2017, Chowaiki, through the Gallery, sold and shipped the Leger from New York to

Glowside Investment Trading, the listed address of which was 115 George Street, 4th Floor, Edinburgh, Scotland, United Kingdom. (Compl. ¶ 106). Chowaiki received money from that sale that was never shared with Plaintiff. (*Id.*). More troublingly, Glowside Investment Trading does not exist, and no such entity maintains an office at the address given in Edinburgh or elsewhere. (*Id.* at ¶ 107). Further, as described below, Plaintiff alleges that Chowaiki also sold the Picasso without Plaintiff's knowledge or authorization.

**3. The Alleged Schemes**

Plaintiff's Complaint outlines several frauds or schemes that, he alleges, constitute predicate acts sufficient to support his RICO claims. To set the stage for its legal analysis, the Court describes those schemes in the remainder of this section.

**a. The Latamie Acts**

The first scheme concerns the sale of Andy Warhol artwork in which DBFA is alleged to have been involved. On February 2, 2012, DBFA — or Benrimon Contemporary LLC, a related art gallery — sold a painting and a set of ten Mao Zedong prints, all by Warhol, to Marc Latamie and DM Fountain, Inc. ("DM"), Latamie's corporate entity, for $1,750,000. (Compl. ¶ 24). The Warhol painting was delivered to Latamie and DM. (*Id.*). However, neither DBFA nor Benrimon Contemporary LLC delivered the complete set of ten Mao Zedong prints to Latamie or DM. (*Id.*).

Cribbing from a state-court complaint filed by Latamie and DM against Benrimon Contemporary LLC, DBFA, David Benrimon, and son Leon Benrimon, Plaintiff alleges that, in connection with the Warhol transaction, Latamie and DM negotiated with, *inter alia*, several members of the Benrimon family. (Compl. ¶ 25). David and Linda Benrimon, in particular, repeatedly promised Latamie and DM that they (the Benrimons) would deliver the Warhol prints to the purchasers, despite the fact that Benrimon Contemporary LLC never had ownership, custody, or control over these prints. (*Id.* at ¶ 26). Plaintiff also alleges that David and Linda Benrimon, through DBFA, sold and delivered to others the very same Warhol prints that they supposedly sold, but failed to deliver, to Latamie and DM. (*Id.* at ¶ 27).

**b. The Pledge Agreement Acts**

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 61 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

The second scheme alleged by Plaintiff involved David and Linda Benrimon, through DBFA, acquiring works from Chowaiki and the Gallery — works they knew Chowaiki and the Gallery did not own — at deeply discounted prices. In support of this claim, Plaintiff alleges the following facts:

On September 19, 2017, David and Linda Benrimon, on behalf of DBFA, agreed to acquire three works of art in a bulk transaction from the Gallery. (Compl. ¶ 45). These were the Picasso; Takashi Murakami's *Jellyfish Eyes* (🔖 *Black I*) (the "Murakami"), which belonged to Thomas Morgan; and Pablo Picasso's *Le Clown* ("*Le Clown*"), which belonged to Andrew and Kristen Neumann. (*Id.*). David and Linda Benrimon structured this transaction with Chowaiki so that Piedmont would "lend" Chowaiki and his Gallery money that, by design, would not be repaid, using the works of art as "collateral" for the "loan." (*Id.* at ¶ 44).

Plaintiff cites several emails between David Benrimon and Chowaiki confirming the loan transactions. (Compl. ¶ 47). He also cites the loan documents comprising the transaction, which include: (i) a "Note" for a loan of $300,000.00 from Piedmont to the Gallery, to be repaid in 30 days, together with $50,000.00 interest, for a total uncompounded annual interest rate of 202.18%; (ii) a "Pledge Agreement" in which Piedmont is given the Picasso, the Murakami, and *Le Clown* as security for repayment of the loan; (iii) a "Shtar Isko"[3] in which the $300,000.00 loan creates a 50%-50% partnership between Piedmont and Chowaiki; and (iv) a "Release and Settlement Agreement" in which the parties agreed that, in light of the Gallery's failure to repay the $300,000.00 loan plus $50,000.00 in interest when due on October 19, 2017, all title and ownership of the three artworks passed to Piedmont. (*Id.* at ¶ 48). Plaintiff alleges that while Piedmont was listed as the lender in the documents, the transactions were negotiated by David and Linda Benrimon, on behalf of, and from, DBFA, and that the $300,000.00 loan was listed on the books and records of the Gallery as being from David Benrimon. (*Id.* at ¶ 50).

**\*4** Significantly, Plaintiff claims that, at the time of the loan agreement, the Benrimon Defendants knew or should have known that: (i) Chowaiki had a court-documented history of selling and pledging artwork, particularly previously consigned artwork, that neither he nor his Gallery owned or had a right to sell or pledge; (ii) Chowaiki was in desperate financial straits, had no assets, and was likely insolvent; (iii) Chowaiki was selling or pledging artwork that he did not own and had no right to sell or pledge; (iv) Chowaiki

needed the $300,000 to pay off another loan, and by depleting his inventory by hypothecating or selling three works of art at steeply discounted prices, it would be impossible to pay back the loan at 202.18% interest within 30 days, or to remain in business; (v) Chowaiki would not and could not fulfill the terms of the Shtar Isko to buy and sell works of art with the $300,000 loan because the $300,000 loan was needed immediately to pay off another loan; (vi) there was a real likelihood that Chowaiki would be arrested for his fraudulent activity; (vii) Chowaiki was selling artwork in bulk at deeply discounted prices, thus giving a clear warning that those works were stolen; and (viii) the price for the three works of art was less than one-third of their true value. (*Id.* at ¶ 55). Further, Plaintiff claims that while the Benrimon Defendants and Chowaiki were structuring the loan for which the Picasso was posted as collateral, the Benrimon Defendants had in their possession a document titled "Provenance" that described the most recent ownership of the Picasso as "Sale Sotheby's London, 6 February 2007, lot 152 Private Collection (acquired at the above sale)." (*Id.* at ¶ 52).

On October 4, 2017, David and Linda Benrimon, on behalf of DBFA, picked up the Picasso from the Gallery. (Compl. ¶ 62). Thereafter, the Benrimons transported the Picasso (or caused it to be transported) to Europe. (*Id.* at ¶ 21). The Picasso has been transported several times — once from Italy to Switzerland in the spring or summer of 2018, a second time from Switzerland to London in the summer or fall of 2018, and a third time from London to Switzerland a few weeks thereafter. (*Id.* at ¶ 64). Further, from March 13 through May 25, 2018, the Picasso was exhibited at the Tega Gallery in Milan. (*Id.* at ¶ 67). Plaintiff alleges that David and Linda Benrimon continue to pay for the Picasso's storage and concealment abroad. (*Id.* at ¶ 72).

### c. The Court Filing Acts

Critical to the success of these schemes of deprivation, Plaintiff alleges, were schemes to create false paper trails. In this regard, Plaintiff alleges that, in order to conceal the true nature of the acquisition of the three works of art by the $300,000 loan, each of the Benrimon Defendants caused numerous "fraudulent" electronic filings to be made in the Bankruptcy Case and Criminal Case. (Compl. ¶ 73). In those filings, Piedmont asserts ownership of the Murakami and *Le Clown*, two of the works taken as security for the $300,000 loan. (*Id.*). Further, Piedmont's verified petition for

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 62 of 162

the Murakami and *Le Clown* in the Criminal Case omits the existence of the Shtar Isko, which shows that Chowaiki and Piedmont were actually 50-50% equal partners and not unrelated *bona fide* purchasers for value. (*Id.* at ¶ 76). Plaintiff alleges that these filings were "fraudulent" because they were intended to deceive other owners of the artwork, the creditors of Chowaiki's Gallery, the victims of Chowaiki's crimes, the Bankruptcy Case Trustee, the courts, and law enforcement officials into believing that David and Linda Benrimon and DBFA had nothing to do with these fraudulent transactions. (*Id.* at ¶ 74).

### d. The *Le Compotier* Acts

The fourth fraudulent scheme alleged in the Complaint concerns a transaction between the Benrimons and Chowaiki in which Plaintiff was not involved. In brief, David and Linda Benrimon acquired *Le Compotier* by Juan Gris from Chowaiki and the Gallery at some point before the summer of 2017. (Compl. ¶ 29). However, *Le Compotier* was owned by Eli Sakhai or his company, The Art Collection Inc., and Chowaiki and his Gallery had no right to sell it. (*Id.* at ¶ 30).

Plaintiff alleges that the Benrimons acquired *Le Compotier* with full knowledge of the fact that Chowaiki and his Gallery did not own it. (Compl. ¶ 29). As support, Plaintiff cites to a complaint filed by The Art Collection Inc. against David Benrimon and DBFA, in which Sakhai alleges that he "specifically told [defendant David Benrimon] that he [Sakhai] owned" *Le Compotier*, and that he (Sakhai) had consigned the work to the Gallery, but "had demanded that Chowaiki and Chowaiki & Co. return that painting to" Sakhai's corporation, and, further, that David Benrimon and DBFA should not pay either Chowaiki or his Gallery for the painting because neither Chowaiki nor his Gallery owned the painting or had the right to sell it to the Benrimons. (*Id.* at ¶ 31).

### e. The Fraud Allegations Specific to Chowaiki

**\*5**  Plaintiff's Complaint also contains certain allegations directed specifically towards Chowaiki and his Gallery. (*See* Compl. ¶¶ 95-111). Specifically, Plaintiff alleges that from its inception through at least July 20, 2009, Chowaiki conducted the Gallery's affairs through repeated acts of wire fraud in which he obtained customers' artworks by fraudulently telling them he would sell them on consignment, when in

fact he used those artworks as collateral for loans. (*Id.* at ¶ 96). Plaintiff alleges that, during this time, Chowaiki used $13 million worth of artwork as collateral, without his clients' knowledge or consent. (*Id.* at ¶ 97).

Plaintiff's only specific example of this type of fraud is the conduct defined earlier as the Pledge Agreement Acts. To substantiate the allegation that Chowaiki engaged in similar conduct repeatedly, Plaintiff relies exclusively on documents filed in the Criminal Case and Bankruptcy Case. Beginning with the former, Plaintiff cites the criminal complaint filed against Chowaiki, which alleges that Chowaiki, with others,

> through the use of e-mail messages, telephone calls, and electronic fund transfers, defrauded purchasers and sellers of fine art by deceiving them into sending funds or artwork to his gallery in New York, New York under the false pretenses that CHOWAIKI would either use the funds to purchase works of art, or that he could sell the artworks that had been provided to him when, in truth and fact, CHOWAIKI never made such purchases and sales.

(Compl. ¶ 99 (quoting Criminal Case, Dkt. #1)). Plaintiff also notes that Chowaiki pleaded guilty to Count One of the Indictment, which charges:

> From at least in or about 2015 through at least in or about 2017, in the Southern District of New York and elsewhere, EZRA CHOWAIKI, the defendant, willfully and knowingly, having devised a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit,

Case 5:22-cv-01261-BKS-ML Document 5 Filed 03/27/23 Page 63 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

CHOWAIKI, through the use of e-mail messages, telephone calls, and electronic fund transfers, defrauded purchasers and sellers of fine art by deceiving them into sending funds or artwork to his gallery in New York, New York under the false pretenses that CHOWAIKI would either use the funds to purchase works of art or that he would sell the artworks that had been provided to him.

(*Id.* at ¶ 100 (quoting Criminal Case, Dkt. #14)).

Ultimately, as part of Chowaiki's guilty plea and resulting conviction, Chowaiki admitted to the forfeiture of at least 26 works of art that he had stolen or otherwise fraudulently acquired (including the Picasso), worth over $16.6 million, and agreed to make restitution to his victims. (Compl. ¶ 101 (citing Criminal Case, Dkt. #16)). In the Criminal Case, the court adjudged Plaintiff's right to the Picasso to be superior to that of the Bankruptcy Case Trustee and the United States. (*Id.* at ¶ 102). Plaintiff alleges that no other party, including Piedmont, filed a petition with respect to the Picasso. (*Id.*).

Plaintiff also cites limited information from the Bankruptcy Case. Plaintiff notes that, in the Bankruptcy Case, there were 69 claims filed against the Gallery, totaling $56,249,794.49. (Compl. ¶ 103). Plaintiff alleges that almost all of those claims were made by claimants who had given Chowaiki money or art, only to have him convert the money or art for his own use. (*Id.*).

**B. Procedural Background**

**\*6** Plaintiff filed the Complaint on April 8, 2019. (Dkt. #1). On June 10, 2019, Defendants DBFA, David Benrimon, Linda Benrimon, Alex Benrimon, Lauren Benrimon, Piedmont, and Avichai Rosen filed a letter requesting a pre-motion conference for their proposed motion to dismiss under Rule 12(b)(6). (Dkt. #14). The same day, Chowaiki also filed a letter requesting a pre-motion conference for his proposed motion to dismiss. (Dkt. #17). Also on the same day, Plaintiff filed a letter in response to the two letters. (Dkt. #18). On June 11, 2019, the Benrimon Defendants filed a letter requesting a pre-motion conference before moving for sanctions pursuant to Fed. R. Civ. P. 11 against Plaintiff and his counsel. (Dkt.

#21). On June 14, 2019, Plaintiff filed a letter opposing the substance of the Benrimon Defendants' letter. (Dkt. #22).

The Court held a pre-motion conference on July 29, 2019, at which time the Court heard arguments from all parties on the Defendants' proposed motions and Plaintiff's proposed amended complaint. (Dkt. #27 ("July 29, 2019 Tr.")). On September 6, 2019, Plaintiff voluntarily dismissed Defendants Alex Benrimon and Lauren Benrimon from the action. (Dkt. #25). Plaintiff filed an amended complaint (the "Complaint") the same day. (Dkt. #26).

The Complaint alleges the following causes of action:

(i) a RICO claim against David and Linda Benrimon for engaging in pattern of racketeering activity through DBFA;

(ii) a RICO conspiracy claim against David and Linda Benrimon, Rosen, Chowaiki, and Piedmont for facilitating the RICO violations in Count I;

(iii) a RICO claim against Rosen for the collection of unlawful debt through Piedmont;

(iv) a RICO conspiracy claim against David and Linda Benrimon, DBFA, Rosen, and Chowaiki for facilitating the RICO violations in Count III;

(v) a RICO claim against David and Linda Benrimon for collection of unlawful debt through DBFA;

(vi) a RICO conspiracy claim against David and Linda Benrimon, Rosen, Chowaiki and Piedmont for facilitating the RICO violations in Count V;

(vii) a RICO claim against Chowaiki for a pattern of racketeering activity;

(viii) a RICO conspiracy claim against all of the Defendants for facilitating the RICO violations in Count VII;

(ix) a common-law fraud claim against Chowaiki and conspiracy to defraud claim against all the Benrimon Defendants;

(x) a conversion claim against all of the Defendants for Plaintiff's loss of the Picasso and a conspiracy to convert claim against all of the Defendants for Plaintiff's loss of the Leger; and

(xi) a replevin claim against all of the Defendants for Plaintiff's Leger.

(Compl. ¶¶ 112-53).

On October 18, 2019, Chowaiki filed his motion to dismiss. (Dkt. #29-31). The Benrimon Defendants filed their motion to dismiss on October 21, 2019. (Dkt. #32-34). The Benrimon Defendants filed their motion for sanctions the same day. (Dkt. #35-38). On November 18, 2019, Plaintiff filed a brief and declaration in opposition to both Chowaiki's and the Benrimon Defendants' motions to dismiss. (Dkt. #39-40). Plaintiff also filed a brief and declaration in opposition to the Benrimon Defendants' motion for sanctions. (Dkt. #41-42). Chowaiki filed his reply brief on December 6, 2019. (Dkt. #45). That same day, the Benrimon Defendants filed their replies in support of both their motion to dismiss and motion for sanctions. (Dkt. #46-48). On December 13, 2019, Plaintiff requested oral argument on the motions. (Dkt. #49). The Court has reviewed the motions and, for the reasons explained below, does not believe that oral argument would be useful.

## DISCUSSION

### A. Plaintiff Has Failed to Allege a Civil RICO Claim Against Any of the Defendants

#### 1. Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

A complaint survives a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

**\*7** The heightened pleading standard specified in *Twombly* "require[s] enough facts to nudge [the plaintiff's] claims across the line from conceivable to plausible." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). While a court should accept plaintiff's allegations from the complaint as true, it need not follow that course for any

of plaintiff's legal conclusions. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Legal conclusions that are stated to support "[t]hreadbare recitals of the elements of a cause of action ... do not suffice." *Id.* Therefore, a court is entitled to dismiss a complaint under Rule 12(b)(6) if the plaintiff merely offers "labels and conclusions or a formulaic recitation of the elements of a cause of action." *Am. Fed'n of State, Cty. & Mun. Emp. Dist. Council 37 Health & Sec. Plan v. Bristol-Myers Squibb Co.*, 948 F. Supp. 2d 338, 344 (S.D.N.Y. 2013) (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

In resolving a Rule 12(b)(6) motion, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (collecting cases). A court may also consider "matters as to which judicial notice may be taken, such as pleadings in other lawsuits and other public records[.]" *Rosado-Acha v. Red Bull Gmbh*, No. 15 Civ. 7620 (KPF), 2016 WL 3636672, at \*6 (S.D.N.Y. June 29, 2016) (quoting *Agron v. Douglas W. Dunham, Esq. & Assocs.*, No. 02 Civ. 10071 (LAP), 2004 WL 691682, at \*2 (S.D.N.Y. Mar. 31, 2004)) (internal quotation marks omitted); *see also Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)."); *see generally Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (discussing documents that may properly be considered in resolving a Rule 12(b)(6) motion).

More specifically, "[i]n the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice*." *Jianjun Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344, 350 n.6 (S.D.N.Y. 2012); *see also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of pleading in another lawsuit). The Court may take judicial notice of a document filed in another court to establish the fact of such litigation and related filings, but not for the truth of the matters asserted in the other litigation. *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (internal quotation marks and citation omitted); *accord In re Ridgemour Meyer Properties, LLC*, 599 B.R.

**Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)**

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 65 of 162

215, 220 (S.D.N.Y. 2019), *aff'd*, 791 F. App'x 279 (2d Cir. 2020) (summary order).

### 2. Pleading a Civil Action Under RICO

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1962(d) applies the same prohibitions to a defendant who conspires to violate subsection (c). Of particular significance here, RICO affords a private right of action to individuals who are harmed by racketeering activity. *See* 18 U.S.C. § 1964. This private right of action allows a plaintiff to bring a claim under RICO for sustaining injuries "in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). A plaintiff who proves injuries in his business or property may "recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" *Id.* A plaintiff bringing a civil RICO claim under Section 1962(c) must allege that: (i) the defendant has violated the substantive RICO statute; and (ii) the plaintiff was injured in his business or property "by reason of a violation of section 1962." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(c)); *accord Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). To make out a substantive RICO violation, in turn, a plaintiff must allege the (i) conduct (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

**\*8** To establish a RICO conspiracy under 18 U.S.C. § 1962(d), a plaintiff must allege "a conspiracy to commit a substantive RICO violation." *Spool*, 520 F.3d at 183. "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990). To make out a RICO conspiracy charge, under § 1962(d), a plaintiff must allege that the conspirator intended to further an endeavor that, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that the conspirator has adopted the goal of furthering or facilitating the criminal endeavor. *First Capital Asset Mgmt. Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) (quoting *Baisch v. Gallina*, 346 F.3d 366, 376-77 (2d Cir. 2003)). In the civil context, a plaintiff must allege that the defendant "knew about and agreed to facilitate the scheme." *Salinas v. United States*, 522 U.S. 52, 66, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *accord City of New York v. Bello*, 579 F. App'x 15, 17 (2d Cir. 2014) (summary order).

#### a. The RICO Enterprise Requirement

An "enterprise" within the meaning of the RICO statute includes any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise is proven by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

A RICO enterprise must be "an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. As the Second Circuit has "long recognized, the plain language and purpose of the statute contemplate that a person violates the statute by conducting an enterprise through a pattern of criminality. It thus follows that a corporate person cannot violate the statute by corrupting itself." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (citing *Bennett v. U.S. Tr. Co. of N.Y.*, 770 F.2d 308, 315 (2d Cir. 1985)). Rather, a plaintiff bringing a RICO claim must allege the existence of two distinct entities — a person and an enterprise. *See id.* (quoting *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 438 n.15 (2d Cir. 2008)).

#### b. The Pattern Requirement

A "pattern of racketeering activity" requires at least two acts of "racketeering activity" occurring within 10 years of each other. *See* 18 U.S.C. § 1961(5); *accord Spool*, 520 F.3d

Case 5:22-cv-01261-BKS-ML    Document 5    Filed 03/27/23    Page 66 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

at 183. The term "racketeering activity" refers to the predicate acts necessary to sustain a RICO claim and includes mail fraud and wire fraud. *See* 18 U.S.C. § 1961(1). In order to constitute a "pattern" of racketeering activity, the predicate acts must be [i] related and [ii] constitute a threat of continued racketeering activity." *H.J. Inc., et al. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238-44, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *accord United States v. Alkins*, 925 F.2d 541, 551 (2d Cir. 1991).

### i. Relatedness

Predicate crimes must be related both to each other ("horizontal relatedness") and to the enterprise as a whole ("vertical relatedness"). *See Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017) (citing *United States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012)). "Vertical relatedness, which entails the simpler analysis, requires only 'that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over the enterprise's affairs, or because the offense related to the activities of the enterprise.' " *Reich*, 858 F.3d at 61 (quoting *United States v. Burden*, 600 F.3d 204, 216 (2d Cir. 2010)).

*\*9* "[P]redicate acts are horizontally related when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Reich*, 858 F.3d at 61 (emphasis in original) (quoting *H.J.*, 492 U.S. at 240, 109 S.Ct. 2893). "When dealing with 'an enterprise whose business is racketeering activity, such as an organized crime family,' horizontal relatedness can be established simply by linking each act to the enterprise." *Id.* (quoting *United States v. Coppola*, 671 F.3d 220, 243 (2d Cir. 2012) (internal punctuation and citations omitted)). "When dealing with an enterprise that is primarily a legitimate business, however, courts must determine whether there is a relationship between the predicate crimes themselves; and that requires a look at, *inter alia*, whether the crimes share 'purposes, results, participants, victims, or methods of commission.' " *Id.* (quoting *H.J.*, 492 U.S. at 240, 109 S.Ct. 2893). "[T]he overall pattern requirement, of which relatedness is one component, is a bulwark against the application of RICO to the perpetrators of isolated or sporadic

criminal acts." *United States v. Daidone*, 471 F.3d 371, 376 (2d Cir. 2006).

### ii. Continuity

To satisfy continuity, the plaintiff must establish either "a series of related predicate acts extending over a substantial period of time" ("closed-ended continuity") or "a threat of continuing criminal activity" ("open-ended continuity"). *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999). "RICO targets conduct that 'amounts to or poses a threat of continued criminal activity.' " *Reich*, 858 F.3d at 60 (alterations omitted) (quoting *H.J.*, 492 U.S. at 239, 109 S.Ct. 2893). "Such continuity can be closed-ended or open-ended." *Id.* "Criminal activity that occurred over a long period of time in the past has closed-ended continuity, regardless of whether it may extend into the future." *Reich*, 858 F.3d at 60. "As such, closed-ended continuity is 'primarily a temporal concept' " *id.* (quoting *Spool*, 520 F.3d at 184), "and it requires that the predicate crimes extend 'over a substantial period of time' " *id.* (quoting *H.J.*, 492 U.S. at 242, 109 S.Ct. 2893). The Second Circuit "generally requires that the crimes extend over at least two years." *Id.* (citing *Spool*, 520 F.3d at 184 ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity[.]")).

"On the other hand, criminal activity 'that by its nature projects into the future with a threat of repetition' possesses open-ended continuity, and that can be established in several ways." *Reich*, 858 F.3d at 60 (quoting *H.J.*, 492 U.S. at 241, 109 S.Ct. 2893). When, for example, "the business of an enterprise is primarily unlawful, the continuity of the enterprise itself projects criminal activity into the future." *Id.* (citing *Spool*, 520 F.3d at 185). "And similarly, criminal activity is continuous when 'the predicate acts were the regular way of operating that business,' even if the business itself is primarily lawful." *Id.* (quoting *Cofacredit*, 187 F.3d at 243).

### c. The Racketeering Activity Requirement

Case 5:22-cv-01261-BKS-ML    Document 5    Filed 03/27/23    Page 67 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

"Racketeering activity" is defined in 🚩18 U.S.C. § 1961(1) to include a variety of offenses including, as relevant here, mail fraud under 🚩18 U.S.C. § 1341; wire fraud under 🚩18 U.S.C. § 1343; interstate transportation of stolen property under 🚩18 U.S.C. §§ 2314 and 🚩2315; and money laundering under 🚩18 U.S.C. §§ 1956 and 🚩1957. *See* 🚩18 U.S.C. § 1961(1).

### i. Mail and Wire Fraud

The "essential elements of [mail and wire fraud] are [i] a scheme to defraud, [ii] money or property as the object of the scheme, and [iii] use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam) (first alteration in original) (internal quotation mark omitted) (quoting 🚩*United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)). "Because the mail fraud and the wire fraud statutes use the same relevant language, [courts] analyze them the same way." *Id.* (internal quotation marks omitted) (quoting *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016)).

**\*10** "[T]he gravamen of the offense is the scheme to defraud." *Weaver*, 860 F.3d at 94 (alteration in original) (internal quotation marks omitted) (quoting *Greenberg*, 835 F.3d at 305). "In order to prove the existence of a scheme to defraud, [a party must prove both] 'that the misrepresentations were material' ... and that the defendant acted with fraudulent intent." *Id.* (quoting 🚩*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016)) (citing *Greenberg*, 835 F.3d at 305-06).

Claims for mail and wire fraud are subject to the heightened pleading standards of Rule 9(b), which requires that averments of fraud be stated with particularity. *See* 🚩*Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013). "To satisfy this requirement, a complaint must 'specify the time, place, speaker, and content of the alleged misrepresentations,' 'explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.' " 🚩*Id.* (quoting

🚩*Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001) (alteration in original) (internal quotation marks omitted));

*accord* 🚩*Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (holding that allegations of predicate wire fraud must "state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent."). This standard applies to all allegations of fraudulent predicate acts supporting a RICO claim. 🚩*First Capital*, 385 F.3d at 178-79.

### ii. Transportation and Receipt of Stolen Property

🚩Section 2314 prohibits, among other things, the interstate or foreign transportation of stolen goods valued at $5,000 or more. 🚩18 U.S.C. § 2314. The elements of such offense are: (i) the defendant transported property, as defined by the statute, in interstate or foreign commerce; (ii) the property was worth $5,000 or more; and (iii) the defendant knew the property was stolen, converted, or taken by fraud. 🚩*United States v. Wallach*, 935 F.2d 445, 466 (2d Cir. 1991). The definition of fraud in 🚩§ 2314 is generally the same as under the mail and wire fraud statutes. 🚩*Id.* Where allegations of interstate or foreign transport of stolen property allege that the property has been taken by fraud, the allegations must meet the heightened requirement of Rule 9(b). *See* 🚩*Kades v. Organic Inc.*, No. 00 Civ. 3671 (LTS) (RLE), 2003 WL 470331, at \*9 (S.D.N.Y. Feb. 24, 2003) (noting that allegations of transportation of stolen property, mail fraud, and wire fraud must be pleaded with particularity); ⚠*Philan Ins. Ltd. v. Hall*, 748 F. Supp. 190, 195 (S.D.N.Y. 1990) (dismissing a RICO claim based on transportation of stolen property, mail fraud, and wire fraud where plaintiffs did not plead each of the elements of these acts with sufficient particularity "to withstand a motion to dismiss under 🚩Rules 12(b)(6) and 9(b)").

🚩Section 2315 prohibits the knowing receipt, sale, concealment, possession, or disposition of stolen goods that have been transported interstate or abroad after being stolen, unlawfully converted, or taken. 🚩18 U.S.C. § 2315. To prove a violation of 🚩§ 2315, a plaintiff must establish that the goods received had been stolen, that the goods had a value

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 68 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

of at least $5,000, that the goods were "moving as," were "part of," or "constituted" interstate or foreign commerce, and that the defendant knew the goods had been stolen. *See United States v. Tashjian*, 660 F.2d 829, 839 (1st Cir. 1981), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981); *accord United States v. Kapeliounyj*, 547 F.3d 149, 153 (2d Cir. 2008).

### iii. Money Laundering

**\*11** To establish a violation of the money laundering statute, 18 U.S.C. § 1956, a plaintiff must first show "[i] that the defendant conducted a financial transaction; [ii] that the transaction in fact involved the proceeds of specified unlawful activity as defined in § 1956(c)(7); [and] [iii] that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity." *United States v. Maher*, 108 F.3d 1513, 1527-28 (2d Cir. 1997). The plaintiff must then make one of two additional showings: (a) that the defendant knew "the transaction was designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(B)(i); or (b) that the defendant conducted or attempted to conduct the transaction "with the intent to promote the carrying on of specified unlawful activity," *id.* § 1956(a)(1)(A)(i). A plaintiff need not allege money laundering with great particularity, but the plaintiff must plead all elements of the offense. *Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 322-23 (S.D.N.Y. 2014).

### d. The Domestic Injury Requirement

In addition to establishing the preceding elements, a plaintiff seeking to allege a civil RICO violation must also adequately plead a "domestic injury." *See RJR Nabisco, Inc. v. European Community*, —— U.S. ——, 136 S. Ct. 2090, 2111, 195 L.Ed.2d 476 (2016); *cf. City of Almaty, Kazakhstan v. Ablyazov*, 226 F. Supp. 3d 272, 281 (S.D.N.Y. 2016) ("*RJR Nabisco* makes clear that domestic injury to business or property is an independent requirement for bringing a private RICO action — separate and apart from the requirement of a substantive RICO violation that is either domestic

or permissibly extraterritorial[.]" (internal quotation marks omitted)), *motion to certify appeal denied*, No. 15 Civ. 5345 (AJN), 2017 WL 1424326 (S.D.N.Y. Apr. 20, 2017). After the Supreme Court's decision in *RJR Nabisco*, putative RICO violations are construed narrowly to adhere to the well-established presumption against extraterritoriality. *RJR Nabisco, Inc.*, 136 S. Ct. at 2108. This presumption holds that "federal laws will be construed to only have domestic application." *Id.* at 2100.

While establishing the requirement of "domestic injury" in *RJR Nabisco*, the Supreme Court left open the question of determining what constitutes a domestic injury, a question taken up by the Second Circuit in *Bascuñán v. Elasca*, 874 F.3d 806 (2d Cir. 2017). There, the Court stated explicitly that "a foreign resident may ... allege a civil RICO injury that is domestic." *Id.* at 814. The Court explained that, "[a]t a minimum, when a foreign plaintiff maintains tangible property in the United States, the misappropriation of that property constitutes a domestic injury." *Id.* The Court explained, however, that application of the domestic injury rule in any given context will, as a general matter, "depend on the particular facts alleged in each case" and "if a plaintiff alleges more than one injury, courts should separately analyze each injury to determine whether any of the injuries alleged are domestic." *Id.* at 818. The Court later "conclude[d] that an injury to tangible property is generally a domestic injury only if the property was physically located in the United States, and that a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one." *Id.* at 819. On the other hand, an "injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad." *Id.* at 820-21.

### B. Analysis

The Complaint in this case is both disjointed and replete with conclusory allegations. The Court has carefully reviewed Plaintiff's allegations to separate the wheat from the chaff and, in the remainder of this section, analyzes only those allegations that are well-pleaded.

**1. The Court Dismisses Plaintiff's Substantive RICO Claim Against David and Linda Benrimon (Count I) and Plaintiff's RICO Conspiracy Claim Against David and Linda Benrimon, Rosen, Piedmont, and Chowaiki (Count II)**

**\*12**  In his brief in opposition to the motions to dismiss, Plaintiff clarifies that his RICO claims against David and Linda Benrimon are as follows: the Benrimons managed and conducted the affairs of their gallery (and RICO enterprise) DBFA through a pattern of racketeering activity that included unlawfully or fraudulently selling artwork that they had no right to sell. (*See* Pl. Opp. 15-16). Plaintiff states that the predicate racketeering acts include the transportation and/or receipt of stolen property, money laundering, wire fraud, mail fraud, fraud in a bankruptcy proceeding, and fraudulent filings in this court. (*See id.* at 16).

Plaintiff argues that this racketeering activity began no later than February 2, 2012, when David and Linda Benrimon, or a company they controlled or owned, purported to sell an Andy Warhol painting and ten Warhol prints to Marc Latamie and DM for $1,750,000, and then, instead of delivering the prints, unlawfully sold (or attempted to sell) them through DBFA to others (*i.e.*, the Latamie Acts). (*See* Pl. Opp. 16). He claims that the racketeering activity continued when David and Linda Benrimon purchased *Le Compotier* by Juan Gris for DBFA with full knowledge that Chowaiki had no right to sell or dispose of that work, and that its owner had requested its return (*i.e.*, the *Le Compotier* Acts). (⌐ *Id.*). And Plaintiff claims the racketeering activity continued further when David and Linda Benrimon, in the conduct of DBFA's business, negotiated with Chowaiki and his Gallery to acquire additional works of art at a sizable (and, Plaintiff claims, telltale) discount. (⌐ *Id.*). They did so by structuring the $300,000 loan from Piedmont to Chowaiki secured by three artworks (the Picasso, the Murakami, and *Le Clown*) (*i.e.*, the Pledge Agreement Acts). (*Id.* at 16-17). Thereafter, David and Linda Benrimon took delivery of the Picasso at DBFA; deleted the Picasso's Provenance, which showed Plaintiff as the artwork's owner; and shipped the stolen Picasso to Milan, where they sold it for $441,000. (*Id.* at 17). Finally, Plaintiff alleges that David and Linda Benrimon's racketeering activity continued as they concealed their role in the loan transaction by having Piedmont make numerous false filings in the Bankruptcy and Criminal Cases (*i.e.*, the Court Filing Fraud). (⌐ *Id.*).

**a. Plaintiff Has Failed to Plead a "Pattern of Racketeering Activity"**

Even accepting Plaintiff's clarification, the Court concludes that the predicate acts here are far too disparate and inadequately pleaded to constitute a pattern of racketeering activity. To begin, the Latamie Acts are not horizontally related to the other predicate acts. "[P]redicate acts are horizontally related when they: have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Reich*, 858 F.3d at 61 (citation omitted). Plaintiff gestures at relatedness by asserting that the Latamie Acts had the "same purpose and function: to fraudulently sell and profit from other people's art-work and to conceal what was done." (Pl. Opp. 18). But Plaintiff fails to show, with the requisite specificity, just how the Latamie Acts relate to the other alleged predicate acts.

In point of fact, Plaintiff cannot make such a showing. The gravamen of the Latamie Acts is that a subset of the Defendants here (DBFA, David and Linda Benrimon) and "other members of the Benrimon family" (Leon Benrimon), along with Leon Benrimon's art gallery, Benrimon Contemporary LLC, failed to deliver artworks that either DBFA or Benrimon Contemporary LLC had sold to a *bona fide* purchaser. (*See* Compl. ¶¶ 24-27). [4]  The alleged fraudulent sale at the center of the Latamie Acts occurred at least five years before the alleged predicate acts in the other three groups. The Latamie Acts also had nothing to do with Plaintiff and were directed instead at other alleged victims. And, most notably, the Latamie Acts had no connection to Chowaiki or the Gallery, and no connection to Rosen or Piedmont. In sum, Plaintiff fails to connect the Latamie Acts to the remainder of the alleged pattern of racketeering activity.

**\*13**  Further, to the extent Plaintiff alleges that the Latamie Acts constitute wire fraud, in violation of ⌐ 18 U.S.C. § 1343 (*see* Compl. ¶ 26), he fails to meet the heightened pleading standards required by Rule 9(b). Plaintiff merely states that "[u]pon information and belief, and as further to be determined in discovery, during the [Latamie Acts] transaction, the purchasers of the Warhol, at all times negotiated with, *inter alia*, David and Linda Benrimon, and other members of the Benrimon family" (*id.* at ¶ 25); and that "David and Linda Benrimon, directly or at their instruction, by wire, telephone, and in person, continued to falsely, and

fraudulently, and repeatedly promise Mr. Latamie and DM, that they (the Benrimons) would deliver the Warhol prints to the purchasers" (*id.* at ¶ 26). Plaintiff's conclusory assertions fail to explain the "the time, place, speaker, and content of the alleged misrepresentations" *Cohen*, 711 F.3d at 359, and Plaintiff fails to explain the "information and belief" upon which his allegations are founded, *see Pilkington North Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 142-43 (S.D.N.Y. 2019). For these reasons as well, Plaintiff fails to plead the Latamie Acts as predicate RICO acts.

The Court next considers whether the Court Filing Acts constitute part of David and Linda Benrimon's alleged pattern of racketeering activity. At the outset, the parties dispute the antecedent issue of whether the Court Filing Acts could qualify as predicate acts for RICO purposes. The Benrimon Defendants cite *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018), in support of their argument that these acts cannot serve as predicate acts. In *Kim*, the plaintiff purported to allege various predicate acts of mail fraud, wire fraud, and obstruction of justice, allegedly committed by the defendants, citing declarations that were prepared, signed, and filed by defendants with full knowledge that they contained fraudulent representations intended to persuade the district court to find in their favor in a separate trademark and breach of contract dispute. *Id.* at 103.

The district court concluded that these litigation activities could not provide the basis for predicate acts under § 1962(c). 884 F.3d at 103-04. The Second Circuit agreed, reasoning as follows:

> Although we have not spoken directly on the issue, other courts have held that "[i]n the absence of corruption," such litigation activity "cannot act as a predicate offense for a civil-RICO claim." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016); *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1087-88 (11th Cir. 2004) (deciding that the "alleged conspiracy to extort money through the filing of malicious lawsuits" were not predicate acts of extortion or mail fraud under RICO); *Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003) (deciding that meritless litigation is not a predicate act of extortion under RICO); *Gabovitch*

> *v. Shear*, 70 F.3d 1252 (table), 1995 WL 697319, at *2, 1995 U.S. App. LEXIS 32856 (1st Cir. 1995) (per curiam) (concluding that "proffering false affidavits and testimony to [a] state court" does not constitute a predicate act of extortion or mail fraud); *see also Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 171-72 (E.D.N.Y. 2010) (collecting cases from district courts in the Second Circuit deciding "that the litigation activities alleged in [the complaint before the court] cannot properly form the basis for RICO predicate acts"). We agree with the reasoning of these opinions and conclude that allegations of frivolous, fraudulent, or baseless litigation activities — without more — cannot constitute a RICO predicate act.

*Id.* at 104 (alterations in original). The Benrimon Defendants argue that *Kim* forecloses Plaintiff from relying on the Court Filing Acts as predicate acts for their RICO claims.

Plaintiff responds that *Kim* is inapposite because, in that case, the Second Circuit explicitly distinguished a district court case relied on by the plaintiff, *Sykes v. Mel Harris and Associates, LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010), where "the district court denied the defendants' motion to dismiss the plaintiffs' section 1962(c) claims, observing that the plaintiff pleaded a pattern of racketeering activity that included at least twenty allegedly fraudulent statements and eighteen acts involving use of the mail or wires over three years, in furtherance of the alleged fraud." *Id.* at 105 (internal quotations omitted). To a degree, Plaintiff is correct: The *Kim* Court did distinguish *Sykes* by explaining that "even though the defendants [in *Sykes*] used litigation to carry out their scheme, they also engaged in a variety of other out-of-court actions to further this activity.... [while] in the case at bar, by contrast, the entire alleged scheme involved the creation of fraudulent court documents." *Id.* But the *Kim* Court "decline[d] to reach the issue of whether all RICO actions based on litigation activity are categorically meritless," and limited its holding to "conclude only that where ... a plaintiff alleges that a defendant engaged in a single frivolous, fraudulent, or baseless lawsuit, such litigation activity alone cannot constitute a viable RICO predicate act." *Id.* Accordingly, Plaintiff contends that because the Court Filing Acts are not the only RICO violation

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 71 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

alleged — and because "the pattern is the fraudulent selling, and profiting from other people's art-work, and concealing what was done" (Pl. Opp. 20) — the Court may consider the Court Filing Acts as predicate acts of wire and mail fraud (📁⚠️ *id.* & n.3).

**\*14** The Court need not resolve whether the Court Filing Acts could qualify as predicate RICO acts because, even if they could, they have not been properly pleaded here. The specific acts Plaintiff alleges in the Complaint are that David and Linda Benrimon caused numerous electronic filings to be made in the Bankruptcy Case and Criminal Case in which Piedmont asserted ownership of the Murakami and *Le Clown.* Plaintiff claims that those filings were fraudulent because: (i) they did not disclose the role or name of the real acquirers/purchasers, *i.e.*, David and Linda Benrimon and DBFA (Compl. ¶ 73); and (ii) Piedmont's petition in the Criminal Case did not disclose the existence of the Shtar Isko (*id.* at ¶ 76). Plaintiff further asserts that

> [t]he filings were each fraudulent and each was designed to deceive plaintiff, other owners of works of art, the creditors of Mr. Chowaiki's Gallery, the victims of Chowaiki's crimes, the Trustee in the Bankruptcy [C]ase, the courts, and law enforcement officials into believing that David and Linda Benrimon and David Benrimon Fine Art LLC had nothing to do with these fraudulent transactions[.]

(*Id.* at ¶ 74). In his brief in opposition to the motions to dismiss, Plaintiff adds that the "fraudulent filings conceal the fact that the $300,000.00 loan was not merely a loan, but was a device to conceal the fact that the Benrimon [D]efendants (and not Piedmont alone) knowingly were acquiring, at a steep discount, fraudulently obtained art belonging to other people and selling it for their own benefit and concealing what they were doing." (Pl. Opp. 20-21).

Despite the sweeping language, Plaintiff provides little in the way of support for his contention that these filings were indeed fraudulent. As it is permitted to do, the Court has reviewed the allegedly fraudulent filings incorporated by reference in the Complaint. The Bankruptcy Case filings

consist of (i) a proof of claim filed by Piedmont reciting Piedmont as the owner of the Murakami and *Le Clown* pursuant to the Release and Settlement Agreement between Piedmont and the Gallery (Bankruptcy Case, Claims 62, 63 (the "Piedmont Petition")), and (ii) a stipulation between the Bankruptcy Trustee and Piedmont, by which Piedmont agreed that " 'the Neumans [who Plaintiff contends are the lawful owners of *Le Clown*] would have right, title and interest in *Le Clown* ... and Piedmont further agreed to withdraw the Piedmont Petition' " (📁⚠️ *id.* at Dkt. #174 (the "Stipulation")). [5]

With respect to the Criminal Case, Plaintiff cites to Piedmont's petition in the district court asserting its interest as claimant in the Murakami and *Le Clown.* (Criminal Case, Dkt. #57). The remainder of Plaintiff's citations to the Criminal Case docket are to Piedmont's opposition to the Government's motion to dismiss its petition (*id.* at Dkt. #98); the oral argument held on the motion (*id.* at Dkt. #114 (transcript)); and Judge Rakoff's decision in that case, concluding, under New York property law and at the motion to dismiss stage, that Piedmont had acquired a legal interest in *Le Clown* as a *bona fide* purchaser for value (*id.* at Dkt. #119). A review of those documents reveals that Piedmont relied on the transaction documents — the pledge agreement documents and the later settlement agreement with the Gallery — to substantiate its interest in the relevant artwork. The Court cannot infer fraudulent intent on the part of Piedmont, let alone the remaining Benrimon Defendants, from Piedmont asserting an ownership interest in the artwork consistent with the loan transaction documents.

And despite Plaintiff's contention otherwise, the docket in the Criminal Case reveals that Piedmont *did* disclose the existence of the Shtar Isko. When Piedmont filed its petition for the Picasso in the Criminal Case, it included as an exhibit the Note between Piedmont and Chowaiki. (*See* Criminal Case, Dkt. #57). The Note explicitly states that the Gallery "shall pay, in accordance with Heter Iska, all outstanding principal to" to Piedmont. (*Id.* at Ex. A). Accordingly, Plaintiff's claim that the Benrimons defrauded the court by having Piedmont keep the existence of the Shtar Isko undisclosed, is belied by the public record in the Criminal Case of which the Court takes judicial notice. [6]

**\*15** Further, Plaintiff cites nothing to suggest that David and Linda Benrimon had any duty to disclose their involvement with the artwork. Given that Piedmont was the entity with the right to the artwork, it is far from clear that David and Linda

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 72 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

Benrimon would be obligated to disclose their affiliations with Piedmont. Since Plaintiff has failed to allege or show that David and Linda Benrimon had a duty to disclose anything to the bankruptcy and criminal courts, Plaintiff's claim for fraud fails. *See* ⚑ *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) ("[A]n omission can violate the fraud statute only in the context of a duty to disclose[.]"); ⚑ *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 296 (S.D.N.Y. 2000) ("In case of fraud resting on an alleged omission, plaintiff must allege facts giving rise to a duty to disclose."). Thus, Plaintiff has failed to plead the Court Filing Acts as predicate acts.

Having rejected two putative categories of racketeering acts, the Court is left to consider whether the *Le Compotier* Acts and the Pledge Agreement Acts constitute a pattern of racketeering activity. Put simply, these two sets of Acts do not a pattern of racketeering activity make.[7] Plaintiff has at best pleaded that on two instances, David and Linda Benrimon acquired artwork from either Chowaiki or the Gallery, knowing that neither Chowaiki nor the Gallery had the lawful ability to transfer it.

Plaintiff has demonstrated neither closed-ended nor open-ended continuity sufficient to satisfy the pattern requirement for racketeering activity. The *Le Compotier* Acts and the Pledge Agreement Acts are alleged to have occurred between "the summer of 2017" and May 2018. (Compl. ¶¶ 29, 67-68). But the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.' " ⚑ *Spool*, 520 F.3d at 184 (quoting ⚑ *Cofacredit*, 187 F.3d at 242); *see* ⚑ *Ramiro Aviles v. S & P Glob. Inc.*, 380 F. Supp. 3d 221, 269 (S.D.N.Y. 2019) (noting that "two years may be the *minimum* duration necessary to find closed-ended continuity" (quotation omitted)). Because the putative predicate acts spanned less than a year's time, they do not satisfy the requirements of closed-ended continuity.

Plaintiff has likewise failed to demonstrate open-ended continuity, because there is no allegation that David and Linda Benrimon's "regular way of operating" DBFA involved retaining artwork after being informed that the individual from whom they purchased the artwork had no right to sell it; obtaining artwork as collateral on fraudulent loans; or falsifying chain of ownership records. *See Reich*, 858 F.3d at 60 (noting that "false phone calls were not [defendant's] regular way of operating its business" (quotation omitted)).

To the contrary, Plaintiff's Complaint acknowledges that DBFA "operates as an art gallery" (Compl. ¶ 6), and that David and Linda Benrimon "are in the business of buying and selling art, either for their own accounts or the account of [DBFA]" (*id.* at ¶ 19).

Nor do the predicate acts "imply a threat of continued activity." *Reich*, 858 F.3d at 60. Predicate acts imply a continued threat only when the acts are "inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement." ⚑ *United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995). By contrast, "frauds in the sale of property," such as those alleged here, "are not inherently unlawful." ⚑ *Id.* These incidents are much better characterized as isolated and sporadic criminal acts, rather than a pattern of racketeering activity. *See* ⚑ *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989). For all of these reasons, Plaintiff's has not adequately pleaded that David and Linda Benrimon engaged in a pattern of racketeering activity.

### b. Plaintiff Has Failed to Plead That the Pledge Agreement Acts Constitute Wire Fraud or Transportation of Stolen Property

**\*16** To review, allegations sounding in fraud must be pleaded with particularity. *See* ⚑ *Cohen*, 711 F.3d at 359. As a separate reason to dismiss Plaintiff's RICO claim against the Benrimon Defendants, the Court concludes that Plaintiff has failed to plead, with the requisite particularity, that the Pledge Agreement Acts depict an instance of fraud.

In stating a claim for fraud, a "plaintiff[ ] must allege facts that give rise to a strong inference of fraudulent intent." ⚑ *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995); *accord* ⚑ *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). "The requisite 'strong inference' of fraud may be established either [i] by alleging facts to show that defendants had both motive and opportunity to commit fraud, or [ii] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." ⚑ *Acito*, 47 F.3d at 52 (quoting ⚑ *Shields v. CityTrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 73 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

Plaintiff attempts to show that the Benrimon Defendants acted with fraudulent intent because Piedmont loaned Chowaiki $300,000 for which Chowaiki pledged artwork that the Benrimon Defendants knew to be stolen. But Plaintiff has pleaded no facts supporting his oft-repeated contention that the Benrimon Defendants knew that the artwork pledged as collateral was stolen. He asks the Court to infer as much based on several alleged facts about Chowaiki and the Gallery. (*See* Compl. ¶ 55). These allegations consist of the following facts: (i) Chowaiki had a court-documented history of selling and pledging stolen artwork that he had no right to sell or pledge; (ii) Chowaiki was in desperate financial straits; (iii) Chowaiki was selling or pledging artwork he did not own; (iv) Chowaiki needed the $300,000 from the loan with Piedmont to pay off another loan; (v) Chowaiki would not and could not fulfill the terms of the Shtar Isko; (vi) there was a real likelihood that Chowaiki would be arrested for his fraudulent activity; (vii) Chowaiki was selling artwork at deeply discounted prices; and (viii) the price of the three artworks was less than one-third of their true value. (🚩 *Id.*). Plaintiff claims that, from these facts, the Benrimon Defendants "knew or should have known" that Chowaiki was pledging them stolen artwork. But for several reasons these allegations do not plausibly allege that the Benrimon Defendants knew that they were buying stolen artwork, let alone give rise to a strong inference of fraudulent intent.

🚩 *First*, if claim (i) should have indicated to the Benrimon Defendants that Chowaiki was committing fraud, it should have indicated the same to Plaintiff, who nevertheless chose to consign his artwork with Chowaiki. At the pre-motion conference in this case, Plaintiff's counsel sourced his allegation that Chowaiki had a "court-documented history" of selling and pledging stolen artwork to an unrelated civil litigation, 🚩 *Mosionzhnik v. Chowaiki*, 41 Misc. 3d 822, 972 N.Y.S.2d 841 (Sup. Ct. N.Y. Cty. 2013). (*See* July 29, 2019 Tr. 7:10-19). Of note, the decision in that case was issued on July 29, 2013, two years *before* Plaintiff consigned his artwork with Chowaiki. Plaintiff would have the Court infer that this state-court decision should have signaled to the Benrimon Defendants that Chowaiki was a crook. But it is entirely unclear to the Court why a decision in a case in which they were neither named nor involved would have put the Benrimon Defendants on notice of Chowaiki's activities. And to the extent that public access to this decision would or should have alerted the Benrimon Defendants to Chowaiki's perfidy, the same argument can be directed at Plaintiff. Relatedly, the Court rejects Plaintiff's claim (vi) that

the Benrimon Defendants are liable under RICO for failing to predict that, some time off in the future, Chowaiki would be arrested and charged with wire fraud.

**\*17** *Second*, Plaintiff does not elaborate on how the Benrimon Defendants would know claim (ii), that Chowaiki was in desperate financial straits. And Plaintiff's claim (iii), that Chowaiki was selling or pledging artwork he did not own, is a circular allegation when proffered for the purpose of showing that the Benrimon Defendants *knew* he was selling or pledging stolen artwork.

*Third*, Plaintiff's claims (iv) and (v) fail to give rise to an inference that the Benrimon Defendants knew that the pledged artwork was stolen. Again, Plaintiff fails to explain how the Benrimon Defendants obtained or should have obtained knowledge of Chowaiki's financial predicament. *Fourth*, claim (viii) does not help because the loan documents evidence that Chowaiki did not sell the pledged artwork to Piedmont; he used it as collateral for the loan. And Plaintiff has not adequately explained how or why the Benrimon Defendants would or should have known that Chowaiki was going to default on the loan. [8]

Plaintiff's strongest allegation is claim (vii), that Chowaiki was selling artwork at deeply discounted prices, giving clear warning that those works were stolen. But this still is insufficient to prove fraudulent intent. At the best, this allegation tends to show that the Benrimon Defendants should have been suspicious of Chowaiki. It certainly does not provide a "strong inference of fraud." 🚩 *Acito*, 47 F.3d at 52 (internal quotation marks omitted).

The pleading technique utilized by Plaintiff here is similar to that in 🚩 *Shields*, 25 F.3d at 1129 (2d Cir. 1994), where the Second Circuit rejected a plaintiff's attempt to "couple a factual statement with a conclusory allegation of fraudulent intent." This type of pleading does not suffice to meet the heightened pleading requirements of Rule 9(b), and Plaintiff therefore has not adequately pleaded the Pledge Agreement Acts as qualifying acts of wire fraud or of transportation or receipt of fraudulently obtained property. [9] The reality of the situation is that Chowaiki and the Benrimon Defendants were both participants in an elite, but opaque, fine art market. That Chowaiki and the Benrimon Defendants engaged in a transaction in which Chowaiki posted collateral that was stolen does not, in and of itself, give rise to the inference that the Benrimon Defendants were in on the fraud. On Plaintiff's

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 74 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

reasoning, any person who purchased artwork from Chowaiki or otherwise came to obtain artwork he had stolen would be subject to RICO liability.

#### c. Plaintiff Has Failed to Plead a Nexus

**\*18** A RICO violation requires a specific relationship between the enterprise and the pattern of racketeering. *D. Penguin Bros. Ltd. v. City Nat. Bank,* 587 F. App'x 663, 667 (2d Cir. 2014) (summary order). Under § 1962(c), the enterprise's affairs must be conducted "through" the pattern of racketeering. *Id.* In other words, a plaintiff must also plausibly allege "that a nexus exist[s] between the enterprise and the racketeering activity that is being conducted." *Id.* (alteration in original) (quoting *First Capital,* 385 F.3d at 174). Plaintiff has failed to plead the required nexus for a RICO claim.

Although the Complaint parrots the RICO statute by alleging that David and Linda Benrimon "control, conduct or participate, directly or indirectly, in the conduct of [DBFA]'s affairs through a pattern of Racketeering Activity" (Compl. ¶ 20), it is devoid of any allegations supporting that characterization. To establish the required "nexus," Plaintiff must show that the Benrimons "engaged in racketeering through [DBFA] or leveraged the [DBFA] corporate structure to perpetrate the fraud." *D. Penguin Bros,* 587 F. App'x at 667; *see also United States v. Thai,* 29 F.3d 785, 815 (2d Cir. 1994) (finding that predicate acts must be "related to the enterprise's activities" or defendant must have been "enabled to commit the offense solely by virtue of his position in the enterprise").

There is no allegation that the Benrimons used or leveraged DBFA to commit any of the alleged RICO predicates. The Complaint itself alleges that the Latamie Acts were accomplished, at least in part, through a separate entity, Benrimon Contemporary LLC (*see* Compl. ¶¶ 24-28), which was owned by David Benrimon's son, who is not a defendant in this case. And Plaintiff does not explain how the Benrimons used or leveraged DBFA to commit the *Le Compotier* Acts, other than by proffering conclusory assertions that (i) the Benrimons acquired the artwork "through their conduct of the affairs of [DBFA]," and (ii) they "knew or should have known," "based on their conduct of the affairs of DBFA," that Chowaiki had no authority to sell the painting. (*Id.* at ¶¶ 29, 32). This form of generic and group pleading

— which does not state what David and Linda Benrimon each did, much less how such conduct involved DBFA — cannot establish the required nexus. Finally, with respect to the Pledge Agreement Acts and the Court Filing Acts, the Complaint itself alleges that the relevant transactions and court filings were conducted through Piedmont, not DBFA. (*See id.* at ¶¶ 34-80). Accordingly, when the Court analyzes the Complaint to discern a nexus between the alleged pattern of racketeering activity and the alleged enterprise, Plaintiff's RICO claim falls apart.

#### d. Plaintiff Has Failed to Plead That Defendants Conspired to Participate in David and Linda Benrimon's Pattern of Racketeering Activity

Building on the foregoing analysis, the Court concludes that Count II of the Complaint must also be dismissed. In that count, Plaintiff alleges that the Benrimon Defendants and Chowaiki conspired to facilitate David and Linda Benrimon's racketeering activity in Count I. But beyond the allegations underlying the substantive RICO claim, Plaintiff has not pleaded any facts from which the Court could infer a conspiracy to commit a RICO violation. *See Hecht,* 897 F.2d at 25 (affirming dismissal of RICO conspiracy claim where complaint "d[id] not allege facts implying any agreement involving each of the defendants to commit at least two predicate acts"). And, as explained above, the allegations making out the substantive RICO claim are deficient. *See Johnson v. Nextel Commc'ns, Inc.,* 763 F. App'x 53, 56 (2d Cir. 2019) (summary order) (dismissing plaintiffs' RICO conspiracy claim for the same reasons that their substantive RICO claim was deficient). Accordingly, the Court dismisses Counts I and II of the Complaint.

#### 2. The Court Dismisses Plaintiff's RICO Claims Predicated on Unlawful Debt Collection (Counts III, IV, V, and VI)

**\*19** Plaintiff's Complaint also contains several RICO claims based on unlawful debt collection. In particular, Count III of the Complaint alleges that Avichai Rosen conducted or participated in the conduct of the Piedmont enterprise's affairs through the collection of unlawful debt. (Compl. ¶¶ 119-21). Count IV alleges that David and Linda Benrimon, DBFA, and Chowaiki conspired with Rosen to conduct or participate in the affairs of Piedmont through the collection of unlawful debt. (*Id.* at ¶¶ 122-25). Count V alleges that David and Linda

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 75 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

Benrimon conducted or participated in the conduct of the DBFA enterprise's affairs through the collection of unlawful debt. (*Id.* at ¶¶ 126-28). And Count VI alleges that David and Linda Benrimon, Chowaiki, Rosen, and Piedmont conspired with each other in the collection of unlawful debt through the affairs of DBFA. (*Id.* at ¶¶ 129-32).

🚩 Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through ... unlawful collection of debt." 🚩 18 U.S.C. § 1962(c). The statute defines "unlawful debt" to mean (as relevant here) debt "which was incurred in connection with ... the business of lending money ... at a rate usurious under State or Federal law." *Id.* § 1961(6).

"The inclusion of 'collection of unlawful debt' as a major predicate for RICO liability seems to have been an explicit recognition of the evils of loan sharking, and there is no indication that Congress was taking aim at legitimate banking institutions." 🚩 *Durante, Bros. & Sons, Inc. v. Flushing Nat'l Bank,* 755 F.2d 239, 250 (2d Cir. 1985). In consequence, the Second Circuit has interpreted the statute to make clear that a RICO claim for collection of unlawful debt does not encompass "occasional usurious transactions by one not in the business of loan sharking." 🚩 *Id.* (noting that "[t]he target of [RICO] is ... not sporadic activity"). Instead, to state a claim under RICO for unlawful debt collection, the plaintiff must allege that "each defendant was lending money or a thing of value at a rate usurious under State or Federal law" and that "each defendant was in the business of doing so." *United States v. Persico,* No. 10 Cr. 147, 2011 WL 2433728, at *2 E.D.N.Y. June 14, 2011) (internal quotation marks omitted).

Plaintiff comes nowhere close to meeting his burden to state a claim for unlawful debt collection practices by any of the Defendants. The Complaint describes but one instance (the $300,000 loan from Piedmont to the Gallery) in which Piedmont made a usurious loan. [10] The remainder of Plaintiff's allegations on this point are wholly (and impermissibly) conclusory. (*See, e.g.,* Compl. ¶ 85 ("Piedmont and Avichai Rosen's business is to lend money or a thing of value at a usurious rate. This business involves extensive activity over a substantial period of time and constitutes a substantial portion of the activities of both Piedmont and Avichai Rosen.")). Plaintiff does not point to a single other instance in which any of the Defendants made a

usurious loan, and there is nothing in the Complaint to support his conclusory assertion that any of the Defendants is in the business of making usurious loans.

Accordingly, as in 🚩 *Durante,* the Complaint here "gives no promise that [Plaintiff] will be able to establish that [any of the Defendants was] engaged in 'the business of' making usurious transactions." 🚩 755 F.2d at 250; *see also Weisel v. Pischel,* 197 F.R.D. 231, 241 (E.D.N.Y. 2000) (finding plaintiff had not established that defendant was in the business of making usurious transactions where "at no point in the complaint, or in any other document submitted to the court, do the plaintiffs describe other individuals or companies to whom [defendants] lent money or the usurious interest rates attached to any other loan by the defendants"); *Robidoux v. Conti,* 741 F. Supp. 1019, 1021-22 (D.R.I. 1990) (dismissing RICO claim for collection of unlawful debt where allegations involved just "two isolated incidents" in which defendant charged usurious rates). [11] And, because the Complaint does not provide any further allegations evidencing that Defendants "consciously agreed" to collect unlawful debts under 🚩 § 1962(c), *see* 🚩 *Black Radio Network, Inc. v. NYNEX Corp.,* 44 F. Supp. 2d 565, 581 (S.D.N.Y. 1999), the Complaint does not "set forth a conspiracy to commit such violations" under 🚩 § 1962(d), 🚩 *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir. 1996), *vacated on other grounds,* 🚩 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). Accordingly, Counts III, IV, V, and VI of the Complaint are dismissed.

### 3. The Court Dismisses Plaintiff's RICO Claims Against Chowaiki (Count VII) and His RICO Conspiracy Claim Against All Defendants (Count VIII)

**\*20** Count VII of the Complaint alleges a RICO claim against Chowaiki for engaging in a pattern of racketeering activity through the Gallery (Compl. ¶¶ 133-35), while Count VIII alleges that the remaining Defendants conspired with Chowaiki to facilitate his racketeering (*id.* at ¶¶ 136-40). According to Plaintiff, the pattern of racketeering activity consisted of numerous acts of wire fraud, transportation of stolen or fraudulently acquired property, money laundering, and various other acts. (*See* Pl. Opp. 13). A look at the substance of Plaintiff's allegations, however, makes clear that he has failed to state a RICO claim against Chowaiki.

With respect to Chowaiki, Plaintiff has pleaded only the following facts: (i) Chowaiki repeatedly promised to return the Picasso and the Leger to Plaintiff but never did; (ii) Plaintiff sold the Leger to another entity, while it belonged to Plaintiff; (iii) Chowaiki used the Picasso, and two other artworks that he did not own, as collateral for a loan. The remainder of Plaintiff's allegations against Chowaiki are conclusory. (*See* Compl. ¶ 96 ("Upon information and belief, from its inception, through at least July 20, 2009, Mr. Chowaiki, repeatedly conducted or participated, directly or indirectly, in the conduct of his Gallery's affairs by repeated acts of wire fraud in which he obtained his customers' art works by fraudulently telling them that he would sell them on consignment, whereas, he illegally used those artworks as collateral for loans, each such instance involving one act of wire fraud[.]"); *id.* at ¶ 100 (quoting wire fraud charging language against Chowaiki); *id.* at ¶¶ 29-30 (alleging that Chowaiki committed fraud by selling *Le Compotier* to the Benrimos despite not owning it, but failing to allege the time, place, speaker, and content of any misrepresentation)). Plaintiff seems to assume that because Chowaiki pleaded guilty to wire fraud, and because the Gallery filed for bankruptcy, it is obvious that Chowaiki can be held liable for RICO violations. While the docket in the Criminal Case undoubtedly contains factual material that could bolster Plaintiff's claims, he does not include any such information in his Complaint, nor does he adequately incorporate such material by reference. (*See, e.g.*, Compl. ¶¶ 98-99 (referring only to paragraphs 1 through 4 of the criminal complaint); *id.* at ¶ 101 (citing forfeiture order in the Criminal Case as evidence that Chowaiki stole the Picasso)).[12] Plaintiff's Complaint does not explain which artwork (other than his own and *Le Compotier*) was stolen, from whom Chowaiki stole any artwork, what misrepresentations he made to obtain such artwork, where it was transported, or how he disposed of such artwork. To the extent Plaintiff relies on predicate acts of wire or mail fraud or transportation of fraudulently obtained property, he must plead them with particularity, which he has failed to do.[13]

**\*21** Further, the acts that Plaintiff does allege with some level of specificity could have spanned, at most, from August 2016 (which is when the Picasso and Leger consignments ended and Chowaiki began promising he would return the paintings (*see* Compl. ¶ 105)), to December 2017, when Chowaiki was arrested (*see* Criminal Case, Dkt. #4). Because the acts occurred over the span of a little more than one year, they cannot demonstrate closed-ended continuity.

*See* Spool, 520 F.3d at 184 ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity[.]"). And Plaintiff has not alleged open-ended continuity because, among other things, Chowaiki was criminally charged and sentenced to 18 months' imprisonment in Federal Bureau of Prisons custody. (*See* Compl. ¶ 5; Criminal Case, Dkt. #76). For this reason, Plaintiff has not adequately pleaded a RICO claim against Chowaiki.[14]

Plaintiff has also failed to plead a claim against the Benrimon Defendants for conspiracy to facilitate Chowaiki's pattern of racketeering activity. As explained above, Plaintiff has not adequately pleaded that the Benrimon Defendants knew that the collateral Chowaiki pledged to Piedmont was obtained fraudulently. (*See supra* 39-42). The most Plaintiff alleges is that the Benrimon Defendants bought *Le Compotier* from Chowaiki despite knowing that Chowaiki had no authority to transfer the artwork to them. (*See* Compl. ¶¶ 32-33). This was just one act. The remainder of Plaintiff's allegations merely incant that the Benrimon Defendants "knew or should have known" about Chowaiki's alleged scheme, or that they "could and should have" done more to vet the provenance of Chowaiki's artworks. (*See, e.g.*, Compl. ¶ 43 ("each of the defendants knew or should have known that the works of art to be sold were in the Gallery's continued possession as a result of fraud"); *id.* at ¶ 53 (defendants "could and should have demanded proof of how Mr. Chowaiki and/or his Gallery came into possession of that work of art"); *id.* at ¶ 55 ("each of the defendants knew, or should have known, that ... Mr. Chowaiki was selling or pledging works of art he did not own and had no right to sell or pledge")). The Court does not credit these conclusory statements about a defendant's knowledge. *See Anonymous v. Simon*, No. 13 Civ. 2927 (RWS), 2014 WL 819122, at \*4 (S.D.N.Y. Mar. 3, 2014). In any event, allegations about what the Benrimon Defendants "should have known" do not "show specifically that [they] had any 'meeting of the minds' [with Chowaiki] in the alleged violations," an essential feature of the required agreement. 4 K & D Corp. v. Concierge Auctions, LLC, 2 F. Supp. 3d 525, 545 (S.D.N.Y. 2014); *Browning Ave. Realty Corp. v. Rosenshein*, 774 F. Supp. 129, 145 (S.D.N.Y. 1991) (no "meeting of the minds" or agreement can be inferred from allegations about what a defendant "knew or should have known").

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 77 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

As yet another pleading deficiency, the Complaint lacks sufficient allegations that the Benrimon Defendants actually agreed with Chowaiki and with each other to violate RICO's substantive provisions. Plaintiff asserts in vague and conclusory terms that Defendants "conspired" and "agreed" with each other. (*See, e.g.,* Compl. ¶¶ 14, 57, 61, 108, 111, 137). But all that the Complaint shows is that the Benrimon Defendants and Chowaiki did business together on two separate occasions. Such allegations are plainly insufficient to show a RICO conspiracy. *See Foster v. 2001 Real Estate,* No. 14 Civ. 9434 (RWS), 2015 WL 7587360, at *6 (S.D.N.Y. Nov. 24, 2015); *Ray Larsen Assocs., Inc. v. Nikko America, Inc.,* No. 89 Civ. 2809 (BSJ), 1996 WL 442799, at *9 (S.D.N.Y. Aug. 6, 1996) (finding that conclusory allegations that defendants "agreed and conspired" do not provide a "factual basis for a finding of conscious agreement among [defendants] to commit predicate acts"). Accordingly, Counts VII and VIII of the Complaint are dismissed.

### 4. The Court Dismisses Plaintiff's RICO Claims Based on a Failure to Allege Domestic Injury

**\*22** In addition to the defects outlined above, the Complaint also fails to plead domestic injury. In *Bascuñán,* the Second Circuit instructed that an "injury to tangible property is generally a domestic injury only if the property was physically located in the United States." 874 F.3d at 819. The Court again explained that "[w]here the injury is to tangible property ... absent some extraordinary circumstance, the injury is domestic if the plaintiff's property was located in the United States when it was stolen or harmed, even if the plaintiff himself resides abroad." *Id.* at 820-21; *see Elsevier Inc. v. Grossmann,* No. 12 Civ. 5121 (KPF), 2017 WL 5135992, at *4 (S.D.N.Y. Nov. 2, 2017). "The [*Bascuñán*] court stressed that the focus of the domestic injury analysis is on the location of the plaintiff's property when it is harmed, and not on the location of the defendant when the wrongful conduct was committed." *Martin Hilti Family Tr. v. Knoedler Gallery, LLC,* 386 F. Supp. 3d 319, 345 (S.D.N.Y. 2019). Following from *Bascuñán,* Plaintiff has alleged domestic injury if his property was located in the United States when it was stolen or harmed, despite the fact that Plaintiff is a foreign resident. *See id.* at 346-47. Conversely, to the extent Plaintiff's property was located abroad when it was stolen or harmed, he has not alleged a domestic injury. *See id.* at 347.

The facts of this case resemble those in *Martin Hilti*. In that case, the plaintiff learned about and received false information about a painting when he visited the defendant-gallery in New York. 386 F. Supp. 3d at 346. The painting was not available to be shown to the plaintiff, however, so the gallery delivered the painting to Liechtenstein, so that the plaintiff could view the painting before deciding whether to purchase it. *Id.* The plaintiff then decided to purchase the painting and transferred money from its bank account in Liechtenstein to the defendant's bank account in New York. *Id.* In *Martin Hilti,* the defendant argued that plaintiff was injured in Liechtenstein, when the funds constituting the purchase price for the painting were transferred from the plaintiff's Liechtenstein bank account to defendant's bank account in New York. *Id.* The district court agreed with the defendant, explaining that the plaintiff's "injury occurred where it relinquished control over its property ... [and] [b]ecause [the plaintiff] relinquished control over its money in Liechtenstein — when it authorized a transfer of funds from its Liechtenstein bank account to [defendant's] New York account — the [plaintiff's] injury was suffered in Liechtenstein." *Id.* at 347-48.

Plaintiff here argues that his artwork was located in New York when it was stolen. He explains that he sent the Picasso and the Leger to Chowaiki on consignment in June 2015, and that it was only after termination of the consignment, once the artwork was already in New York, that the artwork was, in essence, stolen from him. (Pl. Opp. 33 (citing Compl. ¶¶ 35-37)). In opposition, Defendants point to the Complaint's repeated allegations that Chowaiki's scheme was to lure clients to consign their art with him and then sell or otherwise use the artwork in a way in which he was not authorized to do. (*See, e.g.,* Compl. ¶ 96 ("Upon information and belief, from its inception, through at least July 20, 2009, Chowaiki repeatedly conducted or participated, directly or indirectly, in the conduct of his Gallery's affairs by repeated acts of wire fraud in which he obtained his customers' art works by fraudulently telling them that he would sell them on consignment, whereas, he illegally used those artworks as collateral for loans[.]"); *id.* at ¶ 99 (describing Chowaiki's illegal practice as "defraud[ing] purchasers and sellers of fine art by deceiving them into sending funds or artwork to his gallery in New York, New York, under false pretenses")). They also point to Plaintiff's counsel's statements at the pre-motion conference, at which time counsel represented that Plaintiff was injured as part of Chowaiki's scheme of stealing

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 78 of 162

**Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)**

"artwork from abroad on consignment and other ways." (July 29, 2019 Tr. 5:11-15). From these allegations, Defendants reason that the fraud resulting in the alleged theft of the Picasso and the Leger was actually committed at the time Chowaiki represented that he would sell Plaintiff's works on consignment and remit the funds to Plaintiff, with no intention of doing so. Thus, the argument proceeds, Plaintiff's injury occurred in Spain, when Plaintiff was falsely induced into parting with his artwork, and not in the United States, where Chowaiki was located.

**\*23** The Court agrees with the Defendants that Plaintiff has failed to allege a domestic injury. While Plaintiff claims that he began demanding his artwork back after the expiration of the consignment period (*see* Compl. ¶ 37), [15] he also repeatedly alleges that Chowaiki "obtained his customers' art works by fraudulently telling them that he would sell them on consignment" (*id.* at ¶ 96), and that the purpose of the scheme was to "defraud[ ] ... sellers of fine art by deceiving them into sending ... artwork to [Chowaiki's] gallery in New York, New York under ... false pretenses" (*id.* at ¶ 99). The Court cannot turn a blind eye to these allegations when considering when and where Plaintiff's injury occurred. Accepting Plaintiff's own allegations, his injury occurred in Spain, when he relinquished control over the Picasso and the Leger to Chowaiki. Accordingly, Plaintiff's failure to allege a domestic injury provides yet another ground for dismissing his RICO claims.

### C. The Court Dismisses Certain of Plaintiff's State-Law Claims

Having dismissed Plaintiff's RICO claims, the Court now turns to Plaintiff's state-law claims for fraud, conspiracy to defraud, conversion, conspiracy to convert, and replevin. For the reasons explained below, Plaintiff's claims against Chowaiki for fraud, conversion, and replevin survive with respect to both the Picasso and the Leger, and Plaintiff's claims against the Benrimon Defendants for conversion and replevin survive with respect to the Picasso. Plaintiff's remaining state-law claims are dismissed.

### 1. The Court Has Subject Matter Jurisdiction to Consider Plaintiff's State-Law Claims

Chowaiki argues that if the Court dismisses the RICO claims, which are indisputably the only federal claims in this action, it should decline to exercise supplemental (or pendent) jurisdiction over Plaintiff's state-law claims. (Chowaiki Br. 19-20). He argues that, to the extent Plaintiff's claims are

viable against Chowaiki, they should be heard in state court in New York, rather than in federal court, in the absence of a viable federal cause of action. (*Id.*).

What Chowaiki fails to recognize is that the Court has original jurisdiction over this case in the forms of both subject matter *and* diversity jurisdiction. (*See* Compl. ¶ 1). The Court has diversity jurisdiction over this case because Plaintiff is a citizen of a foreign state (Spain) and is not a permanent resident of the United States; Defendants are all citizens of the United States; and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a)(2). Accordingly, the Court can exercise diversity jurisdiction over the remaining state-law claims, without resorting to supplemental jurisdiction. For this reason, the Court will maintain jurisdiction over this matter, despite the dismissal of the RICO claims.

As it happens, Chowaiki moves to dismiss the state-law claims only on jurisdictional grounds. In other words, he does not attack the adequacy of the pleading of those claims. [16] For this reason, Chowaiki's motion is denied insofar as it seeks dismissal of the state-law claims against him. The Court addresses the adequacy of the pleadings of the state-law claims only with respect to the Benrimon Defendants, who have actually challenged the viability of those claims as pleaded.

### 2. Plaintiff Has Not Adequately Pleaded Claims for Common-Law Fraud and Conspiracy to Defraud Against the Benrimon Defendants

**\*24** To state a claim for fraud under New York law, a plaintiff must allege that (i) the defendant made a misrepresentation or material omission of fact, (ii) that was false and known to be false by the defendant, (iii) made for the purpose of inducing the plaintiff to rely upon it, (iv) the plaintiff's justifiable reliance on the misrepresentation or material omission, and (v) injury. *Pasternack v. Laboratory Corp. of America Holdings,* 27 N.Y.3d 817, 827, 59 N.E.3d 485 (2016); *see In re Fyre Festival Litig.,* 399 F. Supp. 3d 203, 212-13 (S.D.N.Y. 2019).* As noted above, claims for fraud, even under state law, must also satisfy the heightened pleading requirements of Rule 9(b). *See Premium Mortg. Corp. v. Equifax, Inc.,* 583 F.3d 103, 108 (2d Cir. 2009). To review, Rule 9(b) requires a plaintiff to specify the fraudulent statements, identify the speaker, state when and where the statements were made,

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 79 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

and explain why the statements were fraudulent. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004). To plead a viable claim for conspiracy to commit fraud under New York law, in addition to pleading the underlying fraud, the plaintiff must allege the following with the required specificity as to each defendant: "[i] an agreement among two or more parties, [ii] a common objective, [iii] acts in furtherance of the objective, and [iv] knowledge." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 259 (S.D.N.Y. 2005).

As the Benrimon Defendants note (*see* Benrimon Br. 21 n.8), Plaintiff's fraud claim appears to allege only that the Benrimon Defendants conspired in Chowaiki's commission of fraud — that is, Plaintiff does not appear to allege a direct claim of fraud against the Benrimon Defendants. (*See* Compl. ¶¶ 141-44). However, the Complaint repeatedly states that the Benrimon Defendants "defrauded" Plaintiff. (*See, e.g., id.* at ¶¶ 21, 59, 63). For this reason, and for the avoidance of doubt, the Court considers both species of fraud claims.

Ultimately, the Court concludes that Plaintiff has not satisfied the pleading requirements with respect to either type of claim against the Benrimon Defendants. The Court dismisses the conspiracy to defraud claim because Plaintiff has failed to allege "a corrupt agreement" and "membership in the conspiracy by each defendant." *Cofacredit*, 187 F.3d at 240. Plaintiff repeatedly protests that the Benrimon Defendants "knew or should have known" about Chowaiki's scheme. (*See, e.g.*, Compl. ¶¶ 40, 43, 46, 54, 57, 60, 61, 86). However, his claim is supported only by conclusory allegations, which are insufficient to establish that the Benrimon Defendants had a "meeting of the minds" with Chowaiki. *See Browning Ave. Realty Corp.*, 774 F. Supp. at 145 (concluding that allegation that defendant "knew or should have known" of another defendant's fraud was insufficient to show that defendant entered into a conspiracy with the other defendant); *see also Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 630 (S.D.N.Y. 2004) ("[M]ere allegations that defendants knew one another, or had prior relationships unrelated to the wrongful acts alleged in the Complaint, are insufficient, standing alone, to set forth a conspiracy claim."). For this reason, Plaintiff's claim that the Benrimon Defendants conspired with Chowaiki to defraud him of the Picasso is dismissed.

To the extent Plaintiff attempts to assert a fraud claim directly against the Benrimon Defendants, that claim is also dismissed. Plaintiff has not alleged a single misstatement or omission that any of the Benrimon Defendants made to Plaintiff. Indeed, aside from alleging that Plaintiff demanded the return of the Leger from the Benrimon Defendants, Plaintiff has not alleged that the Benrimon Defendants had any communication with Plaintiff. Plaintiff vaguely asserts that the Benrimon Defendants intended for Plaintiff to rely on the documents evidencing the $300,000 loan. (*See* Compl. ¶ 59). However, Plaintiff does not allege that the Benrimon Defendants ever provided these documents to him, nor does he allege that (or even how) he reasonably could have relied on them. Accordingly, Plaintiff's fraud claim against the Benrimon Defendants is dismissed.

### 3. Plaintiff Has Adequately Pleaded a Conversion Claim Against the Benrimon Defendants as to the Picasso

**\*25**  By contrast, Plaintiff's non-fraud-based state-law claims survive. Under New York law, to plead a claim of conversion, a plaintiff must establish that "[i] the property subject to conversion is a specific identifiable thing; [ii] plaintiff had ownership, possession[,] or control over the property before its conversion; and [iii] defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Murray Eng'g P.C. v. Remke*, No. 17 Civ. 6267 (KPF), 2018 WL 3773991, at \*13 (S.D.N.Y. Aug. 9, 2018). "The tort of conversion does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another." *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (quotation omitted). Further, New York distinguishes claims that the defendant wrongfully detained — in contrast to having wrongfully taken — the property in question. *Newbro v. Freed*, 409 F. Supp. 2d 386, 394 (S.D.N.Y. 2006). For claims of wrongful detention, where the possession is originally lawful, a conversion does not occur until the owner makes a demand for return of the property and the person in possession of the property refuses to return it. *See Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 414 (S.D.N.Y. 2007).

Plaintiff alleges that the Benrimon Defendants converted the Picasso, and that they conspired with Chowaiki to convert the Leger. (*See* Compl. ¶¶ 145-49). Plaintiff has stated a claim for conversion against the Benrimon Defendants for the Picasso. The Benrimon Defendants do not dispute that

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 80 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

they had possession of the Picasso. They contend, however, that their original possession of the Picasso was lawful because they obtained possession of the Picasso through the Release and Settlement Agreement with Chowaiki, in which Chowaiki stated that he was "the record and beneficial owner" of the Picasso. (*See* Benrimon Br. 21 (quoting Compl. ¶ 49)). The Court agrees. As such, Plaintiff was required to make a demand on the Benrimon Defendants for the return of the Picasso. *See Marks v. Energy Materials Corp.*, No. 14 Civ. 8965 (GHW), 2015 WL 3616973, at \*4-5 (S.D.N.Y. June 9, 2015).

The Benrimon Defendants argue that Plaintiff has insufficiently pleaded that the "demand and refusal" requirement was satisfied because "Plaintiff does not specify when he made his demand of each Benrimon Defendant, when each Benrimon Defendant refused, and the words or actions that each party used to convey the demand or refusal." (Benrimon Br. 23).[17] But in so doing, they misperceive the law. The reason for the demand and refusal requirement is simply so that a *bona fide* purchaser of property does not become a wrongdoer until he is informed of the defect of his title and has an opportunity to deliver the property to its true owner. *See Employers' Fire Ins. Co. v. Cotton*, 245 N.Y. 102, 105, 156 N.E. 629 (1927). But the demand and refusal requirement of a conversion claim, unlike Plaintiff's many fraud-based claims, need not be pleaded with particularity. Plaintiff has alleged that he "has requested each defendant [ ] return [the Picasso to him], and defendants have refused to do so." (Compl. ¶ 65). That is all Plaintiff must allege at this stage. The Benrimon Defendants' claim that they did not refuse to return the Picasso because they did not have it in the first place (*see* Benrimon Br. 23-24), is contrary to the well-pleaded allegations in the Complaint, which allegations plainly state that the Benrimon Defendants are in possession of the Picasso even today (*see* Compl. ¶¶ 71-72).

That said, to the extent Plaintiff has attempted to plead that the Benrimon Defendants conspired with Chowaiki to convert the Leger, the claim must be dismissed. As explained above, Plaintiff has alleged no facts to establish that the Benrimon Defendants had a "meeting of the minds" with Chowaiki. What is more, there are no non-conclusory allegations in the Complaint to show that the Benrimon Defendants even knew of Chowaiki's conversion of the Leger. Accordingly, the Court sustains Plaintiff's claim against the Benrimon Defendants for conversion of the Picasso, and dismisses his claim against them for conspiracy to convert the Leger.

### 4. Plaintiff Has Adequately Pleaded a Replevin Claim Against the Benrimon Defendants as to the Picasso

**\*26** Replevin is a remedy employed to recover specific, identifiable items of personal property. *TAP Manutenção e Engenharia Brasil S.A.* v. *Int'l Aerospace Grp., Corp.*, 127 F. Supp. 3d 202, 211 (S.D.N.Y. 2015). "To establish a claim for replevin, the plaintiff must prove two elements: [i] that plaintiff has a possessory right superior to that of the defendant; and [ii] that plaintiff is entitled to the immediate possession of that property." *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10 Civ. 128 (PAC), 2013 WL 1775367, at \*9 (S.D.N.Y. Apr. 25, 2013). Notably, New York allows a claim of replevin to lie even if the defendant is no longer in possession of the property in question. *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 456 (S.D.N.Y. 2014).

As with a conversion claim, "an innocent purchaser of stolen goods becomes a wrongdoer only after refusing the owner's demand for their return." *Kunstsammlungen Zu Weimar v. Elicofon*, 678 F.2d 1150, 1161 (2d Cir. 1982); *see also Williams v. Nat'l Gallery of Art, London*, No. 16 Civ. 6978 (VEC), 2017 WL 4221084, at \*7 n.13 (S.D.N.Y. Sept. 21, 2017) ("[D]emand and refusal are requisite elements of the cause of action for replevin and conversion if defendant is a good faith purchaser." (quotation omitted)); *Dore v. Wormley*, 690 F. Supp. 2d 176, 183 (S.D.N.Y. 2010) ("Demand upon, and refusal of, the person in possession of the chattel to return it are essential elements of a cause of action in replevin." (citation and alteration omitted)).

Plaintiff has adequately pleaded a replevin claim against the Benrimon Defendants with respect to the Picasso. Plaintiff has claimed that he is the lawful owner of the Picasso; that he has a possessory right superior to that of the Benrimon Defendants because Chowaiki had no right to transfer title of the Picasso to them; and that he has made a demand on the Benrimon Defendants for its return, which demand was refused. The Benrimon Defendants' protestation that they no longer possess the Picasso must be ignored, as the Complaint alleges that the Benrimon Defendants possess the Picasso and continue to pay for its storage abroad. (*See* Compl. ¶¶ 71-72). Accordingly, Plaintiff has adequately pleaded a replevin claim against the Benrimon Defendants for the Picasso.

### D. The Court Denies Plaintiff's Request for Leave to Replead

Case 5:22-cv-01261-BKS-ML    Document 5    Filed 03/27/23    Page 81 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

Plaintiff requests leave to replead his Complaint in the event the Court dismisses any of his claims. (Pl. Opp. 35). Plaintiff's request is denied with respect to his RICO claims. These claims have been dismissed on multiple grounds, and Plaintiff has failed to explain how a further amendment would cure the various deficiencies with these claims. *See Westgate Fin. Corp. v. Beinoni of N.Y. Inc.*, No. 10 Civ. 8102 (TPG), 2012 WL 219334, at *4 (S.D.N.Y. Jan. 25, 2012) (denying leave to replead RICO complaint on futility grounds where plaintiff did not explain how a further amendment would cure deficiencies); *see generally Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (acknowledging that leave to amend a complaint may be denied when amendment would be futile).

Plaintiff's request is also denied insofar as the Court has dismissed his state-law claims. Plaintiff's amendment regarding claims against the Benrimon Defendants relating to the Leger would be futile, as (i) the Complaint contains no allegations tying the Benrimon Defendants to that artwork and (ii) Plaintiff concedes that the Benrimon Defendants are only responsible for the Leger through conspiratorial liability, a theory the Court has already rejected.

### E. The Court Grants in Part and Denies in Part the Benrimon Defendants' Motion for Rule 11 Sanctions

**\*27** The Court now turns to the Benrimon Defendants' motion for sanctions pursuant to Rule 11. Specifically, the Benrimon Defendants have moved for "all available sanctions under Rule 11 against Plaintiff and his counsel ... including by awarding the Benrimon Defendants their attorneys' fees and costs they have incurred in defending this action." (Benrimon Sanctions Br. 3).

#### 1. Applicable Law

Federal Rule of Civil Procedure 11(b) provides, in relevant part, that [b]y presenting to the court a pleading, written motion, or other paper ... an attorney ... certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). The rule imposes on attorneys "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 551, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).

The Second Circuit has offered the following guidance concerning the imposition of sanctions under Rule 11:

"A pleading, motion or other paper violates Rule 11 either when it has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (internal quotation marks omitted). For example, Rule 11 is violated "where it is patently clear that a claim has absolutely no chance of success under the existing precedents." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir. 1985), *superseded on other grounds by rule.*

*Sorenson v. Wolfson*, 683 F. App'x 33, 35 (2d Cir. 2017) (summary order); *see also Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 177 (2d Cir. 2012) (noting that Rule 11 sanctions for pleadings are subject to an "objective unreasonableness" standard); *cf. Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2d Cir. 2011) ("The fact that a legal theory is a long-shot does not necessarily mean it is sanctionable. The operative question is whether the argument is frivolous, *i.e.*, the legal position has 'no chance of success,' and there is 'no reasonable argument to extend, modify or reverse the law as it stands.' " (internal citations omitted)).

"As numerous courts in this Circuit have recognized, Rule 11 is particularly significant in the civil RICO context because commencement of a civil RICO action has an

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 82 of 162

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

almost inevitably stigmatizing effect on those named as defendants." *Edmonds v. Seavey*, No. 08 Civ. 5646 (HB), 2009 WL 4404815, at *3 (S.D.N.Y. Dec. 2, 2009) (internal quotation marks omitted) (citing ⚠️ *Hoatson v. New York Archdiocese*, No. 05 Civ. 10467 (PAC), 2007 WL 431098 (S.D.N.Y. Feb. 8, 2007) (quoting 🚩 *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 660 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997))). That is, civil RICO is considered an "unusually potent weapon," often referred to as the "litigation equivalent of a thermonuclear device."

*See, e.g.,* 🚩 *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 449 (S.D.N.Y. 2007); 🚩 *Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 163 (S.D.N.Y. 2003); 🚩 *Katzman*, 167 F.R.D. at 655 (quoting 🚩 *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)). Courts have not hesitated to impose sanctions under Rule 11 when RICO claims have been found to be frivolous. *Edmonds,* 2009 WL 440815, at *32009 WL 440815, at *3 (citing *Dangerfield v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 02 Civ. 2561 (KMW) (GWG), 2003 WL 22227956, at *13-14 (S.D.N.Y. Sept. 26, 2003) (admonishing plaintiff's counsel for frivolous RICO claim); *see also, e.g.,* 🚩 *O'Malley v. N.Y.C. Transit Auth.*, 896 F.2d 704, 709 (2d Cir. 1990) (remanding for imposition of sanctions where plaintiff "failed to allege even one act that could qualify as racketeering activity under RICO"); 🚩 *Katzman*, 167 F.R.D. at 660 (finding a Rule 11 violation where "even a cursory examination of the requirements for bringing suit under RICO would have revealed the impossibility of the claim's success"); *McLoughlin v. Altman*, 1995 WL 640770, at *2 (S.D.N.Y. Oct. 31, 1995) (finding a Rule 11 violation where plaintiff failed "to properly plead a single element of a substantial RICO claim .... [which] manifest[ed] a total lack of legal research and preparation on the part of plaintiff's attorney"); *Levy v. Aaron Faber, Inc.*, 148 F.R.D. 114, 123 (S.D.N.Y. 1993) (imposing Rule 11 sanctions where "even a cursory investigation into the pleading requirements for RICO would have revealed the inadequacy of [plaintiff's] RICO pleading"). Further, Rule 11 sanctions may also be imposed for baseless factual allegations. *See* 🚩 *Levine v. F.D.I.C.*, 2 F.3d 476, 479 (2d Cir. 1993). The creativity of an attorney may not transcend the facts of a given case. *See* 🚩 *id.*; *accord* 🚩 *In re Kelly*, 808 F.2d 549, 551 (7th Cir. 1986) (when an attorney "chose to state as fact what was at the best a guess and a hope, he engaged in misrepresentation").

**\*28** If a court determines that Rule 11(b) has been violated, Rule 11(c) authorizes the court to "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Such a sanction, however, "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4); *see LCS Grp., LLC v. Shire LLC*, No. 18 Civ. 2688 (AT), 2019 WL 1234848, at *18 (S.D.N.Y. Mar. 8, 2019) (concluding that appropriate sanctions on defendant and its counsel under Rule 11 for asserting frivolous RICO claims consisted of "reasonable attorney's fees and other expenses associated with briefing the motion to dismiss and the motion for sanctions"); *see also AJ Energy LLC v. Woori Bank*, No. 18 Civ. 3735 (JMF), 2019 WL 4688629, at *12 (S.D.N.Y. Sept. 26, 2019) (awarding attorney's fees and costs where complaint was implausible on its face and assertions clearly lacked reasonable evidentiary support).

If sanctions are imposed, a court must also consider how, if at all, to apportion them between counsel and client. To begin, the court must assess each one's respective responsibility for the offending conduct. *See* 🚩 *United Republic Ins. Co., in Receivership v. Chase Manhattan Bank*, 315 F.3d 168, 171 (2d Cir. 2003) (concluding that Rule 11 sanctions should not be imposed on client where attorney bore principal responsibility for any sanctionable conduct); 🚩 *Greenberg v. Hilton Int'l Co.*, 870 F.2d 926, 939 (2d Cir. 1989) (limiting Rule 11 sanctions to counsel where client unaware of abuses), *vacated on other grounds*, 875 F.2d 39, 42 (2d Cir. 1989); *see also* 🚩 *Judin v. United States*, 110 F.3d 780, 785 (Fed. Cir. 1997) (analyzing analogous Court of Claims rule and finding that "[i]n imposing Rule 11 sanctions, a court may allocate sanctions between an attorney and client according to their relative fault" (citing 🚩 *Borowski v. DePuy*, 850 F.2d 297, 305 (7th Cir. 1988))). At base, the court must distinguish clients who were not adequately advised by counsel that their conduct violated Rule 11 from clients who knew their actions were wrongful, or who misled their attorneys about the facts relating to, or the purposes underlying, the lawsuit.

Notably, additional restrictions pertain in the context of sanctions imposed for improper legal (as distinguished from factual) arguments. "Sanctions that involve monetary awards (such as a fine or an award of attorney's fees) may not be imposed on a represented party for causing a violation of subdivision (b)(2), involving frivolous contentions of law. Monetary responsibility for such violations is more properly placed solely on the party's attorneys." Fed. R. Civ. P. 11, 1993 Advisory Committee Notes.

### 2. Analysis

The Benrimon Defendants make four arguments for sanctions under Rule 11; *first*, that Plaintiff's RICO claims against them are frivolous; *second*, that Plaintiff's state-law claims are frivolous; *third*, that Plaintiff's allegations concerning the Shtar Isko are legally frivolous and factually wrong; and *fourth*, that Plaintiff continues to make false and unsubstantiated allegations tying the Benrimon Defendants to the Leger. For the reasons explained below, the Court awards the Benrimon Defendants' a portion of their attorneys' fees and costs in defending against certain of Plaintiff's RICO claims.

### a. The Court Finds the Safe Harbor Provision of Rule 11 to Be Satisfied

At the outset, the Court addresses the parties' dispute with regard to whether the Benrimon Defendants have complied with the safe harbor provision of Rule 11(c)(2). That provision requires a party seeking sanctions to serve its motion on the party to be sanctioned, pursuant to Rule 5, affording the party upon whom the motion is served 21 days to correct or withdraw the allegedly sanctionable filing. *See* Fed. R. Civ. P. 11(c)(2).

**\*29** Plaintiff argues that the Benrimon Defendants served their Rule 11 motion on him on October 16, 2019, only two days before the motion was filed with the Court, and that the Benrimon Defendants did not also serve upon him their brief in support of their motion to dismiss the Complaint. (*See* Pl. Sanctions Opp. 2). The declaration supporting Plaintiff's opposition to the sanctions motion attaches an email thread between counsel for the Benrimon Defendants and counsel for Plaintiff. (*See* Weiss Decl., Ex. 1). It demonstrates that, on the evening of October 16, 2019, counsel for the Benrimon Defendants sent their brief in support of the motion for sanctions to Plaintiff's counsel. (Id.). Plaintiff's counsel

responded the next day, confirming that he had received and reviewed the Benrimon Defendants' Rule 11 motion and responding, "we are not withdrawing the first amended complaint or case. In my opinion, your Rule 11 motion lacks any merit." (Id.). This exchange came after the Court's July 29, 2019 pre-motion conference, during which the Court engaged in an extensive colloquy with the parties about the bases for the Benrimon Defendants' motions to dismiss and for sanctions. (*See generally* July 29, 2019 Tr.). True to his word, Plaintiff and his counsel did not withdraw the first amended complaint or this action in response to the Benrimon Defendants' motions.

The Court recognizes that the safe harbor requirement is a strict procedural requirement. *See Star Mark Mgmt.,* 682 F.3d at 175; *Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1328 (2d Cir. 1995). The Second Circuit has held, for instance, that informal warnings and requests for sanctions in letters, without separate service of the motion, do not trigger Rule 11's 21-day fair warning requirement.

*See Star Mark Mgmt.,* 682 F.3d at 175-76 (citing cases); *see also Gal v. Viacom International, Inc.,* 403 F. Supp. 2d 294, 309 (S.D.N.Y. 2005) ("[T]he plain language of the rule states explicitly that service of the motion itself is required to begin the safe harbor clock — the rule says nothing about the use of letters"). At the same time, neither party points to any controlling law, and the Court's independent research discloses none, on the precise issue facing the Court: Whether a party seeking to file a sanctions motion must wait 21 days, when the party upon whom such motion was served explicitly confirms, in writing, that it will not withdraw or amend its allegedly sanctionable filing.

In *Perpetual Securities, Inc. v. Tang,* 290 F.3d 132 (2d Cir. 2002), the Second Circuit held that the appellees' Rule 11 sanctions motion had been procedurally improper because it was not "made separate from other motions or requests."

Id. at 142. The appellees' sanctions motion had instead been included in a brief that addressed the underlying issues before the district court. Id. The district court's consequent award of sanctions under Rule 11 was thus found to be an abuse of discretion. Id. But rather than foreclosing the possibility of sanctions, the Second Circuit remanded the case back to the district court to reconsider the sanctions request, explicitly stating:

**Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)**

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 84 of 162

Our decision to remand for reconsideration of the sanctions issues does not conflict with our decision in 🚩 *Hadges* to reverse an award of sanctions for failure to adhere to the procedural requirements of Rule 11. *See* 🚩 *Hadges*, 48 F.3d at 1329. In 🚩 *Hadges*, it was clear that the sanctioned party would have corrected his misstatements had he been afforded the opportunity to do so; a reversal was thus appropriate. *See* 🚩 *id.* at 1328. *Here, there is no indication that Perpetual would have corrected or amended its frivolous arguments even had it been given the opportunity.*

🚩 *Id.* (emphasis added).

Courts have interpreted 🚩 *Perpetual Securities* to find that the "failure to follow the safe harbor provisions perfectly may be excused where there is 'no indication that [a party] would have corrected or amended its frivolous arguments even had it been given the opportunity.' " 🚩 *Watkins v. Smith*, No. 12 Civ. 4635 (DLC), 2013 WL 655085, at *6 (S.D.N.Y. Feb. 22, 2013) (quoting 🚩 *Perpetual Securities*, 290 F.3d at 142); *see* 🚩 *id.* at *7 (holding that premature filing of sanctions motion was excused where it was clear that plaintiff would not have withdrawn or corrected his frivolous allegations); *see also Lan v. Time Warner, Inc.*, No. 11 Civ. 2870 (AT) (JCF), 2015 WL 4469838, at *1-2 (S.D.N.Y. July 13, 2015) (same). That is clearly the case here. In response to being served with the Benrimon Defendants' Rule 11 motion, Plaintiff's counsel confirmed in writing that he and his client would not be withdrawing the Complaint. [18] Plaintiff then proceeded to defend the allegations and claims in his Complaint on their merits. Even today, he stands by these allegations. Accordingly, the Court is certain that Plaintiff would not have withdrawn or amended the Complaint, even if he had been provided the full 21 days. Any technical violation of the safe harbor provision is therefore excused, and the Court will consider the merits of the Benrimon Defendants' sanctions motion.

### b. The Benrimon Defendants Are Entitled to a Portion of the Reasonable Attorneys' Fees and Costs Incurred in Defending Against Certain of Plaintiff's RICO Claims

**\*30** The Benrimon Defendants seek sanctions for defending against each of Plaintiff's RICO claims, and the Court thus begins its analysis with Count I of the Complaint, which alleges a substantive RICO claim against David and Linda Benrimon, and Count II, which alleges a RICO conspiracy claim. The Court has dismissed these claims for failure to satisfy the relatedness, continuity, and nexus requirements for a RICO claim. As previously detailed, Plaintiff's Complaint is brimming with conclusory allegations. The vast majority of Plaintiff's fraud allegations have not been pleaded with the particularity required by Rule 9(b), and his allegations as a whole fail to satisfy multiple RICO pleading requirements. But buried within this haystack of allegations, the Court has identified a few needles. These factual allegations, from which the Court was able to discern the existence of the *Le Comptoir* Acts and the Pledge Agreement Acts, have not been (and, under the governing law, cannot be) joined together to show a pattern of racketeering activity. However, the Court cannot say that Plaintiff's attempt to do so was entirely frivolous or otherwise objectively unreasonable. Thus, the Court will not grant the Benrimon Defendants sanctions as to Counts I and II.

The Benrimon Defendants also seek sanctions for defending against Count VIII of the Complaint, which identifies the Gallery as a RICO enterprise and alleges that the Benrimon Defendants conspired with Chowaiki to facilitate the latter's pattern of racketeering activity through the enterprise. This claim fails for many of the same reasons that Counts I and II failed, and it is additionally inadequate because the Complaint lacks sufficient allegations that the Benrimon Defendants agreed with Chowaiki to violate RICO's substantive provisions, a required element of a RICO conspiracy. Again, however, this claim is not so far-fetched as to be sanctionable.

The unlawful debt collection claims, however, are a different story. Counts III through VI are predicated on the Benrimon Defendants' alleged violation of RICO through the "collection of unlawful debt." The Court dismisses these claims, as explained above, because the Complaint lacks

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 85 of 162

**Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)**

sufficient allegations that any of the Benrimon Defendants was "in the business" of making usurious loans, a required element for such claims. But dismissal is not enough.

In his original complaint (*see* Dkt. #1), Plaintiff failed to allege that any of the Benrimon Defendants was "in the business" of making usurious loans — a necessary element of an unlawful debt claim requiring allegations of "other individuals or companies to whom [defendants] lent money or the usurious interest rates attached to any other loan by the defendants." *Weisel*, 197 F.R.D. at 241. Instead, the original complaint alleged a single usurious loan by Piedmont. The Benrimon Defendants raised this deficiency in their pre-motion letter. (*See* Dkt. #14 at 2). And during the July 29, 2019 pre-motion conference, Plaintiff's counsel assured the Court that he would amend the complaint to "make it very clear" that the Benrimon Defendants were "making usurious loans, in the business of usurious loans." (July 29, 2019 Tr. 4:1-5).

Despite those assurances, the Complaint as amended still contains a single allegation of a single usurious transaction: the $300,000 loan from Piedmont to the Gallery. (Compl. ¶¶ 81-91). Yet, inexplicably, Plaintiff has attempted to string out this one instance to four separate causes of action that implicate all six Defendants. To do so, Plaintiff attempts to bolster his unlawful debt allegations by stating, in vague and conclusory fashion, that "Piedmont and Avichai Rosen's business is to lend money or a thing of value at a usurious rate." (Compl. ¶ 85). Such an allegation is, of course, patently insufficient. Worse yet, with respect to Count V, the Complaint lacks even conclusory allegations that the Benrimons were "in the business" of making usurious loans. Given the conspicuous absence of supporting allegations for these claims, the Court is in complete agreement with the Benrimon Defendants that the unlawful debt collection claims against them are particularly egregious, and that Plaintiff's persistence in advancing these claims for which he has no articulable legal or factual basis is objectively unreasonable. *See McCabe*, 761 F. App'x at 41 (noting that Rule 11 sanctions require "objective[ ] unreasonab[leness]").

 **\*31** In imposing sanctions on Plaintiff for the unlawful debt collection claims in this case, the Court also considers the recklessness with which Plaintiff makes certain factual allegations. For example, as part of his RICO claims, Plaintiff alleges that the Benrimon Defendants committed fraud on the court in the Criminal Case by not disclosing the Shtar Isko, an agreement that, according to Plaintiff, shows that Piedmont

and Chowaiki "were actually 50%-50% equal partners — and not unrelated *bona fide* purchasers for value reasonably without knowledge to believe that the property was subject to forfeiture." (Compl. ¶ 76). The Benrimon Defendants argue that the allegations concerning the Shtar Isko are sanctionable because: (i) Piedmont did disclose the existence of the Shtar Isko in the Criminal Case; and (ii) it is settled law that a Shtar Isko document does not create a legally enforceable partnership. (Benrimon Sanctions Br. 8).

The Benrimon Defendants are correct that Plaintiff's allegation is factually inaccurate. When Piedmont filed its petition for the Picasso in the Criminal Case, it included as an exhibit the Note between Piedmont and Chowaiki. (*See* Criminal Case, Dkt. #57). The Note explicitly states that the Gallery "shall pay, in accordance with Heter Iska, all outstanding principal to" Piedmont. (*Id.* at Ex. A). This document is filed publicly on the Criminal Case docket, on which Plaintiff so heavily relies in his Complaint. In alleging that Piedmont did not disclose the existence of the Shtar Isko in the Criminal Case, Plaintiff either failed to conduct a reasonable inquiry into the Criminal Case, or alleged something he knew to be false. In either case, the accusation that the Benrimon Defendants committed a fraud on the criminal court was completely unwarranted. Plaintiff's failure to correct this allegation evinces a carelessness with lodging very serious accusations that greatly troubles the Court.

Having determined that sanctions are warranted for the unlawful debt collection RICO claims, the next issue concerns who, as between Plaintiff and his counsel, is responsible for the sanctionable conduct. On this record, the Court finds it difficult to discern the degree to which Plaintiff himself had a hand in making frivolous claims and unsupported factual contentions. But for several reasons, the Court believes the sanctions here are appropriately placed on Plaintiff's counsel.

🚩 *First*, the Court's decision to impose sanctions is, in large part, due to the Complaint's overstep in asserting four RICO claims for collection of unlawful debt against all six Defendants in this action, based on allegations of a single usurious loan. Putting aside the 1993 Advisory Committee Notes to Rule 11, which state that sanctions based on frivolous contentions of law are properly placed on a party's counsel, it was Plaintiff's counsel who was warned at the July 29, 2019 pre-motion conference that a single allegation of a usurious loan would not suffice to plead such RICO claims adequately. And it was Plaintiff's counsel who told the Court that he

would remedy such deficiency in the amended complaint, yet failed to do so. Thus, all facts before the Court indicate that Plaintiff's counsel is responsible for seeking to transmogrify a single transaction with a subset of Defendants into four RICO claims against all Defendants alleging that all were "in the business" of making usurious loans. The Complaint is signed by Plaintiff's counsel; Plaintiff's counsel appeared at the pre-motion conference; and Plaintiff's counsel wrote and filed the opposition briefs, defending the RICO claims. *See Edmonds*, 2009 WL 4404815, at *5 (sanctioning attorney whose "continued reliance on RICO to prosecute what [was] clearly a private wrong alleged against his former partners and their accounting firm, exhibit[ed] a fundamental lack of familiarity with, or misunderstanding of, the civil RICO statute and the grounds for such an action"); *Dangerfield*, 2003 WL 22227956, at *12-13 (sanctioning attorney where "no attorney conducting a reasonable inquiry into the legal viability of [plaintiff's] RICO claim could have thought it had any chance to succeed").

 **\*32** *Second*, Plaintiff's counsel is also responsible for the inaccurate factual allegations. Plaintiff's counsel signed the Complaint, indicating that he made the necessary inquiry into the factual allegations substantiating the claims. At bottom, Plaintiff's counsel is responsible for the allegations concerning disclosure of the Shtar Isko and the reputational effects of asserting that the Benrimon Defendants committed fraud in both the Criminal Case and Bankruptcy Case. *See Hoatson*, 2007 WL 431098, at *9-10 (imposing sanctions on attorney where "the pleadings [were] so far removed from adequate that they cannot be said to have been filed in good faith or after a reasonable inquiry").

For these reasons, the Court has determined, despite resolving all doubts in his favor, that certain of Plaintiff's counsel's arguments concerning RICO are "losing *and* sanctionable." *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1994). The Court has determined that the Benrimon Defendants are entitled to a portion of the reasonable attorneys' fees and costs they incurred in defending against the RICO claims in Counts III, IV, V, and VI in this action. *See Bus. Guides, Inc.*, 498 U.S. at 548, 111 S.Ct. 922 (confirming that Rule 11 "states unambiguously that any signer must conduct a 'reasonable inquiry' or face sanctions"). In this regard, the Court recognizes that it has the discretion either to award an absolute number now that it believes fairly vindicates the purposes of Rule 11, or to wait and award fees and costs after review of a fee petition filed

by the Benrimon Defendants' counsel and responded to by Plaintiff's counsel. For several reasons, it chooses the former, and will order Plaintiff's counsel to pay a sanction of $20,000 to the Benrimon Defendants.

To begin, the Court recognizes that it may be difficult for defense counsel to separate out the precise amount of fees and costs that were attributable to defending against Plaintiff's unlawful debt collection counts specifically. Moreover, as this section makes clear, not all of Plaintiff's RICO arguments were sanctionable, even if all were ultimately unavailing. The Court also recognizes the disparity in size between Plaintiff's counsel and the Benrimon Defendants' counsel, and strives to sanction, without wholly bankrupting, Plaintiff's counsel. Finally, the Court realizes that a fee petition will itself generate attorneys' fees and costs for which Plaintiff's counsel should arguably be responsible, and wishes to minimize the resources that have been and are contemplated to be expended in this effort.

Ultimately, the Court is reminded that "the principal objective of the imposition of Rule 11 sanctions is not compensation of the victimized party but rather the deterrence of baseless filings and the curbing of abuses." *Caisse Nationale de Credit Agricole-CNCA v. Valcorp, Inc.*, 28 F.3d 259, 266 (2d Cir. 1994); *see also Estate of Calloway v. Marvel Entertainment Group*, 9 F.3d 237, 241 (2d Cir. 1993) ("Rule 11 is not a fee-shifting mechanism and does not create an entitlement in adverse parties to compensatory damages or attorney's fees.... Rather it is intended 'to maintain the integrity of the system of federal practice and procedure.' " (citation omitted)), *cert. denied*, 511 U.S. 1081, 114 S.Ct. 1829, 128 L.Ed.2d 459 (1984). The Court acknowledges that the $20,000 sanction imposed will not fully compensate the Benrimon Defendants for the fees and costs expended on the unlawful debt collection issue, but it will fully punish Plaintiff's counsel for his conduct in accordance with the letter and spirit of Rule 11.

### c. The Benrimon Defendants Are Not Entitled to Sanctions for Plaintiff's State-Law Claims

 **\*33** The Benrimon Defendants also move for sanctions with respect to Plaintiff's state-law claims. Plaintiff's fraud claim against the Benrimon Defendants is dismissed because, as the Court explained above, Plaintiff has not alleged a single misstatement or omission that any of the Benrimon

Defendants made to Plaintiff. To the extent Plaintiff pleaded that the Benrimon Defendants conspired with Chowaiki to defraud Plaintiff, the Court has also dismissed this claim, as Plaintiff has not alleged any agreement between them to make any misrepresentation to Plaintiff. However, the Court has found that Plaintiff adequately pleaded his claims for conversion and replevin against the Benrimon Defendants, at least with respect to the Picasso. While Plaintiff's fraud arguments are a stretch, the Court finds that the filing of these state-law claims was not objectively unreasonable and, further, that some of the other factors that animated the Court's decision to impose sanctions for the RICO claims (*e.g.*, the allegations regarding the Shtar Isko and the stigmatizing effect of a RICO claim), are not present with respect to the state-law claims. For this reason, the Court will not sanction Plaintiff or his counsel for alleging these state-law claims against the Benrimon Defendants.

### d. The Benrimon Defendants Are Not Entitled to Sanctions for Plaintiff's Allegations Tying the Benrimon Defendants to the Loss of the Leger

The Benrimon Defendants' final argument on this point is that Plaintiff should be sanctioned because the Complaint contains numerous allegations that Plaintiff lost the Leger as a direct result of the Benrimon Defendants' actions. At the pre-motion conference in this case, counsel for Chowaiki explained to the Court and counsel for all parties that "the Benrimons had nothing to do with Leger at all." (July 29, 2019 Tr. 42:12-14). Plaintiff's counsel seemed to agree that the Benrimon Defendants were not directly responsible for the Leger. Counsel told the Court, with respect to the original complaint, that "[t]here were no allegations that [the Benrimon Defendants] participated in the Leger," and that "there certainly won't be [any] in the amended complaint." (*Id.* at 55:24-56:2). Plaintiff's counsel also clarified the allegation as stating that the Benrimon Defendants participated in a conspiracy with Chowaiki that led to Plaintiff's loss of the Leger.

The Benrimon Defendants now argue that, despite Plaintiff's counsel's assurances during the pre-motion conference, Plaintiff continues to assert that the Benrimon Defendants are responsible for the loss of the Leger. The Court understands this argument, but does not read the Complaint's allegations as accusing the Benrimon Defendants of directly causing Plaintiff to lose the Leger. The Benrimon Defendants cite to the following provisions of the Complaint:

- David and Linda Benrimon, David Benrimon Fine Art LLC, Piedmont Capital LLC, Avichai Rosen, and Ezra Chowaiki — each knowing that Ezra Chowaiki was engaged in a pattern of Racketeering Activity for the explicit purpose of fraudulently defrauding art-owners of the works of art they had consigned to the Gallery — agreed with each other to join, facilitate, further, and to participate in Ezra Chowaiki's pattern of Racketeering Activity, by their own actions, as set out in ¶¶ 21, 26, 28, 33, 59, 60, 61, 63, 64, 72, 75, 79, 80, 86, and related paragraphs, above, and conspired with each other to do so, in violation of 🚩18 U.S.C. § 1962 (d). As a result, plaintiff was injured by the loss, theft, fraudulent taking, or conversion of his Picasso, le Gueridon and his Leger. (Compl. ¶ 111).

- As a direct and proximate result of the conspiracy defendants' predicate actions in furtherance of violating 🚩18 U.S.C. § 1962(d), as described in above, plaintiff has been and is continuing to be injured in his business or property, including by the unlawful conversion of his Leger and his Picasso's le Gueridon, and as set forth more fully above. Each of the conspiracy defendants is jointly and severally liable to plaintiff pursuant to 🚩18 U.S.C. § 1964(c). (*Id.* at ¶ 140).

- Each of Linda and David Benrimon, Avichai Rosen, David Benrimon Fine Art LLC, and Piedmont Capital LLC, knowing that Ezra Chowaiki was defrauding plaintiff and other art owners of the art works they had consigned to Ezra Chowaiki's Gallery, and knowing of Ezra Chowaiki's scheme and plan to do so, conspired and agreed with Mr. Chowaiki to join that scheme and advance it, and engaged in actions, as set out in this Complaint to do so. And plaintiff was harmed thereby in the loss of le Gueridon and the Leger. (*Id.* at ¶ 143).

**\*34** • Each of the defendants, knowing that Ezra Chowaiki was unlawfully selling art consigned to his Gallery against their owners' wishes, agreed and conspired with each other to participate in that scheme. Each defendant intentionally took overt acts in furtherance of that agreement to defraud art owners of the art they had consigned to Mr. Chowaiki's Gallery. And plaintiff was harmed thereby by the loss of his le Gueridon and Leger. (*Id.* at ¶ 148).

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 88 of 162

(*See* Benrimon Sanctions Br. 10-11). The Court acknowledges the imprecision of these allegations, but reads them merely to allege Plaintiff's loss of the Leger as a result of a conspiracy between Chowaiki and the Benrimon Defendants, which is true to what Plaintiff's counsel stated at the pre-motion conference. Conversely, the Court does not read these allegations as indicating that "Plaintiff lost the Leger as a direct result of the Benrimon Defendants' actions." (*Id.* at 10). Accordingly, the Benrimon Defendants' motion for sanctions is denied insofar as it seeks sanctions for Plaintiff's allegation that the Benrimon Defendants were involved in Plaintiff's loss of the Leger.

## CONCLUSION

For the reasons explained above, the Court GRANTS IN PART and DENIES IN PART Defendants' motions to dismiss. All of the RICO claims in this action are dismissed. Plaintiff may pursue his state-law fraud, conversion, and replevin claims against Defendant Chowaiki for the Picasso and the Leger, and Plaintiff may pursue his state-law conversion and replevin claims against the Benrimon Defendants for the Picasso. All other state-law claims are dismissed.

Defendants are hereby ORDERED to file answers to the remaining claims against them on or before **May 15, 2020**.

Counsel for Plaintiff is ORDERED to pay sanctions under Fed. R. Civ. P. 11 in the amount of $20,000 to the Benrimon Defendants on or before **May 22, 2020**.

The parties are hereby ORDERED to provide a proposed case management plan to the Court on or before **May 22, 2020**.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1974228

---

## Footnotes

1    The facts in this Opinion are drawn primarily from Plaintiff's First Amended Complaint ("Complaint" or "Compl." (Dkt. #26)), which is the operative pleading in this case. The Court notes here that the Complaint contains an abundance of conclusory allegations. For purposes of these motions, the Court considers and accepts only the factual allegations that are well-pleaded. *See Lynch v. City of New York*, 952 F.3d 67, 74-76 (2d Cir. 2020).

For ease of reference, the Court refers to Chowaiki's opening brief as "Chowaiki Br." (Dkt. #31); the Benrimon Defendants' opening brief as "Benrimon Br." (Dkt. #33); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #39); Chowaiki's reply brief as "Chowaiki Reply" (Dkt. #45); and the Benrimon Defendants' reply brief as "Benrimon Reply" (Dkt. #46). Further, the Court refers to the Benrimon Defendants' motion for Rule 11 sanctions as "Benrimon Sanctions Br." (Dkt. #36); Plaintiff's opposition to the Benrimon Defendants' motion for sanctions as "Pl. Sanctions Opp." (Dkt. #41); and the Benrimon Defendants' reply brief in support of their motion for sanctions as "Benrimon Sanctions Reply" (Dkt. #47).

2    Plaintiff also names John Does 1-10 as additional defendants "who, through their own actions, or their actions through agents, conspired with and/or participated in the pattern of racketeering acts and activity, the collection of unlawful debt, and other fraudulent and unlawful acts and activity set out [in the Complaint]." (Compl. ¶ 11).

3    A Shtar Isko, also called a "Heter Iska," is a document that is employed when one Jewish person lends money to another to avoid the Talmudic prohibition on lending money for interest. *See Madison Park Investors LLC*

Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 89 of 162

*v. 488–486 Lefferts LLC*, 2015 N.Y. Slip Op. 30178(U) (Trial Order), 2015 WL 471786, at *10 n.3 (N.Y. Sup. Ct. Feb. 5, 2015).

4    Plaintiff contends that "the common purpose of all these Racketeering Activities is not changed by the fact that Mr. Benrimon's son (Ms. Benrimon's brother, Mr. Rosen's brother-in-law), was involved in yet another art gallery, allegedly acting as a front to help the Benrimons' gallery profit from selling art which was sold to others." (Pl. Opp. 19). But it *does* matter to the Court's analysis that the Latamie Acts involved a different group of players from the ones at the heart of Plaintiff's RICO claims in this Complaint because "no RICO violation can be shown unless there is proof of the specified relationship between the racketeering acts and the RICO enterprise." 🚩 *United States v. Indelicato*, 865 F.2d 1370, 1384 (2d Cir. 1989); *see* 🚩 *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). While the "enterprise" and "pattern of racketeering activity" are distinct elements of a RICO case, the existence of different players changes the mode of commission of the predicate activity.

And though not part of its analysis, the Court observes that in the proceeding brought by Marc Latamie against Benrimon Contemporary LLC, upon which Plaintiff bases his allegations, the court found that the plaintiff there "ha[d] not uncovered any evidence to support his" theory that David Benrimon was the alter ego of Benrimon Contemporary LLC. (Dkt. #34, Nikas Decl., Ex. A).

5    The Court notes that the Stipulation was filed by the Bankruptcy Trustee, not Piedmont. (*See* Bankruptcy Case, Dkt. #174).

6    Those courts that have considered the issue have concluded uniformly that a Shtar Isko does not create a legally enforceable partnership. *See Madison Park,* 2015 WL 471786, at *10 n.3 (collecting cases); 🚩 *Edelkind v. Fairmont Funding, Ltd.*, 539 F. Supp. 2d 449, 454 (D. Mass. Mar. 6, 2008) (collecting cases).

7    *See* 🚩 *Sedima,* 473 U.S. at 496 n.14, 105 S.Ct. 3275:

   [T]he definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern "*requires* at least two acts of racketeering activity," 🚩 § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern."

8    Plaintiff's also contends that the Benrimon Defendants knew that Chowaiki stole the Picasso because the Provenance stated that it belonged to someone who bought the Picasso at Sotheby's in London on February 6, 2007, at Lot 152. (*See* Compl. ¶¶ 51-53; Pl. Opp. 2). While it is true that Plaintiff, rather than Chowaiki, was the purchaser of the Picasso at the Sotheby's sale, there is nothing in the Provenance that would put someone on notice of such fact. The Provenance makes no mention of Plaintiff by name; it merely states that ten years before Chowaiki's transaction with Piedmont, someone bought the work at Sotheby's. Plaintiff's further accusation that the Benrimon Defendants "deleted [the Picasso's] provenance which showed that [Plaintiff] was the artwork's owner" (Pl. Opp. 17), is entirely unfounded.

9    Plaintiff's allegations of money laundering are entirely conclusory. (*See* Compl. ¶ 16 ("The common and unifying purpose [of each RICO enterprise] was to ... launder the proceeds, if possible."); *id.* at ¶ 28 (summarily stating that "payment" for Warhol prints or painting "constitutes a violation of 🚩 18 U.S.C. § 1956 (money laundering)"); *id.* at ¶ 61 (stating that Chowaiki's deposit of the $300,000 loan payment constitutes an act of wire fraud); *id.* at ¶ 78 ("Upon information and belief and as will be disclosed in discovery, [the Benrimon Defendants] by participating in the continued sending of money or things of value to pay for *le Gueridon's* storage, and to continue fraudulently selling *le Gueridon*, without disclosing the true owner of *le Gueridon*, all

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 90 of 162

**Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)**

in violation of wire fraud, money laundering, etc. statutes."); *id.* at ¶ 98 (describing Chowaiki's "illegal practice" of stealing artwork as money laundering violations); *id.* at ¶ 108 (describing Chowaiki's disposition of the Leger as money laundering)). His brief in opposition to the motions to dismiss does not elaborate on these conclusory assertions. (*See generally* Pl. Opp.).

10    The Court is not swayed by Plaintiff's attempt to disaggregate this single loan transaction into its component pieces in order to substantiate his claim that Piedmont and Rosen were in the business of making usurious loans. (*See* Compl. ¶¶ 85-86; Pl. Opp. 30).

11    Plaintiff argues that he need not allege multiple usurious loans made over a long period of time to state a RICO claim for usurious lending. (Pl. Opp. 26). He explains that "there is no requirement in the statute or case law that plaintiff must allege or prove multiple usurious loans, longevity, or a pattern of usurious loans to prevail on a claim that defendants 'were in the business of lending money or a thing of value at a rate usurious under State or Federal law.' " (🚩 *Id.*). Plaintiff is correct that there is nothing in the text of the RICO statute that requires multiple usurious loans be alleged. But, as explained above, the case law requires a plaintiff to show that the defendants were in the business of making usurious transactions, and Plaintiff's allegations on this point do not suffice.

12    The Court recognizes that a complaint may incorporate material or a document outside of the complaint by reference, and that a court can consider such incorporated material on a 🚩Rule 12(b)(6) motion. *See* 🚩*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). The problem here is that Plaintiff does not refer to portions of the Criminal Case docket that would support his RICO claim. *Cf.* 🚩⚠️*Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (finding incorporation where complaint "explicitly refer[ed] to and relie[d] upon two of the documents at issue").

13    As explained 🚩⚠️*infra* note 9, Plaintiff has failed to allege, with any specificity, how the alleged predicate acts satisfy the elements of money laundering.

14    To the extent that Plaintiff means to allege that his consignment with Chowaiki was fraudulent *ab initio*, it fails for two reasons. 🚩*First*, such a fraud is not pleaded with the specificity required by Rule 9(b). *Second*, the claim fails for want of domestic injury, as discussed 🚩*infra.*

15    In Plaintiff's brief, he states that "[a]fter termination of the three-month consignment, Mr. Chowaiki, on multiple occasions, fraudulently induced Mr. Malvar to let the works of art remain in New York, [Compl.] ¶¶ 37, 105-106." (Pl. Br. 6). But the paragraphs of Plaintiff's Complaint that he cites do not state that Chowaiki induced Plaintiff to let the artwork remain in New York, nor do they state that the consignment lasted three months. The Complaint merely states that: (i) the artwork was given to Chowaiki on consignment; (ii) at some point, Plaintiff and his brother requested its return; (iii) Chowaiki repeatedly promised to return the artwork; (iv) Chowaiki never actually returned the artwork; and (v) Chowaiki sold the Leger to a company in the United Kingdom. (*See* Compl. ¶¶ 37, 105-06).

16    Indeed, Chowaiki explicitly states that "when the Complaint is distilled to its essential facts, it is plainly evident that it ... is, in actuality the proverbial sheep of [ ] state-law conversion and replevin claims[.]" (Chowaiki Br. 1).

17    It is unclear to the Court from where the Benrimon Defendants discern the requirement that a plaintiff must plead these specific facts to allege demand and refusal.

18    Plaintiff's argument that the Benrimon Defendants did not provide him with a copy of their brief in support of their motion to dismiss is a non-starter. The Benrimon Defendants' brief in support of their motion for sanctions

**Malvar Egerique v. Chowaiki, Not Reported in Fed. Supp. (2020)**

thoroughly describes the bases for the requested sanctions. (*See generally* Benrimon Sanctions Br.). And, further, the technical requirements of the safe harbor provision do not impose upon the Benrimon Defendants the obligation to provide Plaintiff with their brief in support of their separate motion to dismiss. *See* 🚩 *Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 176-77 (2d Cir. 2012).

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Purdie v. Brown, S.D.N.Y., November 3, 2015

2013 WL 5366394
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Gary LIANG, Plaintiff,
v.
The CITY OF NEW YORK; Raymond Kelly,
Commissioner of the New York City Police Department;
Brian J. Maguire, Deputy Inspector: of NYPD 109th
Precinct; New York City Police Department; Detective
Robert Zee, individually and in his official capacity as
a detective in the New York City Police Department;
Detective Albert Hawkins, individually and in his official
capacity as a detective in the New York City Police
Department; Detective Shim, individually and in his
official capacity as a detective in the New York City
Police Department; Detective Christopher Vaughn,
individually and in his official capacity as a detective
in the New York City Police Department; Detective
Scali, individually and in his official capacity as a
detective in the New York City Police Department;
Lieutenant Conforti, individually and in his official
capacity as a lieutenant: in the New York City Police
Department; Sergeant Michetti, individually and in his
official capacity as a sergeant in the New York City
Police Department; Sergeant Natoli, individually and in
his official capacity as a sergeant in the New York City
Police Department; "John Doe," individually and in his
official capacity as a New York City police officer, "John
Doe" being a fictitious name, the true name not known
at this time; "Jane Doe," individually and in her official
capacity as a New York City police offer, "Jane Doe"
being a fictitious name, the true name not known at this
time; Xin Xu; Bei Wang; Da Peng: Song; Ivan Quek,
aka Ivan Sun; and Yi Jing Tan, aka "Kerry," Defendants.

No. 10–CV–3089 (ENV)(VVP).
|
Sept. 24, 2013.

**Attorneys and Law Firms**

Chunyu Jean Wang, Wang Law Office, PLLC, Flushing, NY, for Plaintiff.

Elizabeth N. Krasnow, Shlomit Aroubas, Sumit Sud, New York City Law Department, Wei Ji, Alliance Law PLLC, New York, NY, Mingli Chen, Kevin Kerveng Tung, P.C., Thomas D. Gearon, Law Office of Thomas D. Gearon, P.C., Flushing, NY, for Defendants.

Ivan Quek, pro se.

*MEMORANDUM AND ORDER*

VITALIANO, District Judge.

**\*1** Plaintiff Gary Liang brings this civil rights action against defendants the City of New York ("the City"), the New York City Police Department ("NYPD"), Police Commissioner Raymond Kelly, Deputy Inspector Brian Maguire, Captain [1] Thomas Conforti, Sergeant Michetti, [2] Sergeant Brian Natoli, Detectives Robert Zee, Albert Hawkins, Jae Shim, Christopher Vaughn, and Edward Scali, and Police Officers "John Doe" and "Jane Doe" (collectively "the City defendants"), as well as against Xin Xu, Bei Wang, Da Peng Song, Ivan Quek (aka Ivan Sun) and Yi Jing Tan (aka Kerry Tan), individuals unaffiliated with the City (collectively "the non-City defendants"). Liang alleges violations of his constitutional rights relating to three occasions on which he was arrested. In his amended complaint, plaintiff sues the City and NYPD as institutional entities, defendants Kelly and Maguire in their official capacities, defendants Zee, Hawkins, Shim, Vaughn, Scali, Conforti, Michetti, Natoli, "John Doe," and "Jane Doe" in both their official and personal capacities, and all non-City defendants personally. (Am.Compl.(Dkt. No. 2) ¶¶ 8–26). The City defendants now move under Rule 12(b)(6) to dismiss all counts against them except for plaintiffs claim for unreasonable search and seizure. [3] For the reasons discussed below, the motion is granted.

*Factual Background*

Liang claims that this § 1983 action springs from the fact, he believes, that he is or was the target of a large conspiracy involving all defendants to deprive him of his civil rights. He alleges that the City defendants falsely arrested him on

three occasions in response to the non-City defendants' bribes or improper gratuities and false complaints. (Am.Compl.¶¶ 145–149). [4] He alleges further that, in the case of each arrest, NYPD officers unlawfully seized or searched his belongings, (*id.* ¶¶ 143–44), failed to read him his Miranda rights, (*id.* ¶ 90), declined to take a statement from him, (*id.* ¶ 91), prohibited him from contacting counsel for approximately 12 hours, (*id.* ¶ 92), and detained him for approximately 24 hours. (*Id.* ¶ 93). The charges stemming from all three arrests were dismissed on speedy trial grounds, pursuant to New York Criminal Procedure Law § 30.30. (*Id.* ¶¶ 53, 80, 89, 147(h)). At the center of the litigation vortex is defendant Tan, with whom Liang had been romantically involved from 1999 through 2007 [5] and with whom he co-owned several businesses. (*Id.* ¶¶ 27–28.)

### I. The July 9 Arrest

On or about July 5, 2007, Tan filed a complaint with NYPD's 109th Precinct in Queens. (Decl. of Elizabeth Norris Krasnow in Support of City Defs.' Mot. to Dismiss ("Krasnow Decl.") (Dkt. No. 54), Exh. B). During her interview with Detective Zee, Tan claimed Liang assaulted her and stole $5000 from her pocketbook before departing for Shanghai. (*Id.*). She showed Detective Zee bruises on her arms and legs that she attributed to Liang, and informed the detective that Liang would be returning from Shanghai on the night of July 8, 2007. (*Id; Krasnow Decl., Exh. E*). On that date, Detectives Zee and Shim met plaintiff at the airport and Detective Zee arrested him (without a warrant, according to Liang) for burglary, robbery, and assault. (Krasnow Decl., Exhs. D, E; Am. Compl. ¶¶ 36–44). [6] According to Liang, Zee claimed that the laptop Liang was carrying belonged to Tan, and seized both the laptop and Liang's passport. (Am.Compl.¶ 45). Additionally, Tan was at the 109th Precinct when Liang was brought in; she was permitted to search his belongings and to take several items, including Liang's apartment keys and ATM card. (*Id.* ¶¶ 49–50). Liang alleges that he received no property voucher for any of the items that were taken from him, and that none of the seizures were documented. (*Id.* ¶ 46).

### II. The February 28 Arrest

**\*2** On January 30, 2008, Tan obtained an order of protection against plaintiff ("the January 30 order of protection"). (*Id.* ¶ 54; Krasnow Decl., Exh. F). The order forbade Liang from communicating with Tan or going to her residence/place of business, but permitted "incidental contact at work and

apartment," (Exh. F), presumably because Liang and Tan co-owned properties and businesses. The addresses where Liang and Tan had joint interest are not explicitly listed on the order of protection. On February 28, 2008, Liang went with three friends to 41–40 Kissena Boulevard. (Am.Compl.¶ 57). Although the amended complaint is not entirely clear on this point, it seems to indicate that 41–40 Kissena Boulevard housed EW Studio, a business Liang and Tan jointly owned. (*Id.* ¶¶ 29, 64). Liang claims he had learned that Tan "had started her own company and had attempted to have the landlord assign the lease to this new company." (*Id.* ¶ 57). The purpose of Liang's visit, he claims, was to defend his property. [7] Upon encountering several people at the premises he determined were Tan's employees, and who are now also non-City defendants, [8] Liang called the police to report the intruders' presence in his store. (*Id.* ¶ 59).

Two uniformed officers arrived in response to Liang's call. (*Id.* ¶ 60). Shortly thereafter, Detectives Zee, Shim, and Hawkins arrived at the scene in plain clothes, but in response to a complaint by Tan, which they received by radio dispatch. (Krasnow Decl., Exh. H). The three detectives instructed the uniformed officers to "step aside," explaining that Liang was not permitted to be on the premises. (*Id.* ¶¶ 61–63). Liang pointed out indicia of his business ownership —namely, two licenses on the wall bearing the name of one of Liang's companies, certificates of incorporation, and stock certificates. (*Id.* ¶¶ 65–66). However, Detective Shim discounted those business authorizations in favor of a customer's invoice that displayed the new company's name, "Sagar Wireless." (*Id.* ¶¶ 63, 67).

Next, Liang claims, Detective Zee searched his belongings without his permission, then instructed the uniformed officers to arrest him and one of his friends. (*Id.* ¶¶ 69–70). Following his arrest, Liang was charged, in a complaint authored by Detective Hawkins, with criminal contempt (violation of an order of protection) and trespassing. (*Id.* ¶ 71; Exh. G). The next day, February 29, Tan obtained a second order of protection prohibiting Liang from going to her residence or place of business and from contacting her ("the February 29 order of protection"). (Krasnow Decl., Exh. L).

### III. The June 18 Arrest

On March 24, 2008, in response to a complaint filed by Tan, Detective Vaughn issued a criminal complaint against Liang charging him with violating the February 29 order of protection by contacting Tan two days earlier and threatening

to kill her. (Krasnow Decl., Exhs. M, S; Am. Compl. ¶ 81). On or around 8 p.m. on May 30, Detective Vaughn and four other detectives went to plaintiff's apartment. (Am.Compl.¶¶ 82–83). After learning Liang was out, Detective Vaughn left his card with plaintiff's doorman. (*Id* .) On June 18, 2008, Liang voluntarily surrendered at the 109th Precincts station house and was arrested by Detective Vaughn. (*Id* . ¶ 84; Krasnow Decl., Exh. T). Liang claims he had an alibi for March 22, 2008, the date of the alleged violation, but that Detective Vaughn refused to take his statement. (Am.Compl.¶¶ 87–88).

### IV. Liang's Post–Arrest Allegations

**\*3** Liang relies on a number of happenings that occurred after one or more of the arrests. First, he claims that, on July 9, 2007, Detective Zee, and/or someone affiliated with Detective Zee and at his behest, went to the office of Allen Chiu, Liang's attorney, and threatened him not to close on a real estate transaction that Liang and Tan had negotiated earlier to transfer a condo from Tan to Liang's mother. (*Id.* ¶¶ 31, 52). Second, he alleges that, on or about July 13, 2007, Detective Zee "activated a demo line phone, which allows the user to make free calls to any number and is supposed to be reserved to either mobile phone carrier employees or affiliates." (*Id.* ¶ 55). Third, he alleges that, "on or about November 10, 2007, Defendant Hawkins activated a wireless account with EW Studio Inc., one of Plaintiffs businesses." (*Id.* ¶ 56).

Liang next claims that, on or about September 23, 2008, an otherwise unidentified "Judge Grace" issued an order enjoining Tan, Tan's employees, and her "agents" from conducting business at 41–40 Kissena Boulevard and enjoining Tan from interfering with EW Studio's business operations. (*Id.* ¶ 98). On or about October 28, 2008, Liang further asserts, Steve Wong, to whom he had granted power of attorney, attempted to execute the "order" issued by "Judge Grace." That effort was stymied, however, when Tan's employees refused to leave the store premises. When Wong and an otherwise unidentified "retired police officer Phil" went to 41–40 Kissena Boulevard accompanied by two officers, one of Tan's employees, he alleges, contacted Detective Zee, who then spoke with the officers who had accompanied Wong to the premises. (*Id.* ¶¶ 99–105).

Following this episode, plaintiff claims that, in October and November of 2008, Defendant Scali convinced two individuals—Xiao Yun Li and "retired police officer Phil"—to falsely accuse him of plotting to murder Detective Zee. (*Id.* ¶¶ 106–07). Liang also alleges that Detectives Conforti and Michetti took from him the key to the store at 41–40

Kissena Boulevard on December 2, 2008 and gave it to Tan. (*Id.* ¶¶ 109–112). Finally, Liang asserts that, on May 27, 2010, he received a letter from the NYPD Investigations Unit in response to two complaints [9] he had filed against Detective Zee, stating there was sufficient evidence to prove misconduct against the detective. (*Id.* ¶¶ 96–97, 119–120).

### V. Liang's Causes of Action

Liang's 13–count complaint asserts federal causes of action based on denial of equal protection of the law in violation of the Fourteenth Amendment (Count 1), unreasonable search and seizure of property in violation of the Fourth Amendment (Count 2), false arrest in violation of the Fourth Amendment (Count 3), civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count 5), conspiracy to violate his civil rights under 🔖 *42 U.S.C. § 1985* [10] (Count 10), and violations of his civil rights under 🔖 *42 U.S.C. § 1983* (Counts 11–13). [11] Liang also asserts supplemental state law claims for unlawful detention and confinement (Count 4), filing of false criminal complaints (Count 6), violations of parallel rights under the New York state constitution (Count 7), tortious interference with a contract (Count 8), violation of the state's police power (Count 9), and negligent supervision (Count 10). As relief, plaintiff seeks, among other things, compensatory damages and injunctions against both the City and non-City defendants.

### *Standard of Review*

### I. Stating a Claim

**\*4** When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. 🔖 *Kiobel v. Royal Dutch Petroleum Co.,* 621 F.3d 111, 123 (2d Cir.2010) (citing 🔖 *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). To survive the motion, the complaint must allege facts sufficient to "state a claim to relief that is plausible on its face." 🔖 *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🔖 *Iqbal,* 556 U.S. at 678. To the extent there are disagreements or ambiguities of fact, the Court must construe all the facts in a light most favorable to

the plaintiff and draw all reasonable inferences in his favor.

See *Matson v. Board of Educ. of City School Dist. of New York,* 631 F.3d 57, 72 (2d Cir.2011).

However, the court need not accept as true legal conclusions couched as factual allegations. *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Moreover, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal,* 556 U.S. at 678 (internal citations and quotations omitted). On the other hand, "a complaint need not pin plaintiffs claim for relief to a precise legal theory." *Skinner v. Switzer,* ——U.S. ——, ——, 131 S.Ct. 1289, 1296, 179 L.Ed.2d 233 (2011). All that is required is "a plausible 'short and plain' statement of the plaintiffs claim, not an exposition of his legal argument." *Id.*

**II. Consideration of Materials Outside the Pleadings**

"[O]n a motion to dismiss, a court may only consider [1] the pleading itself, [2] documents that are referenced in the complaint, [3] documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, and [4] matters of which judicial notice may be taken." *Arrocha v. City Univ. of New York,* 878 F.Supp.2d 364, 368 (E.D.N.Y.2012) (citing *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) and *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)). Throughout their briefing, the City defendants refer to various extrinsic documents they have submitted to the Court as exhibits to the Krasnow Declaration. These exhibits are as follows: Liang's amended complaint (Exh. A); arrest or complaint reports (Exhs.D, H, J, M); resulting criminal complaints and their supporting affidavits (Exhs.E, G, K, U); complaint follow-up reports (or DD5s) (Exhs.B–C, N–T); the two orders of protection issued against plaintiff (Exhs.F, L); and an invoice from the 41–40 Kissena Boulevard store (Exh. I).

There is no dispute that Liang's amended complaint is properly considered on a motion to dismiss. However, Liang contends that none of the City defendants' other exhibits fall within any of the four fair game categories described in *Arrocha.* (*See* PL's Mem. at 3). The City defendants press their consideration, claiming that all exhibits have been implicitly incorporated by reference into the complaint and/

or are proper for judicial notice. (*See* City Defs.' Reply (Dkt. No. 58) at 1–3). All but the invoice (Exh. I), the Court finds, are properly considered on this motion.

**\*5** To start, throughout his complaint, Liang explicitly references and relies upon a number of the exhibits he now seeks to exclude from the Court's consideration. These documents include the first criminal complaint preferred against Liang, (*see* Am. Compl. ¶¶ 33, 146(a)), the first order of protection, (*see id.* ¶¶ 54, 75, 86, 88), the second criminal complaint, (*see id.* ¶¶ 73, 147(a)), supporting affidavits made by Tan, Song, and Wang on March 12, 2008, (*see id.* ¶¶ 73–74, 76–77), and the second order of protection. (*See id.* ¶ 79). Exhibits E, F, G, K, and L, therefore, are clearly incorporated by reference into the complaint, and the Court may consider them as though they were part of the complaint itself.

With the exception of Exhibit I (the invoice), the remaining exhibits are all either complaint reports (Exhs.H, M), follow-up reports to the complaint (DD5s) (Exhs.B–C, N–T), arrest reports (Exhs.D, J), or documents filed in a court of record (Exhs.U, V). [12] The Court may take judicial notice of these materials, as they are in the public record. *See Wims v. New York City Police Dep't.,* No. 10–Civ–6128, 2011 WL 2946369, at \*2 (S.D.N.Y. July 20, 2011) (a district court may take judicial notice of "arrest reports, criminal complaints, indictments and criminal disposition data" when deciding a 12(b)(6) motion); *Obilo v. City Univ. of City of New York,* No. 01–CV–5118, 2003 WL 1809471, at \*5 (E.D.N.Y. Apr. 07, 2003) ("[J]udicial notice can be taken of the incident report, police complaint and two DD5s completed by [defendant police officer]."); *Wingate v. Deas,* No. 11CV1000, 2012 WL 1134893, at \*1 n. 1 (E.D.N.Y. Apr. 02, 2012) (taking judicial notice of arrest reports); *Canessa v. Cnty. of Suffolk,* No. 09–CV–3256, 2010 WL 1438822, at \*1–2 (E.D.N.Y. Apr.10, 2010) (taking judicial notice of arrest records). Consequently, the Court may consider these records as well, but only to establish "their existence and legal effect," or to "determine what statements [they] contained ... not for the truth of the matters asserted." *Twine v. Four Unknown New York Police Officers,* No. 10–cv–6622, 2012 WL 6184014, at \*7 (S.D.N.Y., Dec.12, 2012); *see also Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (internal quotation marks and emphases omitted).

## Discussion

### I. Claims Against NYPD

Among the flock of defendants sued by Liang is NYPD. But, as an organizational entity, NYPD is not a proper defendant, since agencies of New York City do not have a separate legal identity from the City. *See, e.g., Nnebe v. Daus,* 644 F.3d 147, 158 n. 6 (2d Cir.2011) ("It is well settled in this Court that, as a general matter, agencies of New York City are not suable entities in § 1983 actions."); *Graham v. City of New York,* 869 F.Supp.2d 337, 348 (E.D.N.Y.2012) (" 'All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law.' ") (quoting N.Y. City. Charter, Ch. 17 § 396); *Jenkins v. City of New York,* 478 F.3d 76, 93 n. 19 (2d Cir.2007) ("The district court correctly noted that the NYPD is a non-suable agency of the City."). Accordingly, all claims against the NYPD are dismissed with prejudice.

### II. Claims Against All Other City Defendants

#### a. The Legal Framework for § 1983 Claims

**\*6** "Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere. In order to prevail on a section 1983 claim, the plaintiff must show that the defendant's conduct deprived him of a federal right." *Id.* (internal citations omitted). Although individual state officials, such as police officers, may be liable under § 1983 in their individual capacities, they may assert an affirmative defense of qualified immunity if "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Southerland v. City of New York,* 680 F.3d 127, 141 (2d Cir.2012) (internal quotations omitted). "A right is 'clearly established' when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that

right." *Id.* (internal quotations and alterations omitted). An officer's actions are "objectively reasonable" if "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Id.* (internal quotations omitted).

#### b. False Arrest Claims

Claims for false arrest under § 1983 are based on the Fourth Amendment's protection against unreasonable seizures, which includes the right to remain free from arrest absent probable cause. *See, e.g., Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006). It is well established in the Second Circuit that "[p]robable cause is a complete defense to an action for false arrest brought under New York Law or § 1983." *Ackerman v. City of White Plains,* 702 F.3d 15, 19 (2d Cir.2012) (internal quotations omitted); *accord Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 118–19 (2d Cir.1995); *Jaegly,* 439 F.3d at 151. Courts will dismiss a claim for false arrest if the complaint is devoid of facts showing that the arresting officer could not have reasonably concluded that there was probable cause to make the arrest. *See, e.g., Kennie v. White Plains Police Dep't Vice Control Unit,* 108 F.3d 1369, at *2 (2d Cir.1997); *Kafafian v. Young,* 477 Fed.Appx. 762, at *1 (2d Cir.2012); *Pugach v. Ventrella,* 152 F.3d 920, at *1 (2d Cir.1998).

In general, an officer has probable cause to make an arrest if he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Probable cause exists as a matter of law when there is no dispute as to the relevant facts and officers' knowledge at the time of arrest. *See also Fabrikant v. French,* 691 F.3d 193, 217 (2nd Cir.2012) ("Probable cause encompasses only that information available to the arresting officer prior to and including the point of seizure.") (internal quotations omitted). When information is received from a putative victim or eyewitness, probable cause exists "unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern,* 268 F.3d 65, 70 (2d Cir.2001).

**\*7** As the record makes clear, the City defendants had, at the very least, a reasonable basis to find probable cause

when arresting Liang on each of the three occasions described in the complaint. Each arrest either followed a complaint made by civilians Tan, Wang, and/or Song to officers at the 109th Precinct. That these complainants would later be named as defendants in this action is irrelevant to the analysis of the false arrest claims lodged against the City defendants. Each citizen complaint to the police involved allegations that Liang had committed (or was in the process of committing) a crime, or had violated (or was in the process of violating) an order of protection, or both. The record on this motion supports those facts convincingly, and, other than his naked assertion of conspiracy, Liang offers not a single plausibly pleaded fact to the contrary. Surely, Liang protested his innocence to the arresting officers, but points to nothing to show why it was unreasonable for them to believe the contrary claims that established probable cause to arrest him. His false arrest claims therefore fall short. *See, e.g.,* Coyle v. Coyle, 354 F.Supp.2d 207, 211–12 (E.D.N.Y.2005) (dismissing false arrest claims on a 12(b)(6) motion because officers had no reason to doubt victim's statement that plaintiff violated a restraining order).

Specifically, regarding the July 9, 2007 arrest, Tan filed a criminal complaint with the 109th Precinct three days before the arrest, alleging that Liang physically assaulted her, took $5000 from her pocketbook, and used the money to purchase a round-trip ticket to Shanghai. (Am. Compl. ¶ 33; Exh. B). The complainant even advised that plaintiff had a return ticket for July 8. (*Id.*). As reflected in Exhibit E to the Krasnow Declarations—the criminal complaint issued against Liang in New York Criminal Court, Queens County—Detective Zee personally interviewed Tan on July 5. (Exh. E). Consistent with her allegations, he observed bruises on her arms and legs. (*Id.*).

With a powerful effect on this claim, opposite the one he intended, Liang acknowledges Tan made these statements to Detective Zee, but claims that her statements were "false," and asserts that Detective Zee did not conduct an investigation to verify her claims before making the arrest. (Am.Compl.¶ 34). Simply, "[t]he actual accuracy or veracity of [a witness's] statement is irrelevant to a determination of whether [an officer] had arguable probable cause. Rather, the question is whether [the officer] could have reasonably relied on it." *Escalera v. Lunn,* 361 F.3d 737, 745 (2d Cir.2004). Although Tan's complaint alone would have been sufficient for probable cause, even without further verification, Detective Zee visually confirmed that she had

injuries consistent with her allegations of assault. (Exh. E). There can be no contest that Detective Zee had, at a minimum, an objectively reasonable basis to find probable cause. Indeed, he had probable cause. *See, e.g.,* Obilo, 2003 WL 1809471, at *7 (victim's identification of plaintiff as her assailant, as well as visible bruises on her arms, supplied arresting officer with probable cause) . [13]

**\*8** If anything, the circumstances surrounding the February 28 arrest, including breach of the stay away order, demonstrate an even more compelling showing of probable cause. Detectives Zee, Hawkins, and Shim arrived at the Kissena Boulevard address in response to a complaint from Tan alleging that Liang had entered the store, in violation of the January 30 order of protection, and was threatening and harassing her employees, Song and Wang. (Exhs.G–H, K). In line with ordinary police procedures, the arresting officers, the record shows, were dispatched to the store via NYPD's control radio communications. Courts in this circuit have repeatedly found that, in the absence of reason to doubt the complainant, an allegation that an individual has violated a stay away order supports probable cause for arrest. *See, e.g.,* Jaegly, 439 F.3d at 151; *Carthew v. Cnty. of Suffolk,* 709 F.Supp.2d 188, 197 (E.D.N.Y.2010) (dismissing false arrest claims because officer had probable cause based on report that plaintiff violated order of protection); *Dudley v. Torres,* No. 05–CV–1729, 2008 WL 2149603, at *4–5 (E.D.N.Y. May 21, 2008) (finding probable cause for an arrest based on plaintiff's alleged violation of a stay away order, despite plaintiff's statement that he "didn't do anything"); *Welch v. City of New York,* 95Civ8953, 1997 WL 436382, at *5 (S.D.N.Y. Aug.4, 1997) (finding probable cause to arrest plaintiff for violation of an expired order of protection because officer had a reasonable basis to believe it was still in effect), *aff'd,* 166 F.3d 1203 (2d Cir.1998) (summary order).

Once again, Liang pleads no facts supporting even an inference that any of the City defendants had reason to doubt the information provided by Wang, Song, or Tan. Indeed, he readily admits to the existence of the January 30 order of protection, which explicitly directed him to avoid Tan's "place of employment." (Exh. F). Although the Kissena Boulevard address was not explicitly mentioned in the order, it was certainly reasonable for the officers to conclude that the store at that address constituted Tan's "place of employment," since she told the officers that it was "[her] business." (Exh. H). Nothing in any pleading or paper filed by plaintiff suggests Tan's business was not located at that address. Moreover, as

the Complaint Report specifies, Tan alleged that Liang "did steal and hold in his possession a cell phone contract which he removed from the office without authority," (*id.*), another allegation Liang does not deny anywhere in his pleadings. As a result, without a reason to disbelieve the complainants, the officers had an objectively reasonable basis to conclude that there was probable cause to arrest Liang on the evening of February 28, 2008.

Liang sees a firewall barring dismissal. He correctly observes that the January 30 stay away order still permitted "incidental contact ... at work and apartment." (*Id.;* Am. Comp. ¶¶ 54, 75). This limited option avails him nothing. But, the contact on February 28 was far from "incidental." Liang states that he went with three friends to the store that evening because "he heard that Defendant Tan had started her own company and had attempted to have the landlord assign the lease to a new company." (Am.Compl.¶ 57). By his own account, Liang went to the store to provoke a confrontation, and to resort to self-help to recover what he thought was rightfully his. Indeed, Liang stayed at the store for approximately two hours, where, arrest records show, he threatened to beat up Song if he saw him in the store again. (Exh. K). At a minimum, any officer aware of the January 30 order would have had a reasonable basis to conclude that Liang had violated the order. Admissions by plaintiff in his pleadings show that probable cause abounded.

**\*9** Nor did that probable cause evaporate because, as Liang claims, the arresting officers ignored his protestations and the visible indications that he owned and operated the business at 40–41 Kissena Boulevard—namely, two Department of Consumer Affairs licenses on the wall, certificates of incorporation, and stock certificates. (Am.Compl.¶¶ 64–66). All of it, of course, is beside the point. None of it, even if authentic, provided an exception to the January 30 order of protection. At that location, only "incidental" contact was excepted. And, obviously, business ownership and its indicia would not excuse the threatening and harassing conduct about which Tan and her employees complained to the police— crimes chargeable independent of any criminal contempt charge for violating an order of protection.

But, clearly, notwithstanding any other objectively reasonable grounds to conclude that probable cause to arrest Liang existed, the officers arrived at the store to find a confrontational scene, as the pleadings describe, with an order of protection barring the arrestee's presence there (except incidentally). This is enough to establish probable cause,

and no further investigation was required to justify the arrest. *See, e.g., Carthew,* 709 F.Supp.2d. at 197–99 (officers had probable cause based on victims statements, despite "plaintiff's claim that the building was his place of business and that [the victim] did not work there"); *Dudley,* 2008 WL 2149603 at *5; *Welch,* 1997 WL 436382 at *5. Indeed, "officers need not conduct an investigation which exculpates an arrestee.... To hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me .' " *Dukes v. City of New York,* 879 F.Supp. 335, 343 (S.D.N.Y.1995) (internal citations and quotations omitted); *see also Curley,* 268 F.3d at 70 ("[O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest.") (internal quotations omitted). [14] Liang's third arrest, which occurred on June 18, 2008, followed a similar pattern. On February 29, 2008, Tan obtained a second order of protection against Liang, the terms of which mirrored, or were stronger than, the January 30 order. (Exh. L). On March 24, Tan filed a complaint with the 109th Precinct, alleging that Liang had violated the second order two days earlier by harassing her by telephone. (Exh. M). The harassing call demanded payment of $200,000. (*Id.*). Tans' complaint also accused Liang of approaching her in the garage of the building in which they both lived while brandishing a knife at her. (Exh. M). On June 18, after learning that Detective Vaughn and other officers had been looking for him during the previous days, Liang voluntarily surrendered at the police station. (Am.Compl.¶¶ 82–84). There, he was arrested for violating the February 29 order of protection and was charged by a criminal complaint authored by Detective Vaughn. (Exh. U).

**\*10** Once again, Liang fails to plead a plausible false arrest claim. Given the antecedents of the arrest in the record, Liang is required, and fails, to offer reasons why the arresting officers should have doubted Tan's veracity. Instead, he accuses Detective Vaughn of refusing to credit his alibi for March 22, 2008. (Am.Compl.¶¶ 87–88). As discussed above, the case law makes clear that the officers were not obliged to accept Liang's explanation of events over Tan's, and were permitted to arrest him based on Tan's allegations. Stated differently, the officers had an objectively reasonable basis to believe that they had probable cause to arrest Liang for violating the February 29 order of protection.

For these reasons, the Court finds that the officers had probable cause, or a reasonable basis to find probable cause, on all three occasions Liang complains of. Consequently, his § 1983 claims and state law claims sounding in false arrest are dismissed with prejudice against the City defendants.

#### c. Equal Protection Claims

In Count 1, Liang alleges that he was denied equal protection in violation of the Fourteenth Amendment because the City defendants selectively enforced state criminal laws against him. (Am.Compl.¶¶ 130–141). Specifically, he claims that he was selectively mistreated as compared to Tan on account of his gender. However, he fails to plead facts supporting his otherwise speculative assertions. Any claim of improper targeting for prosecution requires pleading of facts to support it. His equal protection claim fails because he offers no such facts in his pleading. *See, e.g., Kamholtz v. Yates County,* 350 Fed. Appx. 589, 590 (2d Cir.2009) (selective enforcement claim lacking sufficient factual support in the complaint was properly dismissed on a Rule 12(b)(6) motion); *33 Seminary LLC v. City of Binghamton,* 869 F.Supp.2d. 282, 309–10 (N.D.N.Y.2012) (same).

Broadly, to succeed on a selective enforcement claim, a plaintiff must prove that "(1) compared with others similarly situated, [he] was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *See Brown v. Syracuse,* 673 F.3d 141, 151–52 (2d Cir.2012) (internal quotations omitted). There can be little doubt that an arrestee's gender is an "impermissible consideration" for the purposes of a selective enforcement claim. *See, e.g., Annis v. County of Westchester,* 136 F.3d 239, 247–48 (2d Cir.1998) (upholding jury's finding that county had selectively enforced workplace rules against plaintiff on account of her gender).

However, Second Circuit courts appear split on how to define "similarly situated." *See Viteritti v. Inc. Vill. of Bayville,* No. 10–CV–3283, 2013 WL 145811, *8 (E.D.N.Y. Jan.14, 2013) (describing competing definitions of "similarly situated"). Under the stricter definition, the aggrieved party must show that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the [treatment selectors] acted on the basis of a mistake." *Id.* (quoting *Ruston v. Town Bd. for the Town of Skaneateles,* 610 F.3d 55, 58 (2d Cir.2010)). Under the looser standard, the aggrieved party need only show that the comparator was or is "similarly situated in all material respects." *Viteritti,* 2013 WL 145811 at *8 (quoting *Vassallo v. Lando,* 591 F.Supp.2d. 172, 184 (E.D.N.Y.2008)).

**\*11** Even under the looser standard, Liang still cannot satisfy the threshold showing described in *Brown.* He conclusorily states that he received disparate treatment as compared to Tan, (*see* Am. Compl. ¶¶ 135–38), but, from his recitation of the actual facts, it is readily apparent that the two were not "similarly situated in all material respects." As discussed in section II.b, *supra,* the City defendants arrested Liang on all three occasions after specific allegations of criminal behavior —physical abuse, verbal harassment, theft of property, violations of the orders of protection, making threatening statements, and brandishing a weapon—had been leveled against him by the putative victims. By contrast, Liang does not allege that he or anyone else ever made complaints about criminal behavior against Tan at or around the time of his arrests, let alone the kinds of allegations that would cause her to be "similarly situated in all material respects." On this ground alone, his selective enforcement claim is subject to dismissal. *See, e.g., Christian v. Town of Riga,* 649 F.Supp.2d. 84, 94 (W.D.N.Y.2009) (dismissing selective enforcement claim because plaintiff failed to plead facts showing disparate treatment to similarly situated individuals).

Assuming, *arguendo,* that Liang could satisfy *Brown's* first prong, his claim would still fail on the second. Front and center are Liang's charge that law enforcement selectively targeted him based on his gender, and/or their malicious intent to deprive him of equal protection. What is missing from his pleadings is something that plausibly pegs this claim to facts. Without even a whiff of facts other than the gender difference between Liang and Tan, all that is offered are naked assertions of discrimination. (*See* Am. Compl. ¶¶ 134–35, 137). They cannot survive a 12(b)(6) motion. *See, e.g., 33 Seminary LLC,* 869 F.Supp.2d. at 309–10 (plaintiffs failed to satisfy second prong of selective enforcement claim because their claims were based on "mere[ly] conclusory allegations"); *John Gil Const., Inc. v. Riverso,* 99 F.Supp.2d. 345,

353 (S.D.N.Y.2000) ("[P]laintiff's assertions of selective enforcement and racial animus are wholly conclusory and unaccompanied by any supporting factual allegations.");

*Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) ("[I]t is well settled that ... allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983."). Nor do they support Liang's claim here, which is dismissed with prejudice.

### d. Civil RICO Claims

Next for consideration are Liang's claims that he was injured by violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* To maintain a civil action under RICO, a plaintiff must show "(1) a violation of the RICO statute; (2) an injury to business or property; and (3) that the injury was caused by the violation of RICO." *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 107 (2d Cir.2001). To state a violation of the RICO statute, the plaintiff must allege "(1) conduct (2) of an enterprise [15] (3) through a pattern (4) of racketeering activity, which is defined to include specified predicate acts." [16] *Zimmerman v. Poly Prep Country Day School,* 888 F.Supp.2d 317, 327 (E.D.N.Y.2012) (quoting *Sedima, S.P.R.L. v. Imrex Co .,* 473, U.S. 479 (1985)). A plaintiff may also advance a cause of action for conspiracy to violate RICO, regardless of whether the predicate acts were successfully carried out. *See* 18 U.S.C. § 1962(d). Courts have required that "each predicate act ... be articulated clearly in a civil RICO complaint. This articulation requirement is particularly enforced when, as in the case at bar, a RICO civil conspiracy claim is made." *Rafter v. Bank of America,* No. 04–Civ.–3341, 2009 WL 691929, at *14 (S.D.N.Y. Mar. 12, 2009).

**\*12** Liang alleges that the City defendants violated RICO by harassing him and taking false complaints against him. (Am.Compl.¶¶ 156–157, 160). He further claims that the City defendants conspired together and with the non-City defendants to violate his constitutional rights, harass and falsely arrest him, seize his business and property, and accept benefits from the non-City defendants in order to harm him. (*Id.* ¶¶ 158–159, 161–164). His litany of injurious wrongs include complaints that he suffered physical, emotional, mental, and financial harm as a result of the conduct violating RICO. (*Id.* ¶ 165).

At the pleading doorway, Liang's RICO claim against the City itself is dismissed because, as many previous courts in this Circuit have held, "a municipal corporation is incapable of having the criminal intent to support RICO's predicate offense requirement." *Brewer v. Vill. of Old Field,* 311 F.Supp.2d. 390, 398 (E.D.N.Y.2004) (internal quotations and alterations omitted); *see also, e.g., Rafter,* 2009 WL 691929, at *15; *Pilitz v. Inc. Vill. of Rockville Centre,* No. 07–CV–4078, 2008 WL 4326996, at *5 (E.D.N .Y. Sept. 22, 2008); *Interstate Flagging, Inc. v. Town of Darien,* 283 F.Supp.2d. 641, 645–46 (D.Conn.2003); *Frooks v. Town of Cortlandt,* 997 F.Supp. 438, 457 (S.D.N.Y.1998); *Wee v. Rome Hosp.,* No. 93–CV–498, 1996 WL 191970, at *5 (N.D.N.Y. Apr. 15, 1996); *O & K Trojan, Inc. v. Mun. & Contractors Equipment Corp.,* 751 F.Supp. 431, 434 (S.D.N.Y.1990); *Nu–Life Construction Corp. v. Bd. of Educ.,* 779 F.Supp. 248, 251 (E.D.N.Y.1991). Furthermore, because the City is immune to civil RICO liability, its individual officers and agents are similarly immune in their official capacities. *See, e.g., Frooks,* 997 F.Supp. at 457 ("[B]ecause the Town cannot be held liable under RICO as a matter of law, neither may the Town employees in their official capacities."); *Rini v. Zwirn,* 886 F.Supp. 270, 295 (E.D.N.Y.1995 ("[S]ince the municipality cannot be held liable for the acts of its agents, the Town employees, in their official capacity, cannot be held liable under RICO."). All civil RICO claims against the individual City defendants in their official capacities are dismissed. *See Wood v. Inc. Vill. of Patchogue of New York,* 311 F.Supp.2d. 344, 354 (E.D.N.Y.2004).

Plaintiff fares no better on his individual capacity claims against the City defendants. None of his allegations are more than "merely consistent" with these officers' liability, had such liability otherwise been plausibly pleaded. *Iqbal,* 556 U.S. at 678. Bluntly, he fails to state facts that plausibly allege racketeering activity. Under § 1961(1), "racketeering activity" encompasses an extensive catalogue of prohibited activities that range from murder to mail fraud. 18 U.S.C. § 1961(1); *see, supra,* p. 27 n. 16. Liang's complaint cites none of the predicate offenses listed in § 1961(1). In stead, he alleges in vague terms that the City defendants harassed and accepted false complaints against him, and that

they conspired with the non-City defendants to do both of those things, as well as to violate his constitutional rights, falsely arrest him, and seize his business and property. (Am.Compl.¶¶ 156–164). None of these acts are among the possible predicate offenses listed in 📄 § 1961(1).

**\*13** Hinged to Liang's RICO claim, but an overtone throughout the entire complaint, is his theory of a grand conspiracy—that the City defendants conspired with non-City defendants to punish him and deprive him of his constitutional rights, and did so corruptly (as RICO predicates) in exchange for bribes, gratuities, and other benefits from Tan. (*Id.* ¶¶ 2, 26, 180, 232, 159). The only "benefits" that Liang points to are a demo phone line that Detective Zee allegedly activated, which provides free cell phone calls, and a wireless account that Detective Hawkins opened with EW Studio, one of the companies Tan and Liang had operated together. (*Id.* ¶¶ 55–56).

Deemed true for the purposes of the motion, the fact train stops there. Standing alone, these acts do not qualify as predicate RICO offenses, nor even crimes. The void left by the absence of pleaded facts connecting any of the charged conduct to a conspiracy is even more gaping. No facts supporting the existence a criminal scheme of any kind are pleaded. *See* 📄 *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (RICO conspiracy must involve a pattern of "related" offenses that "amount to or pose a threat of continued criminal activity"). Indeed, Liang does not even allege that Tan was responsible for providing Zee with access to the demo line, or that Hawkins did not pay for the wireless account with EW Studio. Liang's assertions, plainly, do not "allow[ ] the court to draw the reasonable inference that the defendant[s]" are liable for violating RICO by taking bribes in a conspiracy whose focal point is plaintiffs cell phone business. 📄 *Iqbal,* 556 U.S. at 678.

What remains of the wrongdoing charges offered to advance the RICO claim are, at the end, Liang's allegations that Detective Zee and/or un unidentified associate threatened Liang's attorney not to proceed with a real estate transaction; that Defendant Scali convinced two individuals—Xiao Yun Li and an otherwise unidentified "retired police officer Phil"—to falsely accuse him of plotting to murder Detective Zee; that Liang had seen Detective Zee leaving the 41–40 Kissena Boulevard store in September 2008; and that in response to two complaints he had filed, the NYPD

Investigations Unit informed Liang there was sufficient evidence to prove unspecific misconduct charges against Detective Zee. (Am.Compl.¶¶ 52, 96–97, 106–107, 119–120).

RICO requires more than a scattergun blast. Accepting as true, as the Court must, the litany of peccadilloes pleaded by Liang (even those allegations that are not criminal in nature), Liang pleads no facts showing a pattern of racketeering activity within the meaning of RICO. Of the acts so alleged, only "threatening" (a conclusory allegation) an attorney not to proceed with a legal transaction might conceivably fall within one of the predicate offenses described in 📄 § 1961(1). Yet, at the amended complaint stage, the nature of the putative "threat" is entirely undescribed. In any case, a single predicate offense will not suffice. Rather, a plaintiff must show a pattern of predicate offenses—at least two—such that the acts are "related, and that they amount to or pose a threat of *continued criminal activity."* 📄 *H.J. Inc.,* 492 U.S. at 239 (emphasis added). Liang pleads no facts to suggest that the City defendant have constructed a network of related and ongoing racketeering activities. For this reason in isolation, his RICO claim fails against those defendants involved in this list of alleged misdeeds.

**\*14** Furthermore, Liang does not show the existence of an "enterprise" within the meaning of RICO, which defines it as "group of persons associated together for a common purpose of engaging in a course of conduct" and united by "an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." 📄 *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Although Liang levels most of his fire against officers or detectives from NYPD's 109th Precinct, the bullets are blank. He pleads no facts to support his conclusory assertions that the City defendants constitute, control, or participate in an enterprise with a distinguishable existence or purpose. Nor, from what is in the record, may the Court infer the existence of an enterprise with the objective, as plaintiff effectively claims, to persecute him through a pattern of racketeering activity. Without such an enterprise, a RICO claim like Liang's must fail.

Finally, Liang accuses the City defendants of conspiring to violate RICO. The requirements for maintaining a cause of action under 📄 § 1962(d), which creates a private right of action to bring RICO conspiracies to justice, "are less demanding" than those for standard-issue RICO claims. To

be liable, a " 'conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.' "

🚩 *Baisch v. Gallina,* 346 F.3d 366, 376–77 (2d Cir.2003)

(quoting 🚩 *Salinas v. United States,* 522 U.S. 52, 65, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)). "In the civil context, a plaintiff must allege that the defendant knew about and agreed to facilitate the scheme." 🚩 *Baisch,* 346 F.3d at 377 (internal quotations omitted).

Liang's RICO conspiracy claim is no more meritorious than his standard RICO claim, and for the simple (and identical) reason that he has pleaded no facts suggesting either the kind of "scheme" described in *Baisch* or any enterprise intent on executing such a scheme. To state a claim for a RICO conspiracy, "mere allegations of agreement to commit predicate acts as insufficient." 🚩 *Browning Ave. Realty Corp. v. Rosenshein,* 774 F.Supp. 129, 145 (S.D.N.Y.1991)

(describing the holding in 🚩 *Morin v. Trupin,* 711 F.Supp. 97, 111–12 (S.D.N.Y.1989)). At the core, a plaintiff must plead facts from which a court may infer that a "meeting of the minds" occurred between the defendants. *Rosenshein,* 114 F.Supp. at 145. Liang fundamentally fails to meet that standard, pleading no facts to support the conclusion that there was a meeting of the minds, or to permit even an inference supporting it. As a result, all of Liang's RICO claims, including his claims alleging a conspiracy to violate RICO, are dismissed as to the City defendants.

### e. Claims Under 🚩 *42 U.S.C. § 1985(3)*

Civil rights law § 1985(3) allows plaintiffs to sue state officials who have conspired to violate their constitutional rights. 🚩 *Morpurgo v. Inc. Vill. of Sag Harbor,* 697 F.Supp.2d 309, 339 (E.D.N.Y.2010). A plaintiff advancing such a claim must plead facts that show: 1) a conspiracy; 2) for the purpose of depriving any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is injured in his person or property or deprived of a right or privilege of a citizen.

*See* 🚩 *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). A conspiracy is "an agreement between two or more individuals where one acts in further[ance] of the objective of the conspiracy and each member has knowledge of the nature

and scope of the agreement." 🚩 *Morpurgo,* 697 F.Supp.2d at 339. To sustain a § 1985 claim, a "plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." 🚩 *Webb v. Goord,* 340 F.3d 105, 110 (2d Cir.2003). Further, for a § 1985(3) claim to survive dismissal, the conspiracy must also be "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." 🚩 *Thomas,* 165 F.3d at 146 (internal quotations omitted).

**\*15** Liang's 🚩 § 1985(3) claim fails as a matter of law because, as discussed previously, he has pleaded no facts suggesting a "meeting of the minds" among the City defendants, or any subset of them, or by any one of them with any other person, to violate his civil rights. Although his complaint states, for instance, that "defendants acted together to deprive Plaintiff of equal protection and of forth (sic) amendment protection from unlawful search and seizure," and that they "conspired ... to victimize the plaintiff and take his business away from him," (Am.Compl.¶¶ 16– 21, 206), these are textbook examples of the kinds of conclusory allegations that are devoid of factual content. The crumbling point is Liang's failure to plead facts to support a conspiratorial meeting of the minds. From plaintiffs vantage point, the claim is nevertheless tantalizing. Given the nature of police work, seizure of person and property (clearly a harm) is often the result of officers working together as a team to execute a common plan. What is missing from the pleadings are any facts plausibly showing that any of the City defendants' conduct was prompted by a meeting of the minds to a commit a constitutional violation. *See, e.g.,* 🚩 *Webb,* 340 F.3d at 110 (rejecting a 🚩 § 1985(3) claim because "plaintiffs have not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants"); *Bod die v.* 🚩 *Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("[A] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.") (internal quotations omitted).

Furthermore, plaintiff's 🚩 § 1985(3) claim presents no facts supporting the charge that the conspiratorial harm flowed from "some racial or perhaps otherwise class-based,

invidious discriminatory animus behind the conspirators' action." *Thomas, 165 F.3d at 146* (internal quotations omitted). Liang asserts that the City defendants discriminated against him based on his gender and "arbitrarily chose[ ] to support the female complainant." (Am.Compl.¶¶ 134, 137). Assuming that any non-race based claims qualify, and assuming further that if gender claims *do* qualify, that males fall within a protective umbrella, all there is to support such a claim is Liang's bald assertions that gender drove the conspiracy. That is, as is his entire claim, wholly without support. The § 1985(3) claims is dismissed.

### f. Monell *Claims*

Liang also brings a claim for *Monell* liability against the City of New York under § 1983. A § 1983 cause of action against a municipality cannot be premised on *respondeat superior.* *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Instead, a plaintiff suing a city under § 1983 must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Pearl v. City of Long Beach,* 296 F.3d 76, 87 (2d Cir.2002) (under *Monell,* "a municipality could be held liable for constitutional torts committed pursuant to a municipal custom or policy"). *See also Roe,* 542 F.3d at 36 ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

**\*16** Under *Monell,* an actionable municipal policy or custom exists in the following circumstances:

> (1) the existence of a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making

authority, which caused the alleged violation of plaintiffs civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact with the municipal employees.

*Bliven v. Hunt,* 478 F.Supp.2d 332, 336–37 (E.D.N.Y.2007) (citing *Moray v. City of Yonkers,* 924 F.Supp. 8, 12 (S.D.N.Y.1996)). If a plaintiff seeks to show a city policy by referring to only a single act, that act must have been committed by a city official "responsible for establishing final policy with respect to the subject matter in question," and must represent a deliberate and considered choice among competing alternatives. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). If the plaintiff is challenging what he claims is an unofficial custom or practice of the city, he must show that the practice was "so widespread as to have the force of law." *Id.* (quoting *Bd. of Cnty. Comm'rs,* 520 U.S. at 404). The custom "need not [have] receive[d] formal approval by the appropriate decision-maker ... [but] plaintiff must prove ... that [it] is permanent." *Davis v. City of New York,* 228 F.Supp.2d 327, 337 (S.D.N.Y.2002) (internal citations omitted).

Plaintiff cannot establish a claim for *Monell* liability. He charges generally that the City "maintains an unconstitutional policy, practice, and custom of toleration and approval of their detectives receiving bribes from one party to harass and assault another party," as well as "policies or customs exhibiting deliberate indifference to the constitutional rights of victims of hate crimes in the jurisdiction of the 109th precinct." (Am.Compl.¶¶ 232–32). However, using the same whole cloth throughout, the complaint is entirely devoid of facts to buttress these assertions. Liang makes no claim, much less pleads facts showing, that the City has enacted any sort of official policy pursuant to which his rights were violated, and his allegations regarding an unofficial practice or custom are limited to the actions of specific detectives in a single police

unit and factually supported only by a pleader's perceptions of his own experience.

Though accepted as true on the motion, these factual allegations show nothing like the kind of "widespread" and "permanent" unconstitutional practices or customs that *Monell* implicates. Nor does Liang include any facts showing that a single city official with final decisionmaking authority had any awareness of the supposed "policies or customs" he describes, let alone enacted, formulated, or ratified those policies. Indeed, he actually pleads facts to the contrary—that NYPD's Investigations Unit was investigating Liang's claims against Detective Zee actions because they were *out* of policy. (*See* Am. Compl. ¶ 120).

**\*17** Furthermore, Liang fails to plead facts indicating that the City's alleged failure to properly train or supervise its police officers was so egregious as to amount to "deliberate indifference" to the rights of individuals such as plaintiff. Although he contends that defendants Conforti, Michetti, and Natoli negligently supervised the officers under their command by failing to prevent the actions of which he complains, that charge is but another factually unsupported conclusion. It provides no prop for *Monell* liability.

Finally, as a related matter, Liang brings charges personally against Police Commissioner Kelly and Deputy Inspector Maguire of the 109th Precinct in their official capacities only. An official-capacity suit is in essence another avenue to sue the government entity to which the agent belongs. *See, e.g.,* *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("An official-capacity suit is not a suit against the official but rather is a suit against the official's office. As such it is no different from a suit against the State itself.") (internal quotations omitted); *5 Borough Pawn, LLC v. City of New York,* 640 F.Supp.2d 268, 297 (S.D.N.Y.2009) ("A suit for damages against a municipal officer in their official capacity is the equivalent of a damage suit against the municipality itself.") (internal quotations omitted). Consequently, Liang's claims against Commissioner Kelly and Deputy Inspector Maguire, being equivalent to his *Monell* claim against the City, are dismissed along with the claims against the City, and for the same reasons.

*g. The Sole Remaining Federal Claim for Unreasonable Search and Seizure*

The Court having dismissed Liang's federal claims for false arrest, denial of equal protection, RICO violations, and conspiracy to violate civil rights, his sole remaining federal cause of action is a § 1983 claim for unreasonable search and seizure under the Fourth Amendment. Because the City defendants have explicitly declined to include this claim in their motion to dismiss, and since the parties have not briefed the issue, the Court does not address it. The Court does, though, observe that Liang may only sue those officers who are alleged to have been personally involved in the searches and/or seizures in question. *See, e.g.,* *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) ("It is well settled in [the Second] Circuit that *personal involvement* of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (emphasis added) (internal quotations omitted); *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) (a plaintiff in a § 1983 suit must allege "a tangible connection between the acts of the defendant and the injuries suffered"). Therefore, though not deciding the viability of the claim *in toto,* the Court notes these limiting parameters of case law. At no point does Liang plead facts connecting defendants Kelly, Maguire, Scali, or Natoli to the relevant searches or seizures in any personal manner. Accordingly, to the extent plaintiff's unreasonable search and seizure claim intended to encompass these individual defendants, those claims are dismissed by force of the Court's other determinations.

*h. State Law Claims*

**\*18** Liang also interposes a slew of state law claims against the City defendants that are largely duplicative of his federal claims. The Court shall address them in turn. [17] First, he asserts a cause of action for unlawful detention and confinement, which is fundamentally identical to his federal false arrest claim. (Am.Compl.¶¶ 151–154). For the reasons discussed in section II.b, *supra,* the claim is dismissed. Likewise, his cause of action for filing false complaints is effectively another iteration of false arrest, (*id.* ¶¶ 167–178), and is dismissed as well. [18]

Next, Liang asserts a cause of action for tortious interference with contract. (*Id.* ¶¶ 184–192). To succeed on such a claim, Liang would have to plead "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional

procuring of the breach; and (4) damages." ⚐ *Foster v. Churchill,* 87 N.Y.2d 744, 749–50, 642 N.Y.S.2d 583, 665 N.E.2d 153, 156 (1996). Liang alleges that he had "valid contracts with Open Lifetime Group and a store at 41–40 Kissena Blvd.," that the City defendants "knew of the contract as evidenced by his [sic] relationship with Plaintiffs ex-girlfriend, Defendant Tan," and that they "intentionally interfered with the contract by engaging in false arrests of Plaintiff." (Am.Compl.¶¶ 184–86). Putting aside the question of whether Liang has otherwise pleaded a plausible tortious interference claim, he does specifically plead that his false arrests were the wrongful acts of interference. Since the Court has already found that Liang has not plausibly pleaded viable false arrest claims, his tortious interference claim, with its pleaded link to these allegations, lacks an essential element, and it, too, is dismissed as a matter of law.

Incidentally, as putatively additional component of his tortious interference claim, Liang alleges that "Defendant Zee intentionally interfered with the contract by accepting the demo phone." (Am.Compl.¶ 191). First, he does not specify what contract he is referring to, nor does he plead facts indicating breach. Furthermore, aside from being a naked accusation of a *quid pro quo* (and therefore insufficiently pleaded), it is clear that even this naked claim suggests nothing more than a motive for Detective Zee's "false" arrest of Liang. Neither the interactions between Zee and Tan, nor any other factual allegations in the complaint, plausibly support a claim that Zee or any other defendant tortuously interfered in Liang's contractual relationships.

Liang's next claim is for negligent supervision against the City defendants. As discussed in Section II.f, *supra,* he pleads no material facts to support his conclusory allegations that the supervisory officials exercised improper oversight over subordinate officers. As a consequence, this claim fails as a matter of law.

Lastly, plaintiff advances catchall claims against the City defendants under the New York State Constitution for violating the same kinds of rights protected under the United States Constitution, and for violating the state's police power. ⚐ (*Id.* ¶¶ 180–82, 194–98, 642 N.Y.S.2d 583, 665 N.E.2d 153). The parallel pleading on identical facts yields a

congruent result. More importantly, "a private right of action for a violation of the [New York] Constitution is unavailable where an alternative remedy ... exists." ⚐ *Waxter v. State,* 33 A.D.3d 1180, 1181, 826 N.Y.S.2d 753, 754 (3d Dep't 2006) (citing *Lyles v. State of New York,* 2 A.D.3d 694, 770 N.Y.S.2d 81 (2d Dep't 2003)). As is, by now, obvious, Liang has had a whole host of alternative remedies available to him to vindicate every claim of harm. (Indeed, a federal search and seizure claim remains open.) Plaintiff has made no showing that he lacks an alternative remedy, justifying a private right of action under New York's state constitution. He has convincingly established just the opposite. That his pursuit of alternative relief fails for lack of merit *does not* mean the alternate avenues to relief did not exist.

**\*19**  As for Liang's claim that the City defendants "violat[ed] the state's police power," after the pleadings, it is hard to divine what that last straw is. It seems to amount to nothing more than a vague recapitulation of all his claims that the City and its police officers cloaked with and wielding the power of state law acted unlawfully and caused him injury. It duplicates his federal civil rights claims, but, if having any legitimacy under state law at all, it must be viewed as a private action claiming violations directly under the New York State constitution. The availability of alternative remedies defeats it.

*Conclusion*

For the reasons set forth above, the motion of New York City and its defendant employees is granted. All claims against them are dismissed, except for Liang's ⚐ § 1983 claim for unreasonable search and seizure under the Fourth Amendment. That claim survives, but only as to defendants Zee, Hawkins, Shim, Vaughn, Conforti, and Michetti. [19]

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5366394

## Footnotes

1       Captain Conforti is listed in the complaint as a lieutenant, but, according to the City defendants, his current rank is that of captain.

2       Plaintiff did not provide a first name for Sergeant Michetti. Defendants state that they have been unable to identify any such individual and have received no request for legal representation by anyone of that name. (City Defs.' Mem. (Dkt. No. 55) at 1 n. 1). However, as a purported officer in the NYPD, the Court considers him among the City defendants and considers their arguments on his behalf.

3       Although they have not moved to dismiss this count, the City defendants have hardly conceded it. They have reserved what is certainly the right to move for summary judgment later. (City Defs.' Mem. at 1 n. 2).

4       According to plaintiff, the City defendants received "benefits" from the civilian defendants that included a demo line for unlimited cell phone calls and cell phone accounts; in exchange, City defendants "took the cell phone business from [p]laintiff and gave it to [defendant] Tan." (Pl.'s Mem. (Dkt. No. 56) at 11).

5       Tan asserts in her answer that the relationship began in 2002 (Def. Tan's Ans. (Dkt. No. 38) ¶ 5), but on a motion to dismiss, the Court must accept as true all factual allegations in the complaint and decide factual disputes in favor of the nonmoving party. *See* *Midouin v. Downey Savings and Loan Ass'n, F.A.,* 834 F.Supp.2d 95, 102 (E.D.N.Y.2011).

6       The arrest was actually made shortly after midnight on July 9. (Exh. D).

7       Liang does not identify the landlord of 40–41 Kissena Boulevard.

8       It is unclear precisely which non-City defendants were at the store when Liang arrived. The criminal complaint filed against Liang mentions Wang (Krasnow Decl., Exh. G); Tan mentions Wang and Song in her statement (Krasnow Decl., Exh. K); and the Amended Complaint mentions Quek. (Am.Compl.¶ 58). That someone was there is not disputed; the identities of the entire cast *are* disputed, but the issue is immaterial to this motion.

9       Liang submitted the first of these complaints on July 11, 2008, and the second on or about September 18, 2008, after allegedly seeing Detective Zee walking out of the store at 41–40 Kissena Boulevard. (Am.Compl.¶¶ 96–97).

10      Although plaintiff does not specifically cite 42 U.S.C. § 1985 in this count, it is clear from the context of the complaint that he intends to assert this cause of action.

11      Counts 1, 2 and 3 are folded into Liang's § 1983 claim, which is the statutory vehicle by which an individual may assert a private cause of action against state officials for federal constitutional injuries.

12      Although Liang explicitly references a complaint filed against him regarding the third incident for which he was arrested, he dates this complaint March 22, 2008. (Am.Compl.¶¶ 81, 148(a)). Exhibit V is dated July 18, 2008, and is therefore not incorporated by reference into the complaint.

13      Liang also asserts a false arrest claim against Detective Shim in connection with the July 9 arrest. However, in the complaint, Liang merely alleges that he saw Detective Shim at the airport when he was being escorted a customs agent. (Am.Compl.¶ 37). This allegation cannot support a claim against Detective Shim for false arrest, and the count is dismissed as to that defendant as well.

14    In any event, it is of no moment whether Liang owned and operated a business out of 40–41 Kissena Boulevard, since stay away orders often forbid an individual from entering a place he previously shared with the victim. *See, e.g., Joan FF. v. Ivon GG,* 85 A.D.3d 1219, 1219–20, 924 N.Y.S.2d 611, 611 (3d Dep't 2011) (upholding issuance of order of protection barring plaintiff from entering apartment he had shared with victim); *People v. Qike,* 182 Misc.2d 737, 740, 700 N.Y.S.2d 640, 643 (Sup.Ct., Kings County, 1999) (defendant required to vacate apartment he shared with victim after an order of protection was issued against him); *People v. Scott,* 195 Misc.2d 647, 649, 760 N.Y.S.2d 828, 830 (Sup.Ct., Kings County, 2003) (noting that a home owner can be convicted of burglary for unlawfully entering his own home in defiance of an order of protection).

15    The statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

16    These predicate acts must fall within one of the following categories: a broadly-defined class of offenses encompassing most state—level felonies; an enumerated list of federal felonies; certain offenses pertaining to union and labor activities; various fraud offenses; acts indictable under the Currency and Foreign Transactions Reporting Act; specified acts indictable under the Immigration and Nationality Act; and any act that is indictable under any provision listed in 18 U.S.C. § 2332b(g)(5)(B). 18 U.S.C. § 1961(1). A "pattern of racketeering activity" means two or more predicate acts separated by fewer than ten years. *Id.* § 1961(5).

17    With regard to any state law claims, the Court may only exercise jurisdiction over them if they are "so related" to his remaining federal claim for unreasonable search and seizure "that they form part of the same case or controversy." *Montefiore Med. Ctr. v. Teamsters Local 272,* 642 F.3d 321, 332 (2d Cir.2011) (quoting 28 U.S.C. § 1367(a)). That is, the claims "must stem from the same common nucleus of operative fact," and "must be such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding." *Montefiore Med. Ctr.,* 642 F.3d at 332 (citing *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

18    In the fact section of his complaint, Liang alleges that defendant Scali convinced two individuals—Xiao Yun Li and an unidentified "Officer Phil"—to accuse Laing of "want[ing]" and "attempting" to murder defendant Zee. It is not clear whether he intended to include these allegations as part of his claim against the City defendants for filing false complaints. If he did, they are dismissed along with that claim. Even assuming these allegations are true, Liang makes no claim that any claims or charges were brought against him for attempt or conspiracy to commit murder, nor that he was ever arrested on those grounds. These accusations also concern entirely different events from those on which he bases his Fourth Amendment claim. Hence, they are not part of the same "common nucleus of operative fact," *Montefiore Med. Ctr.,* 642 F.3d at 332, and the court lacks jurisdiction over those claims in any event.

19    Because plaintiff has neither identified nor served John and Jane Doe defendants despite ample time to amend his complaint, and because he has not alleged facts in the complaint supporting Fourth Amendment claims against them, all causes of action against John and Jane Doe defendants are dismissed. *See* Fed.R.Civ.P. 4(m); *Hayward v. City of New York,* No. 12–CV–3220, 2012 WL 3580286, at *2 (E.D.N.Y. Aug. 17, 2012); *Cantave v. New York City Police Officers,* No. 09–CV–2226, 2011 WL 1239895, at *8 n. 4 (E.D.N.Y. Mar.28, 2011).

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 75029
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

R. Bertil PETERSON, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

No. 11 Civ. 3141(DLC).
|
Jan. 9, 2012.

**Attorneys and Law Firms**

Richard Bertil Peterson, Lake Success, NY, pro se.

Diana Marsh Murray, NYC Law Department, Office of the
Corporation Counsel (N.Y.C), New York, NY, for defendants
City of New York and Kevin Watz.

OPINION & ORDER

DENISE COTE, District Judge.

**\*1** *Pro se* plaintiff R. Bertil Peterson ("Peterson") brings
this action against the City of New York (the "City"),
Police Officer Kevin Watz ("Officer Watz"), and one-hundred
unnamed employees, independent contractors, agents, and/
or assignees. Peterson brings claims for compensatory
and punitive damages, attorney's fees, and costs pursuant
to §§ 1962(c) and (d) of the Racketeer Influenced and
Corrupt Organizations Act, ⚑18 U.S.C. § 1962, the Fourth
Amendment to the U.S. Constitution, Article I § 12 of the New
York State Constitution, ⚑42 U.S.C. § 1983, ⚑42 U.S.C. §
1988, ⚑New York Civil Practice Law and Rules § 8303–a,
and New York State law. The City and Officer Watz have filed
a motion to dismiss the complaint for lack of subject matter
jurisdiction and for failure to state a claim. For the following
reasons, the motion to dismiss is granted with respect to all
of plaintiff's federal claims with the exception of his Fourth
Amendment claim of unreasonable seizure. Certain state law
claims and the unreasonable seizure claim are stayed.

*BACKGROUND*

The following facts are taken from the plaintiff's
complaint unless otherwise noted, and are taken to be
true for purposes of this motion. *LaFaro v. New York
Cardiothoracic Group, PLLC,* 570 F.3d 471, 475 (2d
Cir.2009). On March 6, 2010, Peterson was pulled over
for a traffic stop by Officer Watz, and was issued a traffic
summons for driving while using a cell phone. Peterson
claims that he was not, in fact, using his cell phone prior
to being pulled over.

On May 14, 2010, a hearing on the traffic violation
was held before Department of Motor Vehicles ("DMV")
Administrative Law Judge William Lee ("ALJ Lee"). ALJ
Lee convicted Peterson of improper cell phone use in
violation of ⚑New York State Vehicle & Traffic Law, Article
33, § 1225–c. Peterson was fined 130 dollars, including a
30 dollar surcharge. Peterson maintains that he produced
evidence at this hearing, such as his cell phone records,
that demonstrates his innocence. He also claims that he
successfully impeached the testimony of Officer Watz during
cross-examination.

On October 12, 2010, the State of New York DMV
Appeals Board sustained the determination of ALJ Lee. On
November 1, 2010, Peterson filed a petition in the New York
State Supreme Court pursuant to Article 78 of the CPLR
seeking to annul, vacate, and set aside the determination
of the DMV Appeals Board. On January 12, 2011, the
petition was transferred to the Appellate Division, Second
Judicial Department. The defendants have asserted that this
proceeding (the "Article 78 Proceeding") is currently pending
before the Appellate Division, and Peterson has not countered
this assertion.

Peterson filed his complaint in this Court on May 10, 2011.
The complaint asserts the following nine causes of action
against all defendants:

1. A substantive RICO violation pursuant to ⚑18
U.S.C.1962(c);

2. A RICO conspiracy pursuant to ⚑18 U.S.C.1962(d);

**\*2** 3. An illegal search and seizure in violation of the
Fourth Amendment of the Constitution and Article I §
12 of the New York State Constitution;

4. Malicious prosecution pursuant to ⚑§ 1983 and the
Fourth Amendment;

5. Malicious abuse of process under § 1983 and the Fourth Amendment;

6. A procedural due process violation pursuant to § 1983 and the Fourteenth Amendment;

7. A claim for costs and attorney's fees pursuant to 42 U.S.C. § 1988 and CPLR § 8303–a;

8. Malicious prosecution under New York State law; and

9. Malicious abuse of process under New York State law.

On August 15, 2011, defendants the City and Officer Watz moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6), Fed.R.Civ.P., on grounds that the Court should abstain from exercising jurisdiction over the federal claims in light of plaintiff's pending state proceeding, that plaintiff failed to state a federal claim, that the Court should decline to exercise supplemental jurisdiction over State law claims, and that the complaint failed to state a State law claim in any case. The motion to dismiss was fully submitted on October 31, 2011. For the following reasons, the federal claims in counts one, two, and four through seven, and the state law claims in counts eight and nine, are dismissed for failure to state a claim. The remaining claims are stayed until completion of the Article 78 Proceeding.

## DISCUSSION

On a motion to dismiss under Rule 12(b)(6), the court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro,* 570 F.3d at 475 (citation omitted). A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement," and a court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–50, 173 L.Ed.2d 868 (2009). Accordingly, a court may disregard "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Id.* at 1940.

Furthermore, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 1949 (citation omitted). If the factual allegations "are merely consistent with a defendant's liability, [the complaint] stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation omitted).

Applying this plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. There must be a "reasonably founded hope that the discovery process will reveal relevant evidence." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 563 n. 8, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citation omitted). "Plausibility thus depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 430 (2d Cir.2011).

**\*3** Pleadings filed by *pro se* plaintiffs are to be construed liberally. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010). The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims. *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004).

## I. The RICO Claims

The City and Officer Watz have moved to dismiss the complaint's two RICO claims. To state a viable RICO claim pursuant to 18 U.S.C. § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496. To state a RICO claim pursuant to 18 U.S.C.1962(d), a plaintiff must allege a conspiracy to commit a substantive RICO violation pursuant to 18 U.S.C. § 1962(a), (b), or (c). *See* 18 U.S.C. § 1962(d).

An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). In his complaint, Peterson describes the RICO enterprise as consisting of an "associationin-fact" among the named and unnamed defendants. An "association-in-fact" enterprise must have at least three structural features: 1) a purpose, 2) relationships

among those associated with the enterprise, and 3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle v. United States,* 556 U.S. 938, 129 S.Ct. 2237, 2244, 173 L.Ed.2d 1265 (2009). Accordingly, a plaintiff's "conclusory naming of a string of entities does not adequately allege an enterprise." *First Capital Asset Management, Inc. v. Satinwood, Inc.,* 385 F.3d 159, 175 (2d Cir.2004) (citation omitted).

Peterson does not plead sufficient facts to support a plausible claim to the existence of an association-in-fact enterprise. Peterson claims that the defendants participated in a racketeering scheme whereby 1) police officers would illegally stop and detain motorists and falsely accuse them of violating traffic laws, 2) police officers would present false testimony at hearings before DMV Administrative Law Judges ("ALJs"), 3) the DMV ALJs would validate this false testimony and find innocent motorists guilty of traffic violations, and 4) the DMV Appeals Board would affirm these convictions. In furtherance of this scheme, Peterson claims that defendants and their co-conspirators adopted rules that made it easier to convict motorists of traffic violations, such as not providing for prehearing discovery or a supporting deposition, and allowing ALJs to question motorists and convict them based on "clear and convincing evidence." According to Peterson, the scheme garnered over $76 million in traffic fines, surcharges and suspension termination fees.

In support of these claims, Peterson alleges the following facts: that he was not driving while using his cell phone, that he was nonetheless subject to a traffic stop and issued a traffic summons by Officer Watz, that he was convicted by ALJ Lee after an opportunity to present his case and cross-examine Officer Watz, that this conviction was upheld on appeal, that the DMV has adopted certain rules of procedure and evidence in its adjudicatory proceedings that differ from those in more formal proceedings, and that the collection of fines, surcharges and suspension fees from motorists results in income to the City and other municipalities. These facts do not support a plausible claim that the defendants and any co-conspirators shared a common purpose to defraud motorists, that there was a relationship among the defendants, or that the defendants worked towards this common purpose for any amount of time beyond that which was necessary to sustain Peterson's conviction. The sole connection among the entities and individuals in the alleged enterprise is the traffic summons and its subsequent adjudication. [1] The complaint thus fails to plead those facts necessary to nudge plaintiff's

claim across the line "between possibility and plausibility" with respect to all three structural features of an association-in-fact enterprise. *Iqbal,* 129 S.Ct. at 1949.

**\*4** The existence of a RICO enterprise is a necessary element for liability under 28 U.S.C. § 1962(c). *City of N.Y. v. Smokes–Spirits.com, Inc.,* 541 F.3d 425, 439 (2d Cir.2008). Plaintiff's claims pursuant to 28 U.S.C. § 1962(c) must therefore be dismissed.

To state a RICO conspiracy claim pursuant to 28 U.S.C. § 1962(d), a plaintiff must successfully plead the existence of a substantive RICO violation. *See Cofacredit, S.A. v. Windsor Plumbing,* 187 F.3d 229, 244–45 (2d Cir.1999). Thus, because plaintiff has failed to state a claim pursuant to 28 U.S.C. § 1962(c), his claim pursuant to 28 U.S.C. § 1962(d) must also fail.

In his opposition to the motion to dismiss, Peterson cites to a number of cases that, he argues, demonstrate that a municipal corporation such as the City can be a member of a RICO enterprise and that Officer Watz can be named as a RICO defendant. Regardless of whether the City *can* be a member of a RICO enterprise and whether Officer Watz *can* be a RICO defendant, the pleadings do not give rise to a plausible claim that an association-in-fact enterprise *does,* in fact, exist.

Similarly, the plaintiff relies on *Floyd v. The City of New York,* 2011 WL 3856515 (S.D.N.Y.2011), which held that a triable issue of material fact exists as to whether New York Police Department supervisors have a custom or practice of imposing quotas on officers' stop and frisks, summonses, and arrests. *Id.* at \*20. *Floyd* did not involve alleged RICO violations or the alleged existence of an association-in-fact enterprise, and therefore does not salvage plaintiff's RICO claims.

## II. Malicious Prosecution and Abuse of Process

Plaintiff fails to state a claim for malicious prosecution under § 1983 and the Fourth Amendment. To state such a claim, a plaintiff must plead 1) that the defendant initiated a criminal proceeding, 2) that the proceeding was terminated favorably to the plaintiff, 3) that there was no probable cause for the criminal charged, and 4) that the defendant acted maliciously. *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003).

Plaintiff has not been the subject of a criminal proceeding that was terminated in his favor.

Likewise, plaintiff's claim for malicious abuse of process fails to meet the pleading standards of *Iqbal* and *Twombly.* To state a claim for malicious abuse of process under 🚩 § 1983 and the Fourth Amendment, a plaintiff must successfully plead that a defendant 1) employed regularly issued legal process to compel performance or forbearance of some act, 2) with intent to do harm without excuse or justification, and 3) in order to obtain a collateral objective that is outside the legitimate ends of the process. *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). Plaintiff's factual allegations that he was wrongfully subject to a traffic stop and a conviction for driving while using a cell phone, and that this conviction was wrongfully upheld on appeal, fall well short of stating a plausible claim to relief with respect to these three elements. Plaintiff offers no facts to support the conclusion that the defendants intended to do harm without justification, or that they had some collateral objective outside the legitimate ends of Peterson's traffic summons.

**\*5** The elements of malicious prosecution and malicious abuse of process are the same under state law as they are under 🚩 § 1983. *Id .* Thus, the pleadings on these state law claims are insufficient as well.

### III. Procedural Due Process

Plaintiff has not stated a 🚩 § 1983 claim for violation of procedural due process. To succeed on a procedural due process claim, a plaintiff must establish (1) a deprivation of life, liberty or property (2) without due process of law. *See* ⚠️ *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). In accordance with New York Vehicle and Traffic Law § 225, plaintiff has been afforded a hearing in front of an ALJ at which he could have been represented by a lawyer, an opportunity to cross-examine Officer Watz, an administrative appeal, and an appeal before the Appellate Division that is currently pending. Plaintiff has been afforded an opportunity to be heard "at a meaningful time and in a meaningful manner." 🚩 *Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

### IV. Attorney's Fees

Plaintiff's claim for attorney's fees pursuant to 🚩 42 U.S.C. § 1988 fails because, although plaintiff is an attorney, he is proceeding *pro se* and is thus not entitled to attorney's fees.

*See* 🚩 *Kay v. Ehrler,* 499 U.S. 432, 437–38, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991).

### V. Fourth Amendment

The sole remaining federal claim is the Fourth Amendment unreasonable search and seizure claim. "[T]he Fourth Amendment requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." 🚩 *United States v. Harrison,* 606 F.3d 42, 45 (2d Cir.2010) (citation omitted). According to the complaint, there was no legal justification whatsoever for the traffic stop because Peterson was not observed using his cell phone while driving as claimed by Officer Watz. The complaint provides detailed facts in support of this conclusion, including Peterson's cell phone records and his recollections of the traffic stop.

Defendants argue that this claim should be dismissed because a pre-arraignment, non-felony summons requiring a later court appearance does not constitute a seizure under the Fourth Amendment. *See* 🚩 *Burg v. Collen Gosselin,* 591 F.3d 95, 101 (2d Cir.2010). But Peterson claims that he was issued such a summons *and* that he was subjected to a traffic stop. His unreasonable seizure claim therefore survives.

### VI. Abstention

This litigation will be stayed pending completion of the Article 78 Proceeding. Generally, district courts have a "virtually unflagging obligation to exercise the jurisdiction given them." 🚩 *Royal and Sun Alliance Ins. Co. of Canada v. Century,* 466 F.3d 88, 92 (2d Cir.2006) (citation omitted). *Younger v. Harris,* 401 U.S. 37 (1971), and its progeny delineate an exception to this rule, requiring federal courts to abstain where appropriate to "allow state courts to resolve pending matters within their jurisdiction." 🚩 *Washington v. County of Rockland,* 373 F.3d 310, 318 (2d Cir.2004). In *Younger,* the Supreme Court explained that a federal court, "anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger,* 401 U.S. at 44.

Abstention is mandatory when "(1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." *Hartford Courant Co. v. Pellegrino,* 380 F.3d 83, 100–01 (2d Cir.2004) (citation omitted). While "*Younger* was a challenge to an ongoing state criminal case ... the doctrine has been extended with equal force to federal civil litigation challenging certain other state proceedings." *Kaufman v. Kaye,* 466 F.3d 83, 86 (2d Cir.2006). Such state proceedings may include Article 78 proceedings pursuant to the CPRL. *See Christ the King regional High School v. Culvert,* 815 F.2d 219, 224–25 (2d Cir.1987).

**\*6** When the *Younger* requirements are met, the doctrine mandates dismissal of claims for both injunctive and declaratory relief. *See Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). Dismissal may not be appropriate, however, when the *Younger* requirements are met in a lawsuit for damages. *See Kirschner v. Klemons,* 225 F.3d 227, 237–38 (2d Cir.2000). In such cases, a district court may stay the federal case pending resolution of the state proceeding. *Id.* at 238–39.

Peterson's Article 78 petition was transferred to the Appellate Division on January 12, 2011, and Peterson does not challenge defendants' claim that it is currently pending. The Article 78 Proceeding implicates an important state interest, specifically, the safety of the roads and highways. *See Dixon v. Love,* 431 U.S. 105, 114, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977). Furthermore, a finding for or against Peterson on the Fourth Amendment unreasonable seizure claim would rest on the very same factual determinations as the Article 78 Proceeding: whether Peterson was using his cell phone before Officer Watz pulled him over. Such a determination by this Court would fail to afford the Appellate Division proper respect for its function as a judicial entity capable of adjudicating federal claims, and call into question the State proceedings. *See Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 10, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987) (grounding abstention in "the notion of 'comity,' that is, a proper respect for state functions") (citation omitted). Accordingly, the litigation is stayed.

### CONCLUSION

The August 15, 2011 motion to dismiss is granted with respect to plaintiff's federal claims for violations of the RICO statute under 18 U.S.C. §§ 1962(c) and (d), for malicious prosecution and malicious abuse of process under 42 U.S.C. § 1983 and state law, for violation of procedural due process under 42 U.S.C. § 1983, and for attorney's fees pursuant to 42 U.S.C. § 1988. The remainder of the action is stayed pending resolution of plaintiff's Article 78 proceedings.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 75029

### Footnotes

1    By all accounts, the proceedings were held in full accordance New York's Vehicle and Traffic Law and the Rules and Regulations of the State of New York. *See* Vehicle and Traffic Law §§ 225 and 228; 15 NYCRR § 124.4. Plaintiff does not claim otherwise; nor does he claim that these regulations themselves violate any state or federal law.

---

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 332996
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

Pakenauth GEER, Plaintiff,

v.

Audrey I. PHEFFER, Chief Clerk; Jack
Warsawsky, District Attorney, Catherine
H. Tabinsky, Court Reporter, Defendants.

No. 14–CV–2829 (CBA).
|
Signed Jan. 22, 2015.
|
Filed Jan. 23, 2015.

**Attorneys and Law Firms**

Pakenauth Geer, Comstock, NY, pro se.

## MEMORANDUM & ORDER

AMON, Chief Judge.

**\*1** Plaintiff Pakenauth Geer, currently incarcerated at Washington Correctional Facility, in Comstock, N.Y., brings this *pro se* complaint, under 42 U.S.C. § 1983. Plaintiff's request for *in forma pauperis* status, pursuant to 28 U.S.C. § 1915, is granted for the limited purpose of this order. For the reasons set forth below, plaintiffs complaint is dismissed for failure to state a claim upon which relief may be granted. [1]

## Background

Plaintiff alleges that, on April 4, 2005, he was sentenced —apparently in New York state court—to a "12–17 years split bid, with parole release within (5 years)." (Complaint ("Compl.") at 4.) Plaintiff's complaint sets forth three claims, which arise out of alleged actions by state officials subsequent to the imposition of that sentence. First, he alleges that Audrey Pheffer—identified as "chief clerk at [the] Queens County Clerk's office"—violated unspecified rights under the United States Constitution by refusing to provide him with copies of documents relating to his sentencing and imprisonment.

(Compl. at 4–5, 11–13, 16–18.) Based on the complaint and correspondences included as part of it, plaintiff appears to have filed requests for these documents based on two distinct freedom of information regimes. Plaintiff made one request pursuant to New York's state Freedom of Information Law ("FOIL"), under N.Y. Pub. Off. Law § 87. (Compl. at 4, 11–13.) He made a second pursuant to the federal Freedom of Information Act ("FOIA"), under 5 U.S.C. § 552. (Compl. at 5, 12–13.) The office appears to have responded that his sentencing and commitment papers could be viewed but not copied. (Compl. at 16–17.)

Second, plaintiff alleges that Jack Warsawksy, as a member of the Queens District Attorney's Office, induced court reporter Catherine Tabinsky to falsify a transcript in plaintiff's case. (Compl. at 4–5.) That, plaintiff claims, resulted in the extension of his sentence to seventeen years. (Compl. at 4.) Plaintiff remains in prison even though, according to plaintiff, his April 4, 2005, sentence contemplated release on parole after five years, which due in part to time served in pre-trial detention, would have led to plaintiff's release in 2006. (*Id.*)

Plaintiff asks that the Court: (1) order state officials to comply with his FOIL and FOIA requests; (2) order him released from his allegedly "illegal [ ] imprisonment"; and (3) award him monetary damages totaling $10 million on the basis of that illegal imprisonment. (Compl. at 5.)

## Standard of Review

Under the Prison Litigation Reform Act ("PLRA"), a district court "shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A. Upon review, a district court shall dismiss a prisoner's complaint *sua sponte* if the complaint is "frivolous, malicious, or fails to state a claim upon which relief may be granted; or seeks monetary relief from a defendant who is immune from such relief." *Id.; Liner v. Goord,* 196 F.3d 132, 134 & n. 1 (2d Cir.1999) (noting that *sua sponte* dismissal of frivolous prisoner complaints, pursuant to the PLRA, is not only permitted but mandatory); *see also Tapia–Ortiz v. Winter,* 185 F.3d 8, 11 (2d Cir.1999).

**\*2** Moreover, at the pleadings stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co.,* 621 F.3d 111, 123 (2d Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

It is axiomatic that *pro se* complaints are held to less stringent standards than pleadings drafted by attorneys, and the Court is required to construe the plaintiff's *pro se* complaint liberally and interpret it raising the strongest arguments it fairly suggests. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980). Liberal construction is particularly important when a *pro se* litigant's pleadings allege civil rights violations. *Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–93 (2d Cir.2008). Finally, a *pro se* complaint should not be dismissed without granting a *pro se* plaintiff leave to amend "at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (internal quotation marks omitted).

### Discussion

#### 1. FOIA and FOIL Requests

Plaintiff's freedom of information claim, as pleaded, is a component of the plaintiff's Section 1983 claim. However, given the Court's responsibility to construe a *pro se* complaint liberally, the Court first evaluates this claim as if it were a standalone claim pursuant to FOIA and FOIL. On that interpretation, this part of plaintiff's complaint fails.

First, FOIA only authorizes suits against federal agencies and does not apply to individual officers or state agencies. *See* 5 U.S.C. §§ 551(1), 552(a)(4)(B), (f) (authorizing a private right of action against a non-compliant "agency," the definition of which includes neither an individual official nor a state agency); *see also Grand Cent. Partnership. Inc. v. Cuomo,* 166 F.3d 473, 484 (2d Cir.1999) (denying FOIA

relief against an individual city official and stating that "it is beyond question that FOIA applies only to federal and not to state agencies"). Second, although FOIL is the right vehicle for a state agency documents request, federal district courts lack jurisdiction to decide whether a defendant's actions violated FOIL. *See Schuloff v. Fields,* 950 F.Supp., 66, 67 (E.D.N.Y.1997). The appropriate way to bring such a claim is "a state court proceeding pursuant to N.Y. C.P.L.R. Article 78 upon exhaustion of administrative remedies." [2] *Luo v. Baldwin Union Free Sch. Dist.,* No. 12–cv–6054, 2013 WL 4719090, at \*4 (E.D.N.Y. Sept.3, 2013) (internal quotation marks omitted) (quoting *Schuloff,* 950 F.Supp. at 67–68); *see also* N.Y. Pub. Off. Law § 89(4)(b) (laying out appeals procedure).

**\*3** Here, plaintiff's FOIA claim fails because defendant Pheffer is not a federal agency but an individual employed by a state agency. *See Grand Cent. Partnership,* 166 F.3d at 484. Plaintiff's FOIL claim fails because this Court lacks jurisdiction over it. [3] *See Schuloff,* 950 F.Supp. at 67. Therefore, to the extent that plaintiff's complaint arises solely under FOIA or FOIL, as distinguished from a Section 1983 violation, it is dismissed because it fails to state a claim upon which relief may be granted. 28 U.S.C. § 1915A(b)(1).

#### 2. Section 1983 and FOIL

Plaintiff's freedom of information requests fare no better when interpreted as predicates for his Section 1983 claim. That is because, as a matter of law, FOIL violations do not give rise to a colorable claim under 42 U.S.C. § 1983. [4] To maintain a Section 1983 action, plaintiff must allege that the conduct at issue: (1) was "committed by a person acting under color of state law" and (2) "deprived [plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Corneio v. Bell,* 592 F.3d 121, 127 (2d Cir.2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)) (internal quotation marks omitted).

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Morris–Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Okla. City v. Turtle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

"[A] violation of state law is not cognizable under 🚩 § 1983."
🚩 *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985).
FOIL violations are no exception to that rule. *Old St.
George's LLC v. Bianco,* 389 F. App'x 33, 35 (2d Cir.2010).
Moreover, courts in this district have repeatedly held that
FOIL violations do not constitute federal constitutional
claims sufficient to satisfy the second prong of 🚩 Section
1983. *See, e.g., Luo,* 2013 WL 4719090, at *4 (holding that
FOIL violations do not violate First Amendment); *McLean,*
2010 WL 2609341, at *2–3, 7 (finding, in due process
challenge, that FOIL procedures are not "fundamentally
unfair" on their face and that a nearly six year delay in
disclosing documents did not imbue alleged FOIL violation
with constitutional significance); *Blount v. Brown,* No. 10–
cv–1548, 2010 WL 1945858, at *2 (E.D.N.Y. May 11, 2010)
(holding that plaintiffs, in procedural due process context,
have no property interest in FOIL documents); *Schuloff,*
950 F.Supp. at 68 (FOIL requests cannot implicate First
Amendment because it "does not encompass the right to
compel a speaker to speak or otherwise provide information
and ideas.")

Here, plaintiff states that defendant Pheffer's failure to comply
with his FOIL request violated his "Federal Rights" under
"the United States Constitution." [5] (Compl. at 5.) He does not
specify to which rights he is referring. Efforts in 🚩 Section
1983 cases to link FOIL violations to federal rights violations
have repeatedly and uniformly failed to persuade courts in this
district. That includes cases involving what appear to be fairly
egregious FOIL violations. *See McLean,* 2010 WL 2609341,
at *2–3, 7 (six year delay in disclosing FOIL documents to
prisoner). Nothing in plaintiff's complaint suggests that his
FOIL-related claim is distinguishable from past cases. [6] The
complaint, therefore, does not satisfy the second prong of
🚩 Section 1983 and is dismissed for failing to state a claim
upon which relief may be granted. 28 U .S.C. § 1915A(b)(1).

### 3. 🚩 Section 1983 and Illegal Imprisonment

**\*4** Insofar as plaintiff seeks relief from his allegedly illegal
imprisonment, his complaint must be dismissed. Construed
broadly, plaintiff's complaint may be read to seek relief in
the form of release from Washington Correctional Facility or
money damages. (Compl. at 5.) United States Supreme Court
precedent forecloses either form of relief.

In *Preiser v. Rodriguez,* the Supreme Court held that
🚩 Section 1983 is not a proper means for a state
prisoner to "challeng[e] the very fact or duration of ...
physical imprisonment," as opposed to the conditions of his
imprisonment. 🚩 411 U.S. 475, 499–500, 93 S.Ct. 1827, 36
L.Ed.2d 439 (1973); *see also* 🚩 *Poventud v. City of New
York,* 750 F.3d 121, 128 (2d Cir.2014) (outlining *Preiser*
doctrine). For such challenges, the "sole federal remedy is a
writ of habeas corpus." *Abdul–Hakeem v. Koehler,* 910 F.2d
66, 69 (2d Cir.1990) (quoting 🚩 *Preiser,* 411 U.S. at 500)
(internal quotation marks omitted). Subsequently, in 🚩 *Heck
v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383
(1994), the Supreme Court held further that 🚩 Section 1983
suit for money damages grounded in an allegedly unlawful
criminal sentence must comply with what has come to be
called the "favorable termination" rule. *See Foster v. Diop,*
No. 11–cv–4731, 2013 WL 1339408, at *7 (E.D.N.Y. Mar.31,
2013) (citing 🚩 *Peralta v. Vasquez,* 467 F.3d 98, 100 (2d
Cir.2006)). That rule states:

> [I]n order to recover damages for
> allegedly unconstitutional conviction
> or imprisonment, or for other harm
> caused by actions whose unlawfulness
> would render a conviction or sentence
> invalid, a 🚩 § 1983 plaintiff must
> prove that the conviction or sentence
> has been reversed on direct appeal,
> expunged by executive order, declared
> invalid by a state tribunal authorized
> to make such determination, or called
> into question by a federal court's
> issuance of a writ of habeas corpus,
> 🚩 28 U.S.C. § 2254.

🚩 *Peralta,* 467 F.3d at 102 (quoting 🚩 *Heck,* 512 U.S. at
486–87). *Heck* tasked district courts with deciding, when a
state prisoner seeks damages under 🚩 Section 1983, whether
a favorable judgment "would necessarily imply the invalidity
of his conviction or sentence ...." 🚩 *Id.* at 102 (quoting
🚩 *Heck,* 512 U.S. at 487). If so, dismissal is required, unless

the plaintiff can show that his conviction or sentence has already been invalidated. On the other hand, *Heck* is no bar to suit if a successful 🚩 Section 1983 damages claim would not necessarily imply that his conviction or sentence was invalid. *Id.*

To the extent plaintiff seeks release from prison, he must file a federal habeas petition, pursuant to 🚩 28 U.S.C. § 2254. [7] As for money damages, the plaintiff's core contention is that his imprisonment is illegal and that his sentence is the product of a fraud perpetrated by defendants Warsawsky and Tabinsky. (Compl. at 4–5 (On the basis of documents allegedly falsified by these defendants, "my sentence [was] change[d] behind my back by an unknown intelligence judge and that's how I'm in jail illegally ....").) The Court, therefore, finds that, should plaintiff's 🚩 Section 1983 claim succeed, it would "necessarily imply the invalidity" of his sentence. *See* 🚩 *Heck,* 512 U.S. at 487. The only way for plaintiff's claim to survive is for him to show that his conviction or sentence has already been invalidated in one of the ways set forth in *Heck. Id.* at 486–87. Plaintiff has not put forth any allegations to that effect. Accordingly, his claim must be dismissed for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915A(b)(1).

### Conclusion

**\*5** Plaintiff's complaint is dismissed for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915A(b)(1). The Court does not grant leave to amend because the complaint, even when liberally construed, fails to give "any indication that a valid claim might be stated" in this particular case. *See* 🚩 *Gomez,* 171 F.3d at 795. However, that does not mean plaintiff is without recourse. With respect to his FOIL request, it bears emphasizing that nothing in this order precludes plaintiff challenging the response to his request through the administrative appeals processes or Article 78 proceedings referenced above. *See* Section 1, *supra.* Moreover, as to claims arising from plaintiff's sentencing and imprisonment, he has already filed a habeas petition and nothing in this order impedes his ability to pursue that avenue of relief. *See Geer v. People of the State of New York,* No. 14–cv–5216. Moreover, should plaintiff succeed in invalidating his sentence, a valid 🚩 Section 1983 claim for money damages may arise at a later date. *See* 🚩 *Heck,* 512 U.S. at 486–87.

The Court certifies, pursuant to 🚩 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. 🚩 *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 332996

---

### Footnotes

[1]  On February 28, 2014, plaintiff filed an action pursuant to 🚩 42 U.S.C. § 1983 against the same defendants making similar factual allegations. Plaintiff's submission failed to include the filing fee or a completed *in forma pauperis* application. By letter entered March 5, 2014, plaintiff was provided with the proper form and was instructed that, in order to proceed, he had to return the completed *in forma pauperis* application to the Court. Plaintiff failed to do so, and the Court dismissed the matter on May 9, 2014. *See Geer v. Pheffer,* No. 14–cv–1447.

[2]  The "administrative remedies" typically involve a resort to the allegedly non-compliant agency's appeals body. *See McLean v. Brown,* No. 08–cv–5200, 2010 WL 2609341, at *7 (E.D.N.Y. June 25, 2010).

3     However, nothing in this order prevents the plaintiff from pursuing his FOIL claim through the state administrative appeals process and, if necessary, an Article 78 proceeding.

4     FOIA non-compliance is immaterial to a ⚐ Section 1983 claim because FOIA, as noted in the prior section, only applies to federal agencies. *See Reed v. Medford Fire Dep't., Inc.,* 806 F.Supp.2d 594, 607 (E.D.N.Y.2011). Therefore, defendant Pheffer could not have violated any of plaintiff's rights based on her response to plaintiff's FOIA request.

5     Plaintiff claims that defendant Pheffer's alleged failure to comply with his FOIL request violates "section 2255," (Compl. at 5), likely a reference to 28 U.S.C. § 2255. That statute is wholly inapplicable to plaintiff's situation. It applies only to prisoners sentenced under federal law by a federal court. 28 U.S.C. § 2255(a). Plaintiff was sentenced under state law by a state court. (*See* Compl. at 14–15.) Even if plaintiff intended to refer to the state custody habeas statute, an order requiring a state official to comply with a FOIL request—if granted—would not constitute a remedy under that statute. *See* ⚐ 28 U.S.C. § 2254; *see also* Section 3, *infra.*

6     In fact, it seems from materials included as part of plaintiff's complaint, that the Queens County Clerk's Office has responded to plaintiff's request and alerted him to the fact that the requested documents "may be viewed but not copied." (Compl. at 16–20.)

7     Since filing the instant suit, plaintiff has sought a writ of habeas corpus before this Court. The petition was filed September 4, 2014, and has not yet been adjudicated. *See Geer v. People of the State of New York,* No. 14–cv–5216. This order does not affect or make any representation as to the merit of plaintiff's habeas petition.

---

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.     5

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Satterlee v. Internal Revenue Service,   W.D.Mo.,   June 23, 2021

2006 WL 2850608
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Michael SUSSMAN, Plaintiff,

v.

UNITED STATES DEPARTMENT OF JUSTICE;
United States Department of Transportation;
Transportation Security Administration; United
States Postal Service; United States Secret
Service; Internal Revenue Service, Defendants.

No. 03 Civ. 3618(DRH)(ETB).
|
Sept. 30, 2006.

**Attorneys and Law Firms**

Michael Sussman, East McKeesport, PA, Plaintiff Pro Se.

Roslynn Mauskopf, United States Attorney for the Eastern District of New York, by Kathleen A. Mahoney, Esq., Brooklyn, NY, for Defendants.

**MEMORANDUM & ORDER**

HURLEY, Senior District Judge.

*INTRODUCTION*

**\*1** This case arises out of Plaintiff's Freedom of Information Act ("FOIA") and Privacy Act ("PA") requests for all investigative and collection records pertaining to or naming him, made upon various federal agencies (collectively, "government" or "Defendants"). Plaintiff alleges various failures to comply with requests, bringing claims against the United States Department of Justice ("DOJ") in Counts 1–56 and 71; the United States Department of Transportation ("DOT") in Counts 57–60; the Transportation Security Administration ("TSA") in Counts 61–64; the United States Postal Service ("USPS") in Counts 65–66; the United States Secret Service ("USSS") in Counts 67–68; and the Internal Revenue Service ("IRS") in Counts 69–70. In all, Plaintiff

brought seventy-one different claims requesting equitable relief. Both parties have moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons set forth herein, the Court grants in part and denies in part Defendants' motion, and grants in part and denies in part Plaintiff's motion.

*BACKGROUND*

From July 2002 through June 2003, Plaintiff wrote letters to various federal agencies requesting records pursuant to the FOIA and the Privacy Act. Specifically, Plaintiff sent thirty-five letters seeking agency records about himself under the FOIA/PA, four FOIA/PA requests for seven categories of documents and information relating to "No Fly" or "Selectee" lists, *i.e.* watch lists, three FOIA/PA requests for results of searches of specific databases, and, finally, two FOIA requests for agency records to the DOJ Bureau of Prisons ("BOP"). Because of the number of requests at issue, the Court will not detail the contents of each, but rather will discuss the contents of individual requests as necessary for the below analysis.

Plaintiff brought FOIA and Privacy Act claims with regard to each of these requests, save the request to the BOP (Count 71), which only garnered a claim under the FOIA. Plaintiff filed suit on June 23, 2003. Defendants filed their Answer on December 4, 2003. Defendants then moved for summary judgment on July 16, 2004, and Plaintiff filed a cross-motion for summary judgment on August 16, 2004. On March 31, 2005, this Court issued an order requesting supplemental briefing on four issues. The parties provided the requested briefing.

*STANDARD*

In FOIA/PA cases, summary judgment is recognized as the primary mechanism by which a district court will resolve the issues presented. *See Misciavige v. IRS,* 2 F.3d 366, 369 (11th Cir.1993) ("Generally, FOIA cases should be handled on motions for summary judgment, once the documents in issue are properly identified."). A moving party is entitled to summary judgment if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986). To prevail at the summary judgment stage in a FOIA and Privacy Act case, a defending agency must demonstrate that its search for the requested material was adequate and that any withheld material is exempt from disclosure. *See* Carney v. United States Dep't of Justice, 19 F.3d 807, 812 (2d Cir.1994).

## DISCUSSION

**\*2** At issue are thirty-five FOIA/PA requests, and one FOIA request by Plaintiff. Each of the FOIA/PA requests resulted in two legal claims: one under the FOIA and one under the Privacy Act. The government moves for summary judgment as to all seventy-one claims pursuant to a number of theories. First, Defendants argue that the majority of Plaintiff's claims fail for procedural reasons, *i.e.,* Plaintiff failed to exhaust his administrative remedies. Defendants argue that other claims fail for substantive reasons, *i.e.,* the agency did not have the records requested, the agency released all of the records requested, or the requests were inadequate. Finally, Defendants argue that the remaining claims fail because the requested documents were statutorily exempt from release. Plaintiff contests each of these arguments.

One thing to keep in mind while reading the below analysis is that each of the letters consisted of a number of different requests. When a request fails for procedural reasons, the entire request fails. When considering the substantive validity of a request, however, the outcome sometimes depends on the specific request. Therefore, a given letter may contain multiple requests that fail for different reasons.

After briefly surveying the legal landscape of the FOIA and Privacy Act, the Court will address the Government's motion for summary judgment. The Court will then address any remaining claims pursuant to Plaintiff's counter-motion for summary judgment.

## I. The Statutes

The FOIA allows persons to request any public records subject to disclosure. *See* 5 U.S.C. § 552(a)(3). The Privacy Act allows persons to request records pertaining specifically to them. *See* 5 U.S.C. § 552a(d)(1). Both allow persons to bring suit in federal district court to challenge an

agency refusal to disclose. *See* 5 U.S.C. § 552(a)(4)(B); 5 U.S.C. § 552a(g)(1)(B).

"FOIA was enacted in order to promote honest and open government and to assure the existence of an informed citizenry in order to hold the governors accountable to the governed." National Council of La Raza v. Department of Justice, 411 F.3d 350, 355–56 (2d Cir.2005) (citations and quotation marks omitted). FOIA strongly favors a policy of disclosure, and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act. *See* La Raza, 411 F.3d at 355; *see also* 5 U.S.C. § 552(a)(3), (b)(1)-(9). Thus, "[u]pon request, FOIA mandates disclosure of records held by a federal agency unless the documents fall within enumerated exemptions." Department of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 7, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001) (internal citations omitted); Tigue v. United States Dep't of Justice, 312 F.3d 70, 76 (2d Cir.2002). The Supreme Court has counseled that these exceptions are to be interpreted narrowly in the face of the overriding legislative intention to make records public. *See* Klamath, 532 U.S. at 7–8.

**\*3** "[I]n order to protect the privacy of individuals identified in information systems maintained by Federal agencies, it is necessary ... to regulate the collection, maintenance, use, and dissemination of information by such agencies." 5 U.S.C. § 552a(5) (quoted in Doe v. Chao, 540 U.S. 614, 618, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004)). Accordingly, Congress passed the Privacy Act. The relevant provision of the Privacy Act is 5 U.S.C. § 552a(d)(1), which provides that "[e]ach agency that maintains a system of records shall ... upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him and upon his request, a person of his own choosing to accompany him, to review the record and have a copy made of all or any portion thereof in a form comprehensible to him...." The Act defines "system of records" as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C.A. § 552a(a)(5); *see also* Bechhoefer v. United States

*Dep't of Justice,* 312 F.3d 563, 566 (2d Cir.2002). "[T]he prescriptions of the Act do not come into play whenever a document falls into the possession of an employee of a covered agency. It is only when the document becomes incorporated into a record-keeping system under the agency's control that the Act's prescriptions apply." *Bechhoefer,* 312 F.3d at 566.

Unlike the FOIA, an information access law, the Privacy Act is an information protection law. In particular, while any individual may make a request for records pursuant to the FOIA, under the Privacy Act, only an individual, or his authorized representative, may request the individual's records. 5 U.S.C. §§ 552, 552a(d)(1). Moreover, while the FOIA applies to any type of record, the Privacy Act narrowly applies to records that agencies maintain within their "systems of records" that are retrievable by an individual's name, social security number or other or personal identifier. 5 U.S.C. §§ 552, 552a(d). Additionally, unlike the FOIA, the Privacy Act allows individuals to request that agencies amend their records. 5 U.S.C. § 552a(d)(2).

The Privacy Act requires agencies that maintain systems of records to establish procedures by which they notify requesters of whether any systems of records contain records pertaining to them. 5 U.S.C. § 552a(f)(1). Moreover, the Privacy Act requires agencies to "define reasonable times, places, and requirements for identifying an individual who requests his record or information pertaining to him before the agency shall make the record or information available to the individual." 5 U.S.C. § 552a(f)(2). Furthermore, the Privacy Act requires agencies to "establish procedures for reviewing a request from an individual concerning the amendment of any record or information pertaining to the individual, for making a determination on the request, for an appeal within the agency of an initial adverse agency determination, and for whatever additional means may be necessary for each individual to be able to exercise fully his rights under [the Privacy Act]." 5 U.S.C. § 552a(f)(4).

**\*4** Because of the competing goals of each statute (information access versus information protection and amendment), "each provides or limits access to material not opened or closed by the other." *Greentree v. United States Customs Serv.,* 674 F.2d 74, 78 (D.C.Cir.1982). Consequently, requesters seeking the broadest access to information about

themselves make their requests pursuant to both statutes. To facilitate an individual's broad access to his files, Congress added a provision to the Privacy Act that specifies that an exemption under the FOIA is not a bar to release files under the Privacy Act and that a Privacy Act exemption is not to bar release of files under the FOIA. See 5 U.S.C. § 552a(t). This provision of the Privacy Act, which was added in the 1984 amendments after the circuits were split as to whether an exemption under one statute is a bar to release under the other, yields the curious result that, even if the Privacy Act explicitly exempts an agency from having to disclose a record, if the record is available under the FOIA, the requester is entitled to it. *See Greentree,* 674 F.2d at 236 ("[T]he Privacy Act represents a Congressional mandate that the Privacy Act not be used as a barrier to FOIA access.").

## II. Failure to Exhaust Administrative Remedies

A plaintiff must exhaust his administrative remedies under the Privacy Act before the court can exercise jurisdiction over his claim. *Larsen v. Hoffman,* 444 F.Supp. 245 (D.D.C.1977). Similarly, under the FOIA, administrative remedies must be exhausted prior to judicial review. *Thomas v. Office of the United States Attorney,* 171 F.R.D. 53, 55 (E.D.N.Y.1997). The purpose of the requirement is to allow the agency the opportunity to exercise its expertise and develop a record for review. *In re Steele,* 799 F.2d 461, 466 (9th Cir.1986). Thus, when a person asks a court to compel an agency to produce documents before that person has made a formal request to the agency for those documents, the court will decline to act. *See id.;* *Sinito v. United States Dep't of Justice,* 176 F.3d 512, 516 (D.C.Cir.1999); *Taylor v. Appleton,* 30 F.3d 1365, 1367–68 & n. 3 (11th Cir.1994) (concluding that exhaustion, although not jurisdictional, is "condition precedent" to filing suit). Permitting a plaintiff to pursue judicial review without benefit of prior administrative consideration would undercut "the purposes of exhaustion, namely, 'preventing premature interference with agency processes, ... afford [ing] the parties and the courts the benefit of [the agency's] experience and expertise, ... [and] compil[ing] a record which is adequate for judicial review.' " *Ryan v. Bentsen,* 12 F.3d 245, 247 (D.C.Cir.1993) (quoting *Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (alteration original)).

The Acts have slightly different positions when it comes to filing an action without having obtained a response from the

relevant agency. The FOIA requires agencies to respond to requests for documents within ten days, and to respond to appeals within twenty. *See* 5 U.S.C. § 552(a)(6)(A). If the agency fails to comply with these time limits, the person making the request "shall be deemed to have exhausted his administrative remedies." *See* 5 U.S.C. § 552(a)(6)(c)). Finally, under the FOIA, an interim response informing the plaintiff that the agency is in the process of addressing his request is adequate to satisfy the requirement that the agency reply within the statutory period. *Sloman,* 832 F.Supp. at 66 (citing *Open America v. Watergate Special Prosecution Force,* 547 F.2d 605, 610 (D.C.Cir.1976)).

**\*5** The Privacy Act, by contrast, does not allow for "constructive exhaustion," and prohibits a requester from filing an action without having obtained a response from the agency. *See Davis v. United States,* 84 Fed. Appx. 97 (D.C.Cir.2003) ("he failed to exhaust his administrative remedies, a prerequisite to filing a Privacy Act complaint in district court"); *Taylor v. United States Treasury Dep't,* 127 F.3d 470, 476–77 (5th Cir.1997) (applying the "jurisprudential exhaustion doctrine" and dismissing plaintiff's suit against the IRS for failure to exhaust the IRS's non-statutory administrative procedure for Privacy Act requests); *Pollack v. Department of Justice* 49 F.3d 115, 117 n. 1 (4th Cir.1995) ("In his request and subsequent enforcement action, Pollack also relied on the Privacy Act," 5 U.S.C. § 552a.... [T]he Privacy Act contains no equivalent to FOIA's 'constructive exhaustion' provision which, as we point out in this opinion, enabled the district court to review his FOIA request."); *Lane v. Department of Justice,* No. 02 Civ. 06555(ENV), 2006 WL 1455459, at \*6 (E.D.N.Y. May 22, 2006) ("the Privacy Act also requires a requester to exhaust his or her administrative remedies prior to commencing suit in federal court") (citing *Tota v. United States,* No. 99 Civ. 0445E (SC), 2000 WL 1160477, at \* 1 (W.D.N.Y. July 31, 2000)); *Schmidt v. United States Dep't of Defense,* No. 04 Civ. 1159(WWE), 2005 WL 1606910, at \*3 (D.Conn. July 7, 2005) ("jurisdictional provisions of the Privacy Act are inapplicable where a plaintiff has not exhausted available administrative remedies under the act"); *Hogan v. Huff,* No. 00 Civ. 6753(VM), 2002 WL 1359722, at \*4 (S.D.N.Y. June 21, 2002).

Once the agency has responded to the request, the petitioner may no longer exercise his option to go to court immediately. Rather, the requester can seek judicial review only after he has unsuccessfully appealed to the head of the agency as to any denial and thereby exhausted his administrative remedies. Thus, if the agency responds to a FOIA request before the requester files suit, the ten-day constructive exhaustion provision in 5 U.S.C. § 552(a)(6)(C) no longer applies; actual exhaustion of administrative remedies is required. *Oglesby v. United States Dep't of Army,* 920 F.2d 57, 61 (D.C.Cir.1990); *Sloman,* 832 F.Supp. at 66.

As a preliminary matter, three of the requests can be considered quickly as the only arguments levied against them by the government is that they were never received. The government asserts that it never received the June 6, 2003 FOIA/PA request to the DOJ Criminal Division (Counts 5–6); the May 31, 2003 FOIA/PA request to the FBI field office in Melville, New York (Counts 29–30); and the May 15, 2003 FOIA/PA request to the FBI field office in Tampa, Florida (Counts 35–36). (*See* Defs.' Summ. J. Mem. at 10; Defs.' 56.1 Statement ¶ 12, 30.)

With regard to the June 6 DOJ request, Plaintiff argues that "he verified that the USDOJCD did receive delivery" because he sent the request via Priority Mail with tracking. (*See* Pl.'s Opp'n Re: Counts I–VI at 5.) Plaintiff makes similar contentions with regard to the Melville and Tampa requests. (*See* Pl.'s Opp'n Re: Counts IX–LVI at 9.) Despite Plaintiff's assertions, he provides no evidence to support his case: he simply provides copies of receipts to confirm that the request was in fact mailed, but nothing to indicate that the requests were in fact received. Furthermore, he has provided no evidence of bad faith on the government that would undermine its assertion. Finally, even if the government had received the request, Plaintiff has not asserted any attempt on his part to exhausted his administrative remedies as to these requests. Accordingly, the Court grants Defendants' motion for summary judgment as to Counts 5–6, 29–30, and 35–36.

*A. Failure to Appeal*

**\*6** The government also contends that Plaintiff failed to file appeals for a number of claims. Because the statutes have different approaches to the exhaustion requirement, the Court analyzes the FOIA claims and the Privacy Act claims separately.

*1. FOIA: Claims 7 (W.D.Penn.), 17, 21, 37, 39, 41, 51, 53, 69 (Atlanta), 71*

Pursuant to the FOIA, if an agency receives an individual's FOIA request, it has ten working days (or in "unusual circumstances" an agency may obtain 10 additional days) to notify the requester of whether it will comply with the request. *Fisher v. F.B.I,* 94 F.Supp.2d 213, 217 (D.Conn.2000). Note, the response merely informs the requester whether the agency *will* comply; the agency is not required to fully comply within that ten-day time frame. If the agency fails to respond within the statutory time limits, the requester is deemed to have exhausted his administrative remedies, and the requester has a right to sue the agency for civil remedies in federal court. *Id.* However, if the agency either complies or agrees to comply with the request, even if its reply is late or after litigation has begun, the requester's claim for relief under the FOIA is moot. *See id; Grove v. CIA,* 752 F.Supp. 28 (D.C.Cir.1990). Alternatively, if a federal agency denies an individual's request, the requester must exhaust his administrative remedies within the agency before he can obtain the right to sue the agency. 🚩*Kissinger,* 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980).

A federal court may dismiss a lawsuit for failure to exhaust administrative remedies if the requester's initial request or method of submission was defective. *Keese v. United States,* 632 F.Supp. 85, 86 (S.D.Tex.1985). A requester's request may be defective if it was overly broad in scope. *Id.* A request may also be defective if the requester submitted the request to an improper party. *Tuchinsky v. Selective Serv. Sys.,* 418 F.2d 1155 (7th Cir.1969). Additionally, a request may be defective if the requester failed to include the verification of identity that the agency required. *Lilienthal v. Parks,* 574 F.Supp. 14 (E.D.Ark.1983).

Defendants assert that Plaintiff failed to exhaust his administrative remedies with respect to a number of his requests because he did not appeal the decision. (*See* Defs.' Summ. J. Mem. at 11.) According to Defendants, Plaintiff did not file appeals to the following FOIA/PA requests, to which Defendants responded that their searched had uncovered no records: (1) EOUSA's response to Plaintiff's July 19, 2002 request for documents in the Western District of Pennsylvania (Count 7); (2) the FBI's response to Plaintiff's April 27, 2003 request for documents in the FBI's Miami field office (Count 17); (3) the FBI's response to Plaintiff's April 27, 2003 request for documents in the FBI's Cleveland field office (Count 21); (4) the FBI's response to Plaintiff's April 27, 2003 request for documents in the FBI's Albany field office (Count 37); (5) the FBI's response to Plaintiff's April 27, 2003 request for documents in the FBI's Philadelphia field office (Count 39);

(6) the FBI's response to Plaintiff's April 27, 2003 request for documents in the FBI's Las Vegas field office (Count 41); (7) the FBI's response to Plaintiff's April 27, 2003 request for documents in the FBI's El Paso field office (Count 51); (8) the FBI's response to Plaintiff's April 27, 2003 request for documents in the FBI's San Antonio field office (Count 53); (9) the IRS's response to Plaintiff's May 15, 2003 request for documents from the IRS's Atlanta campus (Count 69 (Atlanta)); and (10) the BOP's response to Plaintiff's request for copies of pages from the Community Correction Manual (Count 71).

**\*7** Plaintiff does little to rebut these arguments. As to the EOUSA request, he simply replies, "the facts show that the searches were less than adequate," dodging the central question of whether he appealed the decision. (See Pl.'s Opp'n Re: Counts VII & VIII at 2.) In fact, Plaintiff admits that he did not appeal the decision, insisting that he never received the response because "[i]f he did receive it, he would have appealed...." Accordingly, Count 7, as it relates to the Western District of Pennsylvania, is dismissed.

Plaintiff further admits that he "did not file appeals from the alleged determinations from the FBI's Albany, New York, Philadelphia, Pennsylvania, and San Antonio, Texas field offices." (Pl.'s Opp'n Re: Counts IX–LVI at 8.) Based upon this admission, Plaintiff has clearly not exhausted his administrative remedies, and these claims must be dismissed. The Court thus grants Defendants' motion for summary judgment as to Counts 37, 39, and 53.

Plaintiff does dispute Defendants' arguments as to the letters to the Miami, Las Vegas, El Paso, and Cleveland field offices, arguing simply that he did file appeals, and citing his own declaration. (*See id.* at 8.) Even if an appeal had been filed, however, it is clear that no decision on that appeal was rendered. Again, Plaintiff prematurely sought the assistance of this Court without pursuing his requests diligently with the relevant agencies. Accordingly, the Court grants Defendants' motion as to Counts 17, 21, 41, and 51.

### 2. Privacy Act: Counts 8 (W.D.Penn.),18, 22, 38, 40, 42, 52, 54, and 70 (Atlanta)

The Privacy Act authorizes a requester to bring a civil action for civil remedies in federal district court against an agency that has allegedly violated the Privacy Act. *See* 🚩5 U.S.C. § 552a(g)(1). Prior to bringing suit in federal court, however, a plaintiff seeking injunctive relief regarding the release of

records must first exhaust his administrative remedies. *See Fisher v. F.B .I., 94 F.Supp.2d 213, 216 (D.Conn.2000)* ("For plaintiff to obtain a civil remedy under the Privacy Act for a violation of his access rights, he must first exhaust administrative remedies."). Plaintiff failed to exhaust his administrative remedies with regard to the complimentary Privacy Act claims: 8 (W.D.Penn.), 18, 22, 38, 40, 42, 52, 54, and 70 (Atlanta).

### B. Request Has Not Been Fully Processed: Counts 9–16, 27–28, 31–34, 43–44, 47–50, 55–60

Defendants then argue that a number of the requests must be dismissed because no decision has been rendered. When the action was filed, Defendants "had not issued an initial decision" with respect to the a number of requests to various FBI offices, implicating Counts 9–10, 11–12, 13–14, 15–16, 27–28, 31–32, 33–34, 43–44, 47–48, 49–50, 55–56. The requests to the FBI Headquarters, Pittsburgh (2), New York, Dallas, Portland, Buffalo, Houston, Milwaukee, and Boston were still being processed when this suit was filed. (*See* Defs.' 56.1 Statement ¶¶ 29, 34, 38, 52, 56, 60, 70, 76, 80, 88, 93, 98.)

**\*8** While this motion was pending, a number of documents were released to Plaintiff. Plaintiff disputes the adequacy of these releases. The parties expend considerable effort in briefing the adequacy of the responses to these requests in their supplemental memoranda. (*See* Pl.'s Suppl. Mem. at 5–14; Def.'s Suppl. Mem. at 6–16.) What cannot be ignored, however, is the fact that the disputed materials were released to Plaintiff after the present suit was commenced. Furthermore, the government indicates that it is still processing some of the requests. (*See* Def.'s Supplemental Reply Mem. at 4 ("the FBI will release to Plaintiff any documents created between December 31, 2002 and May 14, 2003 that were located during a more recent search conducted in yet another FOIA case seeking 'No–Fly' list materials").

As previously noted, "permitting a plaintiff to pursue judicial review without benefit of prior administrative consideration would undercut "the purposes of exhaustion, namely, 'preventing premature interference with agency processes, ... afford[ing] the parties and the courts the benefit of [the agency's] experience and expertise, ... [and] compil[ing] a record which is adequate for judicial review.' " *Ryan, 12 F.3d at 247.* Thus, the fact that these requests are still being processed, and have not been appealed internally, merits

dismissal for nonexhaustion. Accordingly, Counts 9–16, 27–28, 31–34, 43–44, 47–50, and 55–56 are dismissed.

Additionally, though Defendants' failed to raise this argument, it is clear that Plaintiff similarly failed to exhaust his administrative remedies with respect to Counts 57–58 and 59–60, *i.e.,* his letter requests to the DOT. On January 24, 2004, approximately six months after Plaintiff filed this suit, Defendants directed Plaintiff to clarify these requests, and Plaintiff subsequently submitted the requested clarifications. It is clear from these facts that these requests are still being processed and any claims based upon these requests are premature. *Fisher,* 94 F.Supp.2d at 217; *Grove,* 752 F.Supp. 28. Accordingly, the Court dismisses Counts 57–58 and 59–60. *See, e.g., Robert v. Dep't of Justice,* 2006 WL 960913, at *1 (2d Cir.2006)* ( "requesters are required to exhaust this administrative remedy *before* turning to litigation") (emphasis added).

### C. Premature Claims: Counts 65–66

The request to the USPS was received on July 2, 2003, though it was dated May 7 and postmarked June 19. (Decl. of Gary D. Hyde, Jr., dated April 12, 2004 ("Hyde Decl.") ¶ 5.) Defendants acknowledged receipt of the request on July 14, 2003, informing Plaintiff that his requests were being processed but that there would be a delay because the USPS processes requests on a "first-in first-out basis." (*See id.,* Ex. D.) Plaintiff filed suit on July 23, 2003, just fourteen days after the request was initially received. (*Id.* ¶ 6.) Defendants response was adequate, however, to satisfy their statutory obligations at that juncture. *See Sloman,* 832 F.Supp. at 66. Thus, Plaintiff filed suit before the USPS was required to respond. Accordingly, Counts 65–66 are dismissed.

### III. Inadequate Requests: Counts 63–64 (Items 6 and 7) and 69–70 (Andover, Fresno, Brookhaven, and Philadelphia Requests)

**\*9** A number of the requests were rejected by the agencies because they were over broad or vague. An agency's obligation to process a request for records is predicated on the agency's receipt of a request which reasonably describes the records sought and is made in accordance with published rules stating the time, place, fees, and procedures to be followed. *Giaimo v. I.R.S.,* 1996 WL 249362, at *2 (E.D.Mo. Feb.23, 1996)* (citing 5 U.S.C. § 552(a)(3)). The FOIA requires a requestor to submit to the appropriate agency a reasonably specific demand for information that complies

with the agency's published rules. 5 U.S.C. § 552(a)(3); see *Robert v. Dep't of Justice,* 2001 WL 34077473, at *7 (E.D.N.Y.).

Defendants argue that several requests did not describe the documents requested with requisite detail, thereby defeating Plaintiff's claims. According to Defendants, Items 6 and 7 of the June 1, 2003 request to the TSA (portions of Counts 63–64) did not comply with 6 C.F.R. § 5.3(b) and the May 15, 2003 requests to IRS offices in Brookhaven, and Philadelphia (portions of Counts 69–70) did not comply with the requirements of 26 C.F.R. § 601.702(c)(1)(I) .[1]

Items 6 and 7 of the June 1, 2003 request to the TSA, Plaintiff asked the TSA to search "any database maintained or accessible by the TSA" and requested a "list of all persons and agencies that accessed my name in the above referenced databases." (Decl. of Patricia M. RiepDice, dated April 9, 2004 ("Riep–Dice Decl."), Ex. D.) According to the TSA, these requests were insufficiently detailed, so that the TSA could not locate the requested documents. (*See id.,* Ex. F, at 2.) This determination is consistent with the pertinent federal regulation, which advises requesters that "[w]henever possible, your request should include specific information about each record sought, such as the date, title or name, author, recipient, and subject matter of the record." 6 C.F.R. § 5.3(b). Plaintiff's vague requests failed to provide any of the information needed to conduct an adequate search. Thus, the TSA appropriately denied the request. Accordingly, the Court grants Defendants' motion as to Items 6 and 7 of the June 1, 2003 TSA requests.

Defendants argue that the May 15, 2003 requests to IRS offices in Brookhaven, and Philadelphia (portions of Counts 69–70) did not comply with the requirements of 26 C.F.R. § 601.702(c)(1)(I). Those requests must "reasonably describe[ ]" the records requested. "Reasonably describe" means:

> the requirement shall generally be satisfied if the requester gives the name, taxpayer identification number (e.g., social security number or employer identification number), subject matter, location, and years at issue, of the requested records. If the request seeks records pertaining to

pending litigation, the request shall indicate the title of the case, the court in which the case was filed, and the nature of the case. It is suggested that the person making the request furnish any additional information which shall more clearly identify the requested records.

***10** 26 C.F.R. § 601.702(c)(5)(I). Plaintiff's request states, "I request all records ... that pertain to me, mention me, relate to me, or otherwise discuss me," and then lists the ten locations where he desires the searches to occur. (*See* Decl. of Peggy M. Leib, dated March 24, 2004, Ex. A.) It included his social security number and date or birth. This request did not contained any details, however, about the subject matter of the request, nor the years at issue. Instead, it describes the documents in the most cursory terms, *i.e.,* those somehow involving Plaintiff. Accordingly, Plaintiff's claims as to Counts 69–70 are dismissed with regard to the Andover, Fresno, Brookhaven, and Philadelphia requests..

*IV. Adequacy of Responses*

Finally, Defendants move for summary judgment on the remaining twenty counts (and portions of nine others) on the ground that their responses were adequate: they either found no documents, all responsive documents were released, or the unreleased responsive documents were rightfully withheld pursuant to statutory exemptions. (*See* Def.'s Mem. at 15–40). Plaintiff opposes each of these arguments.

Defendants only address the adequacy of their searches pursuant to the FOIA. Their arguments in support of summary judgment make no mention of the Privacy Act or its provisions. However, Plaintiff treats the Defendants arguments both regarding the adequacy of the searches as addressing both the Privacy Act and FOIA, and the Court will do the same. Such an approach appears to be consistent with the case law, which, when addressing FOIA/PA requests, applies the "adequacy of search" analysis from the FOIA to both statutes. *See* *Shores v. F.B.I.,* 185 F.Supp.2d 77, 82 (D.D.C.2002); *cf. Sneed v. United States Dep't of Labor,* 14 Fed. Appx. 343, 345 (6th Cir.2001).

Federal courts' jurisdiction over FOIA claims "is dependent on a showing that an agency has (1) 'improperly' (2)

'withheld' (3) 'agency records.' " *Kissinger,* 445 U.S. at 151, 100 S.Ct. 960. If a requester challenges an agency's response, the agency bears the burden to prove that its response was appropriate. Specifically, the agency must show that it undertook an adequate search in response to the request, and that the documents it withheld were exempt from disclosure. *See Kissinger,* 445 U.S. at 145, 100 S.Ct. 960. An agency may meet these burdens by submitting a reasonably specific affidavit of the employee responsible for the search that indicates that the agency undertook an adequate search and failed to recover documents or that the documents it did recover were exempt under FOIA. *See Katzman v. CIA,* 903 F.Supp. 434, 437 (E.D.N.Y.1995). A "search is adequate if it is 'reasonably calculated to discover the requested documents.' " *Id.* "The crucial issue is not whether relevant documents might exist, but whether the agency's search was reasonably calculated to discover the requested documents." *Maynard v. CIA,* 986 F.2d 547, 559 (1st Cir.1993) (internal quotation omitted).

**\*11** The agency is not expected to take extraordinary measures to find the requested records, but only to conduct a search reasonably designed to identify and locate responsive documents." *Garcia v. United States Dep't of Justice,* 181 F.Supp.2d 356, 368 (S.D.N.Y.2002) (internal quotation marks and citations omitted). Courts accord a presumption of good faith to detailed, *i.e.,* non-conclusory, agency affidavits. *Katzman,* 903 F.Supp. at 437. If, however, an agency's affidavits are conclusory or not "relatively detailed," they are inadequate. *Id.* In order to avoid a court's award of summary judgment to an agency based on the agency's adequate affidavits, a requester must show the agency's bad faith. *Tota v. F.B.I.,* 2000 U.S. Dist. LEXIS 11646, (W.D.N.Y.2000). Specifically, the requester must present "specific facts showing that documents exist that were not released by the agency." *Id.*

*A. No Records Found: Counts 1–2, 7–8 (EDNY), 19–20, 23–24, 25–26, 45–46, 51–52, 53–54, and 63–64 (Items 1–5)*

Defendants contend that with regard to a number of requests, no documents were located. (*See* Defs.' Mem. at 17–19.) Those requests include: (1) the December 18, 2002 DOJ–Criminal Division of the Eastern District of New York request for information (Counts 1–2); (2) the requests to the FBI Field Office in the District of Columbia (Counts 19–20), Phoenix (Counts 23–24), Newark (Counts 25–26), and Cincinnati

(Counts 45–46); and (3) the June 1, 2003 request to the TSA (Counts 63–64). Plaintiff disputes these assertions.

In order to demonstrate adequacy of its search, the defendant must submit a reasonably detailed affidavit, "setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched" so as to give the requesting party an opportunity to challenge the adequacy of the search. *Oglesby,* 920 F.2d at 68; *see also The Nation Magazine v. United States Customs Service,* 71 F.3d 885, 890 (D.C.Cir.1995) (affidavits regarding the adequacy of the agency's search must set forth the terms searched)).

Preliminarily, Plaintiff often argues the query *results* themselves should have been part of his file. Plaintiff does not cite to any authority for his position. For example, regarding the December 18, 2002 DOJ–Criminal Division request, Plaintiff argues that the Criminal Division searched several databases and "the query results themselves constituted records containing Sussman's name," and, as such, "they should have been provided to Sussman." (Pl.'s Opp'n Re: Counts I through IV at 2.) Apparently, Plaintiff argues that, as a result of performing searches for Plaintiff's requested documents, Defendants would have created a "query result," and that "query result" would have become part of his file. (*See* Pl.'s Suppl. Mem. at 2 ("the 'no records' response itself constitute an agency record bearing his name").)

**\*12** As Defendants point out, they "were required to produce only agency records existing at the time the search was conducted (which they did), and were not required to create records." (*See* Def.'s Supplemental Mem. at 5.) *See N.L.R.B. v. Sears, Roebuck, & Co.,* 421 U.S. 132, 161–62, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1974) (holding that the FOIA "only requires disclosure of certain documents which the law requires the agency to prepare or which the agency has decided for its own reasons to create"). Thus, the Court will not address this argument as to any particular claim. Nonetheless, there are a number of other arguments regarding the particular claims that must be discussed individually.

*1. Counts 1–2*

Counts 1–2 involved a FOIA/PA request, dated December 18, 2002, for documents relating to Plaintiff in eleven different locales. (*See* Decl. of Joseph S. Beck ("Beck Decl."), dated Feb. 24, 2004, Ex. 3.) Plaintiff detailed the databases he wanted searched. Defendants responded to the request on

April 22, 2003, indicating that the only records that they could find were prior FOIA/PA requests submitted by Plaintiff. (*See* Def.'s 56.1 Statement ¶ 6.) The Beck Declaration details the databases that were searched, and declared that Beck had "personally reviewed all of the original, signed search responses in this case, and ha[d] verified that no records responsive to plaintiff's request were located." (*See* Beck Decl. ¶ 19.)

Plaintiff has not argued that there was any bad faith on the part of the government. Furthermore, the Court's own review of the declaration indicates that the government acted in good faith to comply with the request. The requested databases were searched, save one, but the government adequately explained that searching that database would have been fruitless as it only contains records about past and present personnel and Plaintiff was neither. (*See id.* ¶ 15.) Accordingly, the Court finds that government acted in good faith and grants Defendants motion for summary judgment as to Counts 1–2.

### 2. Counts 7–8 (EDNY)

Counts 7–8 involved FOIA/PA requests to the Executive Offices of the United States Attorney ("EOUSA"), but only the request regarding the Eastern District of New York is relevant here. Defendants responded to the request on November 26, 2003, indicating that they had found no records. (*See* Decl. of Mary Beth Uitti ("Uitti Decl."), dated April 6, 2004, Ex. C.) The response to Plaintiff indicated that the United States Attorney's Offices typically only have records regarding a person who was "indicted or prosecuted in their district." *(See id.)*

Plaintiff suggests that the government's search was not conducted in good faith, but his argument is based solely on Plaintiff's personal certainty that the EOUSA has in its possession documents that pertain to Plaintiff. (*See* Pl.'s Opp'n Re: Counts VII and VIII at 4.) The Court's review of the declaration indicates that the government acted in good faith to comply with the request. Defendants searched a number of databases, and conducted a second search based upon assertions in Plaintiff's appeal. (*See id.* ¶¶ 10–11.) Plaintiff must remember that "[t]he crucial issue is not whether relevant documents might exist, but whether the agency's search was reasonably calculated to discover the requested documents ." 🚩 *Maynard,* 986 F.2d at 559. Plaintiff has not suggested any flaws in the methodology beyond his displeasure with the result. Such an argument does not defeat

the presumption of good faith. Accordingly, the Court grants Defendants motion regarding Counts 7–8.

### 3. Counts 19–20, 23–24, 25–26, 45–46, 51–52, and 53–54

**\*13** Defendants move for summary judgment as to the twelve counts directed at FOIA/PA requests sent to various FBI field offices. Counts 19–20 involve a FOIA/PA request to the Washington D.C. Field Office; 23–24 involve a request to the Phoenix Field Office; 25–26 involve a request to the Newark Field Office; 45–46 involve a request to the Cincinnati Field Office; 51–52 involve a request to the El Paso Field Office; and 53–54 involve a request to the San Antonio Field Office. The FBI asserts that it conducted adequate searches and found no responsive documents. (*See* Decl. of David M. Hardy ("Hardy Decl."), dated April 8, 2004, at ¶ 5.) Despite providing four declarations by David M. Hardy, "Section Chief of the Record/Information Dissemination Section, Records Management Division, at Federal Bureau of Investigation Headquarters in Washington D.C." (Hardy Decl. ¶ 1), the government failed to detail how these searches were conducted. It merely states that no records were found, but does not indicate the search methods, the query terms, or anything specific about those searches. Hardy merely states in conclusory fashion that "[s]earches conducted by these field offices failed to locate main files responsive to [Plaintiff's] FOIA requests." (*Id.* ¶ 5.)

Thus, the Court denies Defendants' motion as to Counts 19, 23, 25, 45, 51, and 53 because they have failed to adequately indicate the rigors of their search. Such a failure does not establish an absence of good faith, however, so the Court similarly denies Plaintiff's motion for summary judgment as to those counts. Instead, Defendants must submit to the Court a reasonably detailed affidavit indicating the search terms for those counts.

Additionally, 🚩 Section 552a(j)(2) of the Privacy Act exempts from disclosure systems of records that are "maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws." Defendants move to dismiss the Privacy Act claims pertaining to the FBI because records concerning plaintiff would be "exempt under section (j)(2) of the Privacy Act." (*See* Third Hardy Decl. at ¶ 13; *see also* Defs.' Supplemental Mem. at 3.) Plaintiff counters that 🚩 § 552a(j)(2) "only applies to records that have been compiled for one of the law enforcement purposes specifically listed

in 5 U.S.C. § 552a(j)(2)(A)-(C)." (*See* Pl.'s Supplemental Mem. at 1 (citing *Holz v. Westphal*, 217 F.Supp.2d 50, 54–56 (D.D.C.2002)).)

Plaintiff has the better of this argument. As the court wrote in *Holz*, "[a]n agency's right to invoke the exemption involving criminal investigation records ... is not absolute." 217 F.Supp.2d at 54. In order to qualify for the exemption, a record must satisfy two criteria. *See Doe v. FBI*, 936 F.2d 1346, 1353 (D.C.Cir.1991); *Holz*, 217 F.Supp.2d at 55. "First, 'the agency's investigatory activities that give rise to the documents sought must be related to the enforcement of federal laws or to the maintenance of national security.'

" *Id.* (quoting *Pratt v. Webster*, 673 F.2d 408, 420 (D.C.Cir.1982)). To make this showing, the agency "must demonstrate a connection between its investigation and the existence of a 'possible security risk or violation of federal law.' " *Id.* (quoting *Pratt*, 673 F.2d at 420). "Second, 'the nexus between the investigation and one of the agency's law enforcement duties must be based on information sufficient to support at least 'a colorable claim' of its rationality." *Id.* (quoting *Pratt*, 673 F.2d at 421). In applying this second requirement, "a reviewing court 'should be hesitant to second-guess a law enforcement agency's decision to investigate if there is a plausible basis for its decision.' " *Id* . at 1353–54 (quoting *Pratt*, 673 F.2d at 421); *Holz*, 217 F.Supp.2d at 55.

 **\*14** As to the Counts 20, 24, 26, 46, 52, and 54, the FBI has provided no basis for its failure to disclose the requested documents beyond the general claim that, as a law enforcement agency, it is exempt. No such general exemption exists in the Privacy Act. As a result of this misinterpretation of the Privacy Act, the FBI admitted that it "referred only to the FOIA in relation to the processing of the information pertaining to Plaintiff," (Third Hardy Decl. at ¶ 16). As such, the FBI admits that it failed to perform its duty under the Privacy Act. (*See* Def.'s Reply Mem. at 20; Def.'s Supplemental Mem. at 4.) As noted earlier, though the FOIA and Privacy Act substantially overlap, the two statues are not "completely coextensive; each provides or limits access to material not opened or closed by the other." *Greentree*, 674 F.2d at 78. If the only basis for withholding a record under one statute is the other the exemption does not apply and the record must be released. *See* 5 U.S.C. § 552a(a)(t). Thus, processing Plaintiff's request pursuant

only to the FOIA is not adequate to comply with Plaintiff's request. Accordingly, the Court grants Plaintiff's motion for summary judgment as to Counts 20, 24, 26, 46, 52, and 54. The Court directs Defendants to perform the searches pursuant to the Privacy Act, and produce such documents that satisfy Plaintiff's request and which are not exempt.

### 5. Counts 63–64 (Items 1–5)

Finally, Defendants contend that they did not locate any responsive documents to items one through five of Plaintiff's second TSA request. In those items, Plaintiff requested results from searches of five different databases: "Capps," "Total Information Awareness," "Terrorism and Intelligence Data Information Sharing Data Mart," "Violent Gang and Terrorism Organization File," and "Rissnet." TSA responded by indicating that Capps I does not contain information regarding individuals, Capps II is not operational, and that it does not maintain the other four databases. (*See* Riep–Dice Decl. ¶ 137.) Plaintiff "will not dispute [these] contentions." (*See* Pl.'s Opp'n Re: Counts LXI through LXIV at 5.) Accordingly, the Court grants Defendants motion to dismiss Counts 63–64 as it pertains to Items 1–5.

### B. All Records Released

### 1. Counts 3–4

With regard to Counts 3–4, Defendants assert that they released all responsive documents. This request involved a May 1, 2003 letter requesting seven categories of documents relating to watch lists. In response to his letter, the government replied that it had "identified a document that might be responsive to Plaintiff's FOIA request for information about 'watchlists,' and send him a copy of it." (*See* Def.'s 56.1 Statement ¶ 11.)

Plaintiff has not argued that there was any bad faith on the part of the government. He simply argues that the DOJ "should have searched all of its areas, not just the components it listed." (Pl .'s Opp'n Re: Counts I through VI at 4.) Plaintiff does not indicate what "areas" those are, however, nor why the DOJ's failure to search those "areas" is an indication of bad faith. Furthermore, the Court's own review of the declaration indicates that the government acted in good faith to comply with the request. The DOJ indicates which databases it searched, and indicates that it did locate one file that was responsive to Plaintiff's request. (*See* Beck Decl. ¶¶ 16–17.) Accordingly, the Court finds that government acted

in good faith and grants Defendants motion for summary judgment as to Counts Three and Four.

### 2. Counts 67–68

**\*15** With regard to Counts 67 and 68, the government moves for summary judgment on the ground that it released all non-exempt documents and the other documents were properly withheld pursuant to 5 U.S.C. § 552(b)(2), (b)(7)(C) and (b)(7)(E). Plaintiff first argues that the USSS's search was inadequate. He then argues that each of the exemptions invoked should not apply. Because the inadequacy of the search is sufficient to deny the government's motion, the Court only considers that issue.

Defendants searched the Master Central Index ("MCI") for filed "indexed under plaintiff's name." (*See* Decl. of Kathy J. Lyerly ("Lyerly Decl."), dated April 12, 2004, ¶ 9.) This search produced one criminal investigative file. As Plaintiff points out, however, it is unclear how the USSS search complied, in good faith, with Plaintiff's request. Plaintiff's requested "all documents that pertain to me, mention me, discuss me, or otherwise list my name," and indicated that the search should be conducted at the following offices: Western District of Pennsylvania, Souther District of New York, Eastern District of New York, and USSS Headquarters. (*See id.,* Ex. 1.)

The USSS did not contend that the request was flawed or lacking in any way. Instead, they argued that they had complied with the request. However, there is nothing in the affidavit to explain that a search of the MCI satisfies a request to search all of the offices listed; that a search of the MCI would indicate any documents held in any offices by the USSS; nor that a search of those offices is unnecessary or unfeasible. As a result, the affidavit is not sufficiently detailed for the Court to conclude that the USSS acted in good faith. Accordingly, the Court denies Defendants' motion for summary judgment as to Counts 61 and 62 without prejudice should Defendants be able to articulate why a search of the MCI would entirely satisfy Plaintiff's request. Until that time, the Court similarly denies Plaintiff's counter-motion.

### 3. Count 71

On March 25, 2001, the BOP received a FOIA request from Plaintiff in which he requested pages 187 through 275 of the *Community Corrections Manual,* and a copy of the agreement between Renewal, Inc. and the BOP with respect to "all aspects of their being a contract facility." (*See* Decl. of Donald K. Hawkins ("Hawkins Decl."), dated March 26, 2004, Ex. A.) Plaintiff did not appeal the response to the *Community Corrections Manual* request, so it was dismissed for failure to exhaust administrative remedies. *See, supra,* Part II.A.1. He did appeal, however, the BOP's response to the Renewal Contract request, so that request is properly before this Court.

Defendants obtained the contract, but Plaintiff first argues that the search was inadequate. (*See* Pl.'s Opp'n Re: Count LXXI at 1–2.) The government only addresses whether the redactions from that contract were proper. As Plaintiff points out, however, the Court cannot assess whether the redactions were proper if the adequacy of the search is at issue. Here, the contract provided to the Court is only five of nine pages. The government offers no explanation for the fact that four pages are missing. It also appears that Plaintiff received no explanation for the fact that a number of pages were not provided to him. (*See id.* at 1.) That being the case, the Court cannot determine whether Defendants effort was in good faith, let alone determine whether the exemptions were properly applied. Accordingly, the Court denies Defendants' motion for summary judgment as to Count 71.

### C. Redacted

**\*16** Finally, the government moves for summary judgment as to Counts 61 and 62 on the grounds that its withholding of certain documents was proper as those documents were exempted from release. Congress recognized that it must limit individuals' access to federal agency records so as to avoid disruptions in the government's daily business. *Kissinger,* 445 U.S. at 136, 100 S.Ct. 960. Accordingly, Congress exempted agencies from having to produce certain documents. *Id.* In congruence with its philosophy of full agency disclosure, Congress advised courts to narrowly construe these exemptions and to resolve doubts in favor of disclosure. *Id.*

In drafting the Privacy Act, Congress recognized the need to limit individual's access to their records. Accordingly, the Privacy Act contains two general exemptions and seven specific exemptions. 5 U.S.C. § 552a(j)(1), (2); 5 U.S.C. § 552a(k)(1)-(7). The Privacy Act generally exempts the Central Intelligence Agency from having to disclose the records it maintains within its systems of records. 5 U.S.C. § 552a(j)(1). The Privacy Act also generally exempts agencies that principally function as criminal law

enforcement agencies from having to disclose the documents they maintain within their systems of records. 5 U.S.C. § 552a(j)(2). Additionally, the Privacy Act, 5 U.S.C. § 552a(k) lists seven specific exemptions.

The government raises arguments in favor of its redactions that referred to both acts, though the government's analysis only applied the law of the FOIA. Plaintiff followed the same analytical practice. Thus, the Court, in performing its own analysis, only considers the analytical framework of the FOIA, but considers the outcome under the FOIA as determining both the FOIA and corresponding Privacy Act claim.

Counts 61–62 are based upon a FOIA/PA request dated May 1, 2003, for seven categories of documents relating to "watch lists." The TSA determined that it could "neither confirm nor deny the existence of records responsive to Items 1 and 2 or Item 5 to the extent that it seeks records relating to individuals named on a watch list because it is sensitive security information." (Def.'s 56.1 Statement ¶ 125.) The TSA then identified 201 pages of records that were responsive to Items 3, 4, 6 and 7. (*Id.* ¶ 127.) Of those 201 pages of records, the TSA redacted "sensitive security information" pursuant to 49 U.S.C. § 114(s), 5 U.S.C. § 552b(2), (3), (5), (6) and 5 U.S.C. § 552a(j)(2), (k)(1), k(2).

Plaintiff expressly waived any objections to documents redacted pursuant to § 552(b)(2) and (3) and implicitly waived any objection to the application of § 552(b)(6). *(See* Pl.'s Opp'n Re: Counts LXI through LXIV at 4 ("although he believes that the TSA capriciously applied Exemptions (b)(2) and (b)(3) ... Sussman consents to the principles set forth by the TSA); *id.* ("without the need to litigate the merits of the TSA's application of exemption (b)(6), Sussman consents that all names, addresses, and identifiers of individuals (including TSA employees) may be redacted").) Therefore, the Court only consider Plaintiff's objection to the application of Exemption (b)(5) ( "Exemption 5").

**\*17** The TSA withheld two documents in full and redacted portions of thirteen others pursuant to the exemption from disclosure of deliberative process information provided for in Exemption 5. (*See* Def.'s 56.1 Statement ¶ 132.) Exemption 5 permits an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by

law to a party other than an agency in litigation with the agency." Properly construed, it calls for "disclosure of all 'opinions and interpretations' which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.' " *Sears, Roebuck & Co.,* 421 U.S. at 153 (quoting Davis, The Information Act: A Preliminary Analysis, 34 U. Chi. L.Rev. 761, 797 (1967)).

With respect to the two documents withheld in full, "this court has an 'affirmative duty' to consider whether non-exempt information could have been segregated from exempt information and released." *Maydak v. United States Dep't of Justice,* 254 F.Supp.2d 23, 39 (D.D.C.2003) (citing *Trans–Pacific Policing Agreement v. United States Customs Service,* 177 F.3d 1022, 1027 (D.C.Cir.1999) (internal citations omitted). Entire records are exempt from disclosure when it is shown that "the exempt and nonexempt information are 'inextricably intertwined,' such that the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value." *Mays v. DEA,* 234 F.3d 1324, 1327 (D.C.Cir.2000) (quoting *Neufeld v. IRS,* 646 F.2d 661, 666 (D.C.Cir.1981)); *Maydak,* 254 F.Supp.2d at 40. Necessary to this showing is "a relatively detailed description" of the withheld documents. *Krikorian v. Dep't of State,* 984 F.2d 461, 467 (D.C.Cir.1993) (citation omitted).

Defendants have provided such "relatively detailed descriptions." The first withheld document is a "draft of a response to a Congressional inquiry regarding the implementation of 49 U.S.C. § 114(h)," and the second is "Draft Policy No. 7—Proposed Policy, Transportation Security Administration (TSA) Air Traveller *[sic]* Watch lists," which is another draft "policy proposal for implementing 49 U.S.C. § 114(h)." (Def.'s Mem. at 34.)

Plaintiff complains, however, that these descriptions "do not answer the threshold question: 'Were the deliberations adopted or not?' " (Pl.'s Opp'n Re: Counts LXI through LXIV at 5.) As the Second Circuit has noted, "[j]ust because a document satisfies these requirements ... does not mean that the deliberative process privilege bars its disclosure. An agency may be required to disclose a document otherwise

entitled to protection under the deliberative process privilege if the agency has chosen 'expressly to adopt or incorporate by reference [a] ... memorandum previously covered by Exemption 5 in what would otherwise be a final opinion.'

" National Council of La Raza v. Department of Justice, 411 F.3d 350, 356 (2d Cir.2005) (quoting Sears, Roebuck & Co., 421 U.S. at 161). "In such a circumstance, the document loses its predecisional and deliberative character, and accordingly, the deliberative process privilege no longer applies." La Raza, 411 F.3d at 356; see also Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C.Cir.1980) ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public.").

 **18** The government has not addressed whether these admittedly predecisional and deliberative drafts regarding policy implementation were ever officially adopted. The government has merely stated that the documents were deliberative, but that is not adequate. See La Raza, 411 F.3d at 358; Taxation With Representation Fund v. IRS, 646 F.2d 666, 678 (D.C.Cir.1981) (noting that deliberative process privilege may evaporate if a document "is used by the agency in its dealings with the public") (quoting Coastal States Gas, 617 F.2d at 866)); Montrose Chem. Corp. v. Train, 491 F.2d 63, 70 (D.C.Cir.1974) (explaining that disclosure is required "where a decision-maker has referred to an intra-agency memorandum as a basis for his decision," since "once adopted as a rationale for a decision, the memorandum becomes part of the public record"). Accordingly, the Government's motion to for summary judgment as to claims 61 and 62 is denied. The Court directs the TSA to provide the redacted documents for *in camera* review. See Grand Central P'ship, Inc. v. Cuomo, 166 F.3d 473, 478 n. 2 (2d Cir.1999) ("it is the well settled practice of this Court to conduct in camera review of contested documents in a FOIA dispute");

cf. Vaughn v. Rosen, 484 F.2d 820, 823 (D.C.Cir.1973) (ordering more detailed affidavit for court inspection, where affidavit received "did not illuminate or reveal the contents of the information sought, but rather set forth in conclusory terms" opinion that documents sought were covered under FOIA exemptions).

*CONCLUSION*

In sum, the Court grants Defendants' motion for summary judgment as to Counts 5–18, 21–22, 27–44, 47–60, 65–66, 69–70 (Atlanta), and 71 (Community Corrections Manual) for failure to exhaust administrative remedies. The Court grants Defendants' motion as to Counts 63–64 (Items 6 and 7) and 69–70 (Andover, Fresno, Brookhaven, and Philadelphia requests) because the requests were inadequately phrased. The Court grants Defendants' motion as to Counts 1–2, 3–4, 7–8 (Eastern District of New York), and 63–64 (Items 1 through 5) because the search was performed in good faith. The Courts grants Plaintiff's motion for summary judgment as to Counts 19–20, 23–26, 45–46, and 51–54 because the searches were either not performed in good faith or they were not performed at all. As to those claims, the government is directed to perform the necessary searches and release all responsive, non-exempt documents within the next 45 days or, if that is not possible, to provide Plaintiff and the Court with evidence of the government's good faith effort to comply with this directive. Finally, the Court denies both parties' motions as to Counts 61–62 and 71 (Renewal Contract) on the grounds that the evidence currently before the Court is inadequate for the Court to make a final determination.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 2850608

---

## Footnotes

1   The IRS requests to the Andover and Fresno offices indicate that there was an ongoing dialogue between Plaintiff and Defendants regarding the adequacy of his requests in the months after he filed suit. (*See* Defs.' 56.1 Statement ¶¶ 155–157, 164.) Though he disputes the Fresno and Andover offices' assertion that his requests were inadequate (*see* Pl.'s Opp'n Re: Counts LXIX through LXX at 4), Plaintiff does not address the

fact that the requests were still being processed. Because the requests had not been fully processed at the time that Plaintiff filed suit, he clearly had not exhausted his administrative remedies. Accordingly, Count 69, as it pertains to the Andover and Fresno IRS offices, is dismissed.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

129 A.F.T.R.2d 2022-5103

2022 WL 2713499
United States District Court, N.D. New York.

Kevin D. CHECKSFIELD, Plaintiff,

v.

INTERNAL REVENUE SERVICE, Defendant.

5:21-CV-1180 (GTS/ML)
|
Signed July 13, 2022

**Attorneys and Law Firms**

KEVIN D. CHECKSFIELD, Plaintiff, Pro Se, 157
Cambridge St., Syracuse, NY 13210.

BENTON T. MORTON, ESQ., DEPARTMENT OF
JUSTICE – TAX, Counsel for Defendant, P.O. Box 227,
Washington, D.C. 20044.

**<u>DECISION and ORDER</u>**

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently, before the Court in this *pro se* civil rights
action filed by Kevin D. Checksfield ("Plaintiff") against
the Internal Revenue Service ("Defendant") pursuant to the
Freedom of Information Act ("FOIA"), is Defendant's motion
to dismiss for lack of subject-matter jurisdiction pursuant to
Fed. R. Civ. P. 12(b)(1) and/or failure to state a claim
pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 18.) For the
reasons set forth below, the Court grants in part and denies in
part Defendant's motion.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint and Relevant Procedural
History**
Generally, liberally construed, Plaintiff's Complaint filed on
October 29, 2021, asserts claims pursuant to 42 U.S.C. §
1983 and 5 U.S.C. § 552 based on Defendant's alleged
failure to provide Plaintiff with records he requested under
FOIA. (Dkt. No. 1.)

On January 27, 2022, Defendant filed its motion to dismiss
Plaintiff's Complaint for lack of subject-matter jurisdiction

and/or failure to state a claim. (Dkt. No. 18.) On February
15, 2022, Plaintiff filed his opposition to Defendant's motion
to dismiss. (Dkt. No. 22.) On February 23, 2022, Defendant
filed its reply in support of its motion to dismiss. (Dkt. No.
23.)

**B. Summary of the Parties' Briefing on Defendant's
Motion to Dismiss**

**1. Defendant's Memorandum of Law**

Generally, in support of its motion to dismiss, Defendant
sets forth four arguments. (Dkt. No. 18-1.) First, Defendant
argues that Plaintiff's Complaint does not satisfy the pleading
requirements of Fed. R. Civ. P. 8(a)(2) because allegations
pertaining to civil rights violations under 42 U.S.C. §
1983 are either non-existent or deficient. (*Id.* at 2-4.) More
specifically, Defendant argues that Plaintiff's Complaint fails
to plead factual allegations regarding the three elements of
a Section 1983 claim, and that Plaintiff's Complaint does
not explain how Defendant may be liable for a civil rights
violation under Section 1983. (*Id.* at 3-4.)

Second, Defendant argues that, to the extent Plaintiff's
Complaint seeks to bring a claim under FOIA, Plaintiff
did not include factual allegations regarding the Court's
jurisdiction and Plaintiff's entitlement to relief. (*Id.* at
4-6.) More specifically, Defendant argues that Plaintiff's
Complaint contains no allegations that Plaintiff exhausted
his administrative remedies, or that he made a "procedurally
compliant request" under FOIA. (*Id.* at 4.) Defendant
further argues that Plaintiff fails to plead any other grounds
regarding this Court's jurisdiction, because Plaintiff did not
provide factual allegations setting forth the three foundational
requirements for federal jurisdiction over a FOIA request
(i.e., that the agency (1) "improperly" (2) "withheld" (3)
"agency records"). (*Id.* at 5 [quoting *Kissinger v. Reporters
Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980)].)
Defendant argues that Plaintiff's Complaint does not allege
what records Plaintiff purportedly sought in his FOIA request,
nor does it explain how Defendant deprived Plaintiff of his
rights under the FOIA. (*Id.* at 5-6.)

**\*2** Third, Defendant argues that the Court should dismiss
Plaintiff's Section 1983 claim because the Court lacks
subject-matter jurisdiction. (*Id.* at 6-7.) More specifically,

Defendant argues that it has not waived sovereign immunity for this type of action, and that 🔖Section 1983 allows only for suits against a "person," not a federal agency. (*Id.*)

Fourth, and finally, Defendant argues that the Court should dismiss this action pursuant to 🔖Fed. R. Civ. P. 12(b)(6) because Plaintiff's Complaint does not, nor could it, establish that Defendant acts under color of state law where it processes FOIA requests pursuant to federal law. (*Id.* at 7-8.)

**2. Plaintiff's Opposition Memorandum of Law**

Generally, in opposition to Defendant's motion to dismiss, Plaintiff sets forth three arguments. (Dkt. No. 22-3.) First, Plaintiff argues that his Complaint includes allegations pled with sufficient specificity to establish his 🔖Section 1983 claim and to satisfy Fed. R. Civ. P. 8(a) and (d). (*Id.* at 3-7.) More specifically, Plaintiff argues that his Complaint contains allegations regarding Defendant violating his rights by denying him review of certain business records under the FOIA. (*Id.* at 3-4.) Plaintiff also argues that 🔖42 U.S.C. § 1983 is a proper basis for this action, and that the allegations in his Complaint satisfy the three elements of a 🔖Section 1983 claim. (*Id.* at 4-5.) Plaintiff further argues that his Complaint is "concise and direct," as is required by Fed. R. Civ. P. 8(d) (1), and that Defendant's arguments regarding specificity are "reaching" and impracticable. (*Id.* at 6-7.)

Second, Plaintiff argues that the Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. (*Id.* at 7-10.) More specifically, Plaintiff argues that, pursuant to Internal Revenue Service, Department of the Treasury § 601.702, this Court has subject-matter jurisdiction because Plaintiff resides in upstate New York and Plaintiff has been involved in litigation that is directly or closely related to the State of New York. (*Id.* at 8-9.) Plaintiff further argues that he did exhaust his administrative remedies, and that his Complaint references this fact where it states that, "by taking an inordinate amount of time to come to this decision, the Internal Revenue Service has violated the spirit and intent of the Freedom of Information Act." (*Id.* at 9-10 [quoting Dkt. No. 1, at ¶ 8].)

Third, and finally, Plaintiff argues that he has sufficiently pled a claim upon which relief can be granted. (*Id.* at 10-13.) More specifically, Plaintiff argues that, once a plaintiff asserts

a sufficient claim against a governmental department or agency and the Court has subject-matter jurisdiction, then the department or agency cannot claim sovereign immunity. (*Id.* at 10.) Plaintiff argues that, because his Complaint sufficiently alleges the three elements of a 🔖Section 1983 claim and because the Court has subject-matter jurisdiction, the Court should deny Defendant's motion. (*Id.* at 10-11.) Plaintiff also argues that the Court should not dismiss the action without allowing him a chance to amend, especially considering his *pro se* status. (*Id.* at 11-12.)

**3. Defendant's Reply Memorandum of Law**

Generally, in reply to Plaintiff's opposition, Defendant sets forth three arguments. (Dkt. No. 23.) First, Defendant argues that the Court lacks subject-matter jurisdiction over Plaintiff's 🔖Section 1983 claim. (*Id.* at 1-2.) More specifically, Defendant argues that 🔖Section 1983 only allows for suits against a "person," which Defendant is not, and therefore Defendant has not waived sovereign immunity for this action. (*Id.* at 1.) Defendant further argues that Plaintiff's assertion that he satisfied the "person" element of a 🔖Section 1983 claim is unavailing, because Plaintiff did not sue the I.R.S. Commissioner, but rather sued the agency itself. (*Id.* at 2.)

**\*3** Second, Defendant argues that Plaintiff fails to state a 🔖Section 1983 claim. (*Id.* at 2-3.) More specifically, Defendant argues that Plaintiff's Complaint lacks a color-of-law allegation, and that Plaintiff cannot sufficiently plead a color-of-law allegation. (*Id.* at 2.) Defendant argues that the FOIA is a federal statute, not a statute of the District of Columbia (as Plaintiff argues), and therefore an alleged FOIA violation cannot support a 🔖Section 1983 claim. (*Id.* at 3.)

Third, Defendant argues that Plaintiff has not pled his claims with specificity. (*Id.* at 3-5.) More specifically, Defendant argues that Plaintiff's Complaint fails to allege that he made a FOIA request, what records he requested, when he requested the records, whether Defendant responded, and more. (*Id.* at 4.) Defendant argues that, even with Plaintiff's *pro se* status in mind, his Complaint does not meet the pleading requirements and the Court therefore should dismiss this action. (*Id.* at 4-5.)

**II. RELEVANT LEGAL STANDARDS**

129 A.F.T.R.2d 2022-5103

### A. Legal Standard Governing a Motion to Dismiss for Lack of Subject-Matter Jurisdiction

"It is a fundamental precept that federal courts are courts of limited jurisdiction." 🚩 *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978). Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it. 🚩 *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000). A district court may look to evidence outside of the pleadings when resolving a motion to dismiss for lack of subject-matter jurisdiction under 🚩 Fed. R. Civ. P. 12(b)(1). 🚩 *Makarova*, 201 F.3d at 113. The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. 🚩 *Makarova*, 201 F.3d at 113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)). When a court evaluates a motion to dismiss for lack of subject-matter jurisdiction, all ambiguities must be resolved, and inferences drawn, in favor of the plaintiff. 🚩 *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) (citing 🚩 *Makarova*, 201 F.3d at 113).

### B. Legal Standard Governing a Motion to Dismiss for Failure to State a Claim

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to 🚩 Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n. 20 (citing 🚩 *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-514 (2002)). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that " 'give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests.' " *Id.* at 212, n. 17 (quoting 🚩 *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 1634, 161 L.Ed.2d 577 (2005)) (emphasis added). [1]

**\*4** The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Id.* at 212, n. 18 (citing Supreme Court cases); 🚩 *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n. 32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). "As a result, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet this liberal notice pleading standard." 🚩 *Rusyniak*, 629 F.Supp.2d at 214; 🚩 *Ashcroft v. Iqbal*, 556 U.S. 662, 677-83, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 🚩 15 U.S.C. § 1. 🚩 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in 🚩 *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 🚩 *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. 🚩 *Id.* at 1965-74. The Court explained that, although this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." 🚩 *Id.* at

1965, n. 3. More precisely, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965.

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 (internal quotation marks and citations omitted). However, although the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

*\*5* This pleading standard applies even to *pro se* litigants. Although the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed. R. Civ. P. 8, 10 and 12.[2] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed. R. Civ. P. 8, 10, and 12, are procedural rules that even *pro se* civil rights plaintiffs must follow.[3] Stated more simply, when a plaintiff is proceeding *pro se*, "all normal rules

of pleading are not absolutely suspended." *Jackson*, 549 F. Supp. 2d at 214, n. 28 (citations omitted).[4]

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case.[5] Moreover, in the Second Circuit, a *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint—to the extent those papers are consistent with the allegations in the complaint.[6]

### C. Legal Standard Governing a Motion to Amend a Pleading

*\*6* A motion for leave to amend a complaint is governed by Fed. R. Civ. P. 15, which states that leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Manson v. Stacescu*, 11 F.3d 1127, 1133 (2d Cir. 1992). Pursuant to Fed. R. Civ. P. 15(a)(2), leave to amend a complaint should be freely given "[i]n the absence of any apparent or declared reason to not grant leave to amend[,] such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment...." *Foman*, 371 U.S. at 182; *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block-Bldg. 1 Hous.*, 608 F.2d 28, 42 (2d Cir. 1979); *Meyer v. First Franklin Loan Servs., Inc.*, 08-CV-1332, 2010 WL 277090, at \*1 (N.D.N.Y. Jan. 19, 2010) (Suddaby, J.); *Jones v. McMahon*, 98-CV-0374, 2007 WL 2027910, at \*10 (N.D.N.Y. July 11, 2007) (Lowe, M.J.). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss...." *Annunziato v. Collecto, Inc.*, 293 F.R.D. 329, 333

(E.D.N.Y. 2013) (citing 🚩 *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).

Under Local Rule 15.1(a), "[a] party moving to amend a pleading pursuant to Fed. R. Civ. P. 14, 15, [or] 19-22 must attach an unsigned copy of the proposed amended pleading to its motion papers." N.D.N.Y. L.R. 15.1(a). "Except if the Court otherwise orders, the proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects." *Id.* "The motion must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means." *Id.*

### III. ANALYSIS

#### A. Whether the Court Should Grant Defendant's Motion to Dismiss for Lack of Subject-Matter Jurisdiction

After carefully considering the matter, the Court answers this question in the affirmative with respect to Plaintiff's 🚩 Section 1983 claim, but in the negative with respect to Plaintiff's FOIA claim, for the reasons set forth below.

Because Defendant raises the question of the Court's subject-matter jurisdiction over this action, the Court addresses those arguments first. As the Court stated above, Defendant argues that Plaintiff cannot assert a 🚩 Section 1983 claim against it because Defendant is not a "person" and has not waived sovereign immunity. (Dkt. No. 23, at 1-2.) " 'The doctrine of sovereign immunity is jurisdictional in nature.' " *Vidurek v. Koskinen*, 789 F. App'x 889, 892 (2d Cir. 2019) (summary order) (quoting 🚩 *Makarova*, 201 F.3d at 113). As Defendant points out, it "is an improper party to a 🚩 Section 1983] action." *Gavigan v. Comm'r of I.R.S.*, 06-CV-0942, 2007 WL 1238651, at *4 (D. Conn. Apr. 27, 2007). The United States District Court for the District of Connecticut addressed this point in *Lopez v. "Director" of the Internal Revenue Serv.'s (IRS) Ogden Utah Office*:

> 🚩 Section 1983 provides a remedy only for state actors' deprivations of federal law or constitutional rights, and it does not apply to the actions of the federal government or its agents. *See United States v. Acosta*, 503 F.3d 54,

60 (2d Cir. 2007) (" 🚩 Section 1983, of course, does not apply to allegedly unlawful acts of federal officers."). Thus, because 🚩 Section 1983 cannot apply to any alleged actions by IRS employees, who are agents of the federal government, there is no 'unequivocally expressed' waiver of sovereign immunity allowing [Plaintiff] to bring suit against the IRS Defendants under 🚩 Section 1983, and the Court has no subject matter jurisdiction over such claims.

*See Binder & Binder*, 818 F.3d at 70; *see also* 🚩 *Yalkut v. Gemignani*, 873 F.2d 31, 35 (2d Cir. 1989) (" 🚩 Section 1983 however, applies only to actions taken under the color of state law that violate constitutional or federal statutory rights. [Plaintiff] makes no allegation of state action, nor can he, because defendants' actions were purely federal in nature.") (discussing suit against IRS for tax assessment and IRS agents' attempt to collect tax debt).

**\*7** *Lopez v. "Director" of the Internal Revenue Serv.'s (IRS) Ogden Utah Office*, 16-CV-0600, 2017 WL 337978, at *5 (D. Conn. Jan. 23, 2017); *Vidurek*, 789 F. App'x at 892-93.

However, Plaintiff repeatedly references 🚩 5 U.S.C. § 552 in his Complaint—a fact of consequence with respect to this Court's subject-matter jurisdiction. (Dkt. No. 1.) Pursuant to 🚩 5 U.S.C. § 552(a)(4)(B),

> [o]n complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions....

5 U.S.C. § 552(a)(4)(B). " ' 'Agency' has been defined as 'any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.' " *Sonds v. Cuomo*, 11-CV-0895, 2012 WL 952540, at *3 (N.D.N.Y. Feb. 3, 2012) (quoting 5 U.S.C. § 552(a)). Defendant qualifies as an "agency" subject to 5 U.S.C. § 552(a)(4)(B). *Marshall-Screen v. I.R.S.*, 01-CV-0811, 2002 WL 264999, at *4 (E.D.N.Y. Feb. 26, 2002); *Radcliffe v. I.R.S.*, 536 F. Supp. 2d 423, 427 (S.D.N.Y. Feb. 29, 2008); *Fischer v. I.R.S.*, 621 F. Supp. 835, 836 (S.D.N.Y. Sept. 26, 1985).

In his Complaint, Plaintiff alleges that "[t]he facts of this case revolve around the Freedom of Information Act, 5 U.S.C. § 552[,] and the application of this act within the Internal Revenue Service." (Dkt. No. 1, at ¶ 5.) Plaintiff alleges that, "[w]ith the denial of Plaintiff's requests for review of business records, Defendant has violated Plaintiff's rights in regard to 5 U.S.C. § 552." (*Id.* at ¶ 10.) Additionally, Plaintiff alleges that he "seeks relief in the above action by access to records requested from the Internal Revenue Service," and that he "requests the Court to provide injunctive relief to ensure the IRS follows the Freedom of Information Act." (*Id.* at ¶ 11.) By requesting injunctive relief instead of damages, Plaintiff's claim corresponds with one brought under FOIA, rather than Section 1983. *See Marshall-Screen*, 2002 WL 264999, at *4 ("[FOIA] confers upon the district courts jurisdiction 'to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.' ") (quoting 5 U.S.C. § 552(a)(4)(B)); *Edelman v. U.S. Gov't*, 18-CV-2143, 2020 WL 7123175, at *9 (E.D.N.Y. Dec. 4, 2020) (emphasizing that the FOIA does not permit recovery of monetary damages and is limited to enjoining the withholding agency and ordering production of the requested records).

**\*8** Based on these allegations, the Court is satisfied that it has subject-matter jurisdiction of a claim asserted under the FOIA. *See Fischer*, 621 F. Supp. at 836 (stating that "[j]urisdiction [was] properly invoked under 5 U.S.C. § 552(a)(4)(B)" where the plaintiff commenced the action under FOIA "to compel the production of documents requested from the IRS"). Despite Plaintiff's Complaint

alleging that he brought this action pursuant to 42 U.S.C. § 1983, in construing his Complaint liberally and providing the special solicitude typically afforded to *pro se* pleadings, the Court finds that Plaintiff attempts to assert a FOIA claim that provides the Court with subject-matter jurisdiction. *See Ambrose v. U.S. Dept. of Justice*, 14-MC-0005, 2014 WL 3644430, at *1-2 (N.D.N.Y. July 22, 2014) (Suddaby, J.) ("Construing this pro se plaintiff's submission liberally, as Second Circuit authority requires, he could have grounds to file a civil complaint under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552."); *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) ("In our review of the sufficiency of a *pro se* complaint ..., we are constrained to conduct our examination with 'special solicitude,' interpreting the complaint to raise the 'strongest [claims] that [it] suggest[s].' ") (quoting *Tristeman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2009)). Any Section 1983 claim against Defendant, however, is dismissed for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1). *Lopez*, 16-CV-0600, 2017 WL 337978, at *5.

**B. Whether the Court Should Grant Defendant's Motion to Dismiss for Failure to State a Claim**

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated in Defendant's memoranda of law. (Dkt. Nos. 18-1, 23.) To those reasons, the Court adds the following analysis.

Plaintiff's Complaint, which the Court liberally construes as attempting to claim that Defendant violated FOIA in denying his request for documents, fails to state a claim for two reasons: (1) Plaintiff failed to plead factual allegations plausibly suggesting exhaustion of his administrative remedies; and (2) Plaintiff failed to plead factual allegations plausibly suggesting that he submitted a proper FOIA request, and that Defendant improperly withheld the requested records.

" '[T]o withstand dismissal, a FOIA plaintiff must plead in his complaint that he has exhausted his administrative remedies.' " *Brady v. Berman*, 18-CV-8459, 2019 WL 4546535, at *6 (S.D.N.Y. Aug. 2, 2019) (quoting *Bida v. Russo*, 14-CV-0104, 2014 WL 1392338, at *2 (E.D.N.Y. Apr. 9, 2014)). The FOIA provides an administrative appeals process for requesters upon receipt of an adverse determination regarding their request. 5 U.S.C. § 552(a)(6)(A)(i), (ii). [7] "Courts have

consistently confirmed that the FOIA requires exhaustion of this appeal process before an individual may seek relief in the courts." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 61-62 (D.D.C. 1990); *Buckley v. Amos*, 14-CV-6055, 2015 WL 12564208, at \*4 (E.D.N.Y. Oct. 16, 2015) ("It is well established that exhaustion of administrative remedies is a mandatory prerequisite to a lawsuit under FOIA.") (internal quotation marks omitted). [8]

**\*9** Plaintiff's Complaint does not contain any factual allegations regarding exhaustion of his administrative remedies. (Dkt. No. 1.) In his opposition, however, Plaintiff argues that he did address exhaustion of his administrative remedies. (Dkt. No. 22-3, at 10.) More specifically, Plaintiff argues that the allegation in his Complaint regarding Defendant "taking an inordinate amount of time to come to [the decision to deny his request]," which he claims "violated the spirit and intent of the Freedom of Information Act," refers to the year and a half that he spent in the administrative appeals' process. (*Id.*) However, even considering this assertion from Plaintiff's opposition as effectively amending the allegations of his complaint (which the Court may do because Plaintiff appears *pro se*), [9] this allegation does not provide the requisite factual information giving Defendant "fair notice" of, for example, the timing, outcome, or merits of the administrative appeals process for Defendant to adequately respond. *Jackson*, 549 F. Supp. 2d at 212, n. 17.

Likewise, Plaintiff did not allege facts plausibly suggesting that he made a proper FOIA request, or that Defendant "(1) improperly (2) withheld (3) agency records." *Gasaway v. Williams*, 11-CV-0549, 2012 WL 264611, at \*5 (N.D.N.Y. Jan. 30, 2012) (Suddaby, C.J.) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)); *Jabar v. U.S. Dep't of Justice*, 17-CV-0301, 2021 WL 6427482, at \*5 (W.D.N.Y. Nov. 24, 2021). Instead, Plaintiff's Complaint contains approximately four conclusory statements regarding Defendant's denial of Plaintiff's request for records, which he contends violated his rights. (Dkt. No. 1, at ¶¶ 7-8, 10-11). Plaintiff fails to allege any factual support regarding whether he made a proper FOIA request, what records he requested, when he made the FOIA request, and how Defendant responded (i.e., the reasons for the alleged denial of Plaintiff's request). (Dkt. No. 23, at 4-5.) Without factual allegations regarding his FOIA request and the circumstances surrounding the alleged denial, Plaintiff has failed to provide Defendant the "fair notice" required by *Fed. R. Civ. P. 8(a)(2)*, *Jackson*, 549 F. Supp. 2d at 212, n. 17, as well

as deprived the Court of the ability to assess the merits of his FOIA claim. *See Brady*, 2019 WL 4546535, at \*6 (dismissing the plaintiff's FOIA claim under *Fed. R. Civ. P. 12(b)(6)* where the plaintiff "[did] not specify what documents he requested," "whether the requested documents [were] 'agency records' which were improperly withheld," or whether "he 'successfully communicated [his] request to the [defendant]'") (quoting *Friedman v. U.S.*, 01-CV-7518, 2003 WL 1460525, at \*8 (S.D.N.Y. Mar. 18, 2003)); *Razzoli v. U.S. Atty. Exec. Office*, 21-CV-4138, 2021 WL 3173458, at \*3 (S.D.N.Y. July 26, 2021) (finding the plaintiff failed to state a claim under the FOIA where his "description in the complaint of the documents that he [sought was] extremely broad and vague" and where he "[did] not allege that he fully exhausted his administrative remedies").

For these reasons, the Court grants Defendant's motion to dismiss for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6)*.

### C. Whether the Court Should Grant Plaintiff's Request for Leave to Amend His Complaint

After carefully considering the matter, the Court answers this question in the affirmative, for the reasons stated below.

Plaintiff included a couple of paragraphs in his opposition that the Court interprets as a request to amend his Complaint. (Dkt. No. 22-3, at 12 ["[T]he Plaintiff wishes to make the point that the U.S. Justice Department is filing for a Motion to Dismiss when they did not allow[ ] the Plaintiff the opportunity to amend pleadings which were agreed upon in the Case Management Plan."].) *See also Doroz v. Delorio's Foods, Inc.*, 437 F. Supp. 3d 140, 153 (N.D.N.Y. Feb. 3, 2020). As the Court explained in *Sobon v. Horizon Eng'g Assocs., LLP*, this request to amend is procedurally defective:

> **\*10** Plaintiff's purported cross-motion to amend [his] complaint consists of one sentence at the conclusion of [his] memorandum of law requesting leave to amend [his] complaint pursuant to *Fed. R. Civ. P. 15(a)(2)*. Such a motion is procedurally defective. Plaintiff has failed to comply with Local Rule [15.1] of the Local Rules of

Practice for this Court, requiring the attachment of an unsigned copy of the proposed amended pleading to [his] motion papers, which must identify the amendments in the proposed pleading, either through the submission of a red-lined version of the original pleading or other equivalent means.

*Sobon v. Horizon Eng'g Assocs., LLP*, 13-CV-1431, 2014 WL 4889340, at *11 (N.D.N.Y. Sept. 30, 2014) (Suddaby, C.J.).

The Court finds, however, that Plaintiff may be able to provide additional factual allegations regarding his FOIA claim against Defendant. More specifically, it is possible that the defects related to Plaintiff's FOIA claim (i.e., whether he exhausted his administrative remedies and whether he can provide the factual allegations regarding his denied FOIA request) are "merely formal," rather than substantive. *Manship*, 2021 WL 981587, at *13-14. As a result, the Court finds that it would not be futile to permit Plaintiff leave to amend his Complaint, especially considering that Plaintiff has not yet amended his Complaint and the omission of the requisite factual allegations (as well as his failure to comply with the Court's procedure when requesting leave to amend) may be due, at least in part, to Plaintiff's *pro se* status. *Frost v. U.S. Dep't of Homeland Sec.*, 22-CV-2858, 2022 WL 1304534, at *2 (S.D.N.Y. May 2, 2022); *Razzoli*, 2021 WL 3173458, at *3.

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion to dismiss is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Section 1983 claim is **DISMISSED without prejudice**; and it is further

**ORDERED** that Plaintiff's FOIA claim **shall be DISMISSED with prejudice, UNLESS**, within **THIRTY (30) DAYS** from the date of this Decision and Order, Plaintiff files an **AMENDED COMPLAINT** that cures the pleading defects identified in this Decision and Order; and it is further

**ORDERED** that any Amended Complaint filed by Plaintiff must be a complete pleading, which will supersede his original Complaint in all respects, and which may not incorporate any portion of his original Complaint by reference; and it is further

**ORDERED** that, in the event that Plaintiff should fail to file an Amended Complaint that complies with the terms of this Decision and Order as set forth above, the Clerk shall enter Judgment dismissing this action without further Order of this Court.

**All Citations**

Slip Copy, 2022 WL 2713499, 129 A.F.T.R.2d 2022-5103

---

**Footnotes**

1   *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

2   *See* Vega v. Artus, 610 F. Supp. 2d 185, 196 & nn. 8-9 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases); Rusyniak, 629 F. Supp. 2d at 214 & n. 34 (citing Second Circuit cases).

3   *See* Vega, 610 F. Supp. 2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); Rusyniak, 629 F. Supp. 2d at 214 & n. 34 (citing Second Circuit cases).

4    It should be emphasized that Fed. R. Civ. P. 8's plausibility standard, explained in *Twombly*, was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus*, in which (when reviewing a *pro se* pleading) the Court stated, "*[s]pecific* facts are not necessary" to successfully state a claim under Fed. R. Civ. P. 8(a)(2). *Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (emphasis added). That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly*, 127 S. Ct. 1965, n. 3 (citing *Conley*, 355 U.S. at 47) (emphasis added). That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough facts set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See* *Rusyniak*, 629 F. Supp. 2d at 214 & n. 35 (explaining holding in *Erickson*).

5    *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted); *L-7 Designs, Inc. v. Old Navy, LLC*, 10-CV-0573, 2011 WL 2135734, at *1 (2d Cir. 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12(d) if the "matters outside the pleadings" consist of (1) documents attached to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case).

6    *See* *Drake v. Delta Airlines, Inc.*, 147 F.3d 169, 170, n. 1 (2d Cir. 1998) (per curiam) ("[W]e deem Drake's complaint to include the facts contained in his memorandum of law filed in response to Delta's 1996 motion to dismiss."); *Gill v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) ("In his affidavit submitted in opposition to defendants' motion to dismiss, Gill asserts that Mooney's actions amounted to deliberate and willful indifference. Liberally construed under *pro se* pleading standards, Gill's allegations against Mooney involve more than ordinary lack of due care for the prisoner's interests or safety, ... and therefore state a colorable claim under the Eighth and Fourteenth Amendments.") (internal quotation marks and citation omitted); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Sharpe, M.J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they "are consistent with the allegations in the complaint.") (collecting district court cases), *vacated on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004) (Hurd, J.).

7    Notably, this process is deemed exhausted in situations where "an agency fails to respond within the statutory time limit." *Marshall-Screen*, 2002 WL 264999, at *4 (citing 5 U.S.C. § 552(a)(6)(C)").

8    Courts within the Second Circuit are split regarding whether failure to exhaust administrative remedies is a jurisdictional or prudential consideration. *Compare Buckley,* 2015 WL 12564208, at *4 (gathering cases), *with Torres v. Dep't of Homeland Sec.*, 09-CV-8640, 2010 WL 4608431, at *4 (S.D.N.Y. Nov. 2, 2010) (gathering cases). The Second Circuit has not yet decided this question but has expressed uncertainty regarding whether failure to exhaust administrative remedies is a jurisdictional issue. *Robert v. Dep't of Justice*, 193 F. App'x 8, 9-10 (2d Cir. 2006) (summary order). In this case, even if failure to exhaust administrative remedies is a jurisdictional question, the Court is not concerned that the alleged failure to exhaust administrative remedies prohibits its subject matter jurisdiction at this time because, as the Court addresses below, Plaintiff states in his opposition that he did engage in the administrative appeals process. (Dkt. No. 22-3, at 10.)

*See also* 🚩*Drake,* 147 F.3d at 170, n. 1 (considering facts in plaintiff's opposition motion as part of the complaint); 🚩*Aurecchione,* 426 F.3d at 638 (reinforcing that all inferences must be drawn in the plaintiff's favor when determining subject matter jurisdiction). Accordingly, the Court's focus at this time is not whether it has subject matter jurisdiction over this action, but rather whether Plaintiff's Complaint contains sufficient factual allegations to provide Defendant fair notice regarding the exhaustion of his administrative remedies so that Defendant can adequately respond.

9    *See* 🚩*Drake,* 147 F.3d at 170, n. 1; 🚩*Gill,* 824 F.2d at 195; *Donhauser,* 314 F. Supp. 2d at 212.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1149525
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sharon L. **CROSS**, Plaintiff,
v.
John E. **POTTER**, et al., Defendants.

No.
3
:
09
–
CV
–
1293
.
|
March 19, 2013.

**Attorneys and Law Firms**

Sharon L. **Cross**, Cooperstown, NY, pro se.

William F. Larkin, Office of the United States Attorney, Syracuse, NY, for Defendants.

### *DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff Sharon **Cross** commenced the instant action against Defendants claiming that she was wrongfully terminated from her employment with the United States Postal Service ("U.S.P.S."). Presently before the Court is Defendants' motion and Plaintiff's **cross**-motion for summary judgment pursuant to Fed.R.Civ.P. 56.

### I. BACKGROUND

Plaintiff was employed by the U.S.P.S. from 1999 until 2009. In or about December 2005, Plaintiff's supervisor, George Alsheimer, stated to the Plaintiff that "[t]he Post Office should not hire women, they take FMLA too much and men don't, Ill [sic] fire you if you keep taking FMLA." Jan. 8, 2013 **Cross** Aff. at ¶ 4. Plaintiff further alleges that she was "harrased and picked on by the [union] stewards in the workplace for being a non-union member." *Id.* at ¶ 6.

On December 14, 2007, the United States Attorneys Office filed a two-count criminal information charging Plaintiff with submitting false medical documentation to the U.S.P.S. in violation of 18 U.S.C. § 1018. On January 14, 2008, based on the same facts as those alleged in the criminal charges, the U.S.P.S. sent Plaintiff a Notice of Removal, informing her that her employment with the U.S.P.S. would be terminated effective February 23, 2008. The Notice of Removal claimed that Plaintiff "submitted seven (7) falsified medical notes to the U.S.P.S ....." in support of her claims for leave. Plaintiff was acquitted of the criminal charges, but the U.S.P.S. continued the removal process. Plaintiff filed a grievance through the union. Plaintiff was removed from service effective June 4, 2009.

Plaintiff then commenced the instant action. Defendants move for summary judgment on the grounds that Plaintiff: (1) failed to timely exhaust her administrative remedies; (2) fails to establish claims for age and gender discrimination and retaliation; (3) fails to establish a claim against John **Potter** in his individual capacity; (4) fails to establish that her privacy rights were violated by the U.S.P.S.; (5) cannot establish a hybrid claim against the U.S.P.S.; and (6) cannot establish independent claims for the intentional infliction of emotional distress and/or defamation. Dkt. 146, at p. 2. Plaintiff filed a **cross**-motion for summary judgment on the same claims, as well as claims for the intentional infliction of emotion distress, defamation, *res ipsa loquitor,* disability harassment, retaliation for taking FMLA leave, and a violation of the Privacy Act and constitutional privacy rights.

### II. STANDARD OF REVIEW

Both parties move for summary judgment pursuant to Fed.R.Civ.P. 56. It is well settled that, on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**\*2** A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of

identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998).

## III. DISCUSSION

Prior to discussing the merits of the claims before the Court, it is necessary to address a number of initial matters, namely matters concerning compliance with the Local Rules, a determination of which claims are properly before the Court, and the effect of Plaintiff's acquittal on the present action. The Court will then consider the pending motions for summary judgment pertaining to the remaining claims.

### a. Non–Compliance with Local Rules

On several occasions, the Court warned Plaintiff that papers that do not comply with Local Rule 10.1 would be rejected. *See* Dkt. Nos. 151, 143. Plaintiff was specifically warned that papers must be consecutively numbered and double-spaced and that the failure to comply with Rule 10.1 will result in her papers being "**STRICKEN AND NOT CONSIDERED BY THE COURT.**" Dkt. 143 (emphasis in original); *see also* N.D.N.Y.L.R. 10.1(a)(3); 10.1(a)(7). Plaintiff's papers do not comply with these requirements and, therefore, need not be considered.

### i. Motion for Leave to File an Amended Complaint

Plaintiff moves for leave to file an amended complaint. The motion does not comply with Local Rule 7.1(a)(4), which requires "[a] party moving to amend a pleading ... [to] attach an unsigned copy of the proposed amended pleading to its motion papers." Local Rule 7.1(a)(4). The motion also

does not comply with the Rule's requirement that she "set forth specifically the proposed amendments and identify the amendments in the proposed pleading, either through the submission of a red-lined version of the original pleading or other equivalent means." *Id.* Plaintiff does not even hint at what amendments she seeks to make. Rather, she states that "[i]n the interest of justice, and for Just Cause shown, due to impaired abilities and as a pro se plaintiff, I request an extension and enlargement of time to research the law, investigate, and respond accordingly with my amended complaint against the defendants which have been recently identified." Dkt. 165, at ¶ 4.

**\*3** The basis for any proposed amendment should have been known to Plaintiff long ago and she presents no valid reason for waiting until now to seek leave to amend. Moreover, this case has been pending for several years and discovery is closed. Accordingly, in light of the delay, the failure to follow the Local Rules, and the failure to identify a proper basis for amending the complaint, the motion to file an amended complaint is DENIED.

### ii. Extension of Time

Plaintiff also seeks "an extension and enlargement of time to research the law, investigate, and respond accordingly with my Summary Judgment Hearing against the defendants or I will be harmed and prejudiced." Dkt. 166, at ¶ 6. On November 14, 2012, Defendants filed a motion for summary judgment. Upon Plaintiff's request, the Court granted her an extension of time to respond to that motion. On January 8, 2013, Plaintiff filed her opposing papers together with a **cross**-motion for summary judgment. Subsequent thereto, Defendants filed opposition papers to the **cross**-motion and reply papers to their initial motion. Plaintiff seeks an extension of time to further reply.

Pursuant to Local Rule 7.1(c), "[t]he **cross**-moving party may not reply in further support of its **cross**-motion without the Court's prior permission." Accordingly, Plaintiff does not have the right to file additional papers in connection with the pending motions without the Court's permission. To the extent Plaintiff seeks such permission, the request is denied for failure to articulate a valid reason therefor. Her generic claims that she needs time to research the law, investigate and respond accordingly and that she will be harmed and prejudiced are insufficient grounds to warrant the filing of additional papers. For the foregoing reasons, Plaintiff's motions (Dkt. Nos. 165 and 166) are DENIED.

### iii. Statement of Material Facts

The Local Rules of the Northern District require a party moving for summary judgment to submit a "Statement of Material Facts" which sets forth, with citations to the record, each material fact about which the moving party contends there exists no genuine issue. N.D.N.Y.L.R. 7.1(a)(3). Once a properly supported Local Rule 7.1(a)(3) Statement is submitted, the party opposing the motion must

> file a response to the [movant's] Statement of Material Facts. The nonmovant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

*Id.* (underscoring in original).

The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly. *See N.Y. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 648–49 (2d Cir.2005) (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a) (3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998) (*per curiam* ) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp.,* 103 F.Supp.2d 104, 108 (N.D.N.Y.2000) (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations—specific or otherwise—to the record")

(emphasis in original); *McKnight v. Dormitory Auth. of N. Y.,* 189 F.R.D. 225, 227 (N.D.N.Y.1999) (McAvoy, J.) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome Cnty.,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999) (McAvoy, J.) (deeming admitted all facts in defendants' Rule 7.1(a)(3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record"). Local Rule 7.1(a)(3) also states that the failure *"to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."* (underscore in original); *see Prestopnik v. Whalen,* 253 F.Supp.2d 369, 371 (N.D.N.Y.2003), *affd,* 83 F. App'x 363 (2d Cir.2003) (denial of plaintiff's **cross**-motion for summary judgment for failure to comply with N.D.N.Y.L.R. 7.1(a)(3) in submitting a Statement of Material Facts Not in Dispute and failing to provide record citations); *see also Osier,* 47 F.Supp.2d at 317 (N.D.N.Y.1999) ("The Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District.").

**\*4** "[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment." *Viscusi v. Proctor & Gamble,* 2007 WL 2071546, at \* 9 (E.D.N.Y. July 16, 2007); *see also Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."). Thus, while the Court must construe a *pro se* litigant's pleadings and papers liberally and interpret them to raise the strongest arguments that they suggest, *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003); [1] *Veloz v. New York,* 339 F.Supp.2d 505, 513 (S.D.N.Y.2004), the application of this lenient standard does not relieve a *pro se* litigant of the requirement to follow the procedural formalities of Local Rule 7.1(a)(3). *Govan,* 289 F.Supp.2d at 295; *see also Edwards v. INS,* 59 F.3d 5, 8 (2d Cir.1995) ("While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.").

Plaintiff has not: (1) submitted an opposing Statement of Material Facts despite being advised of this obligation; [2] or (2) submitted a Statement of Material Facts in support of her **cross**-motion for summary judgment. The failure of a

moving party to file a properly supported Local Rule 7.1 Statement of Material Facts is fatal to a summary judgment motion. *Riley v. Town of Bethlehem,* 5 F.Supp.2d 92, 93 (N.D.N.Y.1998). Accordingly, Plaintiff's **cross**-motion for summary judgment is DENIED and the properly supported material facts submitted with Defendants' summary judgment motion are deemed admitted.

### b. Failure to Plead in Initial Amended Complaint

Defendants move for summary judgment on Plaintiff's claims under *res ipsa loquitur,* for disability harassment under the Americans with Disabilities Act ("ADA"), and for retaliation under the Family and Medical Leave Act ("FMLA") based upon the fact that such claims were not asserted in Plaintiff's amended complaint. [3] Defendants had no notice of such claims as they were not pled in Plaintiff's Amended Complaint. Therefore, the Court agrees with Defendants that such claims are not properly before the Court.

### b. Effect of Acquittal

Much of Plaintiff's Complaint is based on her acquittal of charges based on the same facts as the decision to terminate her employment. This Court has previously addressed Plaintiff's contention that the acquittal of the criminal charges against her means "vindication with respect to anything else pertaining to the same incident." *Cross v. Potter,* No. **3:09–CV–1293,** 2010 WL 5314151, at *6 (N.D.N.Y. Dec.20, 2010). This Court further explained that the standards are different for a criminal and civil trial and the special rules that governed the arbitration. *Id.* The Court iterates that her acquittal on the criminal charges has no impact on the instant litigation.

### d. Failure to Exhaust Administrative Remedies–Title VII Claims

**\*5** Defendants move to dismiss the Title VII claims on the ground that Plaintiff failed to timely exhaust her administrative remedies. "Title VII requires that an employment discrimination claimant pursue administrative procedures before commencing a lawsuit and imposes a deadline for the initiation of such procedures." *Fitzgerald v. Henderson,* 251 F.3d 345, 358–59 (2d Cir.2001). A federal employee must initiate administrative review within forty-five days after the allegedly discriminatory action occurred. 29 C.F.R. § 1614.105; *Fitzgerald,* 251 F.3d at 359. The forty-five day period serves as a statute of limitations and,

"thus, as a general rule, claims alleging conduct that occurred more than 45 days prior to the employee's initiation of administrative review are time-barred." *Id.*

Here, Plaintiff was served with a Notice of Removal on January 14, 2008. This document clearly informed Plaintiff that her employment would be terminated effective February 23, 2008. Although Plaintiff may not have received official notice of her termination until a later date, it is well settled that the proper focus is upon the time of the discriminatory acts and not upon the time at which the consequences of those acts become most painful. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Courts in this Circuit have specifically held that "[i]n a discriminatory discharge case in which the employer informs the employee of a decision to terminate, the limitations period begins to run on that date that the employer gives definite notice of that decision to the employee, not upon the formal date of the employee's discharge." *Carmellino v. Dist. 20 of the N.Y.C. Dept. of Ed.,* No. 03 Civ. 5942, 2004 WL 736988, at *15 (S.D.N.Y. Apr.6, 2004); *see also King v. Potter,* 2006 WL 842402 (E.D.N.Y. Mar.27, 2006). In any event, it is undisputed that Plaintiff was aware of the Notice of Removal and the reason therefore as she filed a union grievance in January 2008. *See Robertson v. Potter,* 2011 WL 3511017, at *5 (N.D.Tex. June 20, 2011).

Plaintiff did not initiate the administrative process until July 2009, long after the forty-five day period had expired. The mere fact that a grievance or some other collateral review of an employment decision may have been pending does not toll the running of the 45 day time. *Ricks,* 449 U.S. at 261; *Robertson,* at *5. Moreover, Plaintiff asserts no valid basis for invoking the continuing violation doctrine or equitable tolling. Accordingly, the Title VII claims relating to the issuance of the Notice of Removal and any earlier actions are dismissed for failure to exhaust Administrative Remedies.

### e. Age & Gender Discrimination

Defendants next move to dismiss the age discrimination claim on the ground that Plaintiff has offered insufficient evidence suggesting that age was a motivating factor in the decision to terminate her employment.

To establish a prima facie case of age discrimination under the ADEA, Plaintiff must demonstrate that: (1) she was within the protected class; (2) she was qualified for the position; (3)

she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 498 (2d Cir.2009). Here, Plaintiff clearly meets the first and third elements and most likely also satisfies the second element. That leaves the issue of element four.

**\*6** Aside from relying on her own age, Plaintiff offers insufficient evidence upon which a fair minded trier of fact could reasonably conclude that age was a factor in the decision to terminate her employment. Further, Defendants have articulated a legitimate, non-discriminatory reason for its actions (their belief that Plaintiff submitted false medical documentation), and Plaintiff has failed to demonstrate that this reason was a pretext for unlawful age discrimination or that age otherwise was a motivating factor in the decision to issue a notice of removal. The mere fact that Plaintiff may have been acquitted of criminal charges does not demonstrate that Plaintiff's reason was a pretext for unlawful discrimination. *See Egonmwan v. Cook Cnty. Sheriff's Dep't,* No. 06 C 4764, 2009 WL 1139150, at \*5 (N.D.Ill. Apr.27, 2009) (holding that an employee's argument that the reason for his termination was pretext for discrimination based on his acquittal in a criminal matter is "without merit."); *see also Britton v. City of Poplar Bluff, Mo.,* 244 F.3d 994, 997 (8th Cir.2001).

The same analysis equally applies to Plaintiff's claims of gender-based discrimination. In her response to Defendants' interrogatories, Plaintiff does not identify any factual bases for her claim of gender based discrimination. In a responsive affidavit, Plaintiff refers to gender-based comments made by her supervisor, George Alsheimer, in 2005. Any such statements, assuming them to be true, occurred more than two years before the Notice of Removal, which is too far of a temporal gap to give rise to an inference that the Notice of Removal was motivated by gender. *See Pellegrino v. Cnty. of Orange,* 313 F.Supp.2d 303, 315 (S.D.N.Y.2004) (holding that evidence of temporal proximity between a protected activity and termination can establish an inference of discrimination); *see also Terry v. Ashcroft,* 336 F.3d 128, 139 (2d Cir.2003) (finding that comments made approximately one year before adverse employment action may give rise to discrimination); *Duncan v. N.Y.C. Transit Auth.,* 45 Fed. App'x 14, 17 (2d Cir.2002) (holding that an eighteen-month temporal gap between employee's termination and her employer's failure to re-hire her was insufficient to establish an inference of discrimination).

Moreover, the Notice of Removal was cosigned by Lisa Liles, Acting Manager, Distribution Operations, and there is no indication that she was motivated by Plaintiff's gender or that her decision to issue the Notice of Removal was unduly influenced by Alsheimer.

### f. Title VII Retaliation

Defendants also move for summary judgment on Plaintiff's Title VII retaliation claim. Plaintiff alleges Title VII retaliation in her amended complaint, *see* Dkt. 9, at ¶ 89, and she explains in her opposition papers that the she was retaliated against for "filling EEO Complaints opposing the hostile environment of the workplace and sexual harassment with threats of firing women 40+ who are on FMLA...." Dkt. 156, at ¶ 16.

**\*7** Even assuming that Plaintiff filed a timely EEO complaint, this Court finds that the evidence proffered by Plaintiff is insufficient to survive summary judgment on her Title VII retaliation claims. Under 2000e–3(a), employers are prohibited from retaliating against employees because they file administrative or other complaints concerning the employer's alleged discriminatory practices. A plaintiff must prove a prima facie case of retaliation by a preponderance of the evidence that: (1) the plaintiff engaged in a protected activity; (2) the defendant was aware of the plaintiff's involvement in the protected activity; (3) an adverse employment action was taken against the plaintiff; and (4) there is a causal connection between the protected activity and the adverse action. *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111,117 (2d Cir.2000) (citing *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993)).

If a plaintiff proves a prima facie case, a presumption of retaliation arises, and the burden then shifts to the employer to provide a legitimate, non-discriminatory reason for a plaintiff's termination. *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005). Once an employer offers such proof, the burden shifts back to the plaintiff to show that retaliation was a motivating reason for the adverse employment action. *Jute,* 420 F.3d at 173 (citing *Fields v. New York State Office of Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 120–121 (2d Cir.1997)). The causal connection between the adverse employment action and a plaintiff's protected activity can be "established indirectly by showing that the protected activity was closely followed in time by the

adverse action," *Manoharan v. Columbia Univ. Coll. Of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988), or through "evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by defendant's." *DuBois v. New York,* 966 F.Supp. 144, 148 (N.D.N.Y.1997) (citing *DeCintio v. Westchester Cnty. Med. Ctr.,* 821 F.2d 111, 115 (2d Cir.1987) *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987) (emphasis in original)).

Here, as above, Plaintiff meets the first and third elements, and can likely meet the second element, which leaves the fourth element in dispute. Plaintiff claims that Alsheimer told her that she was too old for the job. *See* Dkt. 156, at p. 32. However, Plaintiff presents insufficient evidence, besides her own affidavit and an allegation that Alsheimer threatened her with termination. The Notice of Removal was co-signed by Lisa Liles, and there is no indication that she was motivated by Plaintiff's protected activity or that her decision to issue the Notice of Removal was unduly influenced by Alsheimer. Any temporal connection between her EEO complaints on August 22, 2006 and May 7, 2007, and June 22, 2009, when she was terminated is too attenuated. *See Gorzynski v. Jet Blue Airways Corp.,* 596 F.3d 93, 110 (2d Cir.2010) ("This Court has not drawn a bright line defining ... the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too attenuated to establish causation ...."); *see also El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir.2010) (holding that temporal proximity between events may give rise to an inference of retaliation under Title VII, but without more is insufficient to satisfy the burden to show evidence of pretext); *Dixon v. Int'l Fed'n of Accountants,* 416. Fed. App'x 107, 110 (2d Cir.2011) ("noting that the two events must be 'very close," and that a proximity of three months or more is insufficient") (citing *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)).

**\*8** Further, Defendants have articulated a legitimate, non-discriminatory reason for its actions (their belief that Plaintiff submitted false medical documentation). Plaintiff has failed to demonstrate that this reason was a pretext for unlawful retaliation or that a retaliatory animus was a motivating factor in the decision to issue a notice of removal. Plaintiff otherwise offers insufficient evidence upon which a fair minded trier of fact could reasonably conclude that a

retaliatory animus was a motivating factor in the decision to terminate her employment. Therefore, the Court dismisses Plaintiff's retaliation claims. [4]

**g. Claim Against John Potter in His Individual Capacity**

Defendants move for summary judgment on Plaintiff's claim against John Potter in his individual capacity. Plaintiff fails to allege any claim against Potter in his individual capacity. When asked to describe in "full and complete detail the factual and legal basis for naming John Potter as a defendant in his individual capacity," Plaintiff stated: "Objection: This request is undecipherable and cannot be answered." Dkt. Nos. 122, 130. Further, Title VII claims and ADA claims cannot be brought against supervisory persons acting in their individual capacity. *See Amin v. Quad/Graphics, Inc.,* 929 F.Supp. 73, 78 (N.D.N.Y.1996) ("[T]he Second Circuit ... has unambiguously held 'individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VI I.' ") (citing *Tomka v. The Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995)); *see also Duprey v. Prudential Ins. Co. of Am.,* 910 F.Supp. 879, 884 (N.D.N.Y.1996) ("The ADA does not impose liability on individuals."). Because Plaintiff has not alleged any claim against Potter in his individual capacity, the Court grants Defendants' motion for summary judgment on this claim.

**h. Claim Under the Privacy Act**

Defendants move for summary judgment on Plaintiff's claim under the Privacy Act on the grounds that she is unable to establish any violation of the Privacy Act.

The Privacy Act "regulates the collection, maintenance, use, and dissemination of information concerning individuals," *Carton v. Reno,* 310 F.3d 108,111 (2d Cir.2002), and forbids disclosure by a federal government agency of any record which is contained in a system of records regarding an individual without that individual's written consent. *See* 5 U.S.C. § 552a(b). Before a plaintiff can bring a claim under the Privacy Act, administrative procedures must be exhausted as set forth in 5 U.S.C. § 552a(d). *See Liguori v. Alexander,* 495 F.Supp. 641, 646 (S.D.N.Y.1980).

Plaintiff seems to assert four claims under the Privacy Act: (1) she was not given information that she requested, *see* 5 U.S.C. § 552a(g)(1)(B); (2) her records were disclosed in

violation of the Act, *see* 5 U.S.C. § 552a(g)(1)(D); (3) her criminal acquittal and medical records should be expunged from the record, *see* 5 U.S.C. § 552a(d)(2); and (4) there is in inaccuracy in her record because her criminal charge remained in her record even though she was acquitted, *see* 5 U.S.C. § 552a(g)(1)(C); *see* Dkt. 156, at p. 20.

**\*9** To the extent that Plaintiff claims that the acquittal of the criminal charge negates the fact that criminal charges were brought against her, Dkt. 9, at ¶ 77, the Court DISMISSES this claim for reasons stated above regarding Plaintiff's understanding of the relevancy of the criminal charge. The record of a criminal acquittal is not an inaccuracy within her record simply because Plaintiff believes that the criminal charge was improperly brought against her.

The Court addresses Plaintiff's information request and expungement claims together because both claims require a proper pleading that Plaintiff exhausted administrative remedies prior to bringing such claims before this Court. *See* *Sussman v. U.S. Dept. of Justice,* No. 03 Civ. 3618, 2006 WL 2850608, at \*4 (E.D.N.Y. Sept. 30, 2006); *see also* *Miller v. United State s,* 630 F.Supp. 347, 349 (E.D.N.Y.1986) (citing *Hedley v. United States,* 594 F.2d 1043, 1044 (5th Cir.1979); *Morpurgo v. Bd. of Higher Educ.,* 423 F.Supp. 704, 714 n. 26 (S.D.N.Y.1976); 5 U.S.C. § 552(a)(6)(A)). Exhaustion of administrative remedies under the Privacy Act for a request for information and expungement claim requires that the plaintiff obtain a response from the agency pertaining to the requested information or the information requested to be expunged before the claim can be brought before a district court. *See* *Sussman,* 2006 WL 2850608, at \*5 (and cases cited therein); *see also* *Metadure Corp. v. United States,* 569 F.Supp. 1496, 1499 (E.D.N.Y.1983) (a phone conversation requesting expungement is insufficient to exhaust administrative remedies); *Quinn v. Stone,* 978 F.2d 126, 137–38 (3d Cir.1992) (holding that because Plaintiff did not request to have records amended or expunged, summary judgment was granted on this claim for failure to exhaust administrative remedies).

Regarding Plaintiff's request for information claim, Plaintiff does not allege that she made a request for information. *See* Dkt. 9, at p. 8; *see also* Dkt. 156, at pp. 19–20. Plaintiff has not pled that she made a request for information, nor is

there evidence in the record of a response from the U.S.P.S. regarding a request for information. Since Plaintiff does not allege that she took the first step in acquiring the information requested, the appropriate prerequisite measures have not been met. Accordingly, the Court does not have jurisdiction to review Plaintiff's access claim under the Privacy Act on the merits.

The same analysis applies to Plaintiff's expungement/amendment claim. As to Plaintiff's request that her medical records and the criminal charge be expunged from her record in December 2008, she does not allege that she complied with the appropriate prerequisite measures with sufficient specificity to survive summary judgment. Plaintiff does not point to a conversation with anyone in which she requested the expungement, she does not indicate a person to whom she asked of the request, and she does not identify any document in which she may have requested the information or any other document that might create a reasonable inference that Plaintiff requested the information be expunged. Plaintiff offers insufficient evidence upon which a fair minded trier of fact could reasonably conclude that she satisfied the prerequisite administrative remedies necessary for this Court to consider her Privacy Claims on the merits. Accordingly, the request for information and expungement/amendment claims under the Privacy Act are DISMISSED.

**\*10** Plaintiff has also insufficiently pled the requirements of her disclosure claim under the Privacy Act. To succeed in a Privacy Act disclosure claim, "a plaintiff must show that: 1) the information at issue is a record contained within a system of records; 2) the agency violated the Act with respect to that record; 3) the disclosure had an adverse effect on the plaintiff; and 4) the violation was willful and intentional." *Tarullo v. Def. Contract Audit Agency,* 600 F.Supp.2d 353, 358 (D.Conn.2009) (quoting *Int'l Union, Sec., Police, and Fire Prof'ls of Am. (SPFPA) v. U.S. Marshal's Serv.,* 350 F.Supp.2d 522, 528 (S.D.N.Y.2004) (citing *Quinn v. Stone,* 978 F.2d 126, 131 (3d Cir.1992)). A system of records is "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5). An agency is defined as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency."

5 U.S.C. § 552(f)(1). This provision only applies when "the document becomes incorporated into a record-keeping system under the agency's control that the Act's prescriptions apply." *Bechhoefer v. U.S. Dept. of Justice,* 312 F.3d 653, 655 (2d Cir.2002).

Plaintiff does not allege any further facts in any of her affidavits or in her opposition to Defendants' motion for summary judgment other than "the Postal Service has and continues to pass around every scrap of paper they can copy to attach as phony evidence." Because Plaintiff does not articulate the disclosure of any specific information contained in a system of records, Defendants' motion for summary judgment on Plaintiff's Privacy Claim is GRANTED.

Any constitutional claim that Plaintiff attempts to bring must also fail because Plaintiff's claim "fails to allege anything but conclusory, non-specific allegations of constitutional violation, without indicating what constitutional right(s) is/ are violated" and "how the(se) right(s) was/were violated and by whom." *Shannon v. General Elec. Co.,* 812 F.Supp. 308, 322–23 (N.D.N.Y.1993), *aff'd,* 186 F.3d 186 (2d Cir.1999). Accordingly, Defendants' motion for summary judgment pertaining to Plaintiff's claim of constitutional privacy is GRANTED and Plaintiff's **cross**-motion for summary judgment on this claim is DENIED. [5]

## IV. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is GRANTED, Plaintiff's **cross**-motion is DENIED, and Plaintiff's Amended Complaint is DISMISSED. The Clerk of the Court is instructed to close the file in this matter.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1149525

## Footnotes

[1]   To construe pleadings liberally means the Court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Govan,* 289 F.Supp.2d at 295.

[2]   Plaintiff was served with the Northern District's standard summary judgment notification for *pro se* litigants, *see* Dk. 146–12. This notification provided:

> You are hereby advised that if a motion for summary judgment is filed by the defendant(s) in the above-referenced action, any factual assertions in the defendant's affidavits will be taken as true by the District Court unless you contradict these assertions in affidavit form.

> You may not simply rely on your complaint to oppose this motion. You must file a written response in opposition to this motion with the Court, and send a copy of same to opposing counsel.

> Pursuant to Local Rule 7.1 of the Northern District of New York, you are required to submit the following papers in opposition to this motion: (I) a **memorandum of law** (containing relevant factual and legal argument); (ii) **one or more affidavits** in opposition to the motion and (iii) a **short and concise statement of material facts** as to which you claim there are genuine issues in dispute. **These papers must be filed and served in accordance with the time set by Local Rule 7.1.**

> If you do not submit a short and concise statement of material facts as to which you claim there is a genuine issue in dispute, all material facts set forth in the statement filed and served by the defendant(s) shall be deemed admitted.

Dk. 146–12 (emphasis in original, footnotes omitted).

3   This Court vacated the portion of the March 15, 2012 Order that granted Plaintiff leave to amend her FTCA claims. Therefore, Plaintiff's claims for the intentional infliction of emotional distress, defamation, and res ipsa loquitur against the U.S.P.S. are not properly before the Court. The Order also reiterated that Plaintiff's hybrid claim was dismissed. Dkt. 95, at 3. Plaintiff's ADA claim also fails because under the Act, an employer does not include "the United States [or] a corporation wholly owned by the government of the United Sates...."

    ⚐ 42 U.S.C. § 12111(5)(B) (I) (West 2009); *see also* 29 U.S.C. § 701 (West 1998) ("This order does not create any right or benefit, substantive or procedural, enforceable at law by a party against the United States, its agencies, its officers, or any person.").

4   To the extent that Plaintiff alleges retaliation for taking FMLA leave, such claim need not be considered by this Court as it was not pled in her initial complaint, and the Court has denied Plaintiff leave to amend her complaint.

5   To the extent that Plaintiff is asserting a privacy violation under New York State law, this Court will exercise its discretion in refusing to apply supplemental jurisdiction to such a claim pursuant to ⚐ 28 U.S.C. § 1367(c) (3), as Defendant's motion for summary judgment is granted on all claims.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2.
On August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. Ruffolo v. Oppenheimer & Co., 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the

additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss— the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right.

*See* Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

 **\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge

recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint;

(5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See* Camardo v. General Motors Hourly–Rate Employees Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also* Scipio v. Keane, 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P.

**Brown v. Peters, Not Reported in F.Supp. (1997)**

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 154 of 162

72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams,

the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**Brown v. Peters, Not Reported in F.Supp. (1997)**

Case 5:22-cv-01261-BKS-ML   Document 5   Filed 03/27/23   Page 156 of 162

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under 🚩 Rule 12(b)(6), 🚩 *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." 🚩 *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable 🚩 § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. 🚩 *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); 🚩 *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (🚩 section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under 🚩 § 1983. 🚩 *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under 🚩 § 1983. 🚩 *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

**CONCLUSION**

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

**Brown v. Peters, Not Reported in F.Supp. (1997)**

Case 5:22-cv-01261-BKS-ML    Document 5    Filed 03/27/23    Page 157 of 162

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 1869012

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Carlos A. ANTONETTI, ON BEHALF OF Son C.J.A., Plaintiffs,

v.

DAVE & BUSTERS 42ND STREET TIMES SQUARE; John Does & Jane Doe; Dave & Busters Corporate Office; Dave & Busters Inc. HQ, Defendants.

23-CV-0101 (LTS)

|

Signed February 6, 2023

**Attorneys and Law Firms**

Carlos A. Antonetti, Brooklyn, NY, Pro Se.

ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District Judge:

**\*1** Plaintiff Carlos A. Antonetti, who is appearing *pro se*, purports to bring this action on behalf of himself and his minor son, C.J.A. [1] He invokes the court's federal question jurisdiction and asserts claims that he was discriminated against based on his gender in violation of the federal constitution, 42 U.S.C. § 1985, and 42 U.S.C. §§ 2000a, 2000a-1. Named as defendants in the amended complaint are Dave & Busters Times Square, Dave & Busters Corporate Office, Dave & Busters HQ, and John and Jane Does. By order dated January 27, 2023, the Court granted Plaintiff's request to proceed *in forma pauperis* (IFP), that is, without prepayment of fees.

**STANDARD OF REVIEW**

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

Rule 8 requires a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly*, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

**BACKGROUND**

**\*2** Plaintiff Carlos A. Antonetti brings this action on behalf of his minor son. He invokes the Court's federal question jurisdiction, and purports to assert constitutional claims under 42 U.S.C. § 1983, as well as claims under 42 U.S.C. § 1985, 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 2000a, 2000a-1. Named as Defendants are Dave & Busters 42nd Street Times Square, Dave & Busters Corporate Office, Dave & Busters Inc. HQ, and John and Jane Does.

The following allegations are taken from the amended complaint. On October 22, 2022, Plaintiff and his five-year-old son went to Dave & Busters located at 234 W. 42nd Street in Manhattan. After a short while, Plaintiff and his son were "approached and surrounded by a big security guard," another security guard, and an Assistant General Manager named Robert. (ECF 5-1, at 1.) The security guard asked Plaintiff and his son to leave because another employee complained that Plaintiff had made "inappropriate and lewd remarks." (*Id.* at 2.)

Plaintiff maintains that he and his son sat at the bar and ordered food, but that they did not make any inappropriate statements. Instead, Plaintiff attributes Defendants' actions to discrimination on the basis of his gender expression because he is a "heterosexual single man" who was "seen doing the roles of both the mother and the father." (*Id.* at 4.) Plaintiff maintains that his treatment is a "form of gender expression discrimination because of the way that I present myself with my child [which] not all people will like or accept because of there [sic] own personal feelings or hatred towards someone for no apparent reason even not knowing them." (*Id.*) Plaintiff felt "disrespected violated intimidated threatened and discriminated against" and his child was "scared crying and dramatized through out the whole situation." (*Id.*)

Plaintiff called the restaurant on the following day, and spoke to the same assistant general manager, who told Plaintiff that he would speak to the general manager in the coming days and call Plaintiff back. When the assistant manager did not call back, Plaintiff called the Corporate Office in Texas, which told Plaintiff that there was nothing they could do. Plaintiff made additional fruitless attempts to obtain information about any investigation into the incident. (*See id.* at 2-3.) He received the "same run around story" that they were investigating the incident and that Plaintiff will be contacted when the investigation is complete. (*Id.* at 3.) Plaintiff also filed complaints with the Better Business Bureau, the New York State Attorney General's Office of Civil Rights, the United States Department of Health and Human Services Office for Civil Rights, and the New York City Commission on Civil Rights. (*Id.*)

Plaintiff seeks money damages in the amount of $330,000 each for both his son and himself. (*Id.* at 5.)

## DISCUSSION

### A. Claims on behalf of Plaintiff's minor child

A nonlawyer parent ordinarily cannot represent a child's interests *pro se. See Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990); *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005) (holding that it is "a well-established general rule in this Circuit that a parent not admitted to the bar cannot bring an action pro se in federal court on behalf of his or her child"). Minors "are entitled to trained legal assistance so their rights may be fully protected" and nonlawyer parents are not trained to represent competently the interests of their children.

*Cheung*, 906 F.2d at 61. Moreover, "a district court has a duty to raise this issue *sua sponte*." *Thomas v. Astrue*, 674 F. Supp. 2d 507, 511 (S.D.N.Y. 2009).

**\*3** "In determining whether a non-attorney individual is attempting to bring an action on behalf of another, the 'threshold question' is 'whether a given matter is plaintiff's own case or one that belongs to another.' " *Machadio v. Apfel*, 276 F.3d 103, 107 (2d Cir. 2002) (quoting *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998)). Here, Plaintiff purports to assert claims on behalf of his child. Plaintiff, however, cannot bring claims on behalf of the child without counsel. The Court therefore dismisses without prejudice any claims Plaintiff is asserting on behalf of his child.

### B. Claims on Plaintiff's behalf

In light of Plaintiff's *pro se* status, the Court construes the complaint as also attempting to assert claims on his own behalf.

#### 1. Section 1983

Plaintiff purports to assert claims under 42 U.S.C. § 1983 for violations of his federal constitutional rights. A claim for relief under Section 1983 must allege facts showing that each defendant acted under the color of a state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Private parties therefore generally are not liable under the statute. *Sykes v. Bank of America*, 723 F.3d 399, 406 (2d

Cir. 2013) (citing Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001)); see also Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties."). As Defendants Dave & Busters and its various offices are private parties who are not alleged to work for any state or other government body, Plaintiff has not stated a claim against Defendants under Section 1983.

## 2. Section 1985

Plaintiff's complaint appears to suggest that he is attempting to assert claims of conspiracy under 42 U.S.C. § 1985(3). To state such a claim, a plaintiff must show the existence of: (1) a conspiracy; (2) for the purpose of depriving the plaintiff of the equal protection of the laws, or the equal privileges or immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of his right or privilege as a citizen of the United States. Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). "[T]he [ § 1985(3)] conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." Id. (internal quotation marks and citation omitted). Vague and unsupported assertions of a claim of conspiracy will not suffice. See, e.g., Wang v. Miller, 356 F. App'x 516, 517 (2d Cir. 2009) (summary order); Webb v. Goord, 340 F.3d 105, 110-11 (2d Cir. 2003); Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997).

Here, Plaintiff's allegations fail to suggest a claim under Section 1985. Plaintiff alleges that he was asked to leave Dave & Busters after being accused of making inappropriate remarks. Plaintiff maintains that he did nothing inappropriate, but was instead excluded because he was a "heterosexual single man" who was "seen doing the roles of both the mother and the father." (ECF 5-1, at 4.) Plaintiff's alleges no specific facts suggesting that Defendants took action against him because of his gender. He speculates that "not all people will like or accept" his relationship with his son "because of there [sic] own personal feelings or hatred towards someone for no apparent reason even not knowing them." (Id.) Moreover, Plaintiff's allegations do not suggest a conspiracy among the defendants. He alleges that various defendants – consisting of

the restaurant he was asked to leave and its corporate offices – have told him that the incident is being investigated and that they will contact him when the investigation is complete. Nothing in the facts alleged by Plaintiff suggests a conspiracy motivated by invidious discrimination to deprive him of his federally protected rights. Plaintiff therefore fails to state a claim under Section 1985.

## 3. 42 U.S.C. §§ 2000a, 2000a-1

**\*4** Plaintiff also invokes 42 U.S.C. §§ 2000a and 2000a-1. Section 2000a, which is the codification of Title II of the Civil Rights Act of 1964, states, "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." Plaintiff's Title II claim fails because Title II, by its own terms, does not protect against gender discrimination. See Ewideh v. Kohl's Dep't Stores Carlisle Pennsylvania, No. 1:20-CV-2342, 2022 WL 2181235, at \*7 (M.D. Pa. Feb. 4, 2022), report and recommendation adopted, No. 1:20-CV-02342, 2022 WL 1618530 (M.D. Pa. May 23, 2022); Guichardo v. Langston Hughes Queens Library, 2015 WL 13227995, at \*4 (E.D.N.Y. Nov. 20, 2015) ("Title II does not prohibit discrimination on the basis of sex."); Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593, 595 (S.D.N.Y. 1970) (discrimination on the basis of sex is not prohibited by Section 2000a); DeCrow v. Hotel Syracuse Corp., 288 F. Supp. 530, 532 (N.D.N.Y. July 30, 1968) (Title II does not protect against discrimination based on sex).

Section 2000a-1 prohibits "discrimination or segregation of any kind on the ground of race, color, religion, or national origin, if such discrimination or segregation is or purports to be required by any law, statute, ordinance, regulation, rule or order of a State or any agency or political subdivision thereof." Section 2000a-1 does not apply in this case because Plaintiff does not allege that any discrimination he faced was "required by any law, statute, ordinance, regulation, rule or order" of any state or municipality. Even if Section 2000a-1 did apply, Plaintiff's claim would fail because Section 2000a-1, like Section 2000a, does not include sex or gender among the characteristics it protects.

The Court therefore dismisses Plaintiff's claims under Sections 2000a and 2000a-1 for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### 4. 28 U.S.C. §§ 1331, 1343

Finally, Plaintiff invokes 28 U.S.C. §§ 1331 and 1343. These statutes merely provide the court with jurisdiction to hear certain claims – they do not confer substantive rights. Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, law, or treaties of the United States." Section 1331 is a "jurisdictional statute [that] does not, in and of itself create a cause of action, but rather depends upon an action arising under a separate federal law before a district court's jurisdiction is proper." *325 Bleecker, Inc. v. Local Union No. 747*, 500 F. Supp. 2d 110, 119 (N.D.N.Y. Mar. 31, 2007). Likewise, Section 1343 is a jurisdictional statute that does not create an independent cause of action. *See Rivera v. City of New York*, No. 1:20-CV-9968-GHW, 2022 WL 1523165, at *5 (S.D.N.Y. May 13, 2022) (Section 1343 "govern[s] procedure in the federal district courts and [does not] provide a separate claim for relief."). The Court therefore dismisses Plaintiff's claims under Sections 1331 and 1343 for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### 5. State law claims

A district court may decline to exercise supplemental jurisdiction over state law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Having dismissed the federal claims of which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction of any state-law claims Plaintiff may be asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary

nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' ") (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997)).

### C. Leave to amend is denied

**\*5** District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123–24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Because the defects in Plaintiff's complaint cannot be cured with an amendment, the Court declines to grant Plaintiff leave to amend his complaint.

### CONCLUSION

The Court dismisses Plaintiff's complaint, filed IFP under 28 U.S.C. § 1915(a)(1), for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

Any claims that Plaintiff is asserting on behalf of his child are dismissed without prejudice.

The Court declines to exercise supplement jurisdiction of any state law claims that Plaintiff may be asserting. *See* 28 U.S.C. § 1367(c)(3).

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore IFP status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 1869012

**Footnotes**

1    Plaintiff originally filed this action in the United States District Court for the Eastern District of New York. *See Antonetti v. Dave & Busters*, No. 22-CV-6892 (LDH) (JRC) (E.D.N.Y. Dec. 27, 2022). By order dated December 27, 2022, Judge LaShann DeArcy Hall of the Eastern District transferred this action to this court. (ECF 6.) On December 2, 2022, prior to the case being transferred, Plaintiff filed a motion to file an amended complaint, to which he attached a copy of the proposed amended complaint. (ECF 5.) Under Rule 15(a) of the Federal Rules of Civil Procedure, Plaintiff is permitted to file an amended complaint as a matter of course. Because Plaintiff did not need permission to file an amended complaint, the Court denies the motion as moot and, for the purposes of this order, considers the amended complaint (ECF 5-1) as the operative pleading.

---

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.